**DEATH PENALTY CASE**
**No. ________________**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

---

**TONY VON CARRUTHERS**

**Petitioner-Appellant,**

**v.**

**KENNETH NELSEN, Warden**

**Respondent-Appellee**

---

# APPENDIX TO MOTION UNDER 28 U.S.C. § 2244 FOR LEAVE TO FILE A SECOND OR SUCCESSIVE HABEAS CORPUS PETITION UNDER 28 U.S.C. §2254 BY A PERSON IN STATE CUSTODY

---

FEDERAL PUBLIC DEFENDER FOR THE MIDDLE DISTRICT OF TENNESSEE
CAPITAL HABEAS UNIT

AMY D. HARWELL
First Assistant Federal Public Defender

MARCIA A. WIDDER
Research and Writing Attorney
164 Rosa L. Parks Blvd.
Nashville, TN 37203
Phone: (615) 736-5047
Fax: (615) 736-5265

# TABLE OF CONTENTS

R. 195 - ORDER DENYING PETITIONER'S REQUEST FOR HEARING, ORDER GRANTING IN PART AND DENYING IN PART RESPONDENT'S MOTION FOR SUMMARY JUDGMENT, ORDER DENYING PETITION PURSUANT TO 28 U.S.C. § 2254, ORDER OF DISMISSAL, ORDER DENYING A CERTIFICATE OF APPEALABILITY AND ORDER CERTIFYING APPEAL WOULD NOT BE TAKEN IN GOOD FAITH ........ 1

Andre Johnson's 02/23/1994 Statement ........ 252

Indictment of Andre Johnson aka BabeBro ........ 260

Indictment of Alfredo Shaw on 02/24/1994 ........ 285

Charles Smith's 02/28/1994 Statement ........ 298

Jimmy Maze letter dated 08/29/2000 ........ 304

Andre Johnson Testimony in the McDonald Trial........ 313

Declaration from Curtis McDonald on 05/15/2026 ........ 384

Declaration from Juror Zillah Ferrari........ 387

Declaration from Juror David Adams ........ 388

Letter from Charles Ray to ADA John Campbell on 12/16/2002 ........ 389

Letter from ADA Campbell to Ray on 01/07/2003 ........ 391

Shelby County Printout of Kimmons case........ 392

Letter from AFPD Tennent to DA Weirich on 10/03/2019 ........ 400

Letter from ADA Beacham to AFPD Tennent on 10/28/2019 ........ 402

Agreed Order regarding Shaw dated 05/09/2024 .................................. 412

Alfredo Shaw MPD Snitch Jacket .......................................................... 415

Shaw Sheriff Department Snitch Jacket ................................................ 439

Alfredo Shaw 302 Statement ................................................................. 443

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

| | | |
|---|---|---|
| TONY VON CARRUTHERS,<br><br>Petitioner,<br><br>v.<br><br>WAYNE CARPENTER, Warden, Riverbend Maximum Security Institution,<br><br>Respondent. | ) | No. 2:08-cv-02425-JPM-dkv |

---

**ORDER DENYING PETITIONER'S REQUEST FOR HEARING**
**ORDER GRANTING IN PART AND DENYING IN PART RESPONDENT'S MOTION FOR SUMMARY JUDGMENT**
**ORDER DENYING PETITION PURSUANT TO 28 U.S.C. § 2254**
**ORDER OF DISMISSAL**
**ORDER DENYING A CERTIFICATE OF APPEALABILITY**
**AND**
**ORDER CERTIFYING APPEAL WOULD NOT BE TAKEN IN GOOD FAITH**

---

I. HABEAS PROCEEDINGS

II. STATE-COURT PROCEDURAL HISTORY

III. THE TRIAL

IV. PETITIONER'S FEDERAL HABEAS CLAIMS

V. THE LEGAL STANDARD

A. Waiver and Procedural Default

B. Merits Review

C. Summary-Judgment Standard

VI. ANALYSIS OF CARRUTHERS'S CLAIMS

A. Gender Discrimination in the Selection of the Grand Jury Foreperson (Claim 2, Amended Petition ¶¶ 202-12)
B. No Uniform Standards for Prosecutors (Claim 3, Amended Petition ¶¶ 213-15)
C. Defective Indictment (Claim 4, Amended Petition ¶¶ 216-17)

D. Failure to Elect Indictment (Claim 5, Amended Petition ¶¶ 218-21)
  1. Procedural Default
  2. Merits
E. Competence to Stand Trial and Be Sentenced (Claim 6, Amended Petition ¶¶ 222-39)
  1. Procedural Default
    a. Forfeiture, Default, or Waiver of Right
    b. Ineffective Assistance of Post-Conviction Counsel
    c. Miscarriage of Justice
F. Ineffective Assistance of Pre-Trial Counsel (Claim 7, Amended Petition ¶¶ 240-66)
  1. Federal Habeas Allegations
  2. Relevant Post-Conviction Allegations
  3. Procedurally Defaulted Ineffective Assistance Claims
  4. The Tennessee Court of Criminal Appeals' Decision
  5. The Legal Standard
    a. Clear and Convincing Evidence
    b. Different Outcome or Prejudice Standard
    c. Deficient Performance
G. Forced Self Representation (Claim 8, Amended Petition ¶¶ 267-93)
  1. Teague
  2. Procedural Default
  3. Merits
H. Severance (Claim 9, Amended Petition ¶¶ 294-303)
I. Gag Order (Claim 10, Amended Petition ¶¶ 304-12)
  1. The Relevant Standard for Gag Orders
  2. Harmless Error
J. Anonymous Jury (Claim 11, Amended Petition ¶¶ 313-23)
  1. Procedural Default
  2. Merits
K. Excessive Security (Claim 12, Amended Petition ¶¶ 324-28)
  1. Procedural Default
  2. Merits
L. Withheld Exculpatory Evidence (Claim 13, Amended Petition ¶¶ 329-41) and False Testimony (Claim 14, Amended Petition ¶¶ 342-64)
  1. Procedural Default
  2. Merits
    a. Alfredo Shaw
      1. False Testimony
      2. Promise or Deal
    b. Jimmy Maze and Charles Smith
      1. Jimmy Maze
      2. Charles Smith
      3. O.C. Smith
M. Trial Court Precluded Presentation of Defense (Claim 15, Amended Petition ¶¶ 365-76)

N. Judicial Interference with Support Services (Claim 16, Amended Petition ¶¶ 377-96)
1. Procedural Default
2. Merits
O. Admission of Specified Evidence (Claim 17, Amended Petition ¶¶ 397-12)
P. Confrontation Clause (Claim 18, Amended Petition ¶¶ 413-17)
Q. Nakeita Shaw's Competence as a Witness (Claim 19, Amended Petition ¶¶ 418-21)
R. Judicial Bias (Claim 20, Amended Petition ¶¶ 422-42 )
S. Improper Closing Argument (Claim 21, Amended Petition ¶¶ 443-44)
T. Jury Instructions (Claim 22, Amended Petition ¶¶ 445-46, & Claim 23, Amended Petition ¶¶ 447-48)
U. Extraneous, Improper Influences on the Verdict (Claim 24, Amended Petition ¶¶ 449-52)
V. Juror 121 (Claim 25, Amended Petition ¶¶ 453-54, and Claim 27, Amended Petition ¶¶ 459-61)
W. Jurors 120 and 127 (Claim 26, Amended Petition ¶¶ 455-58)
X. Unconstitutional Exclusion of Persons from the Courtroom (Claim 28, Amended Petition ¶¶ 462-74)
Y. Sentencing in Carruthers' Absence (Claim 29, Amended Petition ¶¶ 475-78)
Z. Improper Judicial Fact-Finding in Sentencing (Claim 30, Amended Petition ¶¶ 479-84)
AA. Insufficient Evidence (Claim 31, Amended Petition ¶¶ 485-86)
AB. Constitutionality of the Death Penalty (Claim 32, Amended Petition ¶¶ 487-91)
AC. Actual Innocence (Claim 33, Amended Petition ¶¶ 492-94, and Claim 36, Amended Petition ¶¶ 490-91)
AD. Arbitrary Death Penalty (Claim 34, Amended Petition ¶¶ 495-96)
AE. International Law (Claim 35, Amended Petition ¶¶ 497-98)
AF. Incompetent to Be Executed (Claim 37, Amended Petition)
AG. Death by Lethal Injection and Electrocution (Claim 38)
AH. Ineffective Assistance of Counsel on Direct Appeal (Claim 39)
AI. Cumulative Effect of Constitutional Errors (Claim 40)

VII. CONCLUSION

VIII. APPEAL RIGHTS

**I. HABEAS PROCEEDINGS**

On June 11, 2008, Petitioner Tony Von Carruthers, Tennessee Department of Corrections ("TDOC") prisoner number 139604, a death-sentenced inmate then confined at the Brushy Mountain State Prison in Petros, Tennessee, filed a pro se habeas corpus petition under 28 U.S.C. § 2254 and Motions for leave to proceed in forma pauperis and appointment of counsel. (Electronic Case Filing ("ECF") Nos. 1-3.) On September 3, 2008, the Court entered an Order granting in forma pauperis status and granting in part and denying in part the Motion to appoint counsel. (ECF No. 7.) On September 23, 2008, Carruthers filed a motion for equitable tolling (ECF No. 9), which the Court denied on October 15, 2008. (ECF No. 14.) On November 10, 2008, the Court entered an Order directing the Clerk to serve the habeas petition, directing Carruthers to file an amended petition, and directing Respondent to respond. (ECF No. 17.)

On December 19, 2008, Carruthers, through counsel, filed an amended petition. (ECF No. 21.)

In January and February 2009, Carruthers filed a pro se letter and Motions for partial summary judgment and for hearing (ECF Nos. 23-25, 31); the pro se Motions were stricken. (See ECF No. 32.) On April 21, 2009, Carruthers filed a Motion to proceed pro se. (ECF No. 40.) On May 6, 2009, his counsel filed a Response to the pro se Motion. (ECF No. 42.) A hearing was held on June 16, 2009; the Court denied the motion to proceed pro se. (ECF Nos. 43, 47.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 8

On April 9, 2009, Carruthers's counsel filed a Motion for summary judgment, memorandum, and statement of facts. (ECF Nos. 36-38.) On June 18, 2009, Carruthers's counsel filed an amendment/clarification to the amended petition. (ECF No. 49.) On July 8, 2009, Respondent filed an answer to the amended petition. (ECF No. 53.) In July 2009, Respondent filed the state-court record. (ECF Nos. 55-58.) On September 23, 2009, Respondent filed additional documents that were part of the state-court proceedings under seal. (ECF No. 66 (sealed).) On December 21, 2009, the Court denied Carruthers's Motion for summary judgment and Carruthers's claim of fraud on the court (Claim 1). (ECF No. 70.)

On May 25, 2011, Respondent filed a Motion for summary judgment. (ECF No. 114.) On September 30, 2011, Carruthers filed his redacted Response to the Motion for summary judgment and a request for hearing. (ECF No. 129; see id. at 276.) That same day, Carruthers's counsel, Michael Passino, Esq., filed a Motion under seal entitled "Motion Filed Under Seal Seeking Order That Information from Prior and Present Counsel About Mr. Carruthers's Delusions, Aberrant Behaviors and Inability to Discuss Important Issues Contained in (1) Portions of Petitioner's Response to Motion for Summary Judgment, (2) Portions of Mr. Carruthers's Social History, and (3) a Number of Supporting Exhibits, Is Not Confidential Information and, as Such, It May Be Filed Consistent with RPC 1.14 and RPC 1.16" and a Motion requesting permission to file the Motion under seal. (ECF Nos. 136, 137.) On December 21, 2011, Respondent filed a Reply in support of the Motion for summary

judgment. (ECF No. 149.) On March 29, 2012, the Court granted the Motion for in camera review of the ex parte submission and directed the Clerk to unseal Passino's filings. (ECF No. 152.)[1] On April 24, 2012, the Court entered an Order concluding that the information in the ex parte submission may be disclosed, directing the Clerk to docket the ex parte submission as a supplemental Response to the Motion for summary judgment, and allowing Respondent to file a limited supplemental Reply. (ECF No. 157.) That same day, Carruthers's ex parte submission was docketed. (ECF No. 158.) On May 1, 2012, Respondent filed a supplemental Reply in support of the Motion for summary judgment. (ECF No. 160.)

On September 11, 2012, the Court granted Carruthers's Motion for reconsideration and allowed Carruthers to file a supplemental brief based on Martinez v. Ryan, 132 S. Ct. 1309 (2012). (See ECF Nos. 153-156, 161, 170.) Carruthers filed his initial Martinez memorandum on October 31, 2012. (ECF No. 178.) Carruthers's counsel also filed a post-Martinez discovery Motion and a post-Martinez Motion for relief from the Scheduling Order and discovery deadline. (ECF Nos. 176, 177.) On February 19, 2013, the Court entered an Order postponing a ruling on the Martinez issues related to Carruthers's claims of ineffective assistance of trial counsel until the United States Supreme Court rules in Trevino v. Thaler,

[1] On April 4, 2012, Carruthers's counsel filed a Notice of intent to file a supplemental brief based on Martinez v. Ryan, 132 S. Ct. 1309 (2012) (ECF No. 154.) Respondent filed a Notice in opposition to the filing on April 17, 2012. (ECF No. 155.) The Court construed Carruthers's Notice as a Motion for permission to file a supplemental brief and denied the Motion on April 23, 2012. (ECF No. 156.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 10

499 F. App'x 415 (5th Cir. 2011), cert. granted, 133 S. Ct. 524 (U.S. Oct. 29, 2012) (No. 11-10189). (ECF No. 184.) The Court postponed ruling on these Motions until the Supreme Court ruled in Trevino. (See ECF No. 185.) The parties filed supplemental briefs on August 30, 2013. (ECF Nos. 190, 191.) On October 2, 2013, the Court entered an Order addressing the applicability of Martinez and denying Carruthers's Post-Martinez discovery Motion and post-Martinez Motion for relief from the Scheduling Order and discovery deadline. (ECF No. 192.)[2] Petitioner filed a Motion to reconsider the Court's Order, which the Court denied on February 6, 2014. (See ECF Nos. 193, 194.)

The Court finds that a hearing is not necessary to resolve the issues presented in Respondent's Motion for summary judgment and the habeas petition, as amended. Carruthers's request for a hearing pursuant to Local Rule 7.2(d) is, therefore, DENIED.

## II. STATE-COURT PROCEDURAL HISTORY

In 1996, Carruthers was convicted of three counts of premeditated first-degree murder for the deaths of Marcellos Anderson, his mother Delois Anderson, and Fred Tucker; three counts of especially aggravated kidnapping; and one count of especially

[2] The Court determined that Carruthers's allegations in ¶¶ 222-39, 241, 243, 244, 246.2-246.3, 247-48, 249, 251-54, 256, 258, 261-63, 265, 268-70, 292-93, 337-41, 347-51, 352-54, 365-76, 390-96, 416, 422-42, 445-48, 462-74, 479-81, 508-09, and 510 of the Amended Petition are not subject to Martinez. (See ECF No. 192 at 8-11, 13-32.) Recently, the United States Court of Appeals for the Sixth Circuit determined that Martinez does apply to a Tennessee defendant's procedural default of a substantial claim of ineffective assistance at trial. See Sutton v. Carpenter, No. 12-6310, 2014 WL 1041695, at *7 (6th Cir. Mar. 19, 2014). The Court, however, denied Petitioner's request for relief under Martinez because the claims asserted were either not subject to Martinez or insubstantial. (See ECF No. 192.)

aggravated robbery. Carruthers v. State, 145 S.W.3d 85, 88 (Tenn. Crim. App. 2003). (See ECF No. 55-2 at PageID[3] 1834-35.) Carruthers was sentenced to death by electrocution for the three murder convictions and received forty years for each of the other offenses. Id. (ECF No. 55-2 at PageID 1836-40, 1907-1909, 1913.)

On September 25, 1997, Carruthers appealed (id. at PageID 2134), and the Tennessee Court of Criminal Appeals affirmed the conviction and sentence. State v. Carruthers, No. W1997-00097-CCA-R3-CD, 1999 WL 1530153, at *61 (Tenn. Crim. App. Dec. 21, 1999) (ECF No. 57-1 at PageID 12181-12234). On December 11, 2000, the Tennessee Supreme Court affirmed. State v. Carruthers, 35 S.W.3d 516 (Tenn. 2000) (ECF No. 56-1 at PageID 8622 (judgment); ECF No. 57-1 at PageID 12239-12316 (opinion)).[4] On June 29, 2001, the United States Supreme Court denied Carruthers's petition for writ of certiorari. Carruthers v. Tennessee, 533 U.S. 953 (2001).

On November 30, 2001, Carruthers filed a pro se petition for post-conviction relief pursuant to the Tennessee Post-Conviction Procedure Act, Tennessee Code Annotated §§ 40-30-101 to -122, in the Criminal Court of Shelby County, Tennessee. (ECF No. 56-1 at PageID 8722-8748.) On December 3, 2001, Carruthers filed another pro se petition. (ECF No. 56-1 at PageID 8696-8705.) On

---

[3] The Court uses Page Identification ("PageID") citations to documents in the state-court record and certain exhibits for ease of reference.

[4] Co-defendant James Montgomery's convictions were reversed, and his case remanded for a new trial. See Carruthers, 35 S.W.3d at 572. The Tennessee Department of Correction's Felony Offender Information Lookup indicates that Montgomery's sentence ends on December 1, 2016. See Tennessee Felony Offender Information, https://apps.tn.gov/foil/ (click "Search Now," then complete form and click "Search") (last accessed Mar. 18, 2014).

December 5, 2001, Judge Chris Craft appointed the Office of the Post-Conviction Defender ("PCD") as counsel. (Id. at PageID 8765.) The PCD was allowed to withdraw from the case because of a conflict of interest. (Id. at PageID 8768-69.) Judge Craft recused himself because he had worked in the District Attorney's office during the time of Carruthers's indictment. (Id.) On May 10, 2001, Charles Ray was appointed to represent Carruthers, and Judge Walter C. Kurtz was assigned the post-conviction case to sit by special designation. (Id. at PageID 8771-72.)[5]

On August 3, 2004, Carruthers's counsel filed an amended post-conviction petition.[6] (ECF No. 56-2 at PageID 9195-9261; ECF No. 56-3 at PageID 9264-9320.) The State filed its response on August 13, 2004. (ECF No. 56-3 at PageID 9323-9330.) On September 23, 2004, the State filed a motion to dismiss specific grounds in the amended petition without the necessity of an evidentiary hearing. (Id. at PageID 9331-36.) The court dismissed Carruthers's post-conviction claims related to the prosecutor's closing argument, the trial judge, the constitutionality of the death penalty, international law or treaties, the inclusion of aggravating factors in the indictment, a unanimous verdict for the

---

[5] On June 17, 2002, Larry E. Copeland was appointed as co-counsel. (ECF No. 56-1 at PageID 8784.) At Ray's retirement, William Ramsay was appointed as Copeland's co-counsel. (ECF No. 56-2 at PageID 9098.)

[6] Before the amended post-conviction petition was filed, the State appealed the post-conviction court's interlocutory order to unseal jury records to allow Carruthers to support his claim of ineffective assistance of appellate counsel related to the questioning of jurors. See Carruthers, 145 S.W.3d at 88, perm. app. denied (Tenn. 2004). The Tennessee Court of Criminal Appeals reversed the post-conviction court's ruling unsealing the juror records. Id. at 96.

factual findings concerning the aggravating factors, comparative proportionality review, and the rejection of a plea bargain. (Id. at PageID 9444-46.)

The post-conviction court conducted a hearing on August 29-31, 2005, and by agreement of the parties, the proof was to remain open for thirty days. (See ECF No. 56-4 at PageID 9740-41.) A DNA expert was scheduled to testify on November 3, 2005. (Id. at PageID 9741.) On February 2, 2006, Judge Walter Kurtz filed a memorandum and order dismissing the post-conviction petition. (Id. at PageID 9740-85.) On February 15, 2006, Carruthers filed a notice of appeal. (Id. at PageID 9787.) The Tennessee Court of Criminal Appeals affirmed the post-conviction court's ruling in Carruthers v. State, No. W2006-00376-CCA-R3-PD, 2007 WL 4355481 (Tenn. Crim. App. Dec. 12, 2007) (ECF No. 57-2 at PageID 12331-78), perm. app. denied (Tenn. 2008).

On September 11, 2006, Carruthers filed a pro se petition for habeas corpus relief in the Criminal Court for Morgan County, Tennessee. Carruthers v. Worthington, No. E2007-01478-CCA-R3-HC, 2008 WL 2242534, at *1 (Tenn. Crim. App. June 2, 2008) (ECF No. 57-3 at PageID 12403-405). The State filed a motion to dismiss, which the court granted on June 25, 2007. Id. The Tennessee Court of Criminal Appeals affirmed. Id. at *3.

**III. THE TRIAL**

Petitioner proceeded pro se at trial. (See ECF No. 55-8 at PageID 5662.) The State was represented by Phillip Gerald Harris, Esq., and J. Robert Carter, Jr., Esq., of the Shelby County

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 14

District Attorney General's Office. (Id.) Co-defendant James Montgomery was represented by Harold D. Archibald, Esq., and J.C. McLin, Esq. (Id.) The Honorable Joseph B. Dailey was the presiding judge.

Voir dire was conducted on April 15-17, 1996. (See ECF No. 55-7 at PageID 4707 through ECF No. 55-8 at PageID 5659.) The trial began on Thursday, April 18, 1996, and continued until April 26, 1996. (See ECF No. 55-8 at PageID 5663; ECF No. 55-9 at PageID 7487.)

The day began with the reading of the indictments and the entry of the defendants' pleas of not guilty. (ECF No. 55-8 at Page ID 5698.) In the guilt phase, the State presented testimony from twenty-one witnesses from April 18-23, 1998.[7] Co-defendant James Montgomery presented no proof. (ECF No. 55-9 at PageID 6830.) Carruthers presented the testimony of seventeen witnesses from April 23-26, 1996.[8]

On Thursday, April 25, 1996, at 5:56 p.m., the jury retired from court to begin deliberations in the guilt phase. (Id. at PageID 7497.) Deliberations for the day ended at 9:50 p.m, and the

[7] The State presented the testimony of Michael Harris, Jean Tucker, Joyce Lovett, Ola Jean Anderson, Angela Collins, Laventhia Denise Anderson Briggs, Charles Ray Smith, Archie Yancey, Nakeita Montgomery Shaw, Benton West, Jimmy Lee Maze, Terrell Adair, Andre Jordan Johnson, Chris Hines, Orlandus Buddy Sesley, Jack Ruby, Carolyn Brown, Patrick Williams, Dr. Hugh Edward Berryman, and Dr. O'Brian Cleary Smith. (See ECF No. 55-8 at PageID 5663, 5823, 5977; see also ECF No. 55-9 at PageID 6154, 6327, 6520, 6665.)

[8] Carruthers presented the testimony of Albert James Herman, Jr., Freddy L. McCullough, Alfredo Bernard Shaw, Forrest Baxter Durand, Glenn Faulkner, Wanda Boga, Aldolpho Antonio James, Michael Shea Holmes, Terrence Roderick Carruthers, Richard David Roleson, Antonio Bateman, A.C. Wharton, Jr., Jerry Tyrone Durham, Terry Jerome Durham, Donald M. Justus, Roy Moore, and Glenn Faulkner. (See ECF No. 55-9 at PageID 6827, 6991, 7144, 7303.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 15

jury resumed deliberations on Friday, April 26, 1996, at 9:00 a.m. (Id. at PageID 7504-7505.) At 11:00 a.m., the jury returned to open court to report its verdict. (Id. at PageID 7505-7508.)

The penalty phase began the same day about 1:30 p.m. (Id. at PageID 7511.) The State presented two witnesses: Toney Sanders and Dr. O'Bryan Cleary Smith. (Id. at PageID 7528-64.) Co-defendant James Montgomery presented three witnesses: Nakeita Montgomery Shaw, Mattie M. Calhoun, and himself. (Id. at PageID 7565-79.) Carruthers presented three witnesses: Bishop Richard L. Fiddler, Tonya Miller, and himself. (Id. at PageID 7579-98.)

On April 26, 1996, at 7:40 p.m., the jury began deliberations. (Id. at PageID 7631.) At 10:07 p.m., the jury returned to open court to report its verdict. (ECF No. 55-9 at PageID 7635-43.)

To assess the claims Carruthers raises in his habeas petition, it is necessary briefly to set forth the proof as found by the Tennessee Supreme Court:

> The defendants, Tony V. Carruthers and James Montgomery, were each convicted of first degree murder for killing Marcellos "Cello" Anderson, his mother Delois Anderson, and Frederick Tucker in Memphis in February of 1994. All of the victims disappeared on the night of February 24, 1994. On March 3, 1994, their bodies were found buried together in a pit that had been dug beneath a casket in a grave in a Memphis cemetery.
>
> The Guilt Phase
>
> The proof introduced at the guilt phase of the trial showed that one of the victims, Marcellos Anderson, was heavily involved in the drug trade, along with two other men, Andre "Baby Brother" Johnson and Terrell Adair. Anderson wore expensive jewelry, including a large diamond ring, carried large sums of money on his person,

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 16

and kept a considerable amount of cash in the attic of the home of his mother, victim Delois Anderson. When his body was discovered, Anderson was not wearing any jewelry and did not have any cash on his person. Anderson was acquainted with both defendants, and he considered Carruthers to be a trustworthy friend. The proof showed that Anderson's trust was misplaced.

In the summer of 1993 Jimmy Lee Maze, Jr., a convicted felon, received two letters from Carruthers, who was then in prison on an unrelated conviction. In the letters, Carruthers referred to "a master plan" that was "a winner." Carruthers wrote of his intention to "make those streets pay me" and announced, "everything I do from now on will be well organized and extremely violent." Later, in the fall of 1993, while incarcerated at the Mark Luttrell Reception Center in Memphis awaiting his release, Carruthers was assigned to a work detail at a local cemetery, the West Tennessee Veterans' Cemetery. At one point, as he helped bury a body, Carruthers remarked to fellow inmate Charles Ray Smith "that would be a good way, you know, to bury somebody, if you're going to kill them. . . . [I]f you ain't got no body, you don't have a case."

Smith also testified that he overheard Carruthers and Montgomery, who also was incarcerated at the Reception Center, talking about Marcellos Anderson after Anderson had driven Carruthers back to the Reception Center from a furlough. According to Smith, when Montgomery asked Carruthers about Anderson, Carruthers told him that both Anderson and "Baby Brother" Johnson dealt drugs and had a lot of money. Carruthers said he and Montgomery could "rob" and "get" Anderson and Johnson once they were released from prison.

When Carruthers was released from the Department of Correction on November 15, 1993, he left the Reception Center with Anderson. Carruthers accompanied Anderson to Andre Johnson's house, and received a gift of $200 cash from Anderson, Johnson, and Terrell Adair, who was present at Johnson's house.

One month later, on December 15, 1993, Smith was released from the Department of Correction. Upon his release, Smith warned Anderson and Johnson of Carruthers' and Montgomery's plans to "get them." According to Smith and Johnson, Anderson did not take the warning or the defendants' threats seriously.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 17

In mid-December 1993, Maze, his brother and Carruthers were riding around Memphis together. They came upon Terrell Adair's red Jeep on the street in front of Delois Anderson's home where a drive-by shooting had just occurred. Adair had been injured in the shooting and was in the hospital. Jonathan "Lulu" Montgomery, James Montgomery's brother, was at the scene of the shooting, and he joined Carruthers in the back seat of Maze's car. According to Maze, Carruthers remarked to Jonathan that, "it would be the best time to kidnap Marcellos," and Jonathan asked, "which one Baby Brother or Marcellos?" Carruthers then nudged Montgomery with his elbow and said "it" was going to take place after James Montgomery was released from prison. About two weeks later, on December 31, Maze saw Carruthers loading three antifreeze containers into a car, and Carruthers indicated to Maze that the containers were filled with gasoline.

On January 11, 1994, James Montgomery was released from prison. After his release, Montgomery told "Baby Brother" Johnson that he, not Johnson, was in charge of the neighborhood. Montgomery said, "It was my neighborhood before I left, and now I'm back and its my neighborhood again." Montgomery asked Johnson if he wanted to "go to war about this neighborhood." When Johnson said, "no," Montgomery replied "You feeling now like I'm about to blow your motherf---g brains out" and "you all need to get in line around here or we're going to war about this." Near the end of January or the first of February 1994, Johnson and Adair saw the defendants sitting together in an older model grey car down the street from Johnson's mother's home. It was late at night, between 11 p.m. and 1 a.m. When the defendants approached Johnson and Adair, Montgomery asked why they thought he was trying to harm them. Montgomery told them, "Look, I told you, we ain't got no problem with nobody in this neighborhood. We already got our man staked out. If we wanted some trouble or something, we got you right now. We'd kill your whole family." Confirming Montgomery's statement, Carruthers told them, "We already got our man staked out. You all right. If it's any problem, we'll deal with it later." Montgomery explained that he intended to take the "man's" money and drugs, and said, "if the police didn't have no body, they wouldn't have no case."

On February 23, 1994, Marcellos Anderson borrowed a white Jeep Cherokee from his cousin, Michael Harris. Around 4:30 on the afternoon of February 24, 1994, witnesses saw Marcellos Anderson and Frederick Tucker riding in the Jeep Cherokee along with James and Jonathan Montgomery.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 18

About 5 p.m. that day, James and Jonathan Montgomery and Anderson and Tucker arrived in the Jeep Cherokee at the house of Nakeita Shaw[9], the Montgomery brothers' cousin. Nakeita Shaw, her four children, and Benton West, also her cousin, were present at the house when they arrived.

The four men entered the house and went downstairs to the basement. A short time later, James Montgomery came back upstairs and asked Nakeita Shaw if she could leave for a while so he could "take care of some business." Nakeita Shaw told West that she thought "they" were being kidnapped, and then she left the house with West and her children. West agreed to care for Nakeita Shaw's children while she attended a meeting.

When Nakeita Shaw returned home after the meeting, she saw only Carruthers and James Montgomery. Montgomery asked her to go pick up her children and to "stay gone a little longer." Nakeita Shaw returned home with her children before 10 p.m. The Jeep Cherokee was gone, but James Montgomery and Carruthers were still present at her home. Montgomery told Nakeita Shaw to put her children to bed upstairs and remain there until he told her he was leaving. Sometime later, Montgomery called out to Nakeita Shaw that he was leaving. She returned downstairs and saw James Montgomery, Carruthers, and the two victims, Anderson and Tucker, leave in the Jeep Cherokee. Prior to trial, Nakeita Shaw told the police that Anderson's and Tucker's hands were tied behind their backs when they left her house. While she admitted making this statement, she testified at trial that the statement was false and that she had not seen Anderson's and Tucker's hands tied when they left her home.

In the meantime, around 8 p.m. on February 24, Laventhia Briggs telephoned her aunt, victim Delois Anderson. When someone picked up the telephone but said nothing, Briggs hung up. Briggs called "a couple of more times" but received no answer. Briggs was living with Delois Anderson at the time and arrived at her aunt's home around 9:00 p.m. Although Delois Anderson was not home, her purse, car, and keys were there. Food left in Anderson's bedroom indicated that she had been interrupted while eating. Briggs went to bed, assuming her aunt would return home soon. A co-worker, whom Delois Anderson had driven home around 7:15 p.m., was the last person to have seen her alive.

---

[9] Shaw is also referred to as Nakeita Montgomery or Nakeita Montgomery Shaw.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 19

Chris Hines, who had known the defendants since junior high school, testified that around 8:45 p.m. on February 24, 1994, Jonathan Montgomery "beeped" him. Jonathan said, "Man, an---r got them folks." When Hines asked, "What folks?" Jonathan replied, "Cello and them" and said something about stealing $200,000. Jonathan then indicated that he could not talk more on the telephone and arranged to meet Hines in person. Jonathan arrived at Hines' home at about 9:00 p.m. and told him, "Man, we got them folks out at the cemetery on Elvis Presley, and we got $200,000. Man, a n---r had to kill them folks." At that point, James Montgomery "beeped in" and talked with Jonathan. When the telephone call ended, Jonathan asked Hines to drive him to the cemetery. Hines refused, but he allowed Jonathan to borrow his car, which Jonathan promised to return in an hour. When the car was not returned, Hines called James Montgomery's cellular telephone at around 11 p.m. James told Hines that he did not know where Jonathan was, that Jonathan did not have a driver's license, and that the car should be returned by 4 a.m. because Jonathan was supposed to drive James to his girlfriend's house.

The Jeep Cherokee that Anderson had borrowed was found in Mississippi on February 25 around 2:40 a.m. It had been destroyed by fire. About 3:30 a.m., after he was informed of the vehicle fire by law enforcement officials, Harris telephoned Delois Anderson's home, and Laventhia Briggs then discovered that neither her aunt Delois nor her cousin Marcellos had returned home. Briggs filed a missing person report with the police later that day.

The Montgomery brothers and Carruthers did not return Hines' car until approximately 8:30 a.m. on February 25. The car was very muddy. Hines drove James Montgomery and Carruthers to Montgomery's mother's home and then drove away with Jonathan Montgomery. That morning Jonathan, whom Hines described as acting "paranoid" and "nervous," repeatedly told Hines that "they had to kill some people." About two hours later, James Montgomery and Carruthers came to Hines' home looking for Jonathan. Hines advised Carruthers and James Montgomery that he was celebrating his birthday, and he asked James Montgomery to give him a birthday present. James agreed to give Hines twenty dollars after he picked up his paycheck, and James also agreed to have Hines' car washed immediately as a birthday present.

Hines, the Montgomery brothers, and Carruthers drove to a carwash, and James Montgomery paid an unidentified

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 20

elderly man to clean the car. The man cleaned the interior of the car and the trunk of the car. Neither Carruthers nor James Montgomery supervised the cleaning of the car. After Jonathan Montgomery abruptly left the carwash, Carruthers and James Montgomery asked Hines what Jonathan had told him, but Hines did not tell them. Several days later James Montgomery came to Hines' home and offered Hines an AK-47 assault rifle because Montgomery said he had "heard that Hines was into it with some people on the street." James Montgomery told Hines the rifle had "blood on it." Hines testified that he interpreted this statement to mean that someone had been shot with the weapon.

On March 3, 1994, about one week after a missing person report was filed on Delois and Marcellos Anderson, Jonathan Montgomery directed Detective Jack Ruby of the Memphis Police Department to the grave of Dorothy Daniels at the Rose Hill Cemetery on Elvis Presley Boulevard. Daniels' grave was located six plots away from the grave site of the Montgomery brothers' cousin. Daniels had been buried on February 25, 1994. Pursuant to a court order, Daniels' casket was disinterred, and the authorities discovered the bodies of the three victims buried beneath the casket under several inches of dirt and a single piece of plywood.

An employee of the cemetery testified that a pressed wood box or vault had been placed in Daniels' grave during working hours on February 24 and that it would have taken at least two people to remove the box. Daniels' casket had been placed in the grave inside the box on February 25, and, according to Dr. Hugh Edward Berryman, one of the forensic anthropologists who assisted in the removal of the bodies from the crime scene, there was no evidence to suggest that Daniels' casket had been disturbed after she was buried. Thus, it can be inferred that the bodies of the three victims were placed in the grave and covered with dirt and a piece of plywood prior to the casket being placed in the grave.

Dr. O.C. Smith, who helped remove the bodies from the grave and who performed autopsies on the victims, testified that, when found, the body of Delois Anderson was lying at the bottom of the grave and the bodies of the two male victims were lying on top of her. The hands of all three victims were bound behind their backs. Frederick Tucker's feet were also bound and his neck showed signs of bruising caused by a ligature. A red sock was found around Delois Anderson's neck. Marcellos Anderson was not wearing any jewelry. Dr. Smith

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 21

testified that Delois Anderson died from asphyxia caused by several factors: the position of her head against her body, dirt in her mouth and nose, and trauma from weight on her body. Frederick Tucker had received a gunshot wound to his chest, which would not have been fatal had he received medical care. He had also suffered injuries from blunt trauma to his abdomen and head resulting in broken ribs, a fractured skull, and a ruptured liver. Dr. Smith opined that Tucker was shot and placed in the grave, where the force of compression from being buried produced the other injuries and, along with the gunshot wound, caused his death. According to Dr. Smith, Marcellos Anderson had been shot three times: a contact wound to his forehead that was not severe and two shots to his neck, one of which was also not serious. However, the gunshot causing the other neck wound had entered Anderson's windpipe and severed his spinal cord, paralyzing him from the neck down. This wound was not instantaneously fatal. Anderson had also suffered blunt trauma to his abdomen from compression forces. Dr. Smith opined that each victim was alive when buried.

Defendant James Montgomery presented no proof. Carruthers, acting pro se, called several witnesses to rebut the testimony offered by the State, primarily by attacking the credibility of the State's witnesses.

A health administrator at the Mark Luttrell Reception Center testified that, because of an injury to his arm, Carruthers had been given a job change on October 6, 1993, and had not worked at the cemetery after that date. Another official at the Reception Center testified that Carruthers was not released on furlough after Montgomery arrived at the Reception Center on November 4, 1994. This proof was offered to impeach Smith's testimony that Montgomery and Carruthers discussed robbing and getting Marcellos Anderson after Anderson drove Carruthers back to the Reception Center following a furlough. An investigator appointed to assist Carruthers with his defense testified that he had interviewed Maze, who admitted he did not know anything about the "master plan" to which Carruthers referred in the letters until Carruthers was released from prison. On cross-examination, the investigator admitted that Maze said that when he was released from prison, Carruthers had explained that the master plan involved kidnapping Marcellos Anderson. Carruthers' brother and another witness testified that Jonathan Montgomery was not at the scene of the drive-by shooting involving Terrell Adair. This proof was offered to impeach Maze's testimony that Carruthers and Jonathan Montgomery discussed kidnapping

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 22

Marcellos on the day that Terrell Adair was shot. Another witness, Aldolpho Antonio James testified that he and Carruthers had been visiting a friend between the hours of 1:00 a.m. and 2:00 a.m. the day before these homicides were first reported on the news. This testimony was offered to provide at least a partial alibi for Carruthers for the early morning hours of February 25, 1994. However, on cross-examination, James admitted that he did not know the exact date he and Carruthers had been together.

Carruthers also called Alfredo Shaw as a witness. After seeing a television news report about these killings in March of 1994, Alfredo Shaw had telephoned CrimeStoppers and given a statement to the police implicating Carruthers. Alfredo Shaw later testified before the grand jury which eventually returned the indictments against Carruthers and Montgomery. Prior to trial, however, several press reports indicated that Alfredo Shaw had recanted his grand jury testimony, professed that the statement had been fabricated, and intended to formally recant his grand jury testimony when called as a witness for the defense. Therefore, when Carruthers called Alfredo Shaw to testify, the prosecution announced that if he took the stand and recanted his prior sworn testimony, he would be charged with and prosecuted for two counts of aggravated perjury. In light of the prosecution's announcement, the trial court summoned Alfredo Shaw's attorney and allowed Alfredo Shaw to confer privately with him. Following that private conference, Alfredo Shaw's attorney advised the trial court, defense counsel, including Carruthers, and the prosecution, that Alfredo Shaw intended to testify consistently with his prior statements and grand jury testimony and that any inconsistent statements Alfredo Shaw had made to the press were motivated by his fear of Carruthers and by threats he had received from him.

Despite this information, Carruthers called Alfredo Shaw as a witness and as his attorney advised, Shaw provided testimony consistent with his initial statement to the police and his grand jury testimony. Specifically, Alfredo Shaw testified that he had been on a three-way call with Carruthers and either Terry or Jerry Durham, and during this call, Carruthers had asked him to participate in these murders, saying he had a "sweet plan" and that they would each earn $100,000 and a kilogram of cocaine. Following his arrest for these murders, Carruthers was incarcerated in the Shelby County Jail along with Alfredo Shaw, who was incarcerated on unrelated charges. Carruthers and Alfredo Shaw were in

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 23

the law library when Carruthers told Alfredo Shaw that he and some other unidentified individuals went to Delois Anderson's house looking for Marcellos Anderson and his money. Marcellos was not there when they arrived, but Carruthers told Delois Anderson to call her son and tell him to come home, "it's something important." When Anderson arrived, the defendants forced Anderson, Tucker, who was with Anderson, and Delois Anderson into the jeep at gunpoint and drove them to Mississippi, where the defendants shot Marcellos Anderson and Tucker and burned the jeep. According to Alfredo Shaw, the defendants then drove all three victims back to Memphis in a stolen vehicle. Alfredo Shaw testified that, after they put Marcellos Anderson and Tucker into the grave, Delois Anderson started screaming and one of the defendants told her to "shut up" or she would die like her son and pushed her into the grave. Carruthers also told Alfredo Shaw that the bodies would never have been discovered if "the boy wouldn't have went and told them folks." Carruthers told Alfredo Shaw that he was not going to hire an attorney or post bond because the prosecution would then learn that the murders had been a "hit." Carruthers told Alfredo Shaw that Johnson also was supposed to have been "hit" and that Terry and Jerry Durham were the "main people behind having these individuals killed." Carruthers said that the Durhams wanted revenge because Anderson and Johnson had previously stolen from them.

In response to questioning by Carruthers, Alfredo Shaw acknowledged that he had told the press that his statement to police and his grand jury testimony had been fabricated, but said he had done so because Carruthers had threatened him and his family. According to Alfredo Shaw, one of Carruthers' investigators had arranged for a news reporter to speak with him about recanting his grand jury testimony.

As impeachment of his own witness, Carruthers called both Jerry and Terry Durham, twin brothers, as witnesses. The Durhams denied knowing Alfredo Shaw and said they had never been party to a three-way telephone call involving Alfredo Shaw and Carruthers. Carruthers also called attorney AC Wharton who testified that he was initially retained by Carruthers' mother to represent her son on these murder charges, but was required to withdraw because of a conflict of interest. This testimony was offered to impeach Alfredo Shaw's statement that Carruthers had said he was not going to hire an attorney or post bond. Finally, Carruthers called an administrative assistant from the Shelby County jail who testified that jail records, indicated that Alfredo Shaw

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 24

> was not in the law library at the same time as Carruthers in either February or March of 1994. According to jail records, Alfredo Shaw was in protective custody for much of that time and, as a result, would have been escorted at all times by a guard. However, on cross-examination, this witness admitted that the jail records regarding the law library were not always complete or accurate and that Alfredo Shaw had been housed outside of protective custody from mid-March to early April 1994 which would have afforded him the opportunity to interact with Carruthers.

Carruthers, 35 S.W.3d at 524-30 (footnotes omitted).

## IV. PETITIONER'S FEDERAL HABEAS CLAIMS

Carruthers raises the following issues:

1. Fraud on the court (ECF No. 21 at 51-52; ECF No. 49 at 1-2)[10];

2. Sex discrimination in selecting the grand jury foreperson (ECF No. 21 at 52-54);

3. No uniform standards guide Tennessee prosecutors in deciding whether to seek the death penalty and no standard governed the prosecutor (id. at 54);

4. The indictments did not allege aggravating circumstances (id.);

5. The trial court failed to require the state to elect which indictment it intended to proceed upon at trial (id. at 54-55);

6. Carruthers was not competent to be tried and sentenced (id. at 55-62);

7. Pre-trial counsel rendered ineffective assistance (id. at 62-73);

8. The trial court required Carruthers to represent himself in violation of his constitutional rights (id. at 73-82; ECF No. 49 at 2);

9. The trial court denied the motion to sever (ECF No. 21 at 82-83);

[10] The Court previously dismissed this claim. (ECF No. 70 at 18-19.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 25

10. The trial court entered a gag order (id. at 83-85);

11. The trial court empaneled an anonymous jury (id. at 85-86);

12. The trial court allowed excessive security measures inside the courtroom (id. at 86-87);

13. The state withheld exculpatory evidence (id. at 87-91);

14. The state knowingly presented and/or condoned false testimony (id. at 91-94);

15. The trial court precluded Carruthers from presenting his defense that others with motive and opportunity killed the victims (id. at 95-97);

16. The trial court denied and/or interfered with Carruthers's employment of support services (id. at 97-99);

17. The trial court admitted specified evidence (id. at 99-101);

18. The admission of specified evidence violated Carruthers's right to confront the witnesses against him and to due process (id. at 101-02);

19. The trial court failed to ascertain Nakeita Montgomery Shaw's competence as a witness (id. at 103);

20. The trial judge was biased against Carruthers (id. at 103-06);

21. The prosecution made improper remarks during closing argument at the guilt and sentencing stages (id. at 106-07);

22. The trial court gave the jury improper instructions at the guilt phase of trial (id. at 107-09);

23. The trial court gave the jury improper instructions at the sentencing phase of trial (id. at 109-10);

24. Extraneous, improper influences affected the jury's verdict (id. at 110);

25. Juror 121 misled Carruthers to believe no reason disqualified him from serving (id. at 110);

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 26

26. The trial court failed to hold a hearing about Jurors 120 and 127 (id. at 111);

27. The trial court failed to hold a hearing about Juror 121 (id. at 111-12);

28. The trial court denied Carruthers an open and public trial (id. at 112-14);

29. The trial court conducted a sentencing hearing on Carruthers's convictions for especially aggravated kidnapping and especially aggravated robbery in his absence (id. at 114);

30. The trial court made fact findings to determine Carruthers's sentences (id. at 114-15);

31. The evidence is insufficient to support the convictions (id. at 116);

32. The death sentences violate the Sixth, Eighth, and Fourteenth Amendments (id. at 116);

33. Carruthers is actually innocent (id. at 116-17);

34. The death sentence violated the Eighth and Fourteenth Amendments because it is arbitrary (id. at 117);

35. Carruthers's convictions and death sentences violate Article VI, Clause 2, of the Constitution because the State disregarded rights accorded Carruthers by international law (id. at 117-22);

36. Carruthers is actually innocent (id. at 122)[11];

37. Carruthers is incompetent to be executed (id. at 122);

38. Death by lethal injection and/or electrocution constitute cruel and unusual punishment (id. at 122-28);

39. Appointed counsel rendered ineffective assistance on appeal (id. at 128-31); and

40. The cumulative effect of the constitutional errors render Carruthers's convictions and death sentences unconstitutional (id. at 131).

[11] Claims 33 and 36 appear to be identical.

## V. THE LEGAL STANDARD

The statutory authority for federal courts to grant habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254. A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

### A. Waiver and Procedural Default

Twenty-eight U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts. Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011). The petitioner must "fairly present"[12] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, Baldwin v. Reese, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, O'Sullivan v. Boerckel, 526 U.S. 838, 847-48 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court in order to "be deemed to have exhausted all available state

[12] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." Anderson v. Harless, 459 U.S. 4, 6, (1982) (per curiam) (citations omitted). Nor is it enough to make a general appeal to a broad constitutional guarantee. Gray v. Netherland, 518 U.S. 152, 163 (1996).

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 28

remedies." Adams v. Holland, 330 F.3d 398, 402 (6th Cir. 2003); see also Smith v. Morgan, 371 F. App'x 575, 579 (6th Cir. 2010) (per curiam) (stating that the Adams holding promotes comity by requiring that state courts have the first opportunity to review and evaluate claims and by mandating that federal courts "respect the duly promulgated rule of the Tennessee Supreme Court that recognizes the court's law and policy-making function of that court and the court's desire not to be entangled in the business of simple error correction.").

The procedural-default doctrine is integral to the exhaustion requirement. See Edwards v. Carpenter, 529 U.S. 446, 452-53 (2000) (noting the interplay between the exhaustion rule and the procedural-default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. Coleman v. Thompson, 501 U.S. 722, 729-30 (1991) (stating that a federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment."). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred. See id. at 732; Hicks v. Straub, 377 F.3d 538, 551 (6th Cir. 2004) (noting that the

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 29

procedural-default doctrine prevents circumvention of the exhaustion doctrine).

Under either scenario, a petitioner must show "cause" to excuse his failure to present the claim fairly and "actual prejudice" stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750. The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. Schlup v. Delo, 513 U.S. 298, 321(1995); see also House v. Bell, 547 U.S. 518, 536-39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

**B. Merits Review**

Section 2254(d) establishes the standard for addressing claims that have been adjudicated in state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA]

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 30

standard," which "demands that state-court decisions be given the benefit of the doubt." Pinholster, 131 S. Ct. at 1398 (citations and internal quotation marks omitted).[13]

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Id. at 1399. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000).[14] An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The state court's application of clearly established federal law must be "objectively unreasonable." Id. at 409. The writ may not issue merely because the habeas court, in its independent judgment, determines that the state-court decision applied clearly established federal law erroneously or incorrectly. Renico v. Lett, 130 S. Ct. 1855, 1862 (2010); Williams, 529 U.S. at 411.

---

[13] The AEDPA standard creates "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

[14] The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam); see also Mitchell v. Esparza, 540 U.S. 12, 16 (2003) (per curiam) (same); Treesh v. Bagley, 612 F.3d 424, 429 (6th Cir. 2010) (same).

There is little case law addressing the standard in § 2254(d)(2) that a decision was based on "an unreasonable determination of facts." In Wood v. Allen, 558 U.S. 290, 301 (2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. In Rice v. Collins, 546 U.S. 333, 341-42 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination."[15]

"Notwithstanding the presumption of correctness, the Supreme Court has explained that the standard of § 2254(d)(2) is 'demanding but not insatiable.'" Harris v. Haeberlin, 526 F.3d 903, 910 (6th Cir. 2008) (quoting Miller-El v. Dretke, 545 U.S. 231, 240 (2005)). "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). A state-court adjudication will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state-court proceeding. See Ayers v. Hudson, 623 F.3d 301, 308 (6th Cir. 2010).

[15] In Wood, 558 U.S. at 293, 299, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence. The Court ultimately found it unnecessary to reach that issue. Id. at 293. In Rice, 546 U.S. at 339, the Court recognized that it is unsettled whether there are some factual disputes where § 2254(e)(1) is inapplicable.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 32

**C. Summary-Judgment Standard**

Under Federal Rule of Civil Procedure 56, on motion of a party, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment "bears the initial burden of demonstrating the absence of any genuine issue of material fact." Mosholder v. Barnhardt, 679 F.3d 443, 448 (6th Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." Id. at 448-49 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"In considering a motion for summary judgment, [a court] must draw all reasonable inferences in favor of the nonmoving party." Phelps v. State Farm Mut. Auto. Ins. Co., 736 F.3d 697, 702-03 (6th Cir. 2012) (citing Matsushita, 475 U.S. at 587). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Id. at 703 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). "[A] mere 'scintilla' of evidence in support of the non-moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in [his] favor." Tingle v. Arbors at

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 33

Hilliard, 692 F.3d 523, 529 (6th Cir. 2012) (quoting Anderson, 477 U.S. at 252).

Rule 12 of the Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rules") permits federal courts to apply the Federal Rules of Civil Procedure to petitions for habeas corpus "to the extent that they are not inconsistent with any statutory provision or these rules." Habeas Rule 12. The AEDPA's significant deference to a state court's resolution of factual issues guides summary-judgment review in habeas cases. A federal habeas court must presume the underlying factual determinations of the state court to be correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Malone v. Fortner, No. 3:09-0949, 2013 WL 1099799, at *1 n.3 (M.D. Tenn. Mar. 14, 2013) ("[S]ummary judgment rules in evaluating the evidence do not apply given the statutory presumption of correctness of facts found by the state courts."). The Court applies general summary-judgment standards on federal habeas review only insofar as they do not conflict with the language and intent of the AEDPA.

## VI. ANALYSIS OF CARRUTHERS'S CLAIMS

### A. Gender Discrimination in the Selection of the Grand Jury Foreperson (Claim 2, Amended Petition ¶¶ 202-12)

Carruthers alleges that historically there have been few brief time periods when a woman has served as foreperson on a Shelby County grand jury and that the foreperson on the grand jury that

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 34

indicted him was not female. (ECF No. 21 at 52-53.) He alleges that Tennessee Rule of Criminal Procedure 6(g), which establishes the process for selecting forepersons, is susceptible to discrimination or abuse. (Id. at 53-54.)

Respondent argues that this claim is procedurally defaulted because it was not presented for review to the Tennessee Court of Criminal Appeals. (ECF No. 114-1 at 5-6.) Carruthers argues that he can establish cause for any prejudicial default of this claim through ineffective assistance of trial and/or appellate counsel. (ECF No. 129 at 247-50.) Respondent contends that Carruthers's argument fails because Carruthers did not exhaust the ineffective-assistance claims on which he relies to establish cause for the procedural default of Claim 2. (ECF No. 149 at 2-3.)

Carruthers did not exhaust his claim of discrimination in selecting a jury foreperson in the state court. He failed to exhaust a related ineffective-assistance-of-counsel claim or demonstrate cause and prejudice to excuse his failure to exhaust an ineffective-assistance claim related to the selection of the grand jury foreperson. He has not demonstrated cause and prejudice to overcome the procedural default of Claim 2. See Carpenter, 529 U.S. at 451-52 (quoting Murray v. Carrier, 477 U.S. 478, 489 (1986)) ("'[A] claim of ineffective assistance,' . . . generally must 'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.'" (alteration in original)). Carruthers has not demonstrated that a miscarriage of justice would result from the

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 35

Court's failure to address this claim.

Claim 2 is procedurally defaulted. Accordingly, summary judgment is GRANTED and Claim 2 is DENIED.

**B. No Uniform Standards for Prosecutors (Claim 3, Amended Petition ¶¶ 213-15)**

Carruthers alleges that there are no state-wide standards in Tennessee to guide prosecutors in deciding whether to seek the death penalty and that no standards guided the prosecutors in this case. (ECF No. 21 at 54.) Respondent argues that this claim is procedurally defaulted because it was not presented for review to the Tennessee Court of Criminal Appeals. (ECF No. 114-1 at 5-6.) Carruthers does not specifically respond to the Motion for summary judgment as it relates to this claim. (See ECF No. 149 at 3-4.) He did not exhaust this claim in the state courts. He has not demonstrated cause and prejudice or that a miscarriage of justice would result from the Court's failure to address this claim. Claim 3 is procedurally defaulted; summary judgment is, therefore, GRANTED based on procedural default.

Further, the Supreme Court has refused to strike down various death-penalty statutes on the ground that those laws grant prosecutors discretion in determining whether to seek the death penalty. Gregg v. Georgia, 428 U.S. 153, 199, 206-07 (1976) ("[T]hat the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense" does not indicate that the system is unconstitutional); Campbell v. Kincheloe, 829 F.2d 1453, 1465 (9th Cir. 1987) (noting that the

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 36

Supreme Court has rejected the argument that a death penalty statute "is unconstitutional because it vests unbridled discretion in the prosecutor to decide when to seek the death penalty."); see also Proffitt v. Florida, 428 U.S. 242, 254 (1976) (rejecting argument that arbitrariness is inherent in the Florida criminal justice system because it allows discretion at each stage of a criminal proceeding). Claim 3 is also without merit and, therefore, DENIED.

**C. Defective Indictment (Claim 4, Amended Petition ¶¶ 216-17)**

Carruthers alleges that the indictments did not allege aggravating circumstances and, thus, the Shelby County grand jury did not find facts supporting the imposition of the death penalty. (ECF No. 21 at 54.) Respondent argues that this claim is procedurally defaulted because it was not presented for review to the Tennessee Court of Criminal Appeals. (ECF No. 114-1 at 5-6.) Carruthers does not specifically respond to the Motion for summary judgment as it relates to this claim. (See ECF No. 149 at 3-4.) Carruthers has not exhausted this claim in the state courts. He has not demonstrated cause and prejudice or that a miscarriage of justice would result from the Court's failure to address this claim. Claim 4 is procedurally defaulted. Summary judgment is, therefore, GRANTED.

Further, the federal right to presentment or indictment by a grand jury does not extend to the States through the Fourteenth Amendment. Hurtado v. California, 110 U.S. 516, 520-21 (1884); see

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 37

also Branzburg v. Hayes, 408 U.S. 665, 688 n.25 (1972) ("[I]ndictment by grand jury is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment"). The Fifth Amendment grand jury right does not apply to state prosecutions. Williams v. Haviland, 467 F.3d 527, 531-33 (6th Cir. 2006); see Hall v. Bell, No. 2:06-CV-56, 2010 WL 908933, at *42-43 (E.D. Tenn. Mar. 12, 2010) (a state-court decision denying relief in a death-penalty case for failure to allege aggravating factors in an indictment is not "contrary to" or an "unreasonable application" of relevant Supreme Court precedent). Claim 4 is also without merit and, therefore, DENIED.

**D. Failure to Elect Indictment (Claim 5, Amended Petition ¶¶ 218-21)**

Carruthers alleges that in March 1994, the Shelby County grand jury issued indictment Nos. 94-02797, 94-02798, and 94-02799, charging him with the first-degree murders of Fred Tucker, Delois Anderson, and Marcellos Anderson, respectively. (ECF No. 21 at 54-55.) In November 1995, the Shelby County grand jury issued indictments No. 95-11128, charging especially aggravated kidnapping of the three victims, and No. 95-11129, charging especially aggravated robbery of Marcellos Anderson. (Id. at 55.) Carruthers argues that the trial court did not require the State to elect the indictments with which it would proceed at trial. (Id.)

**1. Procedural Default**

Respondent argues that the claim is procedurally defaulted because it was presented under a state-law theory in the Tennessee

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 38

Court of Criminal Appeals. (ECF No. 114-1 at 6.) Carruthers argues that a constitutional claim was fairly presented on direct appeal and should be resolved on the merits in this habeas proceeding. (ECF No. 129 at 231-32, 240-41.) He relies on United States v. Herbst, 565 F.2d 638, 643 (10th Cir. 1977), for the proposition that an indictment must "apprise the accused of the nature of the crime charged, so that he will be enabled to prepare a defense and plead the judgment in bar." (Id. at 232.) He argues that Herbst calls to mind the right guaranteed by the federal constitution in Cole v. Arkansas, 333 U.S. 196, 201 (1948), that "[n]o principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." (Id.)

Carruthers argues that on direct appeal, the Tennessee Court of Criminal Appeals considered his claim. (ECF No. 129 at 240-41 n.76.) See Carruthers, 35 S.W.3d at 572-74. On direct appeal, he challenged his "reindictment and conviction" based on Rule 8 of the Tennessee Rules of Criminal Procedure. (ECF No. 56-6 at PageID 10223.) He argued that the second indictment was "more akin" to a superseding indictment and cited Herbst, 565 F.2d at 643, for the proposition that a superseding indictment may be returned anytime before trial on the merits of an earlier indictment. (Id. at PageID 10224.)

When determining whether a claim has been "fairly presented,"

the Court looks to see whether the petitioner has taken any of the following four actions:

> (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.

Whiting v. Burt, 395 F.3d 602, 613 (6th Cir. 2005) (quoting McMeans v. Brigano, 228 F.3d 674, 681 (6th Cir. 2000)). Although Carruthers relied on federal cases, those cases do not employ a constitutional analysis relevant to the claim. In Herbst, the petitioner argued that the government's decision to proceed with a superseding indictment was vindictive in nature. 565 F. 2d at 643. The court stated that a superseding indictment may be returned at any time before trial on the merits, and "no prejudice in fact is an incident of such proceeding." Id. Herbst does not cite Cole or any other constitutional principle supportive of Carruthers's argument. Gray v. State, 250 S.W.2d 86, 89 (Tenn. 1952), the state-court case on which Carruthers relied, does not employ a federal constitutional analysis relevant to this claim. (See ECF No. 56-6 at PageID 10225-10226.) Carruthers has not framed his claim in terms of constitutional law and has not alleged facts within the mainstream of constitutional law.[16] Claim 5 was not fairly presented and has not been exhausted in the state courts.

Carruthers asserts ineffective assistance of trial and/or

---

[16] The Tennessee Court of Criminal Appeals' analysis does not invoke constitutional law, see infra pp. 37-40.

appellate counsel as cause for any procedural default. (ECF No. 129 at 247-248, 250.)[17] Respondent argues that Carruthers cannot establish cause because he failed to exhaust an ineffective-assistance-of-counsel claim related to this issue. (ECF No. 149 at 5.) Carruthers has not exhausted an independent claim of ineffective assistance of trial counsel or appellate counsel related to Claim 5 and cannot establish cause.[18] See Carrier, 477 U.S. at 489, supra p. 31. The Court has held that Martinez does not establish cause for Petitioner's procedural default. (See ECF No. 192 at 31-32.) Carruthers has not established cause and prejudice and has not demonstrated that a miscarriage of justice would result from the Court's failure to address the claim. Claim 5 is, therefore, procedurally defaulted.

**2. Merits**

Respondent argues that the claim is also without merit. (ECF No. 114-1 at 7.) The Tennessee Court of Criminal Appeals stated:

> Consolidation of Indictments
>
> Appellant Carruthers claims the trial court erred by not requiring the state to elect upon which indictments it intended to proceed upon at trial. In March 1994, both appellants were originally indicted on three counts of first degree murder. Subsequently, in November 1995, both appellants were indicted on three counts of

---

[17] Carruthers argues that "[a]ny failure of counsel to present this issue to Tennessee's courts thus constitutes ineffective assistance." (ECF No. 129 at 250.) This section only addressed the right to effective counsel at trial and appeal.

[18] In the habeas petition, Carruthers made a broad allegation that appellate counsel were ineffective for "failure to raise on appeal any and all claims raised in this amended petition." (See ECF No. 21 at 130.) There was no specific allegation of ineffective assistance at any stage of the proceedings related to Claim 5.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 41

especially aggravated kidnapping and one count of especially aggravated robbery. All of these offenses arose from the same criminal episode and involved the same three victims. . . .

Carruthers contends that the murder indictments should have been dismissed. Because the state was not forced to elect between the two indictments, according to the appellant's argument, he "could not reasonably have known whether he was defending murder charges or charges of kidnapping and robbery." The appellant further claims that if the trial court had followed "normal procedure," he would have never been tried on the murder charges. The state disagrees and asserts that the appellant was properly tried on all charges.

Tenn. R. Crim. P. 8(a) (emphasis added) regarding mandatory joinder of offenses provides:

Two or more offenses <u>shall be joined</u> in the same indictment, presentment, or information, with each offense stated in a separate count, or <u>consolidated</u> pursuant to Rule 13 if the offenses are based upon the same conduct or arise from the same criminal episode and if such offenses are known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s) and if they are within the jurisdiction of a single court. A defendant shall not be subject to separate trials for multiple offenses falling within this subsection unless they are severed pursuant to Rule 14.

The Advisory Commission Comments to Rule 8 further provide, in pertinent part:

This rule is designed to encourage the disposition in a single trial of multiple offenses arising from the same conduct and from the same criminal episode, and should therefore promote efficiency and economy. Where such joinder of offenses might give rise to an injustice, Rule 14(b)(2) allows the trial court to relax the rule.

The Commission wishes to make clear that section (a) is meant to stop the practice by some prosecuting attorneys of "saving back" one or more charges arising from the same conduct or from the same criminal episode. Such other charges are barred from future prosecution if known to the appropriate prosecuting official at the time that the other prosecution is commenced, but deliberately not presented to a grand jury.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 42

Carruthers' argument ignores the basic premise behind the Rule. The purpose of Rule 8 is to promote efficient administration of justice and to protect the rights of the accused. The rule clearly permits a subsequently returned indictment to be joined with a previous indictment where the alleged offenses relate to the same criminal episode. See King v. State, 717 S.W.2d 306 (Tenn. Crim. App. 1986). This practice, however, does have certain limitations which, as the comments note, safeguard an accused against prosecutorial abuse. For example, a prosecutor cannot simply decide to "save" charges on other offenses arising out of the same conduct until after a trial is had on the original charges. Obviously, this would result in multiple trials and prejudice the defendant. This concern, however, is not present in the case at hand because the subsequent indictments were returned well before the start of trial.

Although there is no written trial court order consolidating the indictments in this case, not only was consolidation mandated by the rules, it was clearly understood by the court and all parties involved in this case. As soon as the 1995 indictments were returned, the appellants filed a motion to dismiss. After a hearing on December 19, 1995, the trial court denied the motion, and the matter proceeded on all charges. In fact, counsel admitted that they knew they were going to trial on the murder charges; they moved to dismiss the new charges. Carruthers' claim that he did not know what charges the state was prosecuting is wholly without merit. Not only did the appellant file a motion to dismiss the subsequent charges, which was denied, the style of the pleadings and orders filed in this case after the return of the 1995 indictments, including letters Carruthers wrote to his attorney, refer to both the 1994 and 1995 indictments. Moreover, jury selection had already started in early January 1996, when the state moved for a continuance. There certainly was no confusion as to charges being tried when a jury was again selected and trial finally began three months later in April 1996. All of the indictments were read to the jury at the beginning of the trial.

As this Court observed in King,

We do not perceive that any evil results from subsequent indictments being returned against a defendant charging him with additional offenses which are based on the same conduct or which arise from the same criminal episode upon which prior indictments have been returned; when the defendant has not been tried on any of the offenses at

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 43

> the time the subsequent indictments are returned. As previously noted, the purpose of Rule 8 is to prevent multiple trials on charges arising from the same conduct or from the same criminal episode except under the circumstances stated in the rule.
>
> 717 S.W.2d at 308. To follow the appellant's suggestion in this case would result in the non-prosecution of three murder charges. Surely this type of windfall was not contemplated by the drafters of the Rules. The appellant has simply failed to show how he was unprepared to defend on kidnapping and robbery charges that stemmed from the same criminal episode in which three individuals were killed.

Carruthers, 1999 WL 1530153, at *33-35.

Carruthers argues that in order for an indictment to be sufficient it must inform the defendant of the charges against which he must defend. (ECF No. 129 at 213, 250.) He asserts that he faced charges in two separate indictments without formal notice of which indictment he must defend against. (Id. at 214, 250.)

Carruthers was informed of the charges in both indictments. He does not argue that the Tennessee Court of Criminal Appeals' decision is contrary to or an unreasonable application of clearly established Supreme Court precedent or is based on an unreasonable determination of facts. In Pointer v. United States, 151 U.S. 396, 399-404 (1894), the Supreme Court held there is no error in refusing to compel an election between charges when it appears that they were so closely connected in respect of time, place, and occasion that it is difficult to separate the proof. In Johnson v. United States, 82 F.2d 500, 504 (6th Cir. 1936), the Sixth Circuit held that there was no error in consolidating indictments where the appellants were the only defendants in each indictment and the

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 44

charges were for acts or transactions that were connected. Further, the court did not err by not requiring the district attorney to elect the indictment that would be prosecuted. Id. "Appellee was not required to abandon either [indictment], and both might be tried at the same time unless some substantial right of appellants were prejudiced thereby." Id. The matter was in the court's discretion. Id. Carruthers's constitutional rights were not violated by the consolidation of these indictments. See Duckett v. McDonough, 701 F. Supp. 2d 1245, 1268 (M.D. Fla. Mar. 25, 2010) (denying ineffective-assistance-of-counsel claim related to counsel's stipulation to consolidation of charges of sexual battery and first-degree murder where they were committed by the same person in a single episode). Claim 5 is without merit. Summary judgment is GRANTED and Claim 5 is, therefore, DENIED.

**E. Competence to Stand Trial and Be Sentenced (Claim 6, Amended Petition ¶¶ 222-39)**

Carruthers alleges that when he was housed at the Shelby County Jail, he suffered unconstitutional living conditions, "giving rise to high levels of fear and anxiety for inmates, and even more so with respect to inmates who suffered from mental and emotional disorders." (ECF No. 21 at 55-56.) He alleges that on or around October 21, 1994, Larry Nance, then Carruthers's counsel, requested a psychological evaluation, which the trial court granted. (Id. at 57.) On December 16, 1994, Dr. John Hutson determined that Carruthers was competent to stand trial and that his "ability to appreciate the wrongfulness of his behavior and

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 45

conform his behavior" was not substantially impaired. (Id.) Around January 17, 1995, Carruthers's new counsel, Craig Morton, filed a motion for a second psychiatric evaluation, which the trial court denied. (Id. at 57-58.) Morton argued at the hearing that he did not have access to Hutson's entire report and the underlying records, and that without those records it was difficult "to make an argument as to why we feel" Carruthers should be re-evaluated. (Id. at 58.) Carruthers argues that

> Notwithstanding a record replete with descriptions by a series of Mr. Carruthers's appointed counsel of his unusual, abrasive and bizarre behavior, similar kinds of remarks and observations by the trial court, and a case file bourgeoning with Mr. Carruthers's letters to his counsel, the District Attorney, the trial court, the Tennessee Board of Professional Responsibility, and others that contained unusual matters, symbols, and observations, Mr. Carruthers was not examined by a psychologist or psychiatrist other than Dr. Hutson during the time between his arrest and the verdicts of the jury.

(ECF No. 21 at 58, ¶ 229.) He alleges that his counsel did not obtain a social history or obtain records that would have shown that he and several of his family members had a serious history of mental illness. (Id. at 59.) Further, he alleges that neuropsychological testing demonstrates that, at the time of his arrest, he suffered organic brain damage and that psychological and neuropsychological testing and Carruthers's social and medical history demonstrate that he suffered substantial mental illness. (Id.) Carruthers alleges that the effects of his mental illness and brain damage affected his ability to communicate and work with his lawyers, and the conditions in the Shelby County Jail aggravated his symptoms. (Id. at 60.) He asserts that these

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 46

adverse effects are reflected in a record full of complaints, comments, and evidence about his conduct and rendered him incompetent to stand trial. (Id. at 60-61.) He contends that his pre-trial counsel and the trial court failed in their duties based on the evidence before them and that, but for their failures, he would have been declared incompetent. (Id. at 61-62.)

**1. Procedural Default**

Respondent argues that the claim was not presented to Tennessee state courts for review and is procedurally defaulted. (ECF No. 114-1 at 9; ECF No. 160 at 2.) Carruthers argues that this claim should not be denied as defaulted because: (1) the substantive issues cannot be forfeited or defaulted; (2) there is an excuse for any default; and (3) there are genuine issues of material fact that are disputed. (ECF No. 129 at 114.) He acknowledges that the issue of his competence to stand trial was never presented in the Tennessee appellate courts. (Id. at 115, 165.)

Carruthers's competence became an issue in the post-conviction proceedings because his counsel filed a petition for a guardian ad litem when Carruthers instructed counsel that he did not want competency issues raised in the post-conviction proceedings even after his expert found that he was incompetent to stand trial. (Id. at 169-171; see also ECF No. 56-3 at PageID 9337-9339.) Carruthers testified unequivocally that he did not want his post-conviction counsel to raise his competency as an issue. (ECF No. 56-3 at PageID 9452.) Carruthers declined to waive the issue

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 47

of competency after several months of proceedings that involved the post-conviction court's appointment of a mental health expert, Carruthers's refusal to be evaluated, and the court's ultimate determination was that he was competent to waive the claim. (Id. at PageID 9548-51; ECF No. 56-4 at PageID 9578-81.) In its final order, the post-conviction court stated:

> The petitioner and his counsel in this proceeding have chosen purposely not to raise any issues regarding the petitioner's mental state, possible insanity defense, or competency to stand trial or waive counsel. The Court has previously held that the petitioner is competent to waive such claims in this proceeding and by purposely not raising them in this proceeding he has waived these claims.

(ECF No. 56-4 at PageID 9746-9747.)

**a. Forfeiture, Default, or Waiver of Right**

Carruthers argues that a substantive claim of incompetence to stand trial cannot be forfeited or defaulted. (ECF No. 129 at 116, 165.) He relies on Medina v. California, 505 U.S. 437, 448-49 (1992), for the proposition that "[t]he competence of the accused is so central to the foundation of our criminal justice system that if the defendant is incompetent, proceedings must be suspended." (Id. at 166.) He asserts that the right not to be tried when incompetent cannot be waived under Johnson v. Zerbst, 304 U.S. 458, 464 (1938), without first determining that there was knowing, voluntary, and intelligent relinquishment of the right and that there was no Zerbst hearing or inquiry about whether he made a knowing and voluntary waiver of his claims. (Id. at 167-68, 171.) He asserts that to the extent Respondent's summary-judgment Motion

is based on the state court's finding of waiver, summary judgment must be denied because the right not to be tried while incompetent cannot be waived. (Id. at 169.)

Carruthers cites Tenth and Eleventh Circuit cases to support his claim that a substantive competency claim cannot be procedurally defaulted. (ECF No. 129 at 166.) Respondent asserts that Carruthers's argument contradicts Sixth Circuit precedent in Ludwig v. United States, 162 F.3d 456, 458 (6th Cir. 1998), and Coleman v. United States, No. 98-3539, 1999 WL 685935, at *2-3 (6th Cir. Aug. 27, 1999) (per curiam). (ECF No. 149 at 8.) Respondent distinguishes cases stating that a competence-to-stand-trial claim cannot be waived from the instant situation involving procedural default. (Id.) He argues that "'allowing a petitioner to raise a competency claim for the first time in a federal habeas petition is contrary to the principles of comity, federalism and judicial economy that are essential to habeas corpus jurisprudence." (Id. (quoting Byrd v. Jones, No. 1:04-CV-785, 2008 WL 151243, at *8 (W.D. Mich. Jan. 14, 2008).)

There is no clearly established precedent on this issue. The Sixth Circuit has not established a per se rule that a substantive due process claim for mental incompetence is not subject to procedural default,[19] as some circuits have.[20] In Ludwig, the Sixth

[19] The Ninth Circuit has rejected the argument that mental incompetency claims can never be procedurally defaulted. Lee v. Schiro, No. CV 04-039-PHX-MHM, 2006 WL 2827162, *7 (D. Ariz. Sept. 25, 2006). A claim alleging actual incompetence to stand trial is subject to the same state procedural default rules as other claims. See Martinez-Villareal v. Lewis, 80 F.3d 1301, 1306-07 (9th Cir. 1996) (rejecting the argument that mental-incompetency claims can never (continued...)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 49

Circuit determined that a defendant's claim that he was not competent to enter a plea raised for the first time in a motion to vacate pursuant to 28 U.S.C. § 2255 was procedurally barred. 162 F.3d at 458; see also Coleman, 1999 WL 685935, at *2-3 (same); Hill v. Mitchell, No. 1:98-CV-452, 2006 WL 2807017, at *75 (S.D. Ohio Sept. 27, 2006) (rejecting the argument that a substantive claim of incompetence can never be procedurally defaulted); Franklin v. Bradshaw, 695 F.3d 439, 448-49 (6th Cir. 2012) (finding a competency claim to be procedurally defaulted). In Hodges v. Colson, 727 F.3d 517, 540 (6th Cir. 2013), the Sixth Circuit stated that "neither the Supreme Court nor this court" has adopted a rule that substantive competency claims cannot be procedurally defaulted, and declined to adopt such a rule.

**b. Ineffective Assistance of Post-Conviction Counsel**

---

[19] (...continued)
be procedurally defaulted and upholding the conclusion of the state court that petitioner's competency claim is procedurally defaulted); LaFlamme v. Hubbard, No. 97-16973, at *2 (9th Cir. June 9, 2000) ("Pate[v. Robinson, 383 U.S. 375, 384 (1966)] does not restrict the scope of the procedural default rule because the standards for evaluating the defenses of waiver and default are different."); see also Lyons v. Luebbers, 403 F.3d 585, 593 (8th Cir. 2005) ("[R]egardless of how incompetent Lyons . . . was, Lyons was represented during the state court proceedings, and Lyons's incompetence did not prevent his counsel from raising the competency issue.").

[20] The Tenth Circuit in Sena v. New Mexico State Prison, 109 F.3d 652, 654 (10th Cir. 1997), held that the failure to appeal in the state court a substantive claim that the petitioner was mentally incompetent at the time that he entered his guilty plea did not bar federal habeas review. The Eighth Circuit in Vogt v. United States, held, "'[T]he procedural default rule . . . does not operate to preclude a defendant who failed to request a competency hearing at trial or pursue a claim of incompetency on direct appeal from contesting his [or her] competency to stand trial and be sentenced through post-conviction proceedings." 88 F.3d 587, 590 (8th Cir. 1996) (alterations in original) (quoting Adams v. Wainwright, 764 F.2d 1356, 1359 (11th Cir. 1985)); see also Pate, 383 U.S. at 384 (noting that "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial.").

Carruthers argues ineffective assistance of post-conviction counsel as cause for the default of the competency claim. (ECF No. 129 at 176.) He contends that it is clear that he suffers from anosognosia and that he does not recognize and is not willing to accept that he suffers severe mental illness and brain damage. (Id. at 176-177.) He relies on Martinez to argue that ineffective assistance of post-conviction counsel constitutes cause and prejudice for procedural default. (Id. at 176.) Carruthers asserts multiple failures of post-conviction counsel that he contends constitute ineffective assistance. (Id. at 177-178.)

Respondent contends that Carruthers's argument that ineffective assistance of counsel is cause for the default is foreclosed because ineffective assistance related to this issue was not raised on post-conviction review, where no right to effective assistance attaches. (ECF No. 149 at 8.)

The Court has determined that Martinez does not excuse the procedural default of Carruthers's competency claim. (See ECF No. 192 at 8-9, 23-26, 28-29.) See Hodges, 727 F.3d at 540 (denying Martinez relief related to the procedural default of a substantive competency claim). Petitioner's argument that ineffective assistance of post-conviction counsel creates cause and prejudice for the procedural default of this claim fails.

**c. Miscarriage of Justice**

Carruthers argues that any procedural default of this claim must be excused under a miscarriage of justice exception. (ECF

No. 129 at 179.) He asserts that, given the complete inability to recognize how seriously ill he is, there is a serious question about whether he can be subjected to a capital sentencing hearing consistent with Eighth and Fourteenth Amendment principles, resulting in a trial "in form only." (Id. at 181.)

The miscarriage of justice exception is not tied to the determination of whether Carruthers had a fair trial but to whether he is actually innocent, see supra p. 26.[21] Carruthers has not made a showing of actual innocence. His argument that a miscarriage of justice excuses the procedural default of this claim fails.

Claim 6 is procedurally defaulted and summary judgment is GRANTED. Claim 6 is, therefore, DENIED.

### F. Ineffective Assistance of Pre-Trial Counsel (Claim 7, Amended Petition ¶¶ 240-66)

#### 1. Federal Habeas Allegations

In Carruthers's amended petition, he alleges that appointed counsel represented him for approximately twenty-two months prior to the trial court determining that Carruthers would represent himself at trial. (ECF No. 21 at 62, ¶ 241.) During that time, counsel purportedly failed to: (1) interview fact witnesses (id. at 62-65, ¶¶ 242-251); (2) interview mitigation witnesses (id. at

[21] If the Court were to conduct a merits review, the state trial court's determination that Carruthers was competent to stand trial is a finding of fact that is entitled to the presumption of correctness. Maggio v. Fulford, 462 U.S. 111, 117 (1983); Mackey v. Dutton, 217 F.3d 399, 412 (6th Cir. 2000). Carruthers was found competent to stand trial based on the evaluations of Dr. John Hutson in 1994 and Dr. Lynn Zager in 1995. (See ECF No. 132-3 at PageID 17716-17717.) Dr. Stephen A. Montgomery determined that Carruthers's ability to make a rational choice in the post-conviction proceeding was not substantially affected by his mental state. (ECF No. 56-3 at PageID 9567-9568.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 52

65-69, ¶¶ 252-254); and (3) obtain support services (id. at 69-73, ¶¶ 255-264). Carruthers contends that the failures of appointed counsel created "an environment in which the trial court ultimately ordered that Mr. Carruthers must represent himself at his capital murder trial," denying him his Sixth Amendment right to counsel and his rights under the Eighth and Fourteenth Amendments. (Id. at 73, ¶ 265.)

Carruthers alleges that his appointed counsel failed to interview any of the 125 potential witnesses identified by the State during the first seventeen months of trial preparation and had "created" only six pages of information from fact witnesses at the conclusion of their representation. (Id. at 62, ¶¶ 242, 245.) Carruthers contends that his appointed counsel would have learned:

- that a powerful drug distribution cartel killed the victims because Marcellos Anderson took a large quantity of cocaine and money (id. at 63, ¶ 246.1);
- of the false testimony of Charles Ray Smith, Jimmy Lee Maze, and Alfredo Shaw, and of deals that the prosecution made with these individuals in exchange for their testimony (id. at 63-64, ¶¶ 246.2-249.9); and
- that Nakeita Montgomery's mental health issues made her testimony unreliable (id. at 64, ¶ 250).

Carruthers alleges that his counsel failed to conduct pre-trial interviews of potential mitigation witnesses and obtain basic social history documents. (Id. at 65, ¶ 253.) He contends that this investigation would have revealed that he was born premature with breathing problems (¶ 253.1); his father was a crack addict and had an emotional disorder (¶¶ 253.2, 253.9.4); he had an uncle

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 53

who was a heroin addict and one who suffered from paranoid schizophrenia (¶¶ 253.3, 253.9.1); he had aunts who had been diagnosed with paranoid schizophrenia, schizo-affective disorder, and bipolar effective illness (¶¶ 253.4, 253.9.2, 253.9.3); he suffered multiples injuries that could have caused brain damage (¶ 253.5); his sister attempted suicide (¶ 253.6); his mother suffered a nervous breakdown (¶ 253.7); he was admitted to a mental hospital for psychiatric observation and diagnosed with depression and adjustment disorder (¶ 253.8); his family lived in a housing project and had at times been on welfare (¶ 253.11); he had difficulties at school and with a transitory upbringing (¶ 253.14); Carruthers's drug and pill usage and cuts and scars on his body were reported to the juvenile courts (¶ 253.16); he had been shot (¶ 253.17); and he bit a hole in the seat of a police cruiser (¶ 253.18). Carruthers alleges that this information would have revealed symptoms of organic brain damage, bipolar disorder type II, schizo-affective disorder, and the failure to diagnose Carruthers because of poverty, racial stereotyping, and bias. (Id. at 69, ¶¶ 253.23-253.26.)

Carruthers alleges that his counsel failed to obtain support services from an independent forensic pathologist to determine whether the victims were alive when they were placed in the grave and the location where the victims were killed. (Id. at 69, ¶¶ 255-56.) Carruthers asserts that, if his appointed counsel had obtained the appropriate support services, he may not have been sentenced to death. (Id. at 69-70, ¶¶ 256-57.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 54

Carruthers alleges that had counsel obtained an independent forensic DNA testing expert to evaluate evidence taken from the crime scene, they would have learned that he was not involved in the victims' deaths. (Id. at 70-71, ¶¶ 258-259.)

Carruthers alleges that had counsel secured the services of an independent mental health professional and/or mitigation specialist to determine his competence to stand trial and to represent himself or any mental disease or defect that he suffered, the trial court would have found him incompetent to stand trial and to represent himself. (Id. at 71-72, ¶¶ 261-263.) He alleges that these expert services would have mitigated the punishment the sentencing jury would impose. (Id. at 72-73, ¶ 264.) Carruthers alleges that the failures of counsel resulted in an environment in which the trial court ultimately ordered him to represent himself. (Id. at 73, ¶ 265.)

### 2. Relevant Post-Conviction Allegations

In Ground One of Carruthers's post-conviction petition, he alleged ineffective assistance of pre-trial counsel Larry Nance, Craig Morton, Coleman Garrett, Glenn Wright, William Massey, and Harry Sayles based on the theory that counsel failed to interview fact and mitigation witnesses and obtain support services.[22] (ECF No. 56-2 at PageID 9206-9207.) Carruthers alleged that Nance met only once with Carruthers's family, was not actively engaged in his

[22] The allegations in the habeas petition are not the same allegations raised on post-conviction. The Court will only address ineffective-assistance claims in this Order to the extent it deems those claims exhausted in the state court.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 55

case, and that, had Nance performed his duties, Carruthers would have been able to provide valuable investigative assistance including the names of witnesses who would support the defense and provided mitigation evidence and assistance related to gathering records relevant to the mitigation case. (Id. at PageID 9207-9208.) Carruthers alleged that Nance failed to adequately prepare by failing to locate and interview all relevant witnesses, including Adolpho James, Bobbi Dickerson, a list of 125 potential witnesses, and especially, potential witnesses Jimmy Maze, Chris Hines, Alfredo Bernard Shaw, Andre Johnson, Reginald Burke, Terrell Adair,[23] Charles Ray Smith, Richard Roleson, Nakeita Montgomery, Keith Brooks, Benton West, and Dr. O.C. Smith. (Id. at PageID 9208.) Carruthers alleged that Nance failed to employ an investigator or investigate the facts surrounding the crimes. (Id. at PageID 9208-9209.)

Carruthers alleged that Nance failed to request necessary expert assistance to review and assist in matters of forensic science and counter the testimony of Dr. O.C. Smith that the victims were buried alive. (Id. at PageID 9209.) Carruthers alleged that Nance failed to obtain the services of a psychologist despite being granted authorization to do so. (Id.) Carruthers further alleged that had Nance obtained a psychologist and obtained evaluations, he could have appropriately explored the possibility that Carruthers's inappropriate conduct in his relationship with

[23] The name is incorrectly listed as "Adair Terrell" in the post-conviction petition. (See ECF No. 56-2 at PageID 9208.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 56

counsel was the result of a mental defect, mental illness, or cognitive defect. (Id. at PageID 9209-9210.) Carruthers asserts that Nance's failure to investigate the psychological and/or psychiatric basis of Carruthers's irrational behavior constituted ineffective assistance. (Id. at PageID 9210.) Carruthers also argued that Nance should have sought funds for experts services related to "the deleterious effects of growing up in urban Memphis" and for a ballistics expert. (Id.) He alleged that Nance failed to file adequate pre-trial motions to obtain adequate investigative services, a jury selection expert, a forensic pathologist, forensic DNA evidence experts, and mental health experts. (Id. at PageID 9210-9211.) Carruthers alleged that Nance failed to do the necessary investigation to develop and pursue a comprehensive mitigation strategy for sentencing. (Id. at PageID 9212.)

Carruthers made similar allegations that Morton failed to investigate, gather records relevant to mitigation, locate and interview witnesses, and obtain appropriate mental health and other experts. (Id. at PageID 9214-9220.) Carruthers made similar allegations against Garrett (id. at PageID 9220-9227); Sayles (id. at PageID 9228-9234); and Massey (id. at PageID 9234-9240). Carruthers alleged that Wright did not produce any work product and also alleged that "each and every deficiency alleged against Craig Morton, III, Esq., and Coleman Garrett, Esq., applies equally to" Wright. (Id. at PageID 9227-9228.)

**3. Procedural Default**

The Court determined that Martinez did not establish cause and

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 57

prejudice for the procedural default of the allegations in ¶¶ 241, 243, 244, 246.2-246.3, 247-48, 249, 251-54, 256, 258, 261-63, and 265 in Claim 7 of the Amended Petition and determined that those allegations are not substantial. (See ECF No. 192 at 12-27.)

### 4. The Tennessee Court of Criminal Appeals' Decision

On appeal of the denial of post-conviction relief, the Tennessee Court of Criminal Appeals stated:

> 2. Ineffective Assistance of Pretrial Counsel
>
> The petitioner contends that the various attorneys who represented him prior to trial collectively rendered ineffective assistance due to their alleged failure to conduct any meaningful factual investigation or otherwise prepare for trial. He asserts that such deficiencies constituted the constructive complete denial of counsel at a critical stage in the proceeding, sufficient to justify a presumption of prejudice under the standard announced in United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). In the alternative, he asserts that pretrial counsel's failure to conduct an investigation or otherwise prepare for trial resulted in actual, demonstrable prejudice under the more familiar Strickland standard. Specifically, he contends that it was pretrial counsel's failure to conduct any meaningful investigation and preparation that directly led to his "involuntary self-representation, with the disastrous results that the [Tennessee] Supreme Court catalogued in its decision on direct appeal."
>
> The State responds by arguing that the petitioner's forfeiture of the right to counsel by his egregious and outrageous conduct necessarily included the forfeiture of his right to effective assistance of counsel. The State acknowledges our supreme court's direct appeal opinion footnote in which it commented that the petitioner retained the right to raise an ineffective assistance claim with respect to any stage of the proceedings where he was represented by counsel. The State contends, however, that under the circumstances of this case, where the petitioner forfeited the right to counsel some four months prior to trial, "it is not possible to gauge the effect of the actions of the various counsel who represented [the petitioner] at the pre-trial stage against the outcome of the proceedings." The State

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 58

further argues that this case does not fall within any of the narrow situations in which prejudice may be presumed.

a. Presumed Prejudice

The petitioner first contends that pretrial counsel's failure to conduct any meaningful preparation or investigation meant that he effectively had no counsel during the critical, investigatory pretrial phase of the proceedings. As such, he argues that his case is one in which prejudice may properly be presumed under Cronic, without the necessity of conducting an inquiry into counsel's actual performance or the effect it had on the trial. We respectfully disagree.

In Cronic, the United States Supreme Court identified three scenarios involving the right to counsel where the circumstances are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658, 104 S. Ct. at 2046 (footnote omitted). In these circumstances, a presumption of prejudice is justified without the necessity of inquiring into counsel's actual performance at trial. Id. at 662, 104 S. Ct. at 2048. These scenarios are: (1) situations involving "the complete denial of counsel," where the accused is denied the presence of counsel at "a critical stage" in the proceeding; (2) situations where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing;" and (3) situations where "counsel is available to assist the accused during trial, [but] the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." Id. at 659-60, 104 S. Ct. at 2047.

The petitioner asserts that pretrial counsel's billing records and testimony reflect that they "did nothing of substance during their respective tenures on the case, apart from routine motion practice, court appearances, obtaining discovery, limited conferences with Petitioner, and interviewing one major prosecution witness, Nakeita Shaw." The record, however, reflects that pretrial counsel actively and diligently worked on the case during their tenures, often in the face of abusive, uncooperative, and threatening behavior on the part of the petitioner. As revealed in both the evidentiary hearing testimony and in our supreme court's direct appeal opinion summary of counsel's representation, pretrial counsel, among other things, met regularly with

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 59

the petitioner, appeared at numerous pretrial report hearings, reviewed discovery, filed and argued numerous substantive pretrial motions, and interviewed a number of potential witnesses. The petitioner may not have been satisfied with the schedule in which pretrial counsel conducted their investigation, but this was by no means a case in which he suffered the complete denial of counsel during a critical stage of the proceeding. Cf. Powell v. Alabama, 287 U.S. 45, 57, 53 S. Ct. 55, 60, 77 L. Ed. 158 (1932) (presuming prejudice based on fact that counsel was not appointed until the morning of trial); Mitchell v. Mason, 325 F.3d 732, 742-44 (6th Cir. 2003) (concluding that the petitioner was constructively denied counsel when counsel only met with him for a total of six minutes and was suspended from practice of law for last month of seven-month pretrial period). Accordingly, we, like the post-conviction court, will review the petitioner's allegations of ineffective assistance of counsel under the familiar Strickland standard, which requires the petitioner to show both a deficiency in counsel's performance and actual prejudice resulting to his case.

b. Failure to Investigate and Prepare Led to Petitioner's Compelled Self-Representation

In the alternative, the petitioner contends that his various pretrial counsel collectively rendered ineffective assistance under the standards of Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975), and Strickland, 466 U.S. at 686, 104 S. Ct. at 2063-64, in that their failure to conduct any meaningful factual investigation, particularly in the face of a list of 125 potential witnesses, led directly to his "disastrous" and compelled self-representation. The petitioner asserts that there was "nothing remotely resembling pretrial investigation . . . before Mr. Billings' entry into the case on January 16, 1996, eight days after [the trial court] had ordered Petitioner to defend himself pro se." We, again, respectfully disagree.

The post-conviction court made the following findings of fact and conclusions of law with respect to the petitioner's ineffective assistance of pretrial counsel claim:

> The Court rejects the petitioner's claim that he is entitled to relief for the failures of his series of appointed counsel.
>
> . . . .

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 60

In the Supreme Court of Tennessee decision in this case[,] the court chronicled the succession of lawyers that represented the petitioner prior to his trial in Memphis. . . . This Court heard the testimony of all these lawyers and their efforts to investigate the case and their relationship with the petitioner. There is no doubt that for all of them their efforts and ability to investigate the case were seriously distracted by the petitioner's behavior. . . .

The deficiency in the petitioner's claim is that there was no evidence presented from witnesses to support the contention that the petitioner was prejudiced. In other words, if there were witnesses not found because of a faulty investigation, the court did not hear from those witnesses. . . . [T]he claim of ineffective assistance of counsel prior to trial must fail for failure to prove prejudice.

The one possible exception to the above is the testimony of Mr. Bille as to the DNA evidence. Here, it appears that the petitioner's theory is that competent counsel would have hired a DNA expert and that this testimony would have been helpful to the petitioner at trial. The testimony of Mr. Bille indicated that there was a blanket-like cloth taken from the grave site, and that on this blanket-like cloth blood was found that did not belong to any of the three (3) victims and did not belong to any of the three (3) defendants. The petitioner asserts that this proof is important and that it is exculpatory and possibly could have [a]ffected the results of the trial. The Court disagrees.

The testimony of Mr. Bille and the DNA results are only very minimally helpful to the petitioner. In no way does this evidence negate all other proof in the case and it is rank speculation to assume that this indicates that a third party might have committed this crime. There is no proof as to the age of the blood, or any explanation of how the blood got on the piece of cloth. This evidence does not carry the prejudice prong of the Strickland test.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 61

The record supports the findings and conclusions of the post-conviction court. As noted by the post-conviction court, our supreme court detailed the succession of lawyers who were appointed to represent the petitioner, as well as the major actions each undertook in preparation for the case. The court also chronicled the obstacles that counsel faced in their attempts to investigate and prepare for trial, which took the form of unfounded accusations and personal attacks against counsel and direct and indirect threats against counsel and counsel's family and employees. Furthermore, while not precluding the petitioner from raising an ineffective assistance of counsel claim in the post-conviction setting, our supreme court concluded that the trial record did not support the petitioner's claim that he was forced to represent himself because his appointed counsel were incompetent:

> [The petitioner] also claims that he was denied due process because he was forced to choose between incompetent counsel and no counsel at all, and he asserts that the trial judge should have held a hearing to determine the validity of his complaints about his attorneys.
>
> We disagree. There is simply no evidence indicating that any one of the many attorneys appointed to represent [the petitioner] was ineffective. In fact, the record fully supports the trial court's repeated findings that the attorneys were qualified, competent, and highly skilled trial lawyers. The record demonstrates that the trial court closely supervised the case, inquired about defense counsel's progress, allowed [the petitioner] to voice his concerns about counsel, and conscientiously reviewed and considered letters from [the petitioner] containing allegations about his attorneys. Based upon this information, the trial court repeatedly found the attorneys representing [the petitioner] to be competent. Most of [the petitioner's] complaints about his attorneys were outrageous personal attacks that had little or nothing to do with legal representation. Indeed, these allegations were so outrageous that the letters were sealed at trial and remain a sealed exhibit to the record on appeal. Although we have reviewed the letters, it is not necessary to

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 62

> reveal the specific nature of the offensive and unfounded allegations. Suffice it to say that, given the nature of the allegations and the trial court's close and careful supervision of the case, a formal hearing to determine counsel's competency was not necessary.

Carruthers, 35 S.W.3d at 550-51 (footnotes omitted).

The evidence at the post-conviction evidentiary hearing, likewise, fails to show that pretrial counsel were deficient in their investigation or trial preparation or that any alleged deficiencies led to the petitioner's self-representation. Larry Nance and his co-counsel, Craig Morton, filed numerous pretrial motions on the petitioner's behalf, including motions for discovery, for investigative services, for a mental examination, to exclude evidence, for individual voir dire, for impeachment evidence, for a competency evaluation of prosecution witnesses, for another mental evaluation of the petitioner, to dismiss the indictments, to suppress the statements of codefendant Jonathan Montgomery, for a severance, for expert services, and for a notice of an alibi defense. Nance estimated that he met with the petitioner at least a dozen times during the six months of his representation and confirmed that his billing records reflected he had spent approximately 60.15 hours on the case prior to Morton's appointment and 18.9 hours after Morton's appointment. He said that the State did not provide discovery, which included over 100 potential witnesses, until approximately two months before his withdrawal from the case. Nonetheless, during that limited time he was able to locate and interview several witnesses. He also communicated with the co-defendant's counsel and spoke with the petitioner's family. Morton testified that he spent 213 hours working on the case, during which time he, among other things, interviewed several witnesses and talked at length with the petitioner and his family.

Coleman Garrett, who was appointed as lead counsel when Nance was relieved of representation, testified that he spent 97.5 out-of-court hours and 28.5 in-court hours on the petitioner's case. He said he had numerous meetings with the petitioner and issued several subpoenas, including one to the chief jailer. However, he, like previous counsel, soon became the target of the petitioner's unfounded attacks and accusations, making his work extremely difficult. Garrett testified that it was "somewhat impossible to prepare for this case because

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 63

of lack of cooperation, because of communication problems, because of team members' attitudes about whether they wanted to continue on the case, and it was a difficult situation." However, he said that had he stayed on the case, he "certainly would have put together any necessary experts, retained necessary experts, would have prepared for mitigation in this situation, and would have been prepared to put forth the best defense that [they] could put together on [the petitioner's] behalf notwithstanding the fact that this was a very difficult situation to deal with."

William Massey, who, along with Harry Sayle, was next appointed to represent the petitioner, testified that he worked approximately 125 hours on the petitioner's case. Among other things, he and Sayle reviewed expert and police reports, interviewed a number of witnesses, met with the petitioner to discuss expert witnesses, requested and received additional funds for investigative services, requested a ballistics and a mitigation expert, and filed numerous pretrial motions. He said they also worked extensively with Montgomery's counsel and investigator, who shared information with them. Sayle testified that the petitioner would not listen to anything he and Massey had to say and appeared to request joint meetings with Montgomery and Montgomery's lawyers simply so that he and Montgomery could get together and talk. Like the petitioner's other counsel, Sayle described abusive and threatening behavior by the petitioner directed toward counsel and counsel's families.

The petitioner contends that the prejudice he suffered from pretrial counsel's alleged deficiencies in investigation and pretrial preparation was his "forced" self-representation. However, it is abundantly clear from the record that the petitioner's compelled self-representation resulted from his own misbehavior and nothing else. All of the counsel appointed to represent the petitioner were competent and experienced trial attorneys who were taking the appropriate steps in their preparation of the case at the time they were relieved from representation. Moreover, the petitioner did not produce any witnesses or evidence that pretrial counsel failed to investigate or uncover that would have altered the outcome of the trial. In this respect, we agree with the trial court that the DNA results of the piece of white cloth, obtained by Todd Bille, were inconclusive and would not have changed the outcome of the trial. In sum, the petitioner has failed to establish that, but for any deficiency on the part of pretrial counsel, the

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 64

> result of the proceedings would have been different or that he would have received a sentence other than death. We conclude, therefore, that the petitioner is not entitled to relief on the basis of this claim.

Carruthers, 2007 WL 4355481, at *36-40 (alterations in original).[24]

**5. The Legal Standard**

A claim that ineffective assistance of counsel has deprived a habeas petitioner of his Sixth Amendment right to counsel is controlled by the standards stated in Strickland v. Washington, 466 U.S. 668 (1984). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. [Strickland, 466 U.S.] at 689, 104 S. Ct. 2052. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' Id., at 687, 104 S. Ct. 2052." Harrington v. Richter, 131 S. Ct. 770, 787 (2011).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

[24] On direct appeal, the Tennessee Supreme Court stated that Carruthers forfeited or waived the right to the effective assistance of counsel. See Carruthers, 35 S.W.3d at 549-51.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 65

Strickland, 466 U.S. at 694.[25] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' [Strickland, 466 U.S.] at 693, 104 S. Ct. 2052. Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' Id., at 687, 104 S. Ct. 2052." Richter, 131 S. Ct. at 787-88; see also id. at 791-72 ("In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . The likelihood of a different result must be substantial, not just conceivable.") citations omitted); Wong v. Belmontes, 558 U.S. 15, 27 (2009) (per curiam) ("But Strickland does not require the State to 'rule out' [a more favorable outcome] to prevail. Rather, Strickland places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

"Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve.

---

[25] "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant . . . ." Strickland, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. Id.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 66

> Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.

Richter, 131 S. Ct. at 788 (citations omitted).

When an ineffective-assistance claim is reviewed under § 2254(d), the review is "doubly deferential." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Richter, 131 S. Ct. at 788 (citations omitted).

**a. Clear and Convincing Evidence**

Carruthers asserts that, pursuant to the Tennessee Post-Conviction Procedures Act, Tenn. Code Ann. § 40-30-110(f), the state courts required Petitioner to establish facts in support his ineffective-assistance-of-counsel claims by clear and convincing evidence. (ECF No. 129 at 212.) He contends that the state court post-conviction standard requires him to show "that there was no serious or substantial doubt that counsel performed deficiently and

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 67

that performance prejudiced him." (Id.) He argues that the state court's "clear and convincing" evidence standard is contrary to clearly established federal law. (Id.) He relies on Walker v. Johnston, 312 U.S. 275, 286 (1941), to argue that clearly established federal law "recognizes post-conviction facts as established when a preponderance of evidence supports them." (Id.)

Respondent contends that the State's clear and convincing evidence standard as to the threshold required for establishing factual issues has previously been found constitutionally permissible. (ECF No. 149 at 15.)[26] See Howell v. Hodge, No. 2:06-CV-108, 2010 WL 1252201, at *13-14 (E.D. Tenn. Mar. 24, 2010) (finding that the claim was adjudicated under the appropriate legal standard despite the petitioner's arguments about the post-conviction standard that factual allegations be proven by clear and convincing evidence).

The standards Carruthers references apply in two very different circumstances. Tennessee's "clear and convincing evidence" standard applies to proof of factual allegations contained in a post-conviction petition, not to legal determinations. See Tenn. Code Ann. § 40-30-110(f); see Howell, 2010 WL 1252201, at *13. In Walker, 312 U.S. at 287, the Supreme Court refers to a standard of proof to establish facts by a

[26] Respondent argues that Carruthers did not allege this argument in his petition, and it is not properly before the Court on summary judgment. (ECF No. 149 at 15.) Any § 2254 petition addresses whether a standard contrary to or an unreasonable application of Supreme Court precedent was applied in the state court. Therefore, the Court will address that argument in the context of § 2254(d)(1).

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 68

preponderance of the evidence at a hearing in a federal habeas case. Carruthers's exhausted ineffective-assistance-of-counsel claims do not, as in Walker, present the necessity for an evidentiary hearing, and this Court must look to whether the state court's analysis of Carruthers's ineffective-assistance-of-counsel claim is contrary to the Supreme Court precedent in Strickland.

On appeal of the denial of post-conviction relief, the Tennessee Court of Criminal Appeals set forth its standard of review for post-conviction relief:

> The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. [Tenn. Code Ann.] § 40-30-110(f) (2006). . . . The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact.

Carruthers, 2007 WL 4355481, at *34. The court then correctly stated the standard in Strickland, noting that the same standard that applied in federal cases applies in Tennessee. Id. at *35. The Tennessee Court of Criminal Appeals' reference to the post-conviction standard for factual allegations does not equate to the court's decision being contrary to Supreme Court precedent. See Howell, 2010 WL 1252201, at *13-14 (reference to the "clear and convincing evidence" standard for factual allegations in post-conviction hearings is not contrary to the standard of whether there is a reasonable probability that the outcome would be different); see also Hughes v. Carlton, No. 3:05-0120, 2005 WL 3338726, at *4 (M.D. Tenn. Dec. 8, 2005) (the state court used the correct standard under federal law despite reference to "clear and

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 69

convincing" standard for post-conviction factual findings). Carruthers's argument that the state court used a standard contrary to clearly established Supreme Court precedent fails.

**b. Different Outcome or Prejudice Standard**

Carruthers argues that the court "misapplied" Strickland by requiring proof that the result would have been "different" instead of requiring petitioner "to show a reasonable probability 'sufficient to undermine confidence in the outcome.'" (ECF No. 129 at 215.) He focuses on the following language:

> In sum, the petitioner has failed to establish that, but for any deficiency on the part of pretrial counsel, the result of the proceedings would have been different or that he would have received a sentence other than death.

(Id.); Carruthers, 2007 WL 4355481, at *40. Carruthers asserts that Strickland does not require the petitioner to show that the outcome would have been different. (Id.)

Respondent argues that Carruthers failed to mention that the Tennessee Court of Criminal Appeals set forth the proper Strickland standard for prejudice, and the court's failure to include the words "reasonable probability" in the summation of its analysis does not establish the application of the wrong standard. (ECF No. 149 at 15-16.) See Carruthers, 2007 WL 44355481, at *36 (the petitioner must show that there is a reasonable probability that, absent counsel's errors, the sentencer would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death). Respondent contends that the context of the opinion demonstrates that Carruthers did not meet the reasonable

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 70

probability standard, noting that the evidence did not "carry the prejudice prong of the Strickland test," id. at *38, and making the stronger finding that the result would have been the same notwithstanding the one omission (evidence related to Bille) on which Carruthers presented additional post-conviction evidence. (Id. at 16.) Respondent notes that even Bille's evidence would not have changed the outcome of the case. (Id.) See Carruthers, 2007 WL 4355481, at *40 ("[W]e agree with the trial court that the DNA results of the piece of white cloth, obtained by Todd Bille, were inconclusive and would not have changed the outcome of the trial.").

Respondent argues that the court did not force Carruthers to show that the result would be different, but stated that the result most definitely would not have been different. (Id.) Respondent argues that,

> In light of the court's multiple prior recitations of the appropriate Strickland standard, and the directive that state court's be given any benefit of the doubt, plus the court's reference to the post-conviction court opinion applying that standard, a statement that the petitioner's proffered evidence would not have changed the trial result does not constitute the use of a standard contrary to clearly established law.

(Id. (citation omitted).) He further asserts that the court's prejudice determination is mooted by the fact that the court did not find deficient performance. (Id. at 17.)

In Vasquez v. Bradshaw, 345 F. App'x 104, 110-12 (6th Cir. 2009), the Sixth Circuit stated that the Ohio Court of Appeals' denial of an ineffective-assistance claim because the petitioner

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 71

did not show that the outcome of the proceeding "would have been different" is not a "casual error." "A 'reasonable probability' of difference does not mean 'would have been different.'" Id. at 111. The Sixth Circuit found that the state court's decision was a "paradigmatic example of an application of law 'contrary to clearly established federal law' that deserves no deference under [§ 2254(d)]." Id. at 112. The court further elaborated:

> Different standards make for different outcomes. Even where a state court explicitly delineated the Strickland test, its decision is contrary to federal law where the court applied an incorrect burden of proof. Indeed, our court has already held that a state's court use of a "would have compelled acquittal" formulation is "contrary to" federal law. While the appellate court did say "reasonable probability" once, the use of the incorrect words cannot be regarded as anodyne shorthand because they actually describe and apply a different standard. The court of appeals emphasized the inability to meet the prejudice prong, underscoring whether the trial "would have been different," and expressly adopted the erroneous legal reasoning of the court below. Accordingly, we hold that the Ohio courts applied law that was contrary to clearly established federal law and we are therefore unconstrained by § 2254(d)(1) . . . and de novo review is appropriate.

Id. (citations and some internal quotation marks omitted).

The Tennessee Court of Criminal Appeals twice stated the correct legal standard for prejudice from Strickland, and specifically defined "reasonable probability" as it relates to the prejudice prong:

> The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.
>
> . . . .

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 72

> "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland." State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991); see also Chambers v. Armontrout, 907 F.2d 825, 832 (8th Cir. 1990). When challenging the imposition of a sentence of death, the petitioner must show that "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.'" Henley, 960 S.W.2d at 579-80 (quoting Strickland, 466 U.S. at 695, 104 S. Ct. at 2069).

Carruthers, 2007 WL 4355481, at *35-36.[27] Given that the court articulated the correct standard and stated that Carruthers had not satisfied the prejudice prong, the omission of "reasonable probability" in summation of the claim does not demonstrate that the court applied a standard contrary to Strickland. See Holland v. Jackson, 542 U.S. 649, 654-55 (2004) (per curiam) (reversing the Sixth Circuit's determination that the state court acted contrary to federal law by requiring proof of prejudice by a preponderance of the evidence rather than by a reasonable probability, noting it is required that "state-court decisions be given the benefit of the doubt" and that "[r]eadiness to attribute error is inconsistent with the presumption that state courts know and follow the law."); Woodford v. Visciotti, 537 U.S. 19, 23-24 (2002) (per curiam) (ruling that the state court's "occasional shorthand reference" to the Strickland prejudice standard was not a "repudiation of the standard"); see also Gosnell v. Hodge, No. 2:07-CV-130, 2010 WL 3521748, at *5 (E.D. Tenn. Sept. 7, 2010) ("In light of Supreme

[27] The court restated the prejudice prong of Strickland when addressing ineffective assistance of appellate counsel. Carruthers, 2007 WL 4355481, at *41.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 73

Court precedent . . . , this Court does not find that the state court repudiated the governing rule in Strickland by its omission of the words 'reasonable probability' from its recitation of the prejudice test . . . .").

Even if it were determined that the Tennessee Court of Criminal Appeals' determination was contrary to Strickland, Carruthers is only entitled to de novo review. See Vasquez, 345 F. App'x at 112. Even under de novo review, because Carruthers "did not produce any witnesses or evidence" and the DNA results that were produced were inconclusive, Carruthers cannot demonstrate that there is a reasonable probability that the outcome of the trial would have been different. See Carruthers, 2007 WL 4355481, at *40; see also Lindsey v. Parker, No. 2:10-CV-193, 2013 WL 3834005, at *8 (E.D. Tenn. July 23, 2013) ("[E]ven under de novo review, Lindsey cannot show that he was given ineffective assistance of trial counsel" where "Lindsey did not adduce any evidence in state court to support his allegations").

**c. Deficient Performance**

Carruthers argues that, after setting aside those facts that Judge Dailey "manufactured"[28], the facts that were announced on the record demonstrate that pretrial counsel did not retain a mitigation specialist, did not obtain a mental evaluation, conducted no guilt phase investigation until shortly before trial, conducted no investigation of Carruthers's education, juvenile or

[28] Carruthers asserts that Dailey "fabricated and embellished" facts, including "The Legend of Larry Nance" and "The Ghost of Jonathan Montgomery." (ECF No. 129 at 96-101.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 74

medical history, prepared no social history, and conducted no mitigation investigation. (ECF No. 129 at 215-216.)[29] Carruthers argues that the Tennessee Court of Criminal Appeals' commendation of his pretrial attorneys is contrary to or an unreasonable application of Wiggins v. Smith, 539 U.S. 510, 521 (2003), and Rompilla v. Beard, 545 U.S. 374, 387 (2005). (Id. at 216.) Carruthers contends that the court misread the record and misapplied the law. (Id.) He argues that there are genuine issues of material fact in dispute and submits additional evidence to support his claim, including the declaration of Russell Stetler, the National Mitigation Coordinator for federal death penalty projects (ECF No. 130-7). (ECF No. 129 at 216.)[30]

At the post-conviction hearing, Larry Nance, Craig Morton,

[29] Carruthers's argument in the state court did not specifically address his social history, a mitigation specialist, mitigation investigation, or obtaining a mental evaluation, see supra pp. 51-53. Respondent argues that these claims are procedurally defaulted. (See ECF No. 149 at 10.)

[30] Carruthers does not specify what material facts are in dispute. He only presents the 110-page exhibit, which includes the declaration of Stetler. (See ECF No. 130-7.) Stetler's review of information provided by Carruthers resulted in a conclusion that:

> (1) None of Mr. Carruthers's trial counsel established a relationship of trust or invested sufficient time to build effective rapport. (2) His various trial counsel failed to investigate his case, despite constant prodding from both Mr. Carruthers and the trial court. (3) His various trial counsel failed to engage the services of a mitigation specialist, despite prodding from the court. (4) His various trial counsel failed to investigate his potential mitigation, including his mental infirmities. (5) His various trial counsel failed to engage the services of any mental health professional who might have provided insight into his behaviors and symptoms. (6) Mr. Carruthers repeatedly presented with behaviors that should have been recognized as symptoms of mental disorders. Ultimately, none of Mr. Carruthers's trial counsel took any steps to protect him from the unprecedented harm of being compelled to represent himself in a death penalty trial.

(ECF No. 130-7 at 40-41, ¶ 60; see also id. at 41-66 (Stetler's analysis of what mitigation might have revealed).)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 75

Glenn Wright, Coleman Garrett, William Massey, and Harry Sayle testified. Carruthers, 2007 WL 4355481, at *26, 28-30, 32. Nance filed pretrial motions for discovery, investigative services, mental evaluations, and for expert services. Id. at *39. Garrett would have retained experts, developed a defense theory, and a mitigation case had he remained on the case. Id. at *40. Massey and Sayle requested and received funds for investigative, mitigation, and expert services. Id.

The Tennessee Court of Criminal Appeals looked at counsel's overall performance during the representation to determine whether their performance was deficient and noted that pretrial counsel "actively and diligently worked on the case during their tenures, often in the face of abusive, uncooperative, and threatening behavior on the part of the petitioner." Id. at *37. Counsel "met regularly with the petitioner, appeared at numerous pretrial report hearings, reviewed discovery, filed and argued numerous substantive pretrial motions, and interviewed a number of potential witnesses." Id. The court determined that "[a]ll of the counsel appointed to represent the petitioner were competent and experienced trial attorneys who were taking the appropriate steps in their preparation of the case at the time they were relieved from representation." Id. at *40.

To the extent Carruthers argues that the Tennessee Court of Criminal Appeals "misread" the record, the state court's factual findings are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 76

28 U.S.C. § 2254(e)(1). (See ECF No. 129 at 216.) Carruthers has not met his burden and the Court cannot conclude that the state court's factual determinations were incorrect.

The court did not penalize counsel for what they were not able to complete because of the termination of representation. Carruthers was required to represent himself beginning January 8, 1996. (See ECF No. 55-5 at PageID 3627.) Trial began on April 18, 1996. Although Carruthers may not have been satisfied with the timing of counsel's investigation and trial preparation, the record does not demonstrate that counsel's performance was deficient or that Carruthers was prejudiced. Stetler's declaration is barred from consideration by Pinholster because this claim was exhausted in the state court. Carruthers has not demonstrated that the Tennessee Court of Criminal Appeals' determination was contrary to or an unreasonable application of clearly established Supreme Court precedent or based on an unreasonable determination of facts.

Carruthers's exhausted ineffective-assistance-of-trial-counsel allegations in Claim 7 are without merit. The allegations in Claim 7 are either procedurally defaulted and/or without merit and, therefore, DENIED.

**G. Forced Self Representation (Claim 8, Amended Petition ¶¶ 267-93)**

Carruthers alleges that the trial court and appointed counsel held in camera and ex parte meetings about him, and the court considered information discussed in these meetings when it ruled on the record with respect to his right to be represented by competent

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 77

counsel. (ECF No. 21 at 73-74.) Carruthers contends that his counsel took positions adverse to his interest without his views being heard. (Id. at 74.) He asserts that there were planning sessions about security measures in which he was not involved, and no record of these sessions was made. (Id.) He notes the circumstances surrounding Massey's withdrawal, and the fact that despite having the district attorney's witness list of 125 people, the investigative report only addressed six people. (Id. at 74-77.) Carruthers contends that,

> At no time during the entire process, including prior proceedings relating to Mr. Carruthers's representation, did the trial court ever explain to Mr. Carruthers the dangers of self-representation, much less self-representation in a death penalty case, including but not limited to: (1) presenting a defense is not simply a matter of telling one's story; (2) a lawyer has substantial training in trial procedure and the state will be represented by two such attorneys; (3) a person unfamiliar with such procedures and who is untrained may be taken advantage of; (4) there may be defenses which counsel could raise, which if not raised timely will be waived; (5) on appeal he will not be able to complain . . . [about] the competence of self-representation, virtually closing the door to state and federal post-conviction relief in many circumstances; and (6) one's ability to present an effective defense may be diminished by the dual role of acting as an advocate and being an accused.

(Id. at 77.) Carruthers outlines the multiple times that his requests for representation were denied without a hearing and asserts that he was not competent to represent himself and was denied legal materials and resources at the jail. (Id. at 77-81.)

Carruthers alleges that the trial court violated his Sixth, Eighth, and Fourteenth Amendment rights with the following conduct:

- the failure to hold a hearing on his competence to

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 78

represent himself;

- the failure to advise him of the dangers of self-representation;
- the court's interference with his ability to contact members of his defense team while in jail and during trial;
- the court's consideration of ex parte, in camera adversarial statements of Carruthers's pre-trial counsel in his absence;
- the failure to appoint counsel to represent Carruthers in connection with his counsel's motions to withdraw and for counsel; and
- the failure to appoint counsel for the extraordinary appeal.

(ECF No. 21 at 80-82.)

**1. Teague**

Respondent argues that Carruthers has not identified any clearly established precedent of the United States Supreme Court supporting the theory that a capital defendant is incapable of forfeiting his right to counsel. (ECF No. 114-1 at 16.) Respondent argues that the Tennessee Supreme Court cited numerous federal cases holding that a defendant may forfeit his right to counsel through his abusive actions. (Id.) Respondent contends that a ruling in Carruthers's favor would create a new rule of law that could not be applied retroactively and, therefore, relief is barred by Teague v. Lane, 489 U.S. 288 (1989). (ECF No. 114-1 at 16; ECF No. 149 at 19.)

Carruthers argues that Teague only bars relief in instances where the case would create a new rule of law, and he is only requesting the application of "the well settled Sixth Amendment

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 79

right to counsel, which a defendant can never impliedly waive or forfeit." (ECF No. 129 at 50-51.) Under Teague, 489 U.S. at 310, "new constitutional rules of criminal procedure will not be applicable to those cases which had become final before the new rules are announced," even though the rules will apply to cases still pending on direct review. As a practical matter, under Teague, a habeas court cannot make new constitutional rules of criminal procedure. Teague, 489 U.S. at 316. Teague provides an exception to the retroactive application bar where a "new rule" of criminal procedure would either decriminalize a class of conduct or is a "watershed" rule that implicates the fundamental fairness and accuracy of a criminal proceeding. Saffle v. Parks, 494 U.S. 484, 494-95 (1990) (citing Teague, 489 U.S. at 311).[31]

The applicability of a Teague bar to review in this case is not certain. Carruthers has raised both issues of forfeiture of a right to counsel and whether a knowing and intelligent waiver of the right was made. The Supreme Court has not fully defined when a defendant's misconduct or defiance warrants a forfeiture of the right to counsel. Fischetti v. Johnson, 384 F.3d 140, 152 (3d Cir. 2004); see also Wilkerson v. Klem, 412 F.3d 449, 454 (3d Cir. 2005) ("[T]he Supreme Court precedents, while not dealing with forfeiture of the right to counsel, provided a 'basis to conclude, as the

[31] The only example of "a watershed rule" ever cited by a majority of the Supreme Court since issuing the Teague decision is the right to counsel, as set forth in Gideon v. Wainwright, 372 U.S. 335 (1963), establishing that an indigent defendant in a criminal prosecution in a state court has the right to have counsel appointed for him. Fulcher v. Motley, 444 F.3d 791, 815 (6th Cir. 2006).

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 80

state judge did, that defiant behavior by a defendant can properly cost that defendant some of his Sixth Amendment protections if necessary to permit a trial to go forward in an orderly fashion.'"). Because there is a lack of Supreme Court precedent addressing the issue before this Court, the Court declines to bar review of Carruthers's forced representation claim based on Teague.

**2. Procedural Default**

Although Respondent does not appear to argue procedural default related to Claim 8, Petitioner argued that the allegations in ¶¶ 268-70 and 292-93 of Claim 8 were subject to Martinez. (ECF No. 178 at 3-4.) The Court determined that Martinez did not establish cause and prejudice for the procedural default of the allegations in ¶¶ 268-70 and 292-93 of Claim 8. (ECF No. 192 at 28-29, 31-32.)

**3. Merits**

On direct appeal, the Tennessee Supreme Court addressed the issue, as a question of first impression, whether Carruthers "both forfeited and implicitly waived his right to appointed counsel and was properly required to proceed pro se." Carruthers, 35 S.W.3d at 516, 533-550. The Tennessee Supreme Court stated:

> Although this Court has never considered the precise question presented in this appeal, when discussing a non-indigent defendant who fired his attorney in open court and thereafter repeatedly protested about going to trial without a lawyer, we recognized that even "[t]hough a defendant has a right to select his own counsel if he acts expeditiously to do so . . . he may not use this right to play a 'cat and mouse' game with the court. . . ." State v. Chadwick, 224 Tenn. 75, 79,

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 81

450 S.W.2d 568, 570 (1970); see also Glasgow v. State, 224 Tenn. 626, 461 S.W.2d 25 (1970); State v. Dubrock, 649 S.W.2d 602 (Tenn. Crim. App. 1983) (holding that non-indigent defendants waived the right to counsel because they refused to hire an attorney). The idea that the right to counsel may not be used to manipulate or toy with the judicial system applies equally to indigent and non-indigent defendants. Although an indigent criminal defendant has a constitutional right to appointed counsel, that right may not be used as a license to manipulate, delay, or disrupt a trial. . . . Accordingly, we conclude that an indigent criminal defendant may implicitly waive or forfeit the right to counsel by utilizing that right to manipulate, delay, or disrupt trial proceedings. We also hold that the distinction between these two concepts is slight and that the record in this case supports a finding of both implicit waiver and forfeiture.

When Garrett and Morton were allowed to withdraw and Massey and Sayle were appointed, the trial court advised Carruthers that Massey and Sayle would be the lawyers representing him at trial and that there would be no further withdrawal and new appointments absent a "gigantic conflict." Despite this admonishment, Carruthers once again launched personal attacks and threats against Massey, threats that eventually extended to Massey's office staff and family members. When Massey renewed his motion to withdraw on January 2, 1996, the trial court specifically and clearly advised Carruthers that he had two choices-cooperate with Massey or represent himself. Carruthers also was advised that if he chose not to cooperate with Massey and to represent himself, he would be required to comply with all procedural rules as if he were an attorney. The trial court repeated his admonishment at a hearing on January 3, 1996. Despite the trial court's clear warnings, quoted fully earlier in this opinion, Carruthers persisted with his attitude of hostility toward Massey, as is evidenced both by his "glaring" at Massey during the hearings and by the letters Massey received after those hearings. In our view, Carruthers implicitly waived his right to counsel, because, after being warned by the trial court that he would lose his attorney if his misconduct continued, Carruthers persisted in his misconduct.

In so holding, we reject Carruthers' claim that the warnings given him by the trial court were not sufficient

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 82

to support a finding of implied waiver. . . . We decline to hold that a trial court must provide extensive and detailed warnings when a defendant's conduct illustrates that he or she understands the right to counsel and is able to use it to manipulate the system. We conclude that an implicit waiver may appropriately be found, where, as here, the record reflects that the trial court advises the defendant the right to counsel will be lost if the misconduct persists and generally explains the risks associated with self-representation. Cf. Kelm, 827 F.2d at 1322 (considering the record as a whole when determining the sufficiency of the trial court's advisements).

Even assuming the warnings given Carruthers were insufficient to support a finding of implicit waiver, however, we conclude that Carruthers' conduct was sufficiently egregious to support a finding that he forfeited his right to counsel. The circumstances culminating in the trial court's ruling have been fully summarized. Carruthers repeatedly and unreasonably demanded that his appointed counsel withdraw and that new counsel be appointed. Carruthers' demands escalated as his scheduled trial dates drew near. As the trial court recognized, the "ploy" to delay the trial became increasingly apparent with each new set of attorneys. In addition, Carruthers' conduct degenerated and his outrageous allegations and threats escalated markedly with each new set of attorneys. As the trial court emphasized, Carruthers was the author of his own predicament and sabotaged his relationship with each successive attorney with the obvious goal of delaying and disrupting the orderly trial of the case. Under these circumstances, the trial court was fully justified in concluding that Carruthers had forfeited his right to counsel. Indeed, in situations such as this one, a trial court has no other choice but to find that a defendant has forfeited the right to counsel; otherwise, an intelligent defendant "could theoretically go through tens of court-appointed attorneys and delay his trial for years." Cummings, 546 N.W.2d at 419.

As did the trial court and the Court of Criminal Appeals, we have carefully considered the ramifications of holding that an indigent criminal defendant in a capital case has implicitly waived and forfeited his valuable right to counsel. We are aware that both implicit waiver and forfeiture are extreme sanctions. However, Carruthers' conduct was extreme and egregious. The sanction is

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 83

> appropriate under the circumstances and commensurate with Carruthers' misconduct. We reiterate that a finding of forfeiture is appropriate only where a defendant egregiously manipulates the constitutional right to counsel so as to delay, disrupt, or prevent the orderly administration of justice. Where the record demonstrates such egregious manipulation a finding of forfeiture should be made and such a finding will be sustained, even if the defendant is charged with a capital offense. Persons charged with capital offenses should not be afforded greater latitude to manipulate and misuse valuable and treasured constitutional rights.
>
> Carruthers also claims that he was denied due process because he was forced to choose between incompetent counsel and no counsel at all, and he asserts that the trial judge should have held a hearing to determine the validity of his complaints about his attorneys.
>
> We disagree. There is simply no evidence indicating that any one of the many attorneys appointed to represent Carruthers was ineffective.

Carruthers, 35 S.W.3d at 549-50 (footnotes omitted).

To the extent Carruthers argued that his pro se representation was ineffective, the Tennessee Supreme Court stated:

> we agree with the Court of Criminal Appeals' conclusion that when a defendant forfeits or waives the right to counsel, regardless of whether the waiver is explicit or implicit, he or she also forfeits or waives the right to effective assistance of counsel. See Small, 988 S.W.2d at 673; State v. Goodwin, 909 S.W.2d 35, 45 (Tenn. Crim. App. 1995); Cf. Faretta, 422 U.S. at 835 n.46, 95 S. Ct. at 2541 n. 46 ("[W]hatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel.").

Id. at 551. "[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" Faretta v. California, 422 U.S. 806, 834 n.46 (1975); see also Holmes v.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 84

United States, 281 F. App'x 475, 480-81 (6th Cir. 2008) (ineffective assistance of counsel claim fails where there is a valid waiver of the Sixth Amendment right); Wilson v. Parker, 515 F.3d 682, 696 (6th Cir. 2008) (same).

Respondent contends that the Tennessee Supreme Court rendered a lengthy discourse on this claim and determined that Carruthers forfeited his right to counsel by repeatedly threatening bodily harm to his counsel, their staff and family members; refusing to cooperate with four different appointed attorneys; and demanding new counsel to delay trial. (ECF No. 114-1 at 15.) Respondent argues that the Tennessee Supreme Court found that the sanction was appropriate given Carruthers's misconduct and manipulation, leaving the trial court with no choice but to order him to represent himself. (Id.) See Carruthers, 35 S.W.3d at 550. Respondent asserts that Carruthers has not identified any clearly established precedent supporting his theory that a capital defendant is not capable of representing himself. (Id. at 16.) In the absence of such precedent, Respondent contends that the Tennessee Supreme Court's decision is neither contrary to nor an unreasonable application of clearly established federal law and based on a reasonable determination of the facts. (Id.)

Carruthers argues that the trial court forced "an incarcerated, mentally ill, brain damaged man to defend himself in a capital case" and failed to warn Carruthers of the dangers of self-representation. (ECF No. 129 at 4-17.) Carruthers argues

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 85

that "[t]he Supreme Court is clear in that the right to counsel cannot be impliedly waived or forfeited." (Id. at 18.) He further asserts that his "conduct, which existed in the context of mental illness and brain damage," did not amount to either implied waiver or forfeiture, but "reflected his frustration with his woefully underperforming lawyers and with the trial court's endorsement of his lawyers's inaction." (Id.) Carruthers argues that competent counsel would have informed the trial of his schizoaffective disorder (bipolar type) including the delusional beliefs, disorganized illogical speech, rapid speech, and concentration problems associated with it and exhibited by Carruthers in the proceedings. (Id. at 19.) He also notes that the symptoms manifested at trial were associated with his brain damage. (Id. at 19-20.)

Carruthers relies on Argersinger v. Hamlin, 407 U.S. 25, 37 (1972), for the "controlling rule" that "'absent a knowing and intelligent waiver, no person may be imprisoned for any offense . . . unless he was represented by counsel at trial.'" (Id. at 27.) He argues that the Tennessee Supreme Court's decision that "an indigent criminal defendant may implicitly waive or forfeit his right to counsel by utilizing that right to manipulate, delay, or disrupt trial proceedings" is contrary to the Supreme Court precedent in Argersinger. (Id.) Carruthers argues that, "if a defendant does not have the mental capacity to represent himself, the court should not honor his desire [to waive or relinquish his

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 86

right] under the Sixth Amendment right to counsel because such self-representation would violate the Sixth Amendment's right to a fair trial" and that the judge has a protective role in ensuring a valid waiver. (Id. at 30-35.) Further, Carruthers argues that the right to counsel cannot be forfeited. (Id. at 31.)

Carruthers also contends that he was faced with the unconstitutional choice of proceeding with incompetent counsel (in this case, William Massey) or representing himself. (Id. at 45.) He contends that even this "choice" was not his because it was up to Massey whether he would continue with the representation. (Id.) Carruthers further contends that the trial court failed to engage him in a discussion regarding his right to counsel and to obtain verbal assurances indicating that he was intelligently and knowingly relinquishing his right. (Id.)

Respondent argues that a large number of federal cases have held that forfeiture may take place and that Carruthers left the trial court with no choice but to order him to represent himself. (ECF No. 149 at 18.) See Carruthers, 35 S.W.3d at 546-47. Respondent argues that the trial court was left with no choice but to order Carruthers to represent himself, as Carruthers repeatedly delayed his case by refusing to cooperate and threatening his appointed attorneys to the point that they could not ethically represent him. (Id.) Respondent asserts that Carruthers has not identified any clearly established precedent supporting his theory that a capital defendant is incapable of forfeiting his right to

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 87

counsel. (Id. at 19.) Respondent argues that, in the absence of Supreme Court precedent, the Tennessee Supreme Court's decision is neither contrary to nor an unreasonable application of clearly established federal law. (Id.)

Carruthers has a right to counsel under the Sixth Amendment. That right to counsel, however, can be waived. "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." Brady v. United States, 397 U.S. 742, 748 (1970). Carruthers's case involves the more unusual circumstance of the possibility of waiver or forfeiture of a right to counsel based on the defendant's conduct. Still, Carruthers, now years after the trial, asserts that his waiver could not be valid because of his brain damage and mental illness and because the trial court failed to warn him of the dangers of self-representation.

There is no clearly established Supreme Court precedent on the issue of implied waiver or forfeiture of the right to counsel based on a defendant's conduct and/or what, if any, warnings are constitutionally required. See United States v. Goldberg, 67 F.3d 1092, 1100 (3d Cir. 1995). In Gilchrist v. O'Keefe, 260 F.3d 87, 97 (2d Cir. 2001), the court stated, "there is no Supreme Court holding either that an indigent defendant may not forfeit (as opposed to waive) his right to counsel through misconduct nor a general Supreme Court holding that a defendant may not forfeit a constitutional

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 88

right." In Barrett v. Meeks, No. S-97-1106LKKJFMP, 2006 WL 3300984, at *16 (E.D. Cal. Nov. 14, 2006), report and recommendation adopted by No. S-97-1106LKKJFMP, 2007 WL 933660 (E.D. Cal. Mar. 27, 2007), the court stated:

> The Supreme Court has held that a criminal defendant can forfeit fundamental trial rights such as the right to be present at trial. See Illinois v. Allen, 397 U.S. 337, 343, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970) (defendant can lose right to be present at trial by being disruptive despite trial court's warnings regarding such conduct); Taylor v. United States, 414 U.S. 17, 20, 94 S. Ct. 194, 38 L. Ed. 2d 174 (1973) (affirming trial judge's decision to proceed with trial when the defendant failed to return to the courtroom following a trial recess).
>
> . . . .
>
> Federal circuit courts have interpreted the Allen and Taylor decisions to be consistent with the concept of forfeiture or 'waiver by conduct' of the right to counsel.

The Sixth Circuit has held that "a defendant may engage in conduct which constitutes a waiver of his right to counsel." United States v. Coles, 695 F.3d 559, 562 (6th Cir. 2012). In Coles, the Court noted that the right to counsel does not equate to the absolute right to counsel of the defendant's choice and further determined that the defendant waived his right to counsel following the removal of the fourth assigned counsel. Id. at 562. In Sullivan v. Pitcher, 82 F. App'x 162, 165-66 (6th Cir. 2003) (per curiam), the Sixth Circuit stated that "when all the evidence supports the conclusion that the Sixth Amendment is being used not as a shield but as a sword - other courts have not hesitated to find waiver through conduct."

Further, the Sixth Circuit has held that "waiver by conduct

requires no more than the minimum Faretta warnings." King v. Bobby, 433 F.3d 483, 493 (6th Cir. 2006). The Court stated that "King's waiver involves the intersection of two rights: the Sixth Amendment rights to self-representation and to an attorney. When a defendant invokes one, he necessarily waives the other." Id. at 490. The Court noted that King did not make a straightforward assertion of his right to self-representation, but he rejected all of his options except self-representation. Id. at 492. The Court examined the whole record to determine if a knowing and intelligent waiver was made. Id. The Sixth Circuit noted its prior decision in Swiger v. Brown, 86 F. App'x 877 (6th Cir. 2004), and the reasoning that

> The problem in this case was not Swiger's lack of understanding about the risks of self-representation, which he understood. The problem was that a defendant cannot be permitted to stop the criminal justice process in its tracks by rejecting appointed counsel and refusing self-representation, which is effectively what he did.

King, 433 F.3d at 493 (quoting Swiger, 86 F. App'x at 882). The Sixth Circuit found that the reasoning in Swiger applied with equal force to King's case. Id. The Sixth Circuit in King described the issue before the trial court as "reining in a defendant who was attempting to manipulate the system by first refusing to retain an attorney, then by refusing to work with his attorney," and determined that the trial court was justified in letting the defendant proceed pro se. Id.

In Fischetti v. Johnson, 384 F.3d 140, 151 (3d Cir. 2004), the Court stated that "the parallel rights to counsel and to self-representation cannot be manipulated to frustrate the orderly

processes of the trial court. In Faretta, for example, the Court warned that the 'right of self-representation is not a license to abuse the dignity of the courtroom.'" The court in Fischetti concluded that "defiant behavior by a defendant can properly cost that defendant some of his Sixth Amendment protections if necessary to permit a trial to go forward in an orderly fashion." Id.

The defendant in King did not have the same mental health issues that Carruthers asserts in his habeas petition. In United States v. Back, 307 F. App'x 876, 878 (6th Cir. 2008), the Sixth Circuit held that a trial court was not required to sua sponte order a competency hearing because of a defendant's request to represent himself when the defendant's competence to stand trial was never in question. In the instant case, Carruthers had been determined competent to stand trial, see supra p. 48 n.21, and competent to waive issues of mental health, see supra pp. 44-45. (See ECF No. 132-3 at PageID 17716-17717.) The mental health evaluations that Carruthers now presents to the Court were not available to the state courts and are barred from consideration by Pinholster.

Given the lack of Supreme Court precedent, the Tennessee Court of Criminal Appeals' decision is not contrary to or an unreasonable application of clearly established Supreme Court precedent and is based on a reasonable determination of facts. Claim 8 is without merit. Summary judgment is GRANTED and Claim 8 is, therefore, DENIED.

**H. Severance (Claim 9, Amended Petition ¶¶ 294-303)**

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 91

Carruthers alleges that the trial court violated his constitutional rights by denying the multiple motions for severance of his trial with co-defendant James Montgomery's trial despite the fact that they had conflicting defenses and strategies. (ECF No. 21 at 82.) Carruthers alleges that his defense was that he was not involved in the murders and that Montgomery's involvement occurred separate and apart from Carruthers. (Id. at 82-83.) Carruthers asserts that the joint trial allowed the jury to infer his guilt from his association with Montgomery. (Id. at 83.) Carruthers contends that the jury inferred his guilt from the evidence at trial that Montgomery told Terrell Adair that the police would not have a case if they did not have a body and that Montgomery gave Chris Hines an AK-47 assault rifle and said that the weapon had "blood on it." (Id.)

Respondent argues that the claim was not presented to the highest available state court for review and is procedurally defaulted. (ECF No. 114-1 at 16; ECF No. 149 at 19.) Carruthers does not address this claim in response to the motion for summary judgment.[32] The claim was not exhausted in the state court.[33]

---

[32] As part of Claim 34, Carruthers asserts that the death penalty is arbitrary because although he and Montgomery were tried together and the State asserted that they committed the murders together, Carruthers was sent to death row, and Montgomery received a term of years for which he is now parole eligible and will be released no later than January 2020. (ECF No. 129 at 273.) See supra p. 8 n.4.

[33] Montgomery raised the issue of severance on direct appeal and was granted a new trial because of the prejudicial effect Carruthers's self-representation had on Montgomery's right to fair trial. See Carruthers, 35 S.W.3d at 524, 552-554.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 92

Carruthers has not demonstrated cause and prejudice for the failure to exhaust this claim or that a miscarriage of justice will result from the Court's failure to consider Claim 9. Claim 9 is procedurally defaulted and summary judgment is GRANTED. Claim 9 is, therefore, DENIED.

**I. Gag Order (Claim 10, Amended Petition ¶¶ 304-12)**

Carruthers alleges a violation of his First, Fifth, Sixth, Eighth, and Fourteenth Amendment rights from the trial court's March 4, 1996, gag order. (ECF No. 21 at 83-84.) He alleges that the trial court did not provide notice or a hearing or consider reasonable alternatives that would ensure a fair trial without restricting his rights. (Id. at 84.) He asserts that the order was not necessary to address any clear and present danger or to ensure that extra-judicial comments did not prejudice the fairness of the trial. (Id. at 84-85.)

The Tennessee Supreme Court, on direct appeal, stated:

> Issuance of Gag Order
>
> Carruthers next argues that the trial court committed reversible error by issuing a "gag order" preventing him from speaking to the media. The trial court's order, issued about a month before the trial began, states:
>
> > The Constitutions of the United States and the State of Tennessee guarantee defendants in all criminal cases due process of law and the right to a fair and impartial jury. It is the duty of the trial court to see that every defendant is afforded all his constitutional rights.
> >
> > In order to safeguard those rights, this Court is of the opinion that the following rule is necessary to constitutionally guarantee an

> orderly and fair trial by an impartial jury. Therefore, this Court orders the following:
>
> All lawyers participating in this case, including any defendants proceeding pro se, the assistants, staff, investigators, and employees of investigators are forbidden to take part in interviews for publicity and from making extra-judicial statements about this case from this date until such time as a verdict is returned in this case in open court.
>
> Because of the gravity of this case, because of the long history of concerns for the personal safety of attorneys, litigants and witnesses in this case, because of the potential danger-believed by this Court to be very real and very present-of undermining the integrity of the judicial system by "trying the case in the media" and of sullying the jury pool, this Court feels compelled to adopt this extraordinary pretrial measure.

Carruthers challenges this order as violating his right to a fair trial, guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. Carruthers is correct to rely upon the Sixth Amendment. We note, however, that the United States Supreme Court has stated that a "right to fair trial" claim also implicates the Fifth and Fourteenth Amendment Due Process Clauses. See, e.g., Strickland v. Washington, 466 U.S. 668, 684-85, 104 S. Ct. 2052, 2063, 80 L. Ed. 2d 674 (1984) ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment."). Nonetheless, numerous courts have referred simply to the Sixth Amendment right to a fair trial in this context, and we will do the same. See, e.g., In re Dow Jones & Co., Inc., 842 F.2d 603, 609 (2d Cir.), cert. denied, 488 U.S. 946, 109 S. Ct. 377, 102 L. Ed. 2d 365 (1988); United States v. Ford, 830 F.2d 596, 600 (6th Cir. 1987).

Carruthers also raises First Amendment concerns, which is understandable given that gag orders exhibit the characteristics of prior restraints. See United States v. Brown, 218 F.3d 415, 424 (5th Cir. 2000). But see Dow Jones, 842 F.2d at 608 (noting a "substantial difference" between a restraint on the press and a restraint on trial participants). Yet the crux of Carruthers' argument on

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 94

appeal is that his defense was inhibited because he could not respond to the media's coverage of the trial; he could do nothing to alter the jurors' preconceptions about the case gained from their exposure to news reports. Carruthers also argues that his inability to speak to the press may have prevented potential witnesses from coming forward to his defense. Properly stated, then, his argument asserts that the gag order interfered with his right to a fair trial. To the extent Carruthers' brief raises a First Amendment claim, however, we find it moot. By its own terms, the trial court's order ceased to exist upon the return of the verdict, which occurred several years ago. Of course, since a gag order is by definition a restriction on speech, our review of Carruthers' Sixth Amendment claim demands consideration of First Amendment principles. As is clear from the case law, discussed below, the proper standard governing the validity of gag orders explicitly incorporates these principles, as do we in our analysis.

The Court of Criminal Appeals rejected Carruthers' arguments and upheld the gag order in its entirety. As noted in its opinion, the following circumstances were considered by the trial court as reasons for issuing the gag order: numerous threats to attorneys; the death of one of the co-defendants; the highly-charged emotional climate of the trial (e.g., the courtroom was guarded by S.W.A.T. team members); the gunning down of a deputy jailer in his driveway, which the trial judge thought was related to the case; the fleeing of one witness after reading about the case in the newspaper; and the statements of two witnesses who had already testified that defendant Montgomery threatened to kill them if they talked about the case. Also, as the Court of Criminal Appeals noted, Alfredo Shaw testified that Carruthers threatened him and made arrangements to have a reporter interview him about recanting his story. Thus, the court held that the trial judge was properly concerned about the media's influence on the potential jury pool and the safety of all involved in the trial. The court also held that the public was certainly aware of the trial from the media's coverage and that Carruthers' statements to the press would not likely have led to unknown witnesses coming forward.

We agree with the Court of Criminal Appeals' judgment that under these circumstances a gag order was proper. We hold, however, that under the constitutional standards discussed below, the scope of that order was too broad. Nevertheless, given the circumstances of this case, the

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 95

error is harmless.

Numerous courts have recognized that the correct standard by which to evaluate the constitutionality of gag orders depends upon who is being restrained: the press or trial participants. See, e.g., Brown, 218 F.3d at 425; Dow Jones, 842 F.2d at 608. If the gag order is directed to the press, the constitutional standard is very stringent. See Montgomery, 929 S.W.2d at 414 (discussing Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976)). Carruthers' appeal before this Court, however, concerns the trial court's gag order directed to him, a defendant, representing himself at trial.

As the United States Court of Appeals for the Fifth Circuit has recently determined, the federal circuit courts are split as to the correct constitutional standard governing gag orders on trial participants. See Brown, 218 F.3d at 425-28. For example, the Sixth Circuit has held that gag orders on trial participants must meet the exacting "clear and present danger" test for free speech cases enunciated in Near v. Minnesota, 283 U.S. 697, 51 S. Ct. 625, 75 L. Ed. 1357 (1931). See Ford, 830 F.2d at 598 ("We see no legitimate reasons for a lower standard for individuals [as compared to the press]."). Accord Chicago Council of Lawyers v. Bauer, 522 F.2d 242, 249 (7th Cir. 1975), cert. denied, 427 U.S. 912, 96 S. Ct. 3201, 49 L. Ed. 2d 1204 (1976) (applying a "serious and imminent threat" test); Levine v. United States District Court, 764 F.2d 590, 595-96 (9th Cir. 1985), cert. denied, 476 U.S. 1158, 106 S. Ct. 2276, 90 L. Ed. 2d 719 (1986) (same). In contrast, the Second, Fourth, and Tenth Circuits analyze the validity of gag orders on trial participants under the less stringent standard of whether the participant's comments present a "reasonable likelihood" of prejudicing a fair trial. See Dow Jones, 842 F.2d at 610; In re Russell, 726 F.2d 1007, 1010 (4th Cir.), cert. denied, 469 U.S. 837, 105 S. Ct. 134, 83 L. Ed. 2d 74 (1984); United States v. Tijerina, 412 F.2d 661, 666-67 (10th Cir.), cert. denied, 396 U.S. 990, 90 S. Ct. 478, 24 L. Ed. 2d 452 (1969). See also News-Journal Corp. v. Foxman, 939 F.2d 1499, 1512-15 (11th Cir. 1991) (discussing the case law authority for the less stringent standard). Without deciding whether to adopt the "reasonable likelihood" standard, the Fifth Circuit determined that the "clear and present danger" test was not required, and analyzed the case before it under a "substantial likelihood" test. See Brown, 218 F.3d at 427-28.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 96

Although this Court has upheld restraints on trial participants, see State v. Hartman, 703 S.W.2d 106 (Tenn. 1985) (order restraining counsel from talking with the public or media about the facts of the case), we have never discussed the underlying constitutional issues. We therefore decide this issue based on our own interpretation of United States Supreme Court precedent and the Tennessee Constitution with guidance from the federal circuit courts. We note that the Court of Criminal Appeals' opinion emphasizes that "[t]he twist in this case, however, is that Carruthers was representing himself during trial." Although this fact is relevant in applying the constitutional standard to determine whether Carruthers' right to a fair trial was breached, our review of the case law indicates that the constitutional standard is the same regardless of which trial participant is restrained.

The Brown court's decision to follow a "substantial likelihood" test rather than the "clear and present danger" test rests on its interpretation of Gentile v. State Bar of Nevada, 501 U.S. 1030, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991). The Brown court determined that Gentile rejected the clear and present danger test for trial participants and that Gentile is the Supreme Court's latest discussion of the issue. See Brown, 218 F.3d at 426-28 (noting that the cases endorsing the more stringent test predated Gentile). We agree with the Brown court's holding.

Gentile involved an attorney who held a press conference the day after his client was indicted on criminal charges. See Gentile, 501 U.S. at 1063-65, 111 S. Ct. at 2738-40 (discussing the facts). The attorney proclaimed his client's innocence, strongly suggested that a police detective was in fact the perpetrator, and stated that the alleged victims were not credible. Although the trial court "succeeded in empaneling a jury that had not been affected by the media coverage and [the client] was acquitted on all charges, the [Nevada] state bar disciplined [the attorney] for his statements." Id. at 1064, 111 S. Ct. at 2739. The Nevada Supreme Court upheld the state bar's disciplinary action, finding that the attorney "knew or reasonably should have known that his comments had a substantial likelihood of materially prejudicing the adjudication of his client's case." Id. at 1065, 111 S. Ct. at 2739. Although the Supreme Court reversed this judgment because it found the Nevada Supreme Court's construction of the disciplinary rule "void for vagueness," id. at 1048-51, 111 S. Ct. at 2731-32, a

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 97

majority of the Court held that the "substantial likelihood of prejudice" test struck the proper constitutional balance between an attorney's First Amendment rights and the state's interest in fair trials. Id. at 1065-76, 111 S. Ct. at 2740-45.

In so doing, the Court held that the stringent standard governing restraints on the press articulated in Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976) should not apply to restraints on lawyers whose clients are parties to the proceeding. Id. at 1074, 111 S. Ct. at 2744. See also News-Journal Corp., 939 F.2d at 1512-13 (noting that the Supreme Court has suggested restricting trial participants as an alternative to a prior restraint on the media). The Court quoted with approval from Sheppard v. Maxwell, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966) in which the defendant's conviction was overturned because of prejudicial publicity that prevented him from receiving a fair trial:

> The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures. 384 U.S. at 363, 86 S. Ct. at 1522.

Id. at 1072, 111 S. Ct. at 2743.

As the Brown court held, however, see Brown, 218 F.3d at 426, the Court in Gentile did not conclude that the "substantial likelihood of prejudice" test was required; it held only that this test complies with the First Amendment. See Gentile, 501 U.S. at 1075, 111 S. Ct. at 2745 ("We agree with the majority of the States that [this standard] constitutes a constitutionally permissible balance between the First Amendment rights of attorneys in pending cases and the State's interest in fair trials."). Moreover, Gentile involved a restraint on an attorney's speech; in this case, Carruthers was a party as well as his own attorney. It is necessary, therefore, to decide whether the Gentile rationale applies to parties.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 98

Although unnecessary to its holding, we find significant evidence in the Gentile opinion that the clear and present danger test is not required for gag orders restraining parties or other trial participants. The Court emphasized the distinction between "participants in the litigation and strangers to it" as recognized by an earlier case, Seattle Times Co. v. Rhinehart, 467 U.S. 20, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984). Id. at 1072-73, 111 S. Ct. at 2743-44. As characterized by the Gentile Court, the Court in Seattle Times "unanimously held that a newspaper, which was itself a defendant in a libel action, could be restrained from publishing material about the plaintiffs and their supporters to which it had gained access through court-ordered discovery." Id. at 1073, 111 S. Ct. at 2744. The Gentile Court then quoted from Seattle Times as follows: "[a]lthough litigants do not 'surrender their First Amendment rights at the courthouse door,' those rights may be subordinated to other interests that arise in this setting" (citation omitted); and further, "on several occasions [we have] approved restriction on the communications of trial participants where necessary to ensure a fair trial for a criminal defendant." Id. The Court also stated that "[f]ew, if any interests under the Constitution are more fundamental than the right to a fair trial by 'impartial' jurors, and an outcome affected by extrajudicial statements would violate that fundamental right." Id. at 1075, 111 S. Ct. at 2745 (citing Sheppard, 384 U.S. at 350-51, 86 S. Ct. at 1515-16).

We conclude that the concerns raised in Gentile and Sheppard are applicable regardless of whether a party or his or her attorney is being restrained. A prejudicial statement made to the press by an attorney is not somehow less prejudicial if made by a party. In short, what matters is what is being said and not who is saying it. See Brown, 218 F.3d at 428 ("As the district court pointed out, trial participants, like attorneys, are 'privy to a wealth of information that, if disclosed to the public, could readily jeopardize the fair trial rights of all parties.'"). If anything, as one court has reasoned, extrajudicial comments made by trial participants have the potential to be more harmful than comments made by attorneys:

> Gentile involved a state supreme court rule governing the conduct of members of the bar of that state, while we examine a state trial court's restrictive order entered in a particular case and directed to all trial participants. Because of their legal training,

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 99

> attorneys are knowledgeable regarding which extrajudicial communications are likely to be prejudicial. The other trial participants encompassed by the restrictive order in this case did not have such legal discernment and expertise. Given the public attention generated by this case, defendants, witnesses and law enforcement personnel were eager to talk with the press concerning their particular views. While attorneys can be governed by state supreme court or bar rules, other trial participants do not have these guidelines. News-Journal Corp., 939 F.2d at 1515 n.18.

Thus, we conclude that for purposes of the constitutional right to a fair trial, Gentile's rationale applies to all trial participants, meaning that the more stringent clear and present danger test is not required.

Having decided that the clear and present danger test is not constitutionally mandated, we must now decide which test to adopt: the "substantial likelihood of prejudice" test or, as some courts have employed, the "reasonable likelihood" test. As noted, Gentile held only that the substantial likelihood test was constitutional, not that it was required. See Brown, 218 F.3d at 426-28; News-Journal Corp., 939 F.2d at 1515 n.18. Nonetheless, we conclude under both the state and federal constitutions that the substantial likelihood test strikes a constitutionally permissible balance between the free speech rights of trial participants, the Sixth Amendment right of defendants to a fair trial, and the State's interest in a fair trial. Cf. Gentile, 501 U.S. at 1070, 111 S. Ct. at 2742. Accordingly, we hold that a trial court may constitutionally restrict extrajudicial comments by trial participants, including lawyers, parties, and witnesses, when the trial court determines that those comments pose a substantial likelihood of prejudicing a fair trial.

Under this constitutional standard, we hold that the trial court was justified in imposing a gag order on Carruthers. At trial, this case garnered a significant amount of media coverage, raising the concerns expressed in Sheppard. As Carruthers himself notes in his brief:

> This trial was charged with emotion from start to finish. There were allegations of gang affiliations and testimony of large scale narcotics dealings. The courtroom was guarded

> by S.W.A.T. team members and by Sheriff's deputies who were authorized to search those entering the courtroom. Representatives of news organizations were present daily to record the proceedings.

In addition to its concerns about media coverage, the trial court was presented with the problem of witness intimidation. The trial judge found that witnesses who had already testified stated that defendant Montgomery threatened to kill them if they talked. Moreover, Alfredo Shaw testified that Carruthers had threatened him and made arrangements to have a reporter interview him about recanting his story. Under these unusual circumstances, the trial court was justified in employing heightened measures to ensure that a proper jury could be found and to prevent Carruthers from manipulating the media so as to intimidate witnesses. The trial judge could not ignore these issues. Indeed, he had a constitutional duty under the state and federal constitutions to ensure a fair trial.

Before a gag order can be entered, however, the case law suggests that a trial court should consider reasonable alternative measures that would ensure a fair trial without restricting speech. In the context of restraints on the press, the United States Supreme Court has specifically held that a trial court should consider such measures. See Nebraska Press, 427 U.S. at 563-64, 96 S. Ct. at 2804-05. These measures include: a change of trial venue; postponement of the trial to allow public attention to subside; searching questions of prospective jurors; and "emphatic" instructions to the jurors to decide the case on the evidence. Id. (discussing Sheppard, 384 U.S. at 357-62, 86 S. Ct. at 1519-22).

Although it is not clear whether the need to consider alternatives is also necessary in the context of restraints on trial participants, some federal circuit courts have assumed so, see, e.g., Brown, 218 F.3d at 430-31; Dow Jones, 842 F.2d at 611-12, and the trial judge considered several of the alternatives. The trial court found that neither a change of venue nor a continuance was practical because the case was several years old and one attempt to try the case had already been made. The court appropriately gave careful attention to voir dire and jury instructions, but determined that these alternatives alone were insufficient.

Given the extraordinary nature of this case, we hold that

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 101

the trial court was entitled to make this judgment. We also note that in addition to and apart from the concerns about pretrial publicity interfering with the task of finding an unbiased jury, the trial court was concerned about witness intimidation and Carruthers' potential manipulation of the press. None of the alternatives mentioned in Nebraska Press and Sheppard would likely have alleviated these concerns. The trial court reasonably concluded that only a gag order would be effective. Finally, we note that the alternatives mentioned above are not free of cost to the judicial system. As the Gentile Court wrote:

> Even if a fair trial can ultimately be ensured through voir dire, change of venue, or some other device, these measures entail serious costs to the system. Extensive voir dire may not be able to filter out all of the effects of pretrial publicity, and with increasingly widespread media coverage of criminal trials, a change of venue may not suffice to undo the effects of statements such as those made by the petitioner. Gentile, 501 U.S. at 1075, 111 S. Ct. at 2745.

Having decided that the trial court did not err in issuing the gag order, the final issue to consider is the scope of the order. As discussed above, Carruthers' argument on appeal is properly construed as a "right to fair trial" claim rather than a First Amendment claim. Nevertheless, a gag order by definition restricts speech. In determining whether a gag order is appropriate, therefore, a court must be mindful that "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Ward v. Rock Against Racism, 491 U.S. 781, 799, 109 S. Ct. 2746, 2758, 105 L. Ed. 2d 661 (1989); see also Procunier v. Martinez, 416 U.S. 396, 413, 94 S. Ct. 1800, 1811, 40 L. Ed. 2d 224 (1974) (the limitation on speech "must be no greater than is necessary or essential to the protection of the particular governmental interest involved") (quoted in Brown, 218 F.3d at 429).

On its face, the trial court's order has no exceptions or limitations: it prohibits the defendants and their attorneys from making any comments to the press about the case. This gag order is considerably broader than any upheld in the cases discussed above. Gentile, though not a gag order case, involved a limitation on attorney speech which prohibited only statements "substantially likely to

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 102

> prejudice" the adjudication of the case. See Gentile, 501 U.S. at 1064, 111 S. Ct. at 2739. Brown involved an order which "left available to the parties various avenues of expression, including assertions of innocence, general statements about the nature of an allegation or defense, and statements of matters of public record." Brown, 218 F.3d at 429-30. The order in Dow Jones was similar. See Dow Jones, 842 F.2d at 606.
>
> Given the history of this trial, we certainly understand why the trial court crafted such a broad order. Indeed, in certain cases, as where a defendant takes advantage of a limited gag order or fails to comply with it, an order of such breadth may be justified. Nonetheless, we hold that initial gag orders on trial participants should ordinarily contain the exceptions found in the Brown order and allow trial participants to make general statements asserting innocence, commenting on the nature of an allegation or defense, and discussing matters of public record.
>
> We find the trial court's failure to include these exceptions in the gag order was harmless error. We fail to see how limited statements made by Carruthers to the media about his innocence, allegations or defenses, or matters in the public record would have altered the result of the trial. We do not think that allowing Carruthers to make such statements would have furthered the goal of finding an impartial jury, nor do we think it probable that any new witnesses would have come forward. We also point out that these crimes occurred in 1994, and the gag order was issued only one month before trial in 1996. In the two years preceding issuance of the gag order, Carruthers had access to the media. The record shows both that he availed himself of that access and that the media responded by actively covering the trial and events leading up to the trial. Under these circumstances, the error below was harmless.

Carruthers, 35 S.W.3d at 558-65 (footnotes omitted).

Carruthers argues that the state fails to meet its burden for summary judgment on this claim. (ECF No. 129 at 209-211.) He asserts that the Tennessee Supreme Court's decision suffers from "at least two fatal flaws." (Id. at 216.) First, he argues that the court applied a test requiring invalidation of a gag order "if 'the

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 103

trial court determines that . . . comments pose a substantial likelihood prejudicing a fair trial,'" while the United States Supreme Court in Gentile v. State Bar of Nevada, 501 U.S. 1030, 1058 (1991), states that the appropriate test is whether extrajudicial remarks pose a "real or specific threat to the judicial process." (Id. at 216-217.) Second, he argues that the court erred by concluding that the gag order was subject to harmless error analysis instead of creating a structural error. (Id. at 217.) Further, he asserts that the Tennessee Supreme Court's failure to grant a new trial despite the existence of a structural error was "contrary to" clearly established law. (Id.)

Respondent argues that that the Tennessee Supreme Court's decision is neither contrary to nor an unreasonable application of clearly established federal law. (ECF No. 114-1 at 19.) He asserts that despite Carruthers's argument, he has presented no clearly established federal law that the trial court's gag order constituted a structural error. (ECF No. 149 at 14.)

**1. The Relevant Standard for Gag Orders**

In Gentile, an attorney held a press conference the day after his client was indicted on criminal charges in violation of a Nevada Supreme Court Rule prohibiting a lawyer from making extrajudicial statements to the press that he knows or reasonably should know will have a "substantial likelihood of materially prejudicing" an adjudicative proceeding. 501 U.S. at 1062-63. See United States v. Fieger, No. 07-CR-20414, 2008 WL 659767 (E.D. Mich. Mar. 11, 2008)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 104

("[I]t is undisputed that the Supreme Court has held that a party's free speech may be prohibited to the extent that the speech presents a 'substantial likelihood of materially prejudicing' a fair trial."). The Court in Gentile observed,

> The "substantial likelihood" test . . . is constitutional under this analysis, for it is designed to protect the integrity and fairness of a State's judicial system, and it imposes only narrow and necessary limitations on lawyers' speech. The limitations are aimed at two principal evils: (1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire, even if an untainted panel can ultimately be found. Few, if any, interests under the Constitution are more fundamental than the right to a fair trial by "impartial" jurors, and an outcome affected by extrajudicial statements would violate that fundamental right.

Gentile, 510 U.S. at 1075 (citations omitted). Although the Supreme Court stated, "It cannot be said that petitioner's conduct demonstrated any real or specific threat to the legal process," the Court also determined that the "substantial likelihood of material prejudice" test is "a constitutionally permissible balance between the First Amendment rights of attorneys in pending cases and the States' interest in fair trials." Gentile, 501 U.S. at 1058, 1075.[34] The Court noted that the "clear and present danger" test is the linguistic equivalent to "substantial likelihood of material

[34] The Sixth Circuit in Carey v. Wolnitzek, 614 F.3d 189, 200 (6th Cir. 2010), limited the Gentile holding to speech restrictions on attorneys and a determination of the balance of "litigants' fair trial rights with attorneys' free speech rights in upholding a rule prohibiting attorneys involved in a pending trial from making statements likely to prejudice the proceedings." Id. at 200 (citing Gentile, 501 U.S. at 1073 n.5 & 1075, 111 S. Ct. at 2744 n.5, 2745). In United States v. Ford, 830 F.2d 596, 600 (6th Cir. 1987), the Sixth Circuit applied the "clear and present danger" test to a gag order on a defendant congressman undergoing criminal prosecution.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 105

prejudice" because both standards require an assessment of proximity and degree of harm. 501 U.S. at 1037. The Tennessee Supreme Court's ruling is not contrary to Supreme Court precedent because of its application of the "substantial likelihood of prejudice" standard.

**2. Harmless Error**

The "common thread" connecting the Supreme Court's harmless error cases is that "each involved 'trial error' — error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." Arizona v. Fulminante, 499 U.S. 279, 307 (1991); see also Brecht v. Abrahamson, 507 U.S. 619, 638 (1993) (the harmless error standard applies to "constitutional error of the trial type"); United States v. Marcus, 560 U.S. 258, 263 (2010) (structural errors are "a very limited class" of errors that affect the "framework within which the trial proceeds"). The Supreme Court has identified the following "structural" errors: the complete denial of counsel, a biased judge, denial of the right to self-representation at trial, racial discrimination in jury composition, denial of a public trial, and a defective jury instruction on the reasonable-doubt standard of proof. Neder v. United States, 527 U.S. 1, 8 (1999); Marcus, 560 U.S. at 263; Becht v. United States, 403 F.3d 541, 547 (8th Cir. 2005). The error in those cases "necessarily render[s] a criminal

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 106

trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." Washington v. Recuenco, 548 U.S. 212, 218-19 (2006) (alteration in original) (internal quotation marks omitted). The error in the gag order is not a structural error.

The Tennessee Supreme Court's determination is not contrary to or an unreasonable application of clearly established Supreme Court precedent or based on an unreasonable determination of facts. Summary judgment is GRANTED; Claim 10 is, therefore, DENIED.

**J. Anonymous Jury (Claim 11, Amended Petition ¶¶ 313-23)**

Carruthers alleges that the empaneling of an anonymous jury violated his Sixth, Eighth, and Fourteenth Amendment rights. (ECF No. 21 at 85.) He alleges that: (1) the trial court did not first hold a hearing or make a record of the factual basis for its extraordinary action (id.); (2) the trial court did not suggest that special procedures be used, that instructions be given to the prospective or empaneled jurors, or solicit the parties' input (id. at 85-86); and (3) the trial court did not explain why the jury needed to be anonymous or give instructions on the fact that the use of an anonymous jury would not effect the deliberations (id. at 86). He asserts that his right to a fair trial by an impartial jury was prejudiced and that this was compounded by the extraordinary security at trial, especially at the return of the guilty verdict and at sentencing when, "Before the guilty verdicts were read shortly after 11:a.m., a dozen armed SWAT members and sheriff's deputies were positioned around the tense courtroom" and after the

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 107

jury's deliberation at sentencing, "[t]he same security routine followed . . . ." (Id.)

### 1. Procedural Default

Respondent argues that the claim was not presented in the Tennessee state courts and is procedurally defaulted. (ECF No. 114-1 at 19-20.) Carruthers asserts that he argued in his post-conviction appellate brief that empaneling an anonymous jury was "unjustified." (ECF No. 129 at 233.) Carruthers contends that his claim about the anonymous jury is not procedurally defaulted because he cited State v Ivy, 188 S.W.3d 132, 143-44 (Tenn. 2006), noting that the Tennessee test for determining whether to empanel an anonymous jury exists to "preserv(e) the individual rights of the accused," including those guaranteed by the Fifth, Sixth, and Fourteenth Amendments. (Id. at 233-34.)

In Carruthers's post-conviction appellate brief, he asserts ineffective assistance of appellate counsel for the failure to challenge the use of an anonymous jury as a violation of Tennessee law and the Sixth and Fourteenth Amendments. (ECF No. 134-1 at PageID 18117.) Carruthers noted that the second prong of the Ivy framework was "whether reasonable precautions will minimize prejudice to the defendant and ensure that fundamental rights are protected." (Id. at PageID 18119, 18122.) Carruthers cited State v. Bobo, 814 S.W.2d 353, 358 (Tenn. 1991), which addressed the "constitutional right to trial by jury." (Id. at PageID 18123.) Carruthers argued that Judge Dailey was completely oblivious to

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 108

federal precedents resulting in a failure that rose to the "level of . . . Sixth and Fourteenth Amendment violation[s] as well." (Id. at PageID 18124 n.35.) Carruthers raised the issue in his post-conviction appellate brief.[35] The Tennessee Court of Criminal Appeals addressed the anonymous jury argument in the context of an ineffective-assistance-of-appellate-counsel claim, concluded that the trial court did not abuse its discretion by empaneling an anonymous jury, and also that Carruthers was not unduly prejudiced by the anonymous jury. Carruthers, 2007 WL 4355481, at *49-50. Claim 11 was exhausted in the state courts. Summary judgment based on procedural default is, therefore, DENIED.

**2. Merits**

On the merits of the anonymous-jury claim, the Tennessee Court of Criminal Appeals stated:

> c. Anonymous Jury
>
> The petitioner next argues that appellate counsel were ineffective for failing to challenge the impaneling of an anonymous jury.
>
> There was no precedent in Tennessee for impaneling an anonymous jury at the time of the petitioner's trial. Since that time, however, our supreme court concluded in State v. Ivy, 188 S.W.3d 132, 143 (Tenn.), cert. denied,--- U.S. ----, 127 S. Ct. 258, 166 L. Ed. 2d 200 (2006), that anonymous juries do not *per se* violate a defendant's right to a fair and impartial trial and that it is within a trial court's discretion to determine whether an anonymous jury is appropriate in any particular case. In analyzing this issue, our supreme court first found that nothing in our statutes or constitution prohibits the impaneling of an anonymous jury in

[35] Carruthers asserted ineffective assistance of counsel as cause for any prejudicial default. (ECF No. 129 at 247-48, 252-53.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 109

Tennessee. The court then turned to a review of other jurisdictions, noting that "nearly every court that has addressed the issue has recognized that anonymous juries may be impaneled in an appropriate case without violating a defendant's constitutional rights under the United States Constitution." Id. (citing United States v. Talley, 164 F.3d 989, 1001 (6th Cir. 1999); United States v. Edmond, 52 F.3d 1080, 1090 (D.C. Cir. 1995); United States v. Ross, 33 F.3d 1507, 1519 (11th Cir. 1994); United States v. Crockett, 979 F.2d 1204, 1215 (7th Cir. 1992); United States v. Scarfo, 850 F.2d 1015, 1021 (3d Cir. 1988); United States v. Barnes, 604 F.2d 121, 140 (2d Cir. 1979)).

The Ivy court acknowledged that the impaneling of an anonymous jury "requires a court to 'balance the defendant's interest in conducting meaningful voir dire and in maintaining the presumption of innocence, against the jury member's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict.'" Id. at 144 (quoting United States v. Amuso, 21 F.3d 1251, 1264 (2d Cir. 1994)). The court, therefore, adopted the two-prong framework used by other courts for determining the appropriateness of an anonymous jury in any particular case: (1) whether there is a strong reason to believe that the jury needs protection; and (2) whether reasonable precautions will minimize prejudice to the defendant and ensure that fundamental rights are protected.

In determining whether the circumstances support a finding that the jury needs protection, a court may consider a defendant's alleged participation in organized crime, a defendant's alleged participation in a group with the capacity to threaten jurors, a defendant's past efforts to interfere with the judicial process, the defendant's possible punishment if convicted, and the pervasiveness of trial publicity that may reveal the jurors' names and expose them to public scrutiny. Id. (citing Edmond, 52 F.3d at 1091; Ross, 33 F.3d at 1520). Reasonable precautions to minimize prejudice to the accused include enhanced voir dire, instructions to the jury as to neutral reasons for their anonymity, and instructions to the jury on the presumption of innocence. Id. (citing Edmond, 52 F.3d at 1093 (noting that jury was instructed that anonymity was routine); Talley, 164 F.3d at 1002 (observing that jury was instructed that anonymity was due to media interest); Crockett, 979 F.2d at 1216 (noting that jury was instructed on the presumption of innocence).

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 110

Applying Ivy to the present case, we conclude that the trial court did not abuse its discretion by impaneling an anonymous jury. First, the trial court had ample reasons to believe that this was a case in which the jurors needed to be protected. The record reveals, among other things, that one of the petitioner's codefendants had been found hanged in his cell prior to trial; the petitioner had repeatedly threatened his counsel and their families and staff; the petitioner had several prior convictions for violent offenses; and books on wire-tapping, explosives, and surveillance methods had been found in the petitioner's cell. A history of violence and attempting to obstruct justice may support a determination that impaneling an anonymous jury is appropriate. Id. at 144-45.

Second, the petitioner was not unduly prejudiced as a result of the anonymous jury. The trial court permitted a lengthy voir dire and allowed the parties to question the prospective jurors extensively. As in Ivy, the trial court instructed the jury that the petitioner was presumed innocent, that the prosecution had the burden of establishing guilt beyond a reasonable doubt, and that the indictment was not evidence. Additionally, the trial court instructed the jurors that they "should have [no] sympathy or prejudice or allow anything but the law and the evidence to have any influence upon them in determining their verdict." Since the jury is presumed to follow jury instructions absent evidence to the contrary, we conclude that these instructions protected against the possibility of prejudice. See id. at 145.

We note that although this case predated Ivy, the trial court, in its decision to impanel the anonymous jury, appropriately balanced the need to ensure the safety and integrity of the trial and all its participants against the potential prejudice to the petitioner:

> I think the record is replete with references of threats and harassment by [the petitioner]. Mr. William Massey filed several affidavits of his own on his own behalf and on behalf of his secretary indicating that he had been threatened personally by [the petitioner], that the car that his daughter drives was specifically identified in one of the threats in a letter authored by [the petitioner], that the color of the toothbrush in his house could be discovered, that he had investigators from out of town that could come in and do all of this

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 111

work, a threatening call was made to Mr. Massey's office which resulted in his secretary being reduced to tears because of the threats that were communicated over the telephone. All of this is in the record. This isn't any secret. And there was never any attempt to deny authorship of these letters.

. . . .

It goes back farther than that. Mr. Larry Nance was physically intimidated and threatened sufficiently to cause him to want to get off of the case.

This case is replete with threats and intimidation, and [the petitioner] standing up and saying today that it never happened doesn't change history. And all that has happened, including the books that were found in his cell, tend to indicate that this is a case that should be viewed in a most serious light, that intimidation and threats and bullying tactics have been part of this case from day one.

And what I intend to do is to take every measure possible to reduce that sort of conduct as it may apply to witnesses who come in here to testify and jurors who volunteer their time to sit and serve on this jury. And I may well employ a numbering system for this case.

. . . .

And I guess the argument can be made that it would somehow increase the tension and raise the level of tension in the trial. I guess there are a lot of things that to one degree or another do that. I mean, any time you have a sequestered jury, as opposed to a nonsequestered jury, I guess arguably that would increase the tension and focus the jurors' attention on the case and send a message to them that this is a serious matter, that they should do this or that.

. . . [B]ut that's just a part of the process. And if that's necessary, if that has to be done to maintain the safety and integrity of the system and the safety of the participants, then

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 112

> so be it. In my opinion . . . that would be appropriate.
>
> I can't, you know, getting back to the letter that [the petitioner] sent to Mr. Massey in which he mentioned the car that his daughter drove, I mean, Mr. Massey even indicated in that letter that wasn't even the car he drove. And how [the petitioner] found out about that car, I don't know, but he had some way of finding that out. And those are the types of things that lead me to believe that this is the type of case, given the charges involved, the facts involved, and the lengthy history of intimidation and threats that exist in this case in the record, that this may well be the type of case that some sort of numbering system would be appropriate for.
>
> And I think it would benefit everyone involved in allowing the jurors to feel freer to respond and freer to stay on the case and to listen to the facts of the case and render-and focus on the facts of the case and render a fair and impartial decision.

> Accordingly, we conclude the record supports the determination of the post-conviction court that appellate counsel were not deficient by not raising as an issue on appeal the trial court's use of an anonymous jury.

Carruthers, 2007 WL 4355481, at *48-51 (alterations in original).

Carruthers argues that the Supreme Court in Taylor v. Kentucky, 436 U.S. 478, 485 (1978), recognized that the Sixth and Fourteenth Amendments establish a fundamental right that

> one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduces as proof at trial.

(ECF No. 129 at 252.) He asserts that the fundamental right takes on additional importance when the State seeks the death penalty. (Id.) He argues that the Supreme Court requires "close judicial

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 113

scrutiny" of any measures having the potential of "casting suspicion's shadow on the accused." (Id.) He cites United States v. Talley, 164 F.3d 989, 1001-1002 (6th Cir. 1999), for the level of scrutiny required before a trial court can empanel an anonymous jury. (Id.) Carruthers asserts that there was no hearing and no evidence on factors that would support a determination that an anonymous jury was necessary. (Id.) He contends that Judge Dailey "did nothing other than issue a knee-jerk fiat" and failed to engage in any scrutiny in empaneling an anonymous jury. (Id. at 253.)

There is no Supreme Court case setting out the criteria for empaneling an anonymous jury and, as such, there is no Supreme Court precedent directly addressing that issue. See Miller v. Lafler, No. 2:10-CV-14955, 2011 WL 4062410, at *2 (E.D. Mich. Sept. 13, 2011) (denying habeas relief because "[t]he United States Supreme Court has never held that jurors must be referred to by their name and not by number during the jury selection process."), rev'd on other grounds, Miller v. Lafler, 505 F. App'x 452 (6th Cir. 2012).[36]

Further, there is no constitutional right to a public jury, but only a Sixth Amendment right to "a public trial by an impartial jury." United States v. Lawson, 535 F.3d 434, 440-41 (6th Cir. 2008). In Lawson, the Sixth Circuit noted:

> There may be instances in which an anonymous jury is empaneled in such a way as to jeopardize constitutional

[36] Despite Carruthers's reliance on Taylor, that case did not involve an anonymous jury, but whether a trial court's failure to give a jury instruction on the presumption of innocence resulted in a violation of the right to fair trial. Taylor, 436 U.S. at 479.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 114

> rights - such as the right to a presumption of innocence - but an anonymous jury is not a constitutional violation in and of itself.

Id. at 441. A trial court "may empanel an anonymous jury in any case in which the interest of justice so require" and within its sound discretion. United States v. Warman, 578 F.3d 320, 343 (6th Cir. 2009). The Fourth Circuit in United States v. Dinkins, 691 F.3d 358, 372 (4th Cir. 2012), held that "[a]n anonymous jury is warranted only when there is strong reason to conclude that the jury needs protection from interference or harm, or that the integrity of the jury's function will be compromised if the jury does not remain anonymous." See United States v. Candelario-Santana, 909 F. Supp. 2d 68, 76 (D.P.R. 2012) (an anonymous jury may be necessary to enable the jury to perform its fact finding function and to ensure juror protection); Wren v. Fabian, No. 07-4353 (JNE/JSM), 2008 WL 4933950, at *7 (D. Minn. Nov. 14, 2008) (denying habeas relief related to anonymous jury claims where jurors remained anonymous "to ensure their safety and impartiality: (1) a potential trial witness had been assaulted, (2) retaliation was the alleged motive for the crime, and thus the jurors might have reason to fear retaliation against themselves, and (3) there was some 'potential gang affiliation evidence,' which could suggest a need for juror anonymity."). The trial court must ensure that the defendant retains his right to an unbiased jury by conducting voir dire designed to uncover bias as to issues in the case and the defendant and provide the jury a neutral, non-prejudicial reason for requiring

the jury to be anonymous. Talley, 164 F.3d at 1001-1002.

In the instant case, there was substantial evidence of threats of violence associated with the case. The trial court permitted a lengthy voir dire and allowed the parties to question the jury extensively. See Carruthers, 2007 WL 4355481, at *50. The court gave instructions on the presumption of innocence, reasonable doubt, and that the indictment did not constitute evidence. Id. Nothing in the record demonstrates that the use of the anonymous jury violated Carruthers's clearly established constitutional rights.

The Tennessee Court of Criminal Appeals' decision is not contrary to, or an unreasonable application of clearly established Supreme Court precedent. See Hanks v. Palmer, No. 1:08cv192, 2008 WL 2923425, at *10 (W.D. Mich. July 25, 2008) (denying habeas where no clearly established Supreme Court ruling).

In the context of Carruthers's ineffective assistance of appellate counsel claim (Claim 39), he argues that the Tennessee Court of Criminal Appeals' findings were based on false and misleading facts, presumably an unreasonable determination of facts based on the evidence presented. (See ECF No. 129 at 227.) He contends that the court "emphasized that Judge Dailey had sufficient reasons for empaneling such a jury," that attorney Larry Nance was "physically intimidated and threatened sufficiently to cause him to want to get off the case," and "that one of the petitioner's co-defendants had been found hanged in his cell prior to trial." (Id.) See Carruthers v. State, 2007 WL 4355481, at *50. Carruthers argues

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 116

that Nance was never threatened and did not seek to get off the case. (ECF No. 129 at 96-99, 227-28.) He further asserts that the record contains no evidence that Jonathan Montgomery's tragic death was anything other than a suicide. (Id. at 99-101, 228.)

The Tennessee Court of Criminal Appeals finding that Jonathan Montgomery "had been found hanged in his cell prior to trial" is an undisputed fact. See Carruthers, 2007 WL 4355481, at *50. The court does not state that Montgomery was murdered or infer otherwise.

With regard to Nance, Carruthers filed a pro se motion for substitution of counsel. (ECF No. 55-1 at PageID 1158-60.) An order substituting Coleman Garrett as counsel was signed by Nance and filed on December 9, 1994. (Id. at PageID 1162; see ECF No. 56-7 at PageID 10887.) At the post-conviction hearing, Nance testified that the court had a bench conference, and he was relieved as counsel without explanation. (ECF No. 56-7 at PageID 10883.) Nance testified that Carruthers refused his visits. (Id. at PageID 10902.) Carruthers did not threaten Nance, and Nance did not fear him. (Id.)

In a hearing on February 20, 1996, the trial court addressed Carruthers's motion for appointment of counsel and specifically noted the history of Carruthers's issues with counsel:

> Soon after the initial arraignment the complaints began. The letters started flying, letters to the Board of Professional Responsibility, letters to me, letters to the attorneys, letters to The Commercial Appeal, letters to anybody and everybody. But those types of letters and complaints are not uncommon coming from defendants

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 117

> awaiting trial in the jail. . . .
>
> . . . Those letters soon escalated to physical-personal threats against Mr. Larry Nance. Physical threats that grew to the point where Mr. Larry Nance did not feel comfortable or safe, personally safe, in continuing to represent Mr. Tony Carruthers; and in deference to his concern for his own personal safety, and his concerns were conveyed to me, and certain specific incidents, threatening incidents were conveyed to me that I took to be true.
>
> I know Mr. Larry Nance to be a man of great integrity. He has tried many cases in here. I've known him for many years, and I know him to be a man of great integrity, and I took his statements to be true with regard to the incidents that gave rise to his own personal safety if he were to continue representing Mr. Tony Carruthers. And, accordingly, I relieved him from continuing to represent Mr. Carruthers.

(ECF No. 55-6 at PageID 4389-4390.)

The Tennessee Court of Criminal Appeals stated, "Nance admitted that 'some enmity' had developed between him and Carruthers" and that "communication between the two of [them] broke down fairly early in the representation." Carruthers, 2007 WL 4355481, at *10, 26 (alteration in original). The court noted that the record does not reflect that a hearing was held on the motion for substitution of counsel and cited Judge Dailey's comments in a subsequent hearing that Nance was allowed to withdraw because of "personal physical threats" and because he did not "feel comfortable or safe, personally safe, in continuing to represent Mr. Tony Carruthers." Id. at *11. The court noted other references to Nance being threatened, intimidated, or hassled sufficiently to cause him to want to withdraw from the case. Id. at *50, 52. The Tennessee Court of Criminal Appeals did not cite Nance's testimony about not

being threatened or fearful of Carruthers.

The state-court record does not state what occurred at the bench conference. Dailey's recitation of events at hearings during the trial is closer in time and more reliable than Nance's testimony nearly ten years later. The state court's factual determination is presumed to be correct absent clear and convincing evidence to the contrary and will not be overturned unless objectively unreasonable in light of the evidence presented. See Ayers, 623 F.3d at 308.

The Court finds that it was not objectively unreasonable for the Tennessee Court of Criminal Appeals to rely on Dailey's recitations about the circumstances surrounding Nance's withdrawal. Carruthers did not directly question Nance about the judge's statements or present clear and convincing evidence contrary to those statements. Further, Nance's withdrawal was not the sole, nor the determinative factor in the trial court's choice to use an anonymous jury. The Tennessee Court of Criminal Appeals relied on a series of events surrounding the trial that supported the empaneling of an anonymous jury including the threats and intimidation on Massey, his staff, and family, but also the information on wire-tapping, explosives, and surveillance methods found in Carruthers's cell. See Carruthers, 2007 WL 4355481, at *50-52.

The Tennessee Court of Criminal Appeals' decision is not contrary to or an unreasonable application of clearly established Supreme Court precedent or based on an unreasonable determination of

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 119

facts in light of the evidence presented. Claim 11 is without merit and is, therefore, DENIED.

**K. Excessive Security (Claim 12, Amended Petition ¶¶ 324-28)**

Carruthers alleges that his Sixth, Eighth, and Fourteenth Amendment rights were violated by the excessive security measures for his trial. (ECF No. 21 at 86-87.) He alleges that the trial court never held a hearing on the need for security or the least restrictive means to address the court's concerns. (Id. at 87.) He asserts that the security measures, coupled with the jurors' unexplained anonymity, made impermissible factors unavoidable and prejudiced the trial. (Id.)

**1. Procedural Default**

Respondent argues that the claim was not presented in the Tennessee state courts and is procedurally defaulted. (ECF No. 114-1 at 19-20.) He argues that Carruthers did not object to the security at trial or raise the issue on appeal. (Id.) Respondent asserts that, although Carruthers presented a claim in the state post-conviction proceedings for ineffective assistance of appellate counsel for failing to challenge the security measures at trial, Carruthers did not challenge the security measures themselves or show that they were excessive. (Id.; ECF No. 149 at 20.) Respondent contends that because Carruthers has not established that his counsel were ineffective for failing to present the claim, he cannot establish cause for the failure to exhaust the claim. (ECF No. 149 at 20.) Respondent further argues that to the extent

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 120

Carruthers's argument is based on the assertion that the trial court's security decisions were based on improper ex parte information, that claim was not alleged in the petition, not exhausted in the state court, and procedurally defaulted. (Id. at 20-21.)

Carruthers argues that he did object to the security measures at trial, pointing out motions to determine the regulation of courtroom security[37] and several instances where security was raised as an issue at hearings.[38] (ECF No. 129 at 234.) He argues that in the post-conviction proceedings, he presented proof that: (1) experienced courtroom observers could not remember a trial where there were more security officers in the courtroom; (2) jurors were aware that, in addition to uniformed officers, the courtroom held armed plain clothes officers; (3) there were armed uniformed officers on each side of Judge Dailey; (4) there was at least one plain clothes officer armed with a machine gun that was, at times, visible; and (5) SWAT officers guarded the jury's sequestered quarters. (ECF No. 129 at 234-235.) Carruthers contends that these assertions were presented through his post-conviction appellate brief in the context of his ineffective-assistance-of-counsel claim,

---

[37] (See ECF No. 55-1 at PageID 1487-88, 1504-1505.) The trial court denied the motions. (Id. at PageID 1514.)

[38] (See ECF No. 55-4 at PageID 3186-87 (Judge Dailey states that "we will have appropriate security measures in place . . . designed to not prejudice your client in any way."); ECF No. 55-6 at PageID 4630-36 (Carruthers brings up security, specifically restraints and crime scene tape around the courtroom); ECF No. 55-7 at PageID 4672-74 (the court notes that Carruthers raised the issue of security previously); id. at PageID 5460 ("I don't think I can get a fair trial with . . . all the security.").)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 121

that his claim was fairly presented in the Tennessee courts, and not procedurally defaulted. (Id. at 235 & n.74.) He asserts ineffective assistance of counsel as cause for any procedural default. (ECF No. 129 at 247-48, 253-54.)

The Tennessee Court of Criminal Appeals addressed the excessive security claim in the context of Carruthers's ineffective-assistance-of-appellate-counsel claim. See Carruthers, 2007 WL 4355481, at *51-53. The court found support for the trial court's measures and determined that appellate counsel were not deficient for not raising the security measures as an issue on appeal. Id. at *53. Because the state court addressed the merits of the underlying excessive-security claim in the context of the ineffective-assistance-of-appellate-counsel claim, the claim was fairly presented and exhausted in the state courts. Summary judgment based on procedural default is DENIED for Claim 12.

**2. Merits**

The Tennessee Court of Criminal Appeals stated:

> d. Excessive Security
>
> The petitioner next contends that appellate counsel were ineffective for failing to challenge the excessive security measures used at his trial, which included the use of S.W.A.T. team officers, additional deputies, plain clothes officers, a metal detector, and crime scene tape outside the courtroom. In Holbrook v. Flynn, 475 U.S. 560, 568-69, 106 S. Ct. 1340, 1345-46, 89 L. Ed. 2d 525 (1986), which the petitioner cites in support of this claim, the United States Supreme Court concluded that "the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial" is not an inherently prejudicial practice. The Court noted that jurors may well either infer that the security personnel are present "to guard against disruptions emanating from

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 122

outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence," or simply accept them as "elements of an impressive drama." Id. at 569, 106 S. Ct. at 1346. The Court held that when a courtroom security arrangement is challenged as inherently prejudicial, the question becomes whether there is "an unacceptable risk . . . of impermissible factors coming into play." Id. at 570, 106 S. Ct. at 1346-47. The Court explained:

> We do not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial. But we simply cannot find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section. Even had the jurors been aware that the deployment of troopers was not common practice in Rhode Island, we cannot believe that the use of the four troopers tended to brand respondent in their eyes "with an unmistakable mark of guilt." Four troopers are unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings. Indeed, any juror who for some other reason believed defendants particularly dangerous might well have wondered why there were only four armed troopers for the six defendants.

Id. at 571, 106 S. Ct. at 1347 (citations and footnote omitted).

Here, the trial court articulated sound reasons for employing additional security personnel in the courtroom:

> [W]hile it would be nice to not have to worry about any security, while it would be nice to go to the airport and not have to go through a metal detector, and come here and not have to go through [a] metal detector, and not have to worry about security, unfortunately, that's not the world we live in, and this case-certainly, if there ever was a case that cried out for security, this would be the case. It's-it is full of instances in which threats have been made, a co-defendant was found hanged in his jail cell. These are facts in the record.

> One attorney was threatened so repeatedly and so genuinely by [the petitioner] that he-well, Mr. Nance, the first attorney, was threatened and hassled by individuals sufficiently to cause him to get off the case and Mr. Massey . . . was threatened so repeatedly and so genuinely by [the petitioner] as to cause him to get off the case even after I insisted that Mr. Massey stay on the case.
>
> The Court of Criminal Appeals reviewed the record and determined that the threats were so genuine and so real and so immediate that they reversed me and ordered him off. And then I determined that, well, he should stay on as elbow counsel and the Court of Criminal Appeals reviewed it again and said, no, no, there [sic] threats are in fact genuine and real. He needs off the case.
>
> And then we have, of course, the three books that were found in [the petitioner's] cell involving tailing people and tapping telephones and explosives and weapons and things of that sort. I mean, the case is full of reference after reference to violence, threats, intimidation, bullying tactics, and I am determined that the jurors that come over here, two weeks from today, will not be exposed to any sort of misconduct or bullying tactics or intimidation or threats. And as a consequence, I'm going to take whatever measures are needed to make sure that they are well protected and well insulated. We'll try to be discreet[.]

The record fully supports the trial court's finding that additional security was warranted under the circumstances in this case. Furthermore, testimony presented at the evidentiary hearing suggests that the trial court was at least partially successful in its attempt to be discreet in the use of additional security personnel. Although John Billings testified that the security in the courtroom was "intimidating" and "frightening," counsel for Montgomery testified that security was heavier than usual but that he saw nothing about the security detail that would have drawn the jurors' attention. Juror 121 testified that the courtroom atmosphere was "intense" with S.W.A.T. team members present but said that it did not affect his decision-making. Finally, Juror 127 was unable to recall any unusual amount of security at the trial.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 124

> Accordingly, we conclude the record supports the determination of the post-conviction court that appellate counsel were not deficient by not raising as an issue on appeal the trial court's use of additional security measures.

Carruthers, 2007 WL 4355481, at *51-53 (alterations in original).

Carruthers argues that Judge Dailey fabricated and embellished facts in the "legend of Larry Nance" on which the Tennessee Court of Criminal Appeals relied to determine the excessive security issue, that the findings about Nance are wrong, and that the decisions resting on them are based on an unreasonable determination of fact. (ECF No. 129 at 96-99.) Like with the anonymous-jury claim, the court's decision was based on more than the trial court's statements about Nance. Further, the Tennessee Court of Criminal Appeals' decision was not based on an unreasonable determination of facts related to Nance.

Carruthers describes the security measures at trial, as including:

- uniformed Special Weapons and Tactics officers, armed with small rifles and pistols;
- armed uniformed officers stationed at Dailey's side;
- armed plainclothes officers throughout the courtroom; and
- a plainclothes officer armed with an Uzi submachine gun.

(ECF No. 129 at 253; see also ECF No. 56-7 at PageID 10839-10842, 10982-10984, 11126, 11147-11148.) Although Carruthers argues that his constitutional rights were violated (ECF No. 129 at 254), he does not assert whether he contends that the state court's decision was contrary to or an unreasonable application of Supreme Court

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 125

precedent.

In Holbrook v. Flynn, 475 U.S. 560, 568-72 (1986), the Supreme Court held that a prisoner was not denied his constitutional right to a fair trial when the customary courtroom security force was supplemented with four uniformed state troopers sitting in the first row of the spectator section of the courtroom. The Court stated:

> All a federal court may do . . . is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over . . . .

475 U.S. at 572. The Court did not find the presence of armed guards at trial to be particularly troubling or prejudicial:

> the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm.

Holbrook, 475 U.S. at 569.

The Tennessee Court of Criminal Appeals applied the correct Supreme Court precedent in Holbrook. Carruthers, 2007 WL 4355481, at *51. The court looked at the scene presented to the jurors, noting that "the trial court was at least partially successful in

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 126

its attempt to be discreet in the use of additional security personnel." Id. at *53. Co-defendant's counsel testified that there was nothing about the security that would have drawn the juror's attention. Id. Juror 121 noticed the security but was not prejudiced by it. Id. Juror 127 did not recall any unusual amount of security. Id. Carruthers has not demonstrated prejudice from the security measures in place at his trial. See United States v. Elder, 90 F.3d 1110, 1131 (6th Cir. 1996) (denying relief where defendants failed to show any inherent or actual prejudice from the security measures at trial); see also Wilkens v. Lafler, 487 F. App'x 983, 990-91 (6th Cir. 2012) (denying relief where defendant failed to show prejudice from the presence of uniformed corrections guards around defendant and discarded shackles in the jury box); Sutton v. Bell, 645 F.3d 752, 756 (6th Cir. 2011) (denying relief where there were "legitimate security concerns involved in trying three inmates for violently murdering a fourth inmate, where the defendants were not wearing upper-body restraints and six other inmates were testifying as witnesses"). The Tennessee Court of Criminal Appeals' decision that the excessive-security claim lacked merit was not contrary to or an unreasonable application of Supreme Court precedent or based on an unreasonable determination of fact. Claim 12 is without merit and, therefore, DENIED.

**L. Withheld Exculpatory Evidence (Claim 13, Amended Petition ¶¶ 329-41) and False Testimony (Claim 14, Amended Petition ¶¶ 342-64)**

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 127

In Claim 13, Carruthers alleges that, contrary to the State's pre-trial assertions, it withheld the following evidence:

- in exchange for Jimmy Lee Maze's testimony against, and/or information about Carruthers, the prosecution would assist Maze in his attempt to receive probation and in securing employment (ECF No. 21 at 87-88);
- in exchange for Charles Ray Smith's testimony against, and/or information about Carruthers, the prosecution would assist Smith in obtaining a favorable resolution on pending criminal charges (id. at 88);
- in exchange for Alfredo Shaw's testimony against, and/or information about Carruthers, the prosecution would assist Shaw in obtaining a favorable resolution on pending criminal charges and/or arrange a monetary payment (id. at 89);
- Alfredo Shaw's testimony was false, and he had acted as an informant (id. at 89-90);
- agents for a powerful drug cartel had killed Marcellos Anderson, Fred Tucker, and Delois Anderson because Marcellos Anderson had been involved in taking cocaine and money from the cartel (id. at 90); and
- when Marcellos Anderson, Fred Tucker, and Delois Anderson were placed in the freshly dug grave, all three were dead (id. at 90-91).

In Claim 14, Carruthers alleges that the prosecution knew about the following false testimony presented at trial:

- Maze's testimony that he received nothing from the State in exchange for his testimony (ECF No. 21 at 91);
- Charles Smith's testimony that: (1) he overheard Carruthers and James Montgomery talking about robbing Marcellos Anderson and his drug distribution associate Andre Johnson; and (2) while Smith was working at a cemetery with Carruthers, Carruthers told Smith that putting a murder victim in an open grave would be a good way to dispose of the body, opining that "if you ain't got no body, you don't have a case" (id. at 92);
- Alfredo Shaw's testimony that: (1) while he received favorable treatment from the State on the conditions of his incarceration, it was not because of Shaw's involvement in the Carruthers trial; (2) Shaw had a conversation with Carruthers

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 128

in the county jail; (3) Shaw had a conversation with Carruthers on the telephone; and (4) Carruthers told Shaw about the murders (id. at 92-93);[39]

- Benton West's testimony that when Marcellos Anderson and Fred Tucker were brought to Nakeita Shaw's home, she told West that she believed they were being kidnapped (id. at 93-94); and

- Dr. O.C. Smith's testimony that the three victims were alive when they were buried. (Id. at 94).

Carruthers alleges that the false testimony prejudiced him because there is a reasonable probability that at least one juror would have voted not guilty and/or against the death sentence. (Id. at 91-94.)

Respondent argues that, during the post-conviction proceedings, Carruthers only alleged claims about: (1) the false grand jury testimony of Alfredo Shaw; (2) the false testimony of O.C. Smith, Charles Hines, and Jimmy Maze; and (3) withheld evidence of deals made with Charles Smith and Maze. (ECF No. 114-1 at 20.) See Carruthers, 2007 WL 4355481, at *55-57. Respondent argues that the theories of Carruthers's claim that were not previously presented are procedurally defaulted. (Id.) He contends that the Tennessee Court of Criminal Appeals found no factual support for the exhausted claims, and no evidence that the State was aware of false testimony. (Id. at 20-21.) He contends that the Tennessee Court of Criminal Appeals' decision is neither contrary to nor an unreasonable application of clearly established federal law and was based on a

[39] Carruthers alleges that the Memphis Police Department ("MPD") knew Carruthers did not kill the victims, and that the Assistant District Attorney and the MPD knew that Shaw had been an informant for years for multiple law enforcement agencies and had testified falsely in the prosecutions of a number of Shelby County deputies. (ECF No. 21 at 93.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 129

reasonable determination of facts, and that the Brady claims are without merit. (Id. at 21.) He further notes that this Court has already dismissed the claim related to Alfredo Shaw and found that his testimony was not material due to "overwhelming" evidence against Carruthers. (Id.) He asserts that, even with the depositions of Charles Smith and the former district attorney, Carruthers has not presented any evidence of a deal in exchange for Smith's testimony. (Id.)

In response to the Motion for summary judgment, Carruthers argues that the State knew Maze's and Shaw's testimony was false and that genuine issues of facts exist about whether the state withheld evidence about deals in exchange for the testimony of Charles Smith, Shaw, and Johnson.[40] (ECF No. 129 at 183-191.) Carruthers argues that the State withheld evidence that the victims were dead and/or unconscious and presented the false testimony of Dr. O.C. Smith that the victims were buried alive. (Id. at 191-192.) Carruthers asserts that there is a reasonable probability that the withheld evidence affected the jury's verdict and its imposition of the death sentence. (Id. at 193-197.)

**1. Procedural Default**

---

[40] Carruthers admits that his claim that the state withheld evidence that it promised to help Johnson on pending criminal charges in return for his testimony is a new claim first asserted in his Response to the Motion for summary judgment. (ECF No. 129 at 189 n.65.) Rule 2(c) of the Habeas Rules states that a petition must "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground." See McFarland v. Scott, 512 U.S. 849, 860 (1994) ("[T]he habeas petition, unlike a complaint, must allege the factual underpinning of the petitioner's claims."). Carruthers did not plead facts to support this claim. Accordingly, this claim is DENIED.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 130

Carruthers asserts ineffective assistance of post-conviction counsel as cause for any procedural default. (Id. at 203-205, 207-209.) The Court has determined that, under Martinez, ineffective assistance of post-conviction counsel does not establish cause for the procedural default of Carruthers's Brady and false-testimony claims. (ECF No. 192 at 27-29.)[41]

Carruthers asserts prosecutorial misconduct and misrepresentations as cause for any procedural default of the withheld-evidence and false-testimony claims. (Id. at 199-202.) He further asserts that his lack of discovery rights in the state proceedings creates cause for the default. (Id. at 202-203.)

"Cause and prejudice" in the context of the procedural default of an alleged Brady claim "parallel[s] two of the three components of the alleged Brady violation itself." Banks v. Dretke, 540 U.S. 668, 691 (2004) (quoting Strickler v. Greene, 527 U.S. 263, 282 (1999)). A petitioner shows "cause" when the petitioner fails to develop the facts in state court because of suppression of the evidence. Banks, 540 U.S. at 691. A petitioner shows "prejudice" by establishing that the evidence was "material" for Brady purposes. Id.; see also Johnson v. Folino, 671 F. Supp. 2d 658, 668 (E.D. Pa. 2009) ("[I]f the government wrongfully suppresses evidence, then an

[41] Carruthers attempts to avoid the conclusion that ineffective assistance of post-conviction counsel cannot be cause for procedural default based on the Sixth Amendment by asserting a due-process claim for deprivation of a recognized property right to "a competent attorney" in a post-conviction proceeding. (ECF No. 129 at 205-207.) See Ballentine v. Quarterman, No. 2:03-CV-00039, 2008 WL 862992, at *4-5 (N.D. Tex. Mar. 31, 2008) (rejecting assertion that deprivation of a constitutionally protected property right to legal service was cause for failure to exhaust a claim).

external factor prevented a petitioner's compliance with state procedure, and if the withheld evidence was material to a petitioner's trial, then barring a petition on procedural grounds would create prejudice."), rev'd on other grounds, 705 F.3d 117 (3d Cir. 2013). Because prosecutorial misconduct associated with withholding evidence or suborning perjury from a government witness can create cause and prejudice for the failure to exhaust these claims, the Court will review Claims 13 and 14 on the merits. Summary judgment based on the procedural default of Claims 13 and 14 is, therefore, DENIED.

**2. Merits**

The Tennessee Court of Criminal Appeals stated:

> B. Prosecutorial Misconduct
>
> The petitioner next contends that the prosecution engaged in numerous acts of misconduct which cumulatively deprived him of his right to a fair trial. Specifically, he complains that the prosecution suppressed evidence of the deals it had made with prosecution witnesses, misrepresented the evidence, and knowingly presented perjured testimony to the grand jury. The State responds by arguing that the claims that the prosecution elicited false testimony or presented perjured testimony to the grand jury have previously been determined by our supreme court on direct appeal; the claim that the prosecution misrepresented evidence has been waived for failure to raise it on direct appeal; and the claim that the prosecution suppressed evidence is without merit.
>
> 1. Alfredo Shaw's Grand Jury Testimony
>
> The petitioner contends that the State had at least constructive knowledge that Shaw's testimony to the grand jury was false. He bases this claim on the fact that Shaw testified that the petitioner implicated himself in the crimes during a conversation that occurred while the men were in the legal room of the Shelby County Jail. According to the petitioner, the jail records indicate

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 132

that he and Shaw were never together in the legal room of the jail during the relevant time period, a fact which could have been easily ascertained by the prosecutor.

The State may not present false testimony and has an affirmative duty to correct false testimony presented by State's witnesses. State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). However, nothing in the record suggests that the prosecutor knew that Shaw's testimony was false at the time he presented his testimony to the grand jury. In its direct appeal opinion, our supreme court noted that Shaw's testimony at trial was consistent with his initial statement to police and with his testimony before the grand jury. Carruthers, 35 S.W.3d at 529, 532. We conclude, therefore, that the petitioner is not entitled to relief on the basis of this claim.

2. Misrepresentation of Evidence

The petitioner next contends that the State misrepresented evidence at trial by asking various questions of Jimmy Maze, Chris Hines, and Dr. O.C. Smith that were improper and prejudicial because there was no factual basis to support the questions posed. The State responds that these claims are waived for failure to raise them on direct appeal or present any evidence in support of these claims. We agree with the State. This court has previously held that "issues [of prosecutorial misconduct] are more properly the subject of a direct appeal and are not properly issues for post-conviction relief." John C. Johnson v. State, No. M2004-02675-CCA-R3-CO, 2006 WL 721300, at *19 (Tenn. Crim. App., at Nashville, Mar. 22, 2006), perm. to appeal denied (Tenn. Aug. 20, 2007). Regardless, we conclude that the petitioner is not entitled to relief on the basis of this claim.

The petitioner bases his claim that the prosecutor misrepresented evidence on testimony elicited from three witnesses: Jimmy Maze, Chris Hines, and Dr. O.C. Smith. He first contends that the prosecutor misrepresented evidence by eliciting testimony from Maze that he had seen the petitioner with three antifreeze jugs on New Year's Eve, 1993, and that the petitioner had told him that the jugs were filled with gasoline. The petitioner argues that the necessary implication of this testimony was that the petitioner later used these jugs of gasoline to burn the Jeep Cherokee found in DeSoto County, Mississippi, which was "improper and extremely prejudicial, as there was no factual basis to support the theory that the gasoline allegedly contained in the antifreeze jugs was

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 133

> used to start the vehicle fire." The petitioner also asserts that the prosecutor improperly asked Maze a question that implied that Maze had been threatened at the jail by the petitioner and his codefendant.
>
> . . . .
>
> Finally, the petitioner contends that the prosecutor's conduct in eliciting testimony from Dr. O.C. Smith that the victims were buried alive was without factual underpinning and prejudicial in the extreme. He asserts that the proof at the evidentiary hearing established that there was no basis in the autopsy reports for Dr. Smith's conclusion that the victims were buried alive.
>
> "It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw." State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). In determining whether statements made by the prosecutor constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978); Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965). We are guided by such factors as the intent of the prosecutor in light of the facts and circumstances of the case, the strength or weakness of the evidence, the curative measures, if any, undertaken by the trial court in response to the conduct, and the cumulative effect of the conduct. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).
>
> Based on our review, we cannot conclude that the prosecutor knowingly misrepresented the evidence in its questioning of these witnesses. Even if we presumed that the questioning was improper, we would conclude that it was harmless beyond a reasonable doubt. Given the rest of the evidence presented by the State and the three additional aggravating circumstances found by the jury, none of the questioned testimony, including Dr. Smith's testimony that the three victims were buried alive, would have changed the verdict of guilt or the sentence of death. Accordingly, we conclude that the petitioner is not entitled to relief on the basis of his claim that the prosecutor misrepresented the evidence.

Carruthers, 2007 WL 4355481, at *54-56.

Under Brady, "due process requires the prosecution to turn over

evidence favorable to the accused and material to his guilt or punishment." Connick v. Thompson, 131 S. Ct. 1350, 1370 (2011) (Ginsburg, J., dissenting). Impeachment evidence falls within the Brady rule. United States v. Bagley, 473 U.S. 667, 676 (1985); see also Connick, 131 S. Ct. at 1381 ("[I]mpeachment evidence is Brady material prosecutors are obligated to disclose.") (Ginsburg, J., dissenting). To establish that a Brady violation undermined a conviction, a petitioner must show "(1) the evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the [s]tate suppressed the evidence, either willfully or inadvertently; and (3) prejudice . . . ensued." Skinner v. Switzer, 131 S. Ct. 1289, 1300 (2011) (second alteration in original) (quoting Strickler, 527 U.S. at 281–82) (internal quotation marks omitted). Further, "'[t]he government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, provided that it does not promise anything to the witness prior to the testimony.'" Akrawi v. Booker, 572 F.3d 252, 263 (6th Cir. 2009) (quoting Bell v. Bell, 512 F.3d 223, 234 (6th Cir. 2008) (en banc)); Melville v. United States, 457 F. App'x 522, 527 (6th Cir. 2012).

To determine whether "withheld information was material and therefore prejudicial," a reviewing court considers the withheld information "in light of the evidence available for trial that supports the petitioner's conviction." Jells v. Mitchell, 538 F.3d



131

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 135

478, 502 (6th Cir. 2008). "[E]vidence is 'material' within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Cone v. Bell, 556 U.S. 449, 469-470 (2009). The withheld information does not have to result "ultimately in the defendant's acquittal." Kyles v. Whitley, 514 U.S. 419, 434 (1995). Favorable evidence is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Cone, 556 U.S. at 470 (quoting Kyles, 514 U.S. at 435). The Court must consider the effect of the suppressed evidence "collectively." Cone, 556 U.S. at 473-474 (quoting Kyles, 514 U.S. at 436). If materiality is established, harmless-error inquiry does not apply. Kyles, 514 U.S. at 435.

Similarly, a conviction obtained by the knowing use of perjured testimony must be set aside if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . ." Giglio v. United States, 405 U.S. 150, 154 (1972) (internal quotation marks omitted); see also United States v. Agurs, 427 U.S. 97, 103 (1976) (same); Wogenstahl v. Mitchell, 668 F.3d 307, 323 (6th Cir. 2012) (same).[42] A false-testimony claim is cognizable on habeas review because the "'deliberate deception of a court and jurors by the presentation of known false evidence is

[42] A Brady violation can arise from the prosecution's knowing use at trial of perjured testimony. Kyles, 514 U.S. at 433 (citing Agurs, 427 U.S. at 103-104); Agurs, 427 U.S. at 103-104 (the knowing use of perjured testimony is one of three situations where Brady applies).


132

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 136

incompatible with rudimentary demands of justice.'" Abdus-Samad v. Bell, 420 F.3d 614, 625 (6th Cir. 2005) (quoting Giglio, 405 U.S. at 153). To prevail, Carruthers must show (1) that the prosecution presented false testimony; (2) that the prosecution knew the testimony was false; and (3) that the testimony was material. Akrawi, 572 F.3d at 265; Rosencrantz v. Lafler, 568 F.3d 577, 583-84 (6th Cir. 2009). The subject testimony must be "indisputably false" rather than "merely misleading." Akrawi, 572 F.3d at 265; see also Coe v. Bell, 161 F.3d 320, 343 (6th Cir. 1998) ("'The burden is on the defendant[] to show that the testimony was actually perjured, and mere inconsistences in testimony by government witnesses do not establish knowing use of false testimony.'" (quoting United States v. Lochmondy, 890 F.2d 817, 822 (6th Cir. 1989))).

**a. Alfredo Shaw**

Respondent argues that Carruthers's claim related to Alfredo Shaw was dismissed, stating that Shaw's testimony was not material due to the "overwhelming" evidence against Carruthers. (ECF No. 149 at 21.) The Court denied the fraud-on-the-court claim related to Alfredo Shaw's grand jury testimony. (ECF No. 70 at 18.)[43] Carruthers's habeas false-testimony claims related to Shaw are based

[43] The Court rejected Carruthers's discovery requests related to Shaw because Carruthers "can not likely demonstrate that any withheld evidence prejudiced his case to the point it undermines confidence in the verdict." (ECF No. 77 at 7-8.) This Court has also acknowledged that Shaw's credibility has been an issue for both Carruthers and the prosecution, even prior to the trial. (See ECF No. 70 at 15-16.) The preliminary assertion that Carruthers is not likely to demonstrate prejudice was based on argument in the discovery stage and does not foreclose the Court's review of Carruthers's false-testimony claim related to Shaw.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 137

on his trial testimony and have not been dismissed by the Court. (See ECF No. 21 at 92-93.)[44]

**1. False Testimony**

Carruthers argues that Shaw's false grand jury testimony that Shaw and Carruthers spoke about the murders in the Shelby County Jail's legal room was repeated at trial. (ECF No. 129 at 190.) He contends that the State knew Shaw's testimony was false because it had documents demonstrating that Carruthers and Shaw were never in the legal room at the same time and remained silent during Shaw's testimony at trial. (Id. at 190-191.) Carruthers asserts that the Tennessee Court of Criminal Appeals' determination that "nothing in the record suggests that the prosecutor knew that Shaw's testimony was false" is an unreasonable determination of fact. (Id. at 197-198.) Carruthers contends that, in a May 1995 hearing, his defense counsel specifically discussed the fact that jail records established that Carruthers and Shaw were never in the legal room at the same time. (Id. at 198; see ECF No. 55-4 at PageID 3241-3245.)

Prior to Shaw testifying, the trial court stated on the record its concerns about his testimony:

> You're aware of the fact that certainly this – you have every right to testify, and no one is trying to stop you from testifying. I do want to advise you, however, before you testify that based on what has been said in court, in court proceedings, what has been implied in court proceedings, what has been suggested through various

[44] The Tennessee Court of Criminal Appeals addressed Shaw's grand jury testimony and noted the consistency in Shaw's testimony before the grand jury and at trial. Carruthers, 2007 WL 4355481, at *55.


134

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 138

> media outlets, it has given me reason to believe that you might come into court today and state on the record under oath that you had lied on previous occasions when testifying in this court and before the grand jury. . . .
>
> All right. Now, wait a minute. Wait a minute. I need to advise you, you will be under oath today, of course. You are under oath now, and if you are to testify today you will be under oath.
>
> You need to be aware of the fact that if you state today that you in fact lied under oath before the Shelby County Grand Jury when you testified before the grand jury and if you and if you – and/or if you in fact lied under oath when you came into this courtroom a year or so ago and gave a deposition, that may well constitute, that admission may well constitute the basis for an indictment for aggravated perjury, which is a felony.

(ECF No. 55-9 at PageID 6931-6932.) Shaw was allowed to consult with his attorney before taking the stand; his attorney expressed that Shaw's prior testimony was true, but Shaw was "scared to death" because Carruthers delivered a threat "as to the life and limb" of Shaw and his family. (Id. at PageID 6933-6934, 6952-6953, 6957.)

The prosecution asserted that, because it refused to aid Shaw with his continued arrests, he "called the media and began this program of recantation or attempted recantation." (Id. at PageID 6935-6936.) The prosecution noted that Shaw's behavior in constantly getting arrested and seeking aid from them was the reason why they announced in open court that they would not use him at trial. (Id. at PageID 6935-6936.) The decision was not because they did not believe his prior testimony was true, but because they could not "give him carte blanc to go out and get arrested." (Id. at PageID 6936-6937.)

Prior to Shaw testifying, Carruthers was aware of what Shaw's

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 139

testimony would be and that Shaw went to the media and recanted because of threats Shaw claims Carruthers made. (Id. at PageID 6957-6958.) At trial, Shaw testified about the information he reported to the police about the murders. (Id. at PageID 7001-7005, 7008-7027.)[45] After giving the police statement, Shaw was taken to another facility. (Id. at PageID 7029.) Shaw was released from jail about eight months later because he had cancer and was receiving treatments. (Id. at PageID 7029-31.) He testified that after he gave the police his statement, he had a court date about probation; his pending cases were postponed, and he was allowed to go home. (Id. at PageID 7044.) Carruthers asked Shaw if there were any promises made for his deposition, his grand jury testimony, or his statement. (Id. at PageID 7045.) Shaw said that no promises were made. (Id.) He stated, "the reasons for all this publicizing that's going on concerning myself and Mr. Harris[46]" was because Shaw was "stuck between a rock and a hard place," and Shaw's life and his family's lives were in danger. (Id. at PageID 7045-46)

Carruthers's investigator came to see Shaw and told him that he had been stricken from the witness list. (Id. at PageID 7051.) Shaw testified:

> And that was the whole plan, for me to come in here and say that Mr. Harris planned this, you know what I mean,

---

[45] Shaw's statement to the police is attached as an exhibit in response to the Motion for summary judgment. (ECF No. 133-17.) Carruthers went over Shaw's grand jury testimony at trial (see ECF No. 55-9 at PageID 7032-33), re-emphasizing points with the jury that he now contends were lies.

[46] The reference is to Assistant Attorney General Phillip Gerald ("Jerry") Harris, one of the prosecutors on Carruthers's case.

> coerced me into this and gave police reports and everything. This was the plan, you know what I mean. My life was threatened, either I do that or I don't.

(Id.) Shaw testified that it was Carruthers's plan. (Id. at PageID 7052.) Shaw testified that he received threats from Carruthers and a deputy jailer after his name was stricken from the prosecution's witness list; that his testimony before the grand jury and at his deposition was true; and that he "would rather take a perjury charge than to lose my life or lose someone in my family's life." (Id. at PageID 7048, 7051-63.)

Carruthers argues that § 2254(d) does not preclude relief because the Tennessee Court of Criminal Appeals made an unreasonable fact determination when it opined that "nothing in the record suggests that the prosecutor knew that Shaw's testimony was false . . . ." (ECF No. 129 at 197-198.) See Carruthers, 2007 WL 4355481, at *55. The issue of whether Shaw was actually in the legal room had been raised in prior hearings. Carruthers, however, did not establish at trial or on the record that Shaw was not in the legal room with him. Testimony at trial indicated that the jail records for the law library were not always complete or accurate (see ECF No. 55-9 at PageID 7169-71, 7190-91) and that Shaw would have had the opportunity to interact with Carruthers in jail during the time that Shaw was not housed in protective custody. Carruthers, 35 S.W.3d at 529-30. The prosecution continued to express that they believed Shaw was telling the truth. Carruthers has not presented clear and convincing evidence to the contrary. He

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 141

has not demonstrated that the Tennessee Court of Criminal Appeals' decision was based on an unreasonable determination of the facts based on the evidence presented.

**2. Promise or Deal**

Carruthers argues that Shaw was a "professional snitch" with nine pending theft charges at the time he took the witness stand. (ECF No. 129 at 186.) The month after Carruthers's trial ended, Shaw pled guilty to all nine theft charges, which carried sentences in the range of one to twelve or three to fifteen years. (Id. at 187.) Carruthers argues that, at Shaw's plea hearing, the State recommended that Shaw receive an effective sentence of four years on all charges and that his sentences be suspended in favor of probation. (Id.; see also ECF No. 133-10 at PageID 17851-17853.) At the hearing to suspend Shaw's sentence on July 3, 1996, Judge Joe Brown notes that Shaw was given "some bond consideration because you were looked at as a potential witness in that Carruthers matter," and Shaw responded, "Yes, sir." (ECF No. 129 at 187; ECF No. 133-11 at PageID 17874.) Brown stated:

> you've been a snitch and you've been acting like you've got immunity to any kind of prosecution and you can do what you want to do cause you think you got information you can exchange with the State.

(ECF No. 133-11 at PageID 17875.) Brown stated, "[t]he Court would repeat that it appears the defendant has been a long term snitch and has gotten into the habit of feeling that he has basic immunity to suffering the ordinary consequences of criminal activity." (Id. at PageID 17885.) Nevertheless, Brown sentenced Shaw to four years'

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 142

supervised probation, with intensive probation for the first year after his completion of strict confinement until April 3, 1997. (Id. at PageID 17885-17886.) Carruthers contends that there are genuine issues of fact about whether Shaw lied when he testified that he was not receiving consideration for his testimony against Carruthers. (ECF No. 129 at 188.)

At trial, Shaw was not a government witness; Carruthers called Shaw to testify. (ECF No. 55-9 at PageID 6931.) Any deal or promise previously discussed with Shaw was clearly not in exchange for Shaw's testimony as a government witness. To the extent, Carruthers contends that Shaw was given bond consideration in exchange for his testimony, Shaw explained the circumstances surrounding his release at trial. The jury could weigh Shaw's credibility in considering his testimony. Carruthers has not demonstrated that Shaw was induced by a promise or deal from the government to testify falsely at Carruthers's trial.

**b. Jimmy Maze and Charles Smith**

The Tennessee Court of Criminal Appeals addressed Carruthers's argument that the State made deals with witnesses in exchange for their trial testimony and withheld evidence of those deals:

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 143

3. Withholding of Evidence of Deals Made with State Witnesses

The petitioner contends that the State improperly withheld evidence of deals it made with prosecution witnesses in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). Specifically, the petitioner asserts that the State failed to disclose deals made with witnesses Jimmy Maze and Charles Ray Smith in exchange for their testimony at trial.

The duty to disclose exculpatory evidence extends to all "favorable information" irrespective of whether the evidence is admissible at trial. State v. Robinson, 146 S.W.3d 469, 512 (Tenn. 2004); Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001). The prosecution's duty to disclose Brady material also applies to evidence affecting the credibility of a government witness, including evidence of any agreement or promise of leniency given to the witness in exchange for favorable testimony against an accused. Johnson, 38 S.W.3d at 56. Although Brady does not require the State to investigate for the defendant, it does burden the prosecution with the responsibility of disclosing statements of witnesses favorable to the defense. State v. Reynolds, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984). However, this duty does not extend to information that the defense already possesses, or is able to obtain, or to information not in the possession or control of the prosecution or another governmental agency. State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

Jimmy Maze testified that the prosecution had promised him that he would be "taken care of" if he testified. He said he understood this as a promise to protect him, since his life had been threatened. He further testified that the prosecutor told him after the trial that he would help him get probation for some pending charges. However, he did not know whether the prosecutor ever helped him or not. With respect to this claim, the post-conviction court determined that Maze's deposition testimony "[did] not support a finding that any promise was made related to his April 1996 testimony." The post-conviction court further found that the only evidence of any deal between the prosecution and Charles Ray Smith came from the testimony of Jimmy Maze, which the post-conviction court did not find credible.

The record supports the findings and conclusions of the

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 144

> post-conviction court. Maze's deposition testimony does not support the petitioner's claim that the prosecution entered into an agreement with either Maze or Smith in exchange for their trial testimony. Moreover, we agree with the post-conviction court that even if the State failed to disclose "deals" it had made with Maze and Smith, the error would have been harmless. Both Maze and Smith were heavily impeached at trial by their long criminal records and the pending criminal proceedings against them.

Carruthers, 2007 WL 4355481, at *56-57.

**1. Jimmy Maze**

Carruthers asserts that Maze was arrested in January 1994 for reckless endangerment and theft. (ECF No. 129 at 183.) Carruthers submits Maze's declaration in support of his response to the Motion for summary judgment to assert that Maze led the prosecution to believe he had information about the murders and that Harris told Maze that if he testified, the State would: (1) not pursue a probation violation for Maze's new charges; and (2) help him get a favorable disposition of the new charges. (Id.; ECF No. 133-2 at PageID 17738, ¶¶ 3, 4.)[47] Carruthers asserts Maze accepted the offer and, shortly thereafter, was released to community corrections and probation. (ECF No. 129 at 183; ECF No. 133-2 at PageID 17738, ¶ 5.) Carruthers contends that Maze was arrested again and, while in jail, the prosecution met with him and "went over the testimony he was to give at the trial." (ECF No. 129 at 183.)[48] Carruthers

---

[47] The declaration is not dated, but it differs from a prior affidavit submitted by Maze in the post-conviction proceedings. (See ECF No. 87-7 at PageID 14555-14556.)

[48] The declaration actually states that Harris "met with me to discuss my testimony" and does not imply that Maze was coached to testify in a certain (continued...)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 145

asserts that the State helped Maze with a favorable disposition for the subsequent charges. (Id.) Carruthers argues that co-defendant's counsel "smelled a rat" and cites Maze's trial testimony about whether promises were made. (Id. at 184-85.) Carruthers asserts that the State knew Maze's testimony was false. (Id. at 185.)

Respondent argues that the only support for the claim that the prosecution made a deal with Maze is Maze's testimony in the post-conviction proceedings, which the Tennessee Court of Criminal Appeals did not find credible. (ECF No. 149 at 22.) See Carruthers, 2007 WL 4355481, at *57.[49] In the habeas proceedings, there is also no evidence except from Maze to establish that a promise or deal was made. Because the claim was exhausted in state court, Maze's declaration submitted in response to the motion for summary judgment is barred from consideration under Pinholster and § 2254(d)(2).

State-court deference applies to the fact-finder's ability to adjudge a witness's demeanor and credibility. See Combs v. Coyle, 205 F.3d 269, 277 (6th Cir. 2000). Carruthers has not presented clear and convincing evidence that would rebut the presumption that the state court's determination was correct. See Pritchett v. Pitcher, 117 F.3d 959, 964 (6th Cir. 1997) (state court's assessment

---

[48] (...continued)
manner. (See ECF No. 133-2 at PageID 17738, ¶ 7.)

[49] This Court previously stated that Maze's post-conviction deposition testimony does not establish that the prosecution failed to disclose a deal made in consideration for his testimony. (See ECF No. 99 at 18.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 146

of the relative credibility of a police officer was entitled to a presumption of correctness); see also Kinsel v. Cain, 647 F.3d 265, 270 (5th Cir. 2011) ("[C]redibility determinations in particular are entitled to a strong presumption of correctness."). Petitioner's claim as it relates to Maze is without merit.

**2. Charles Smith**

Smith was arrested on charges of being a felon in possession of a firearm on February 26, 1994. (ECF No. 133-3.) Smith was indicted on May 12, 1994, on the gun charge. (ECF No. 129-15.) Don Strother, former assistant district attorney and then legal counsel to the Shelby County Sheriff, was involved in Charles Smith's indictment, and Carruthers implies that demonstrates that a deal was made for Smith's testimony. (ECF No. 129 at 70.) Smith hired attorney Howard Wagerman to "help (him) out the best he could." (Id. at 185; see also ECF No. 133-4[50] at PageID 17768.) On May 19, 1994, Wagerman sent a letter to Jerry Harris stating that Smith had violated parole, and that Wagerman "would greatly appreciate it if you could send a letter addressed to the Parole Board . . . indicating the mitigation which you and I both feel exist [sic] in this case." (ECF No. 133-5 at PageID 17834.) Wagerman further states,

> I would greatly appreciate it if your letter would confirm the circumstances surrounding the Homicides that occurred, and the threats that were made to Charles during this time frame. I would also appreciate it if you could advise in

[50] Excerpts from Smith's deposition were also filed by Respondent. (See ECF No. 114-2.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 147

> this letter that you are holding the matter under advisement so to speak with an eye toward making a mitigated misdemeanor offense offer of some form or fashion after the Homicides have been disposed of.

(Id.)

On May 25, 1994, Harris wrote,

> Please advise the Parole Board that I agree with you in stating that there is mitigation in this case. While I feel that it is not our duty to try to usurp the powers of the Parole Board, I think we should bring facts to their attention that we feel are pertinent to this decision.
>
> There is no question that Charles Smith aided Officers Wilkinson and Robeson in their investigation of the triple homicide that has come to be known as the Cemetery Homicides. There is also no question that Mr. Smith properly felt that his life was in danger. Mr. Smith has helped this investigation and has done so at great risk to himself. The defendants in this case were intent on killing several people to simply prove the point that they were capable of murder. Your client was definitely one of the targets.
>
> I feel we will probably reduce this case to a misdemeanor and have Mr. Smith pay a large fine once the case is indicted.

(ECF No. 133-6 at PageID 17836.) On July 8, 1994, despite the prior reference to the case being reduced to a misdemeanor, Smith pled guilty to a felony charge of felon in possession of a weapon and was assessed a $250 fine. (ECF No. 133-7 at PageID 17839.)

Carruthers contends that there is a genuine issue of material fact related to the claim that the state withheld evidence about a deal for Smith's testimony because, based on Tenn. Code Ann. §§ 39-17-1307(b)(2) and 40-35-111(b)(5), Smith should have received at least a one-year sentence. (ECF No. 129 at 185-86.)

Respondent argues that, despite extensive discovery, Carruthers

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 148

has not uncovered evidence to support his Brady and prosecutorial misconduct claims. (ECF No. 114-1 at 21.) Respondent cites Harris's and Charles Smith's deposition testimony that no such deal occurred. (Id.; ECF No. 149 at 22.) Charles Smith testified that Wagerman tried to get Harris to help him, but there was nothing he could do; Smith did fifteen months for having the gun in violation of parole. (ECF No. 114-2 at PageID 15916-15917.) Smith stated that he testified "out of good faith because of what happened to my friends." (Id. at PageID 15917.) Smith talked about the threats he received and that Carruthers "faked at me like the whole court scene. Members over there throwing gang signs. . . . I got stabbed and shot at and jumped." (Id. at PageID 15918-15919.)[51] Smith stated that, if Harris had helped with the probation violation, he would not have gone to jail. (Id. at PageID 15920, 15931.) Smith stated, "I'm telling you, man, they didn't help me with anything." (Id. at PageID 15922.) Smith stated,

> They don't make promises. They can't – they - they don't do that. I mean they can't promise you anything. So, if you're going to do something for them, you just got to hope that they do something for you, you know.

(Id. at PageID 15924.) When Smith was asked whether the prosecution suggested they would do something for him, he testified,

> No, sir. I didn't need them. I'm trying to tell you I wasn't in no trouble when I testified for them and – and I still got all these threats on my life.

[51] Smith admitted that Harris asked him to testify for Montgomery's second trial and he was put in the witness protection program. (ECF No. 114-2 at PageID 15919.) Smith received fifteen years on the federal gun charge when he got caught with another gun trying to protect himself again "'cause the threats started up again"; "Nobody helped me." (Id.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 149

(Id.)

Smith was being threatened for "snitching," and his lawyer convinced him to testify against Carruthers and Montgomery. (ECF No. 114-2 at PageID 15933-15934.) He denied talking to the Tri-State Defender or Mike Fleming about the case. (Id. at PageID 15936-15940.)

Harris denied that any deals were made:

> You don't make a deal with somebody, number one, because – before he testifies, because it's wrong.
>
> Number two, you don't do it because tactically it's stupid. . . .
>
> But in this case, nobody asked for a deal. That was the surprising thing about this case.

(ECF No. 114-3 at PageID 15944.) He testified that, with regard to the February 1994 offense, Smith was stopped for a traffic offense. (ECF No. 130-2 at PageID 16871.) The officers searched the car and found a weapon under the seat; Smith fled. (Id.) He stated that it was a "bogus case" because there was no probable cause to believe Smith had a weapon or was committing a felony. (Id. at PageID 16872.)

Harris denied talking to federal prosecutors and interfering with them about who they chose to charge. (Id. at PageID 16872-16873.) "We didn't call them, we did't [sic] talk to them about that. That was their deal. That was a no-no." (Id. at PageID 16873.)

Carruthers contends that the Tennessee Court of Criminal Appeals' decision about Jimmy Maze and Charles Smith applied the

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 150

wrong standard and is contrary to and involves an unreasonable application of clearly established federal law. (ECF No. 129 at 212.) First, Carruthers argues that the court's determination that the State's failure to reveal any deal it had with Maze or Smith "would have been harmless" is contrary to Kyles, 514 U.S. at 435, which states that withheld evidence claims are not subject to harmless-error analysis, and the decision is therefore contrary to clearly established federal law. (Id. at 199.) Second, he argues that the court's affirmation of the post-conviction court's ruling that the record "did not support a finding that any promise was made" is an unreasonable determination of fact in light of the record. (Id.) See Carruthers, 2007 WL 4355481, at *57.

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Pinholster, 131 S. Ct. at 1399. Both Carruthers and Respondent have presented information outside the record in their arguments. The Tennessee Court of Criminal Appeals only had evidence from Maze and found that "Maze's deposition testimony does not support the petitioner's claim that the prosecution entered into an agreement with either Maze or Smith in exchange for their trial testimony." Carruthers, 2007 WL 4355481, at *57. This factual finding is entitled to deference, see 28 U.S.C. § 2254(e). Carruthers has not presented clear and convincing evidence to rebut the presumption of correctness.

The Tennessee Court of Criminal Appeals asserted, as an aside,

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 151

"we agree with the post-conviction court that even if the State failed to disclose 'deals' it had made with Maze and Smith, the error would have been harmless" because both Maze and Charles Smith were heavily impeached at trial with their long criminal records and pending charges. Carruthers, 2007 WL 4355481, at *57. This Court has upheld the Tennessee Court of Criminal Appeals' factual determination that no promise or deal was made. Carruthers's argument about materiality and harmless error does not provide a basis for relief. See Williams v. Coyle, 260 F.3d 684, 707-08 (6th Cir. 2001) (denying habeas relief where evidence of a deal was factually and legally suspicious and jury was aware of witness's motivation for testifying in the hope of getting favorable treatment). The Tennessee Court of Criminal Appeals' decision about Maze and Charles Smith is not contrary to or an unreasonable application of clearly established Supreme Court precedent and is based on a reasonable determination of facts in light of the evidence presented.

**3. Dr. O.C. Smith**

Dr. Smith, the medical examiner, testified that the victims were alive when they were buried. Carruthers, 2007 WL 4355481, at *5. Prior to trial, Dr. Cleveland Blake, an expert hired for Carruthers, concluded, "All three of the victims having their lives snuffed out well before adequate time to place them and conceal their bodies in the bottom of the already prepared burial site before Daniel's casket and vault were placed in the ground some time

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 152

on February the 25th." Id. at *23. Blake did not testify at trial. Id. at *43. In the post-conviction hearing, Blake testified that the first time he heard any suggestion that any of the victims had been buried alive was when he read Dr. O.C. Smith's trial testimony. Id. at *23. The Tennessee Court of Criminal Appeals summarized Blake's post-conviction testimony:

> Dr. Blake stated that it was possible that Delois Anderson had been buried alive but that she already had some previously inflicted wounds, "including a neck strangulation." Had he been called to testify at trial, he would have disagreed with Dr. Smith's conclusions that the two male victims had been buried alive. Furthermore, "because of the ligature issue," he would have disagreed that Delois Anderson was conscious at the time she was buried. When questioned by the post-conviction court about the discrepancy between his present testimony and the conclusions he had reached in his April 1, 1996, letter to the trial court, Dr. Blake explained that he had changed his opinion after learning details, such as the description of the grave and the placement of the bodies in the grave, which were not available to him at the time he rendered his April 1, 1996, opinion . . . .

Id.

In the post-conviction proceedings, Dr. George Nichols concluded that none of the victims were buried alive:

> Dr. Nichols testified that there was no evidence, in his opinion, "that any person was alive in the site in which their bodies were discovered." He further testified that there was "no proof of the best evidence of conscious activity of any victim while alive in the grave site." Specifically, he found no evidence of inhalation of dirt, mud, dust, or earth in the upper airways, mouth, or lungs of any of the victims, which would have indicated that the victims had breathed after being placed in the grave. On redirect examination, he reiterated that he found no evidence to show that "any of these three people were alive and breathing in that space. None."

Id. at *24.

Carruthers argues that the State withheld evidence that the victims were dead and/or unconscious when they were buried and suborned O.C. Smith's false testimony that they were alive. (ECF No. 129 at 191-92.) Carruthers contends that every expert who has reviewed the evidence, including O.C. Smith, now recognizes that Smith's trial testimony was inaccurate. (Id. at 191.)

Carruthers relies on Smith's April 2007 affidavit (ECF No. 129-7) which was not presented in the state post-conviction proceedings. The affidavit states:

> I am the Medical Examiner and forensic pathologist responsible for the autopsies on the victims in Tony Carruthers' and James Montgomery's trial in which I testified to certain facts including, but not limited to, the fact that the victims were alive at the time of the burial. This opinion was formed on the basis of the facts that dirt was contained in the airway of one victim and the presence of active bleeding (as signs of life) in the multiple injuries of the other two victims. These injuries are gunshot wounds that would not have been immediately lethal, as well as blunt force injury patterns of the type expected from one person falling atop another, and further compressed by the overburden of the grave and its contents above. The bleeding patterns associated with these injuries were interpreted by me as signs of active bleeding and hence as signs of life.
>
> In that regard, and since that time I have continued to observe and be involved in like and similar circumstances and I have also researched the medical literature and found it devoid of any peer-reviewed scientific articles specifically referencing the effects of post-mortem pressures upon a corpse and its ability to mimic active bleeding as a sign of life. . . .
>
> Given the above, requiring evidence-based medicine and through an abundance of caution, I will no longer sustain an opinion, as I did in my original testimony, that to a reasonable degree of medical certainty, the victims were in fact alive at the time they were buried beneath the coffin. The absence of probative research on these issues, must by default, create the opportunity for

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 154

> an alternative hypothesis to explain the appearance of active bleeding as a sign of life, when in fact life is absent.

(ECF No. 129-7 at PageID 16363-16364.) Carruthers contends that any knowledge that Smith's testimony was false can be imputed to the State. (ECF No. 129 at 192.)

Respondent argues that Carruthers has not shown under Napue v. Illinois, 360 U.S. 264 (1959), that the prosecution knowingly presented false testimony. (ECF No. 149 at 23.) He contends that the only evidence Carruthers presents is that other medical experts have disagreed with Smith's testimony and that Smith is now unsure of the opinion he testified to at trial. (Id.) Respondent asserts that Smith's affidavit (ECF No. 129-7) is barred from consideration in these habeas proceedings by Pinholster. (ECF No. 149 at 23.) He further argues that the evidence is not material to the death sentence given the other aggravating factors involved. (Id.)

The Tennessee Court of Criminal Appeals did not address whether Smith's testimony was in fact false. The court found that, given the evidence presented and the additional aggravating circumstances, neither the guilty verdict nor the death sentence would have changed even if Smith's testimony were false. Carruthers, 2007 WL 4355781, at *56.

Carruthers has not established that Smith's testimony was false. Smith, Blake, and Nichols had differences of opinion as to whether the victims were buried alive. Although the Court finds Smith's affidavit to be barred for § 2254(d)(1) review under

Pinholster, even that affidavit does not establish Carruthers's claim. Smith indicated that after he "continued to observe and be involved in like and similar circumstances," he could "no longer sustain his opinion" because of a lack of peer-reviewed scientific articles and the necessity of "evidence-based medicine" on the relevant subject. (See ECF No. 129-7 at PageID 16363-16364.) Smith's affidavit does not demonstrate that the testimony was either false or not Smith's opinion at the time when it was presented.

Further, there is no evidence to demonstrate that the prosecution knew about the falsehood or even the unreliability of Smith's testimony.[52] There is no Supreme Court precedent that allows imputing the knowledge of a state's expert witness on the prosecution. When a witness acts only in the capacity of an expert witness for the state and not as a fully functioning member of the prosecution team, the expert's knowledge should not be imputed to the prosecutors. Sutton v. Bell, No. 3:06-CV-388, 2011 WL 1225891, at *10 n.17 (E.D. Tenn. Mar. 30, 2011) (citing Avila v. Quarterman, 560 F.3d 299, 308-09 (5th Cir. 2009)); see also United States v. Stewart, 423 F.3d 273, 298-99 (2d Cir. 2006) (knowledge of false testimony cannot be imputed to the prosecution where the expert is acting only in that capacity and not as a "fully functioning member of the prosecution team").

The Tennessee Court of Criminal Appeals' determination that

[52] Blake's summary differed from Smith, and Carruthers could have cross-examined Smith based on Blake's report or called Blake as a witness to rebut Smith's testimony. He did neither.

Carruthers was not entitled to relief because it could not "conclude that the prosecutor knowingly misrepresented evidence" related to O.C. Smith's testimony is not contrary to or an unreasonable application of clearly established Supreme Court precedent or based on an unreasonable determination of fact in light of the evidence presented. See Carruthers, 2007 WL 435581, at *56. The claim is without merit.

Carruthers did not present his claims that the State withheld evidence that agents for a powerful drug cartel executed the victims because Anderson had been involved in taking cocaine and money from the cartel or that Benton West testified falsely in the state courts. He has not demonstrated cause and prejudice for the procedural default of these claims or that a miscarriage of justice will result from the Court's failure to consider these claims. There is no evidence before the Court to establish either of these claims.

Carruthers presents a theory that he was precluded from presenting the defense (Claim 15) that Anderson was murdered by the Cali Drug Cartel because Andre Johnson and Marcellos Anderson were friends who were part of the Memphis distribution system, and Johnson was known for taking cocaine that had been fronted to him and keeping the proceeds. (ECF No. 129 at 219.) He argues that these murders were similar to others committed by the cartel. (Id. at 220.) He provides no evidence, however, that the prosecution was aware of Marcellos Anderson having a direct tie to the Cali Drug

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 157

Cartel or the cartel's involvement in Anderson's murder.

There is no evidence that Benton West's testimony that Nakeita Montgomery Shaw told him she thought Anderson and Tucker were being kidnapped (see ECF No. 55-8 at PageID 6048-6050) was false or that the prosecution knew it to be false. Carruthers did not cross-examine West. (Id. at PageID 6054.) Nothing in James Montgomery's counsel's cross-examination indicated that West's statement was false.[53]

Carruthers's false-testimony and withheld-evidence claims are without merit and/or procedurally defaulted. The Tennessee Court of Criminal Appeals' decision was not contrary to or an unreasonable application of clearly established Supreme Court precedent and was based on a reasonable determination of facts in light of the evidence presented. Claims 13 and 14 are, therefore, DENIED.

### M. Trial Court Precluded Presentation of Defense (Claim 15, Amended Petition ¶¶ 365-76)

Carruthers alleges that prior to trial, the defense sought information from the State that Marcellos Anderson was significantly involved in drug distribution and had "crossed a powerful drug cartel by taking from the cartel a large amount of cocaine and money." (ECF No. 21 at 95.) The State refused, and the defense requested that the trial court order the defense to provide this information. (Id.) The trial court denied the request, "reasoning

[53] Nakeita Montgomery Shaw told police that Anderson's and Tucker's hands were tied (see ECF No. 55-8 at PageID 6015), indicating that they may have been held against their will. At trial, however, she denied that she ever saw anyone tied up in her house. (Id. at PageID 6016-6017.)

that because two of the victims were found with their hands tied behind their backs the information that the defense sought was of no relevance." (Id.) Carruthers alleges that the trial court precluded him from asserting that he was innocent and that agents for a powerful drug cartel had executed the victims because of the stolen drugs and money, including precluding him from presenting the following evidence:

- Marcellos Anderson had been involved in an expensive drug deal with a Colombian drug cartel operating out of Houston, Texas, and during the deal Anderson had taken from the cartel a large amount of cocaine and money;
- Agents for a Colombian drug cartel had traveled from Houston to North Memphis looking for Marcellos Anderson and his associates;
- During Carruthers's incarceration, Delois Anderson's home was sprayed with bullets fired from a semi-automatic assault rifle;
- During Carruthers's incarceration, Andre Johnson's house was sprayed with bullets fired from a semi-automatic assault rifle; and
- During Carruthers's incarceration, Andre Tucker, the brother of Fred Tucker, was murdered.

(Id. at 95-96.) Carruthers alleges that he served Drug Enforcement Administration Agents Mark Chism and David McGriff with trial subpoenas to testify about their knowledge of Marcellos Anderson's involvement in drug distribution and with a Colombian cartel, but Judge Dailey quashed the subpoenas for failure to comply with the Code of Federal Regulations. (Id. at 96-97.) Carruthers alleges that he was denied his right to compulsory process and his due process rights. (Id. at 97.)

Respondent argues that Carruthers presented this claim as a

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 159

state evidentiary law issue rather than a constitutional violation. (ECF No. 114-1 at 21.) He contends that the claim is procedurally defaulted. (Id.) To the extent the claim is deemed exhausted, Respondent argues that it is without merit. (Id. at 22.) He further asserts that the trial court allowed Carruthers to put on some proof of other suspects, just not proof that was hearsay or irrelevant and that state evidentiary rulings are not generally grounds for habeas relief. (ECF No. 149 at 24.)

The Tennessee Court of Criminal Appeals addressed Carruthers's argument about evidence related to other perpetrators:

> Both appellants argue the trial court limited their ability to establish that other people involved in the Memphis drug trade had motives to kill the victims in this case. Again, the admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with that discretion absent a clear showing of abuse. See State v. Howard, 926 S.W.2d 579, 585 (Tenn. Crim. App. 1996). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Tenn. R. Evid. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Rule 403.
>
> As is commonly recognized, an accused is entitled to present evidence implicating others in the crime. See Green v. State, 285 S.W. 554 (1926); Sawyers v. State, 83 Tenn. 694 (1885); State v. Spurlock, 874 S.W.2d 602, 612-13 (Tenn. Crim. App. 1993). Evidence in support of this third party defense, however, must conform to the general rules governing the admissibility of evidence. State v. McAlister, 751 S.W.2d 436, 439 (Tenn. Crim. App. 1987). The evidence must be the type that would be admissible against the third party if he or she were on trial, and the proof must be limited to facts inconsistent with the appellant's guilt. State v. Kilburn, 782 S.W.2d 199, 204-05 (Tenn. Crim. App. 1989). Accordingly, hearsay

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 160

> evidence implicating another individual would not be admissible.
>
> Having reviewed the record in light of the appellants' claims, we find that the trial court did not exclude any relevant admissible evidence tending to implicate others in the murders while exonerating the appellants. The jury was well aware that Marcellos Anderson was heavily involved in the drug trade in Memphis. The jury heard evidence about Anderson's drug dealings with Johnson and Adair. The jury heard that Anderson and Adair had previously been shot by others in drive-by shootings. They heard that Andre Tucker, the brother of one of the victims in this case, was subsequently killed after the appellants had been arrested on the present charges. As the state notes, this evidence clearly suggests that the killings in the drug world were still happening. The evidence the appellants refer to was either hearsay (testimony that Anderson was in debt to Colombian drug dealers) or cumulative and would have confused the issues and misled the jury (attacks on others involved in the Memphis drug trade). Again, the jury knew this case centered around activities in the drug world and they could reasonably have used their common knowledge to conclude that there were many players involved. The evidence in this case, however, pointed to the guilt of the appellants. This issue is without merit.

Carruthers, 1999 WL 1530153, at *40-41; see also Carruthers, 35 S.W.3d at 574-75.

Carruthers argues that the State has failed to meet its burden for summary judgment. (ECF No. 129 at 209, 211.) He contends that the Tennessee Court of Criminal Appeals' analysis, that he was not entitled to present evidence that others had a motive to kill and did kill the victims because: (1) the jury knew the killings were drug-related; (2) jurors could reasonably use "their common knowledge to conclude that there were many players involved"; (3) the "evidence . . . pointed to the guilt of the appellants"; and (4) hearsay evidence was inadmissible, was contrary to federal law.

(Id. at 217-18.) See Carruthers, 35 S.W.3d at 575. He asserts that it is well-settled under Crane v. Kentucky, 476 U.S. 683, 690 (1986), that a defendant is constitutionally entitled to a "meaningful opportunity to present a complete defense." (Id. at 218.) He also states that, based on Holmes v. South Carolina, 547 U.S. 319 (2006), a state court cannot deny the opportunity to present proof that someone else committed a crime by concluding that exculpatory evidence should not be admitted because there was proof of the defendant's guilt. (Id.) Further, he asserts that hearsay rules do not categorically prohibit consideration of exculpatory evidence of someone else's guilt under Chambers v. Mississippi, 410 U.S. 284 (1973), and Green v. Georgia, 442 U.S. 95 (1979) (per curiam). (Id.)

On direct appeal, Carruthers argued that the trial court committed reversible error when it denied his motion to require the State to produce evidence of ongoing drug investigations involving the State's witnesses and denied a motion for Marcellos Anderson's prior convictions and criminal investigations involving Anderson. (ECF No. 56-6 at PageID 10234-10235.) In Carruthers's reply brief, he asserts that the State tacitly admitted that evidence of drug dealing by other actors and witnesses involved in the case is relevant, and that the trial court's exclusion of this evidence "flies in the face of fundamental fairness, and denied Carruthers a legitimate opportunity to raise a valid defense." (Id. at PageID 10298.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 162

Carruthers's argument was based on Tennessee law. (Id. at PageID 10236-10238.) He does not rely on federal cases, and the state cases he cited did not employ federal constitutional analysis. See State v. Kilburn, 782 S.W.2d 199, 204 (Tenn. Crim. App. 1989) (a defendant is allowed to present proof tending to show that another had the opportunity and motive to commit the offense); see also Green v. State, 285 S.W. 554, 558 (Tenn. 1926) (the motives of the deceased are as much the subject of inquiry as those of the defendant). He does not phrase the claim in terms of constitutional law except to the extent he casually references "fundamental fairness" in his reply, nor does he allege facts well within the mainstream of constitutional law. Carruthers has not fairly presented a constitutional claim. See supra pp. 36-47; see also Duncan v. Henry, 513 U.S. 364 (1995) (per curiam) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

The Court has determined that Martinez does not apply to establish cause for procedural default. (ECF No. 192 at 10, 27-29.) Carruthers has not otherwise demonstrated cause and prejudice or that a miscarriage of justice will result from the Court's failure to consider his claim. Claim 15 is procedurally defaulted. Summary judgment is, therefore, GRANTED.

The Court further finds that Carruthers's claim is without

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 163

merit. Carruthers attempts to support his theory of the murders by asserting that the murders occurred at a time that the Cali Drug Cartel was bringing thousands of kilos of cocaine into Memphis. (ECF No. 129 at 219.) He alleges that the cartel "fronted" cocaine to Memphis distribution systems and received payment after the sales. (Id.) When the cartel did not receive timely payment, it kidnapped, tortured, and killed the persons responsible, along with their family members. (Id.) Johnson and Marcellos Anderson were friends who were part of the Memphis distribution system. (Id.) Johnson had a reputation of taking cocaine that had been fronted to him and keeping the proceeds. (Id.) Carruthers asserts,

> it takes little imagination to connect the dots - Johnson and Marcellos Anderson received fronted cocaine from the Cartel, they sold it on the street, they kept the money, and the Cartel came for either its money or its pound of flesh. Not getting its money, the Cartel killed Marcellos, his mother, and Fred Tucker who was wrapped up in it with Marcellos. The similarities between another Memphis murder and the murders of the victims confirm this suspicion.
>
> During the period in which the victims were murdered, Chellis Thomas was part of a Memphis distribution system. By January 1995, Thomas owed the Cartel more than five million dollars for fronted cocaine. Authorities arrested Thomas and others for possession with intent to distribute three kilograms of cocaine, but released him on bond. After Thomas failed to appear for arraignment, police found his decomposing body in the trunk of a car. Thomas's hands had been bound behind his back, and a plastic bag had been taped over his head and neck.
>
> Just like Thomas, when authorities found the bodies of Marcellos Anderson, his mother, and Fred Tucker, their hands had been bound behind their back. Authorities found a knitted sock tied around the neck of one body, and injuries consistent with ligature strangulation on another, indicating that, just like Thomas, the victims had been suffocated.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 164

(Id. at 219-20 (citations omitted); see ECF No. 133-12; ECF No. 133-21 at PageID 17994-17995; ECF No. 133-22.) Carruthers argues that that these similarities in conjunction with the facts of the murders entitled him to pursue a viable defense. (ECF No. 129 at 220.)

Under the Sixth Amendment Compulsory Process Clause, criminal defendants generally have the right to present "competent, reliable [exculpatory] evidence." Crane, 476 U.S. at 690-91 (state rule excluding evidence concerning means by which a voluntary confession was obtained violated Sixth Amendment); see also Chambers, 410 U.S. at 295-96 (application of state hearsay rule to bar testimony regarding third party's repeated confession of crime violated defendant's Sixth Amendment rights). The Supreme Court stated, "A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," including the state's legitimate interest in "ensuring that reliable evidence is presented to the trier of fact in a criminal trial." United States v. Scheffer, 523 U.S. 303, 308-09 (1998). Evidentiary exclusions will not violate the constitution "so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" Id. at 308 (quoting Rock v. Arkansas, 483 U.S. 44, 56 (1987)). The Supreme Court cases undoing state-court convictions based on exclusion of evidence involve egregious situations; the Court has shown little interest in carrying the doctrine beyond egregious cases. See DiBenedetto v. Hall, 272 F.3d 1, 8 (1st Cir. 2001). Due process is violated and habeas relief warranted only if an

evidentiary ruling is "so egregious that it results in a denial of fundamental fairness." Bugh v. Mitchell, 329 F.3d 496, 512 (6th Cir. 2003). There must be evidence that there is a connection between the perpetrators and the crime, not mere speculation. DiBenedetto, 272 F.3d at 8; see also Miller v. Brunsman, 599 F.3d 517, 526 (6th Cir. 2010) (the exclusion of the evidence on the ground that it failed to show a sufficient nexus between a third party and the murder is consistent with United States Supreme Court precedent). A combination of unreliability of the evidence, disparagement of the victims as bad people deserving of death, and the tangential nature of the evidence is sufficient to uphold a trial judge's decision against a constitutional challenge. DiBenedetto, 272 F.3d at 9.

In the instant case, Carruthers's theory is speculative and risked portraying victims Anderson and/or Tucker as bad men deserving of death. The jury was aware of Anderson's involvement in the drug trade and heard evidence from other witnesses about the violence related to the drug trade. Carruthers, 35 S.W.3d at 575. The inclusion of cumulative hearsay evidence would have confused the issues; the exclusion of this evidence does not violate Carruthers's constitutional rights. Summary judgment is GRANTED. Claim 15 is without merit and, therefore, DENIED.

**N. Judicial Interference with Support Services (Claim 16, Amended Petition ¶¶ 377-96)**

Carruthers alleges that he requested that the trial court authorize him to employ a forensic pathologist, and without

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 166

Carruthers's knowledge or consent, Dr. Cleland Blake, the pathologist that was authorized, was told that he worked for the trial court. (ECF No. 21 at 97.) Carruthers alleges that, without his knowledge or consent, the trial court and the prosecution communicated with Blake and sent him materials to review in forming his opinion. (Id.) On April 1, 1996, Blake sent the trial court a letter stating that he believed that the victims died at some point prior to being placed in the freshly dug grave. (Id. at 97-98.) On April 19, 1996, during the trial, Blake wrote the trial court stating, "(m)y testimony . . . would most likely be of little value for (defendant Carruthers), perhaps serving only to assure that the District Attorney's side of the case is not trying to 'railroad' this man for his accused acts." (Id. at 98.) The court gave Carruthers the letter and told him that he had to decide that day whether he would call Blake as a witness, and if Carruthers decided to call him, Blake would have to testify "irrespective of any future events that would transpire." (Id.) Carruthers told the court that he would not know whether he would call Blake until after the State's witness, Dr. O.C. Smith, testified. (Id.) The trial court told Carruthers that it was maintaining its position. (Id.) Carruthers decided not to call Blake; as a result, Smith's opinion that all three victims were buried alive went unchallenged. (Id.)

Carruthers also alleges that the trial court interfered with his use of investigator John Billings. (Id. at 99.) Carruthers complains that the trial court only allowed funding to be received

in $1,000 increments based on the presentation of detailed invoices. (Id.) He contends that the trial court refused to authorize payment for certain of the investigator's activities and failed to securely maintain the invoices, resulting in the prosecution being able to review them. (Id.) He alleges that the trial court limited his ability to meet and confer with Billings prior to and during trial. (Id.)

**1. Procedural Default**

Respondent asserts that this claim was not presented in the Tennessee state courts and is procedurally defaulted. (ECF No. 114-1 at 23; ECF No. 149 at 25.) Carruthers asserts that this claim was fairly presented in the post-conviction proceedings. (ECF No. 129 at 237.) He cites his post-conviction appellate brief for the argument that Judge Dailey interfered with his ability to consult with the forensic pathologist and the due process arguments for allowing a defendant a fair opportunity to present a defense. (Id.; see also ECF No. 134-1 at PageID 18100-18106; ECF No. 134-2 at PageID 18260-18263.) He acknowledges that the merits of the claim as it relates to Blake were not presented independently, but in the context of an ineffective-assistance-of-counsel claim. (ECF No. 129 at 237-38 n.75.) Carruthers asserts that ineffective assistance of counsel provides cause for any prejudicial default of Claim 16 as it relates to Blake. (Id. at 247, 254-55.)

Carruthers has fairly presented his claim as it relates to Blake. The Tennessee Court of Criminal Appeals addressed the merits

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 168

of this claim in the context of ineffective assistance of counsel. Carruthers, 2007 WL 4355481, at *41. Summary judgment based on procedural default is, therefore, DENIED.

Carruthers did not make a similar claim in his post-conviction appellate brief about Billings. Carruthers failed to exhaust his claim related to Billings in the state court. The Court has determined that Martinez does not establish cause and prejudice for the procedural default of Carruthers's claims as it relates to Billings. (ECF No. 192 at 10, 27-30.) Carruthers failed to otherwise demonstrate cause and prejudice or that a miscarriage of justice would result from the Court's failure to consider this claim. The issue of interference with support services as it relates to Billings is procedurally defaulted. Summary judgment is GRANTED, and Claim 16 as it relates to Billings is DENIED.

**2. Merits**

With regard to Blake, the Tennessee Court of Criminal Appeals stated:

> a. Dr. Cleland Blake
>
> The petitioner first contends that he was unconstitutionally denied the benefit of an expert witness because the trial court appointed Dr. Blake, who communicated directly with the trial court instead of the petitioner. He also asserts that the trial court forced him to make an uninformed decision about whether to call Dr. Blake as a witness four days before he had heard the testimony of Dr. O.C. Smith. The State argues that the petitioner was not denied the benefit of an expert witness and, as such, cannot establish either deficient performance or prejudice on the basis of appellate counsel's failure to raise this issue on appeal.
>
> The petitioner complained during voir dire about the trial

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 169

court's communications with Dr. Blake, asserting that by sending information from the prosecutor directly to Dr. Blake, the trial court had led Dr. Blake to, in the petitioner's eyes, believe that he was working for the trial court and the prosecution instead of for the petitioner. The trial court addressed these concerns:

> I contacted Dr. Blake, obviously, the record will reflect, at your request, to have an independent forensic pathologist review the determination made by the Shelby County Medical Examiner's Office, to see if he or she could come up with a more specific time of death for the three victims in this case.
>
> At Dr. Blake's request I needed some basic summary of facts so that he would have some context in which to review the findings of the medical examiner's office, and toward that end I asked [the prosecutor] to provide me with a general summary of what the State felt the facts were so that he, Dr. Blake, could have some factual context in which to conduct his analysis.
>
> There has never been any question in my mind on Dr. Blake's behalf with regard to the fact that he has been retained at taxpayers' expense by me on your behalf as an independent expert to review the findings of the Shelby County Medical Examiner's Office.
>
> . . . .
>
> You think that all he needed was what was in the file or what came from Dr. Francisco's office, but that's not what he thinks. He asked me to prepare him a factual summary of the case so he could operate . . . within some factual context.
>
> And so the record should reflect that all of this came from him. He asked for other information from Dr. Francisco's office, and again, on your behalf and on his behalf I told him to feel free to contact them. I mean, he is contacting a lot of people in an effort to reach this decision that you're seeking. And so he's, in trying to reach this independent decision that you're asking for, it's necessary for him

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 170

> to contact a lot of people to get the information needed to make an informed decision.

The post-conviction court determined that the petitioner's claims with respect to this issue were without merit:

> Petitioner now makes much of the role of the trial judge in relation to Dr. Blake and infers that his involvement interfered with the petitioner's ability to prepare for trial and to rebut Dr. Smith.
>
> The record shows considerable confusion about the role of Dr. Blake. Was he an "independent" expert (See T.R.E. 706) or a defense expert? . . . It was obvious that when Dr. Blake testified in the post-conviction case he was still unclear as to whether he was working for the court or for the [petitioner]. . . . While all this confusion may have resulted from an informality with normal procedures and role definitions it had no impact on the end result. Dr. Blake submitted a report and offered an opinion about the time and manner of the death of the victims, referenced above, and all that was available to the petitioner before trial.
>
> Perhaps the actions of the trial judge were unusual, but this was an unusual situation and it appears that the trial judge was attempting to obtain an expert for the petitioner. As it turned out, Dr. Blake's findings were communicated to [the petitioner] and [the petitioner] made the decision not to call Dr. Blake. This now appears to have been a bad decision and may have deprived [the petitioner] of testimony which would have rebutted Dr. Smith. A criminal defendant who represents himself cannot complain about his bad judgments. See State v. Carruthers, 35 S.W.3d at 551. The Court would also note that at no time after Dr. Smith's testimony did the petitioner request that Dr. Blake be called in rebuttal.

We conclude that the evidence does not preponderate against the findings and conclusions of the post-conviction court. At the petitioner's request, the trial court provided him with a qualified forensic pathologist to review the findings of the Shelby County

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 171

Medical Examiner's office and to prepare an independent cause-and-time-of-death report. While the trial court initiated the contact with Dr. Blake and facilitated his access to needed information, the court made it clear to the petitioner that he and his investigator were free to contact Dr. Blake directly and that he could communicate directly with the petitioner if he wished. The trial court also made Dr. Blake's report and findings available to the petitioner several weeks prior to the start of the trial. Nowhere in the record is there any indication that the prosecution communicated directly with Dr. Blake. The petitioner was given the opportunity to call Dr. Blake as a witness at his trial but opted not to do so, apparently on the advice of one of his investigators.

The petitioner additionally complains that the trial court interfered in his relationship with Dr. Blake by "forcing" the petitioner to decide whether to call Dr. Blake as a witness when he had not yet had the benefit of Dr. Smith's surprise testimony that all three victims had been buried alive. We respectfully disagree. During a break in the trial, the trial court asked the petitioner to decide if he wanted Dr. Blake as a witness, informing him that Dr. Blake had a tight schedule and needed time to make the necessary arrangements to attend the trial. The trial court told the petitioner that he would have Dr. Blake there if the petitioner wanted him, but, barring some "brand new, surprising, novel revelation" by Dr. Smith or any other medical expert called by the State, the court expected the petitioner to put Dr. Blake on the stand if he went to the trouble and expense of coming to Memphis for the trial:

> [Y]ou know generally what he [Dr. Smith] is going to testify to, generally what his findings are, generally what his conclusions are, generally what the videotape from the crime scene reveals, and so-and you have two or three communications, several communications from Dr. Blake, both sent to me and his direct communications with Mr. John Billings, Mr. Richard Billings, Mr. Les Arms, all of which should provide you with ample information to make your decision today as to whether you plan to put him on the stand or not.
>
> If you don't want to put him on the stand, I want to notify him today so that he can go on about his business and not worry about making arrangements to come to Memphis, Tennessee, next

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 172

> week.
>
> If you do want to put him on the stand, that's no problem. We will have him here.
>
> But if we get him all the way down here next week, then unless there is some dramatic last second surprise in the medical testimony presented by the State, I expect him to be put on the stand. I don't want . . . to play games with regard to getting him down here and then not putting him on the stand. That's my statement.

> As noted by the post-conviction court, the petitioner never requested that Dr. Blake be called in rebuttal following Dr. Smith's testimony that all three victims were buried alive. Given the trial court's statement that it would allow the petitioner to change his mind about putting Dr. Blake on the stand should there be a dramatic last minute change in the State's medical evidence, we have no basis to conclude that the trial court would not have allowed the petitioner to call Dr. Blake in rebuttal had the petitioner made such a request. Additionally, the petitioner did not call Dr. Blake as a witness during the penalty stage of the trial, when his testimony that the two male victims were not buried alive and the female victim was probably unconscious at the time of her burial might have been relevant to refute the aggravating circumstance that the murders were especially heinous, atrocious, or cruel. We conclude, therefore, that the record supports the determination of the post-conviction court that the petitioner has not met his burden of showing that appellate counsel were deficient in not raising as an issue on appeal the trial court's alleged interference in the petitioner's relationship with Dr. Blake, or that the petitioner was prejudiced as a result of that alleged deficiency in representation.

Carruthers, 2007 WL 4355481, at *41-44.

Carruthers relies on the fundamental right to present a defense to establish a constitutional violation under the Sixth Amendment's Compulsory Process Clause. He cites Ake v. Oklahoma, 470 U.S. 68, 76-77 (1965), for the proposition that when a state fails to ensure that an indigent defendant has access to the raw materials needed to

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 173

build an effective defense, the proceeding is fundamentally unfair. (ECF No. 129 at 255.)[54] He cites Washington v. Texas, 388 U.S. 14, 19 (1967), for the proposition that when a state meddles with the work the expert performs or the ability of the defendant to use the expert, the state interferes with the defendant's right to present his defense. (Id.) Carruthers asserts that the trial court interfered with the use of his expert in the following manner:

- prevented Blake from visiting Carruthers;
- established that Judge Dailey would be in charge of transmitting information to Blake for review;
- indicated to Blake that he was working for the court and should submit his report to the court;
- sent Blake a letter from the prosecution along with Dr. O.C. Smith's autopsy reports;
- told Blake that his only job was to determine the accuracy of Dr. Smith's time of death estimate; and
- authorized Blake to talk with attorneys prosecuting Carruthers.

(Id. at 255-56.) Carruthers contends that Blake never spoke with him about anything. (Id. at 256.)

Carruthers has not cited any Supreme Court precedent extending the principles of Ake to the use of a forensic pathologist.[55] The

---

[54] Ake addresses the right to a competent psychiatrist to conduct an appropriate examination of an indigent defendant on issues relevant to the defense, to present testimony, and to assist in preparing cross-examination of the state's psychiatric witnesses. 470 U.S. at 82-83.

[55] Carruthers cites Terry v. Rees, 985 F.2d 283, 284 (6th Cir. 1993) (per curiam), where the Sixth Circuit determined that the defendant was deprived of the opportunity to present an effective defense when he was denied an independent pathologist to challenge the government's position as to the victim's cause of death. In Terry, the court completely denied the request for an expert. Id. at 283.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 174

Supreme Court specifically declined to extend the principles of Ake to non-psychiatric experts. See Caldwell v. Mississippi, 472 U.S. 320, 323 n.1 (1985); see also Johnson v. Oklahoma, 484 U.S. 878, 880 (1987) (Marshall, J., dissenting) ("[I]n [Caldwell], we reserved the equally important questions whether and when an indigent defendant is entitled to nonpsychiatric expert assistance. This case demonstrates the pressing need to consider and resolve those questions."); Babick v. Berghuis, 620 F.3d 571, 579 (6th Cir. 2010) (Sixth Circuit precedent is unclear about the right to a state-paid nonpsychiatric expert witness).

Carruthers's reliance on Washington is misplaced. In Washington, the Supreme Court found that a Texas statute violated the defendant's right to compulsory process by "arbitrarily den[ying] him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." Washington, 388 U.S. at 23. There is no indication that Blake was ever prevented from testifying. See Johnson v. Bell, 525 F.3d 466, 480-81 (6th Cir. 2008) (Washington is not applicable where the witness was not prevented from testifying). Further Carruthers has not cited any Supreme Court precedent addressing a similar factual scenario where the judge coordinated expert services for a pro se defendant who was incarcerated.

A defendant has the right to present his own witnesses free from government action designed to discourage those witnesses from

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 175

testifying. United States v. Emuegbunam, 268 F.3d 377, 400 (6th Cir. 2001). "[G]overnmental conduct must amount to a substantial interference with a witness's free and unhampered determination to testify before we will find a violation of due process or the Sixth Amendment." Id. at 400. Judicial action aimed at discouraging defense witnesses from testifying deprives a defendant of the right to present his own witnesses. See Webb v. Texas, 409 U.S. 95, 97-98 (1972) (per curiam) (judge who singled out sole defense witness for lengthy admonition on dangers of perjury, implied that he expected witness to lie, and assured witness that if he did lie, he would be prosecuted and probably convicted for perjury drove the witness off the stand and deprived the petitioner of due process).

Carruthers makes multiple allegations to demonstrate the judge's interference with his expert. He misrepresents, however, Judge Dailey's comments about Blake testifying at trial. The Tennessee Court of Criminal Appeals correctly outlined the trial court's concern with Blake's schedule and the time and expense related to his travel. (See ECF No. 55-8 at PageID 6058-6061.) The trial court also expressed that it was willing to reconsider whether Blake should be called if there were a surprise in the State's testimony:

> If, for example, Dr. O.C. Smith, or any other medical expert that the State might call, comes up with some brand new, surprising, novel revelation that causes you to change your defense strategy at the 11th hour . . . that's fine. If you can articulate that sort of last second change, that is fine.



172

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 176

(Id. at PageID 6059-6060.)

Carruthers misrepresents Judge Dailey's comments when he asserts that Blake was prevented from visiting him and that the court would be in charge of transmitting information to Blake.

> THE COURT: Hold on, Mr. Carruthers. I need to mention to you I have located a forensic pathologist in the state of Tennessee who I deem to be a fully capable and competent forensic pathologist. And he is in Morristown, Tennessee. And I intend to forward him the coroner's report – the medical examiner's report – autopsy - autopsy report in this case for his review – for his opinion with regard to his ability to come up with a more specific time of death, which is the narrow question that was posed through your ex parte motion.
>
> MR. CARRUTHERS: My question is: For me to prepare my defense, it is possible that I meet with this forensic pathologist to show him basically what I know about the case – again, all the stuff that I have – all the information that I have concerning the case and to see possibly could he find out the things that I need that can prove – I mean also seeing where the video of the crime scene that we just received two years later, and it shows that the an [sic] - Dr. Barry Sims – I guess he's an anthropologist from the University of Tennessee. He was dusting one of the victims off, and if you notice on the tape, her leg was still shaking like – it still had a little life in it to show that, I mean, that these people were possibly just killed instead of –
>
> THE COURT: You're welcome to send all that to – package it up and send it to him and let him review it, along with a cover letter pointing out these matters that concern you about the video and the autopsy and the autopsy report. And he can – and he's a man who has rendered many second opinions.
>
> MR. CARRUTHERS: So basically you're saying that he's working for the state. He's not working for me.
>
> THE COURT: No.
>
> MR. CARRUTHERS: So he don't come down here and contact me. I can't contact him. I can't be informed of his findings.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 177

THE COURT: That's not [at] all what I said. I don't know where you heard that –

. . . .

THE COURT: He's not working for the state. You can contact him. You're welcome to send it.

MR. CARRUTHERS: Can he come see me?

THE COURT: No, not at this time. I'm going to send him all the materials. You can send him all the materials that you have.

MR. CARRUTHERS: Can I see the material that you're going to send him?

THE COURT: Sure.

. . . .

THE COURT: It's basically going to be the autopsy and the autopsy report.

(ECF No. 55-3 at PageID 2314-2316.) The trial court initially denied Carruthers's request to have Blake visit him, but there is no evidence that a subsequent request was made. Further, the trial court made it clear that Carruthers could send Blake the information he thought was needed to obtain Blake's opinion.

Carruthers also complains that the judge limited Blake's opinion to a determination of the accuracy of Dr. Smith's time-of-death estimate. The colloquy above, however, indicates that Carruthers's ex parte motion was limited to a determination of the issue of time of death. Carruthers has not pointed to any motion or request in the record related to a request for Blake to address the issue of whether the victims were buried alive or any other issue.

In <u>Tinsley v. Million</u>, 399 F.3d 796, 807 (6th Cir. 2005), the

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 178

Sixth Circuit determined that counsel's choice not to hire a blood-splatter expert when provided with sufficient funds does not constitute a violation of due process rights. Similarly, Carruthers's choice not to call Blake as a witness did not amount to a violation of his constitutional rights. Carruthers was granted an expert, paid for by the state, from whom he obtained an opinion prior to trial, and was given the opportunity to present the expert's testimony at trial. No clearly established constitutional right was violated. Claim 16, as it relates to Blake, is without merit and is, therefore, DENIED.

**O. Admission of Specified Evidence (Claim 17, Amended Petition ¶¶ 397-412)**

Carruthers alleges that the trial court allowed Jimmy Maze to testify to the following information that was "irrelevant and prejudicial":

- that Carruthers wrote him letters in which Carruthers referenced an unspecified plan that would garner Carruthers a large sum of money and read the letters to the jury; and
- that on December 31, 1993, he saw Carruthers carrying containers filled with gasoline.

(ECF No. 21 at 99-100.)

Carruthers alleges that the trial court allowed Chris Hines to testify about the following information that was "irrelevant, unreliable, and prejudicial":

- that Jonathan Montgomery told Hines that he (Jonathan) had stolen money and killed someone; and
- about his opinion of what James Montgomery meant when he told Hines that a gun he offered Hines "had blood on it."

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 179

(Id. at 100.)

Carruthers alleges that the court admitted evidence that was "unnecessary and prejudicial" in the form of:

- a videotape of the crime scene, which included images of the victims' bodies; and
- photographs of the crime scene, which included images of the victims' bodies.

(Id.) He alleges that the trial court allowed unreliable and prejudicial testimony: (1) from Benton West that Nakeita Montgomery Shaw said she thought Marcellos Anderson and Fred Tucker were being kidnapped and she hoped nothing would happen to them; (2) from Nakeita Montgomery Shaw about a statement she gave to Milwaukee police that she saw Marcellos Anderson and Fred Tucker with their hands tied behind their backs when they were leaving her home; (3) from Terrell Adair that he participated in a conversation with Charles Ray Smith, Marcellos Anderson, and Andre Johnson about personal safety; and (4) from Andre Johnson that he told Terrell Adair and Marcellos Anderson not to ride in a car with James Montgomery and Carruthers because they were out to rob and kill Adair and Marcellos Anderson. (Id. at 100-01.) Carruthers contends that the admission of this evidence deprived him of a fair trial and sentencing hearing. (Id. at 101.)

Respondent argues that "an overwhelming majority of the theories in this claim" were not presented to the state courts and

are procedurally defaulted. (ECF No. 114-1 at 23.)[56] Respondent contends that the only claims presented in the state court were related to the admission of statements made by Jonathan Montgomery before his death, the admission of a letter Carruthers wrote to Maze, and the admission of photographs and videotapes. (Id.) Respondent asserts, however, that these claims were presented as a matter of state evidentiary law rather than as a constitutional violation and are procedurally defaulted. (Id.) Although Carruthers raised claims in the state court related to the admission into evidence of the letters written to Maze and Jonathan Montgomery's confession to Hines that he had stolen money and killed someone, these claims were based on state evidentiary rulings and were not fairly presented as constitutional claims. See Carruthers, 35 S.W.3d at 555-57, 574. (See ECF No. 56-6 at PageID 10229-10234.)

Carruthers argues that Claim 17 as it relates to the photographs and videotape was fairly presented in the state courts. (ECF No. 129 at 238.) He cites his appellate brief and argues, based on Gardner v. Florida, 430 U.S. 349, 356-58 (1977), and Woodson v. North Carolina, 428 U.S. 280 (1976), that the introduction of this evidence "transgressed the heightened standard of care" for capital cases. (Id.; see also ECF No. 56-6 at PageID 10244-10249.) Neither Gardner nor Woodson address the issue before the Court. "It is not enough to make a general appeal to a

---

[56] James Montgomery raised claims about the testimony of Benton West, Nakeita Shaw, Terrell Adair, and Andre Johnson before the Tennessee Court of Criminal Appeals. See Carruthers, 1999 WL 1530153, at *54-56.



177

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 181

constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." Gray, 518 U.S. at 163. The claim was not fairly presented in the state courts.

Carruthers argues that ineffective assistance of counsel establishes cause for prejudicial default because Claim 17 is arguably meritorious and counsel's failure to raise it constitutes deficient performance. (ECF No. 129 at 247-48, 257-58.) He contends that a habeas petitioner is entitled to relief when a state evidentiary error renders the proceeding fundamentally unfair. (Id. at 257.) Carruthers has not exhausted an ineffective-assistance-of-counsel claim related to the admission of this specified evidence and, therefore, cannot establish cause for the failure to exhaust these claims. Carruthers has not demonstrated that a miscarriage of justice will result from the Court's failure to consider these claims.

Summary judgment based on procedural default is GRANTED. Claim 17 is, therefore, DENIED.

**P. Confrontation Clause (Claim 18, Amended Petition ¶¶ 413-17)**

Carruthers alleges that the following testimony was admitted without confrontation, not subjected to cross-examination, and violated his rights to confrontation, due process under the Sixth and Fourteenth Amendments, and cruel and unusual punishment under the Eighth Amendment: (1) Benton West's testimony about Nakeita Montgomery Shaw's statements; (2) Jimmy Maze's and Chris Hines's testimony about Jonathan Montgomery's statements; and (3) Andre

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 182

Johnson's testimony about Charles Smith's statements. (ECF No. 21 at 101-02.) Respondent argues that this claim was not presented in the state courts and is procedurally defaulted. (ECF No. 114-1 at 24; ECF No. 149 at 25.) Carruthers argues that ineffective assistance of counsel establishes cause for prejudicial default because the claim is arguably meritorious and counsel's failure to raise it constitutes deficient performance. (ECF No. 129 at 247-248, 259.) Carruthers relies on Ohio v. Roberts, 448 U.S. 56 (1980),[57] to allow the admission of absent witnesses' testimonial statements based on a judicial determination of reliability. (Id. at 273.) He contends that Judge Dailey made no determination of reliability before allowing the admission of Jimmy Maze's and Chris Hines's testimony related to Jonathan Montgomery's statements in violation of the Sixth Amendment's Confrontation Clause. (Id.) Carruthers does not address the merits of his other allegations.

Carruthers has not exhausted an ineffective-assistance-of-counsel claim related to the admission of this testimony and cannot establish cause for the failure to exhaust these claims. He was not represented by counsel at trial and, therefore, any ineffective-assistance-of-counsel claim would be without merit and would not establish cause to overcome procedural default. Further, the Court has ruled that Martinez does not establish cause for Carruthers's claims as it relates to Andre Johnson's testimony. (ECF No. 192 at 10, 27-30.) Carruthers has not demonstrated that a miscarriage of

[57] Roberts was abrogated by Crawford v. Washington, 541 U.S. 36 (2004).

justice will result from the Court's failure to consider this claim. Claim 18 is procedurally defaulted. Summary judgment is GRANTED, and Claim 18 is DENIED.

**Q. Nakeita Shaw's Competence as a Witness (Claim 19, Amended Petition ¶¶ 418-21)**

Carruthers alleges that, on or around January 10, 1996, the trial court became aware that Nakeita Montgomery Shaw had been admitted to a mental hospital for treatment of a debilitating mental illness. (ECF No. 21 at 103.) The State called Shaw as a witness and the trial court did not determine whether she was competent to testify. (Id.)

Respondent argues that the Tennessee Court of Criminal Appeals determined that Carruthers waived this claim because he did not object to the witness's testimony at trial or impeach her through cross-examination. (ECF No. 114-1 at 24.) See Carruthers, 1999 WL 1530153, at *42. Respondent contends that the claim was not fully and fairly presented for review, was not presented to the state courts under a theory of constitutional law, and is procedurally defaulted. (ECF No. 114-1 at 24.)

Carruthers argues that the claim was fairly presented as a federal claim in the state courts. (ECF No. 129 at 238-39.) He argues that he relied on the federal case Gardner, 430 U.S. at 358, for the proposition that "any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion," invoking the heightened standard for capital cases under the Eighth and Fourteenth Amendments. (Id.) He further asserts

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 184

that he asserted a claim in terms that call to mind the specific right guaranteed by the federal constitution. (Id. at 240.) Despite Carruthers's reference to Gardner to fend off procedural default, he cites the Federal Rules of Evidence as the federal precedent on which he relies for the merits of his claim. (Id. at 220-21.)

None of the state cases that Carruthers relied on employed a federal constitutional analysis. Although Carruthers cited Gardner for a general proposition related to capital cases, Gardner does not address the issue of the competency of witnesses. Therefore, Carruthers cannot be said to have relied upon a federal case employing constitutional analysis relevant to the issue, phrased the claim in terms of constitutional law or the denial of a specific constitutional right, or alleged facts well within the mainstream of constitutional law. Additionally, the Tennessee Court of Criminal Appeals' determination was based on state law and did not employ a constitutional analysis. See Carruthers, 35 S.W.3d at 575-76. Carruthers has not fairly presented the habeas claim. Carruthers has not demonstrated cause and prejudice for his failure to exhaust this claim or that a miscarriage of justice would result from the Court's failure to consider the claim. Claim 19 is, therefore, procedurally defaulted.

Carruthers argues that this claim is not subject to the strictures of § 2254(d) because the Tennessee Court of Criminal Appeals' decision is contrary to clearly established federal law

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 185

under Fed. R. Evid. 104(a), which requires the trial court to determine the qualification of a person to be a witness. (ECF No. 129 at 213, 220.) He contends that although Fed. R. Evid. 601 presumes that a witness is competent to testify, "judges have the power, and in appropriate instances, the duty, to hold a hearing to determine whether a witness should not be allowed to testify because a mental defect has rendered him incapable of testifying competently." (Id. at 220-21.)

Habeas relief is granted for a violation of constitutional rights. Carruthers has not pointed to any Supreme Court case that requires courts to question witnesses, other than the defendant, to determine competence. See Moreland v. Bradshaw, 635 F. Supp. 2d 680, 752 (S.D. Ohio 2009) (denying habeas relief where no Supreme Court precedent established that a criminal defendant was entitled to a psychological examination of a presumptively competent witness). A judge's power under the Federal Rules of Evidence to determine a witness's competence does not create a clearly established constitutional right, especially considering that the federal rules do not apply in a state-court proceeding. Additionally, there is nothing in the record to demonstrate that Shaw's depression made her incompetent to testify.

Claim 19 is procedurally defaulted and without merit. Summary judgment is GRANTED. Accordingly, Claim 19 is DENIED.

**R. Judicial Bias (Claim 20, Amended Petition ¶¶ 422-42 )**

Carruthers alleges that early in the case, he wrote letters to

the trial court "blaming the court for not doing its job, for racism, and for discrimination." (ECF No. 21 at 103.) He alleges that the trial court held in camera meetings with defense counsel to discuss his letters, counsel's complaints about him, and his counsel's defense of their inaction. (Id. at 103-04.) Carruthers alleges that the trial court effectively adopted the adversarial position of appointed counsel and that the Court did not hold evidentiary hearings about his conduct and his right to counsel. (Id. at 104.) He asserts that the trial judge announced that it would throw away Carruthers's letters and direct the clerk not to open them, in effect destroying part of the record. (Id.) Carruthers asserts that after the trial court directed him to proceed pro se, it was "indifferent to the difficulties, harassment and obstacles in the Shelby County Jail, stating these problems were of his own making." (Id. at 105.) He contends that the trial court interfered with the defense team's performance of its duties, believed he was a physical threat to the judge and his children, and became "embroiled in a running, bitter controversy." (Id. at 105-06.) Carruthers contends that, under these circumstances, there is a substantial likelihood of bias or an appearance of bias and, based on the facts, the bias of the trial court is clear. (Id. at 106.)

Respondent argues that the claim was not presented in the Tennessee courts for review and is procedurally defaulted. (ECF No. 114-1 at 24; ECF No. 149 at 26.) Carruthers admits that the "judicial bias" claim was not presented in the Tennessee courts, but

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 187

he contends that the Tennessee courts considered the merits of the claim irrespective of any failure to raise it. (ECF No. 129 at 51-52, 109, 239-240.) He argues that the claim cannot be forfeited or defaulted. (Id. at 51-52, 108-13.) Carruthers argues cause and prejudice for any default: (1) in light of recently disclosed evidence of ongoing off-the-record conversations and investigations that establish Judge Dailey's bias; (2) the general rule is that cause need not be shown because parties are permitted to assume that state trial judges act properly; and (3) judicial bias is structural error. (Id. at 52.) Carruthers contends that he establishes cause because:

- Judge Dailey did not report off-the-record discussions;
- material information was not in the record;
- material conversations and information were concealed;
- the record was misrepresented as being complete; and
- material facts were not discovered or revealed until Carruthers's habeas petition was filed.

(Id. at 112.) He further asserts that his convictions and death sentence are wholly unreliable and constitute a miscarriage of justice because his trial "was one in form only." (Id. at 114.)

Judicial bias claims are subject to procedural default. See Alley v. Bell, 307 F.3d 380, 388 (6th Cir. 2002); see also Towery v. Schriro, 641 F.3d 300, 312 (9th Cir. 2010); Stoutamire v. Morgan, No. 4:10 CV 2657, 2011 WL 6934809, at *13 (N.D. Ohio Oct. 5, 2011) (procedurally barring judicial bias claim from federal habeas

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 188

review).[58] Carruthers contends that the Tennessee Court of Criminal Appeals addressed this issue on direct appeal when it considered whether, as a result of self-representation, Carruthers was not treated fairly and concluded that Dailey did not deny Carruthers a fair and impartial trial. (ECF No. 129 at 109, 239-40.) See Carruthers, 1999 WL 1530153, at *32-33. Carruthers asserts that the court considered this issue because determining whether a defendant received fair treatment at an impartial trial is the very question courts resolve when considering a claim of judicial bias. (Id. at 240.)

The Tennessee Court of Criminal Appeals did not address a judicial-bias claim. The court addressed the forfeiture of the right to counsel, and the judicial bias claim is exhausted only to the extent that the state court addressed whether the judge was biased in its treatment of Carruthers as it relates to him proceeding pro se. As such, the issue is encompassed in Claim 8, see supra pp. 73-87, which the Court denied on the merits. Carruthers's other judicial-bias concerns were not exhausted in the state court. The Court has determined that Martinez does not establish cause and prejudice for Carruthers's judicial-bias claims. (ECF No. 192 at 10, 27-30.) He has not otherwise demonstrated cause and prejudice or that a miscarriage of justice would result from the Court's failure to consider the claim, and these allegations are

[58] Judicial bias is a "structural defect." See Coley v. Bagley, 706 F.3d 741, 750 (6th Cir. 2013). That does not, however, prevent a determination of procedural default.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 189

procedurally defaulted. Summary judgment based on procedural default is partially GRANTED. Claim 20 is DENIED because the allegations are either procedurally defaulted or without merit.

**S. Improper Closing Argument (Claim 21, Amended Petition ¶¶ 443-44)**

Carruthers alleges that the prosecutor's remarks during closing arguments violated Carruthers's Sixth, Eighth, and Fourteenth Amendment rights. (ECF No. 21 at 106.) He alleges that, at the guilt stage, the prosecutor stated that:

- Carruthers was "a conniver, manipulator, stalker, deceiver, and a liar who was attempting to manipulate the jury;"
- the jurors needed to avoid falling prey to "mind games;"
- Carruthers's witnesses were not credible;
- Carruthers was trying to manipulate the media;
- Carruthers effectuated a "second part" of a plan that was referenced in a letter he had written to Jimmy Maze; and
- the jury had a responsibility to the victims' families.

(Id. at 106-07.)

Carruthers alleges that, at the sentencing stage, the prosecutor:

- referenced that one of the Bible's Ten Commandments is "Thou shall not commit murder" instead of "thou shall not kill;"
- expressed his pride in witnesses who were family members of the victims because they did not cry or make speeches and they trusted the jury to do the right thing; and
- commented that the prosecution chose not to solicit additional available testimony from the victims' families about the impact the killings has had on them.

(Id. at 107.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 190

Respondent argues that the Tennessee Court of Criminal Appeals found that these claims were waived at trial because Carruthers failed to contemporaneously object to the statements. (ECF No. 114-1 at 24-25.) He asserts that this independent and adequate state ground bars these statements from federal review, and the claim is procedurally defaulted because it was not fully and fairly presented in the state courts. (Id. at 25.) Respondent notes that the Tennessee Court of Criminal Appeals also addressed the merits of the claim, and its decision is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court and was based on a reasonable determination of facts in light of the evidence presented. (Id.; ECF No. 149 at 28.)

Carruthers argues that the Tennessee Court of Criminal Appeals' decision does not contain a plain statement about waiver that can support a federal default determination. (ECF No. 129 at 243.) He points out that, while the court determined that Carruthers waived his challenges, it also stated that it would "nonetheless" review the merits, making the claim available for habeas review on the merits under Harris v. Reed, 489 U.S. 255 (1989), and Levine v. Torvik, 986 F.2d 1506 (6th Cir. 1993). (Id. at 243-45.)

Carruthers argues that this claim is not subject to the strictures of § 2254(d) because the state court's decision was contrary to clearly established federal law. (ECF No. 129 at 211-13, 221-22.) He asserts that, on direct appeal, the Tennessee Court

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 191

of Criminal Appeals did not apply governing federal principles to assess entitlement to relief based on constitutional arguments about whether the proceedings were unfair and did not make its required determination under Darden v. Wainwright, 477 U.S. 168 (1986), of whether the "misconduct was 'harmless beyond a reasonable doubt' under the constitutional harmless-error standard of Chapman v. California, 386 U.S. 18 (1967)." (Id. at 221-22.) He contends that the court reviewed the claim under a state-court "reversible error" standard and denied a new trial or sentencing because the "'improper comments by the prosecutors did not affect the verdict to the prejudice' of Tony Carruthers." (Id. at 222.) Carruthers argues that the state court's decision failed to provide the higher standard of "harmless beyond a reasonable doubt" from Supreme Court precedent in Darden and Chapman. (Id.)

The Tennessee Court of Criminal Appeals stated:

> Prosecutorial Misconduct
>
> Both appellants claim the prosecutors made improper arguments during both phases of the trial which require a remand for a new trial.
>
> As is commonly recognized, closing arguments are an important tool for the parties during the trial process. Consequently, the attorneys are usually given wide latitude in the scope of their arguments, see State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994), and trial judges, in turn, are accorded wide discretion in their control of those arguments, see State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). Such scope and discretion, however, is not completely unfettered. Argument must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law. Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). The test for determining whether the prosecuting attorney

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 192

committed reversible misconduct in the argument is "whether the improper conduct could have affected the verdict to the prejudice of the defendant." Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). The following factors have been recognized to aid the Court in this determination: 1) the conduct complained of, viewed in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecutor; 3) the intent of the prosecutor in making the improper statement; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength or weakness of the case. State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994); State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).

Initially, Carruthers claims that because he was representing himself the trial court should have taken a more active role in guarding against prosecutorial misconduct during argument. As we noted earlier, there are certain perils a defendant faces when representing himself at trial. Knowing when to object during argument obviously is one of those perils. While the trial court can intervene sua sponte and take curative measures when the argument becomes blatantly improper, see, e.g., State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998), the trial court must exercise its discretion and should not exert too much control over the arguments. The judge does not serve as a pro se defendant's counselor during trial. The judge should intervene only when requested or when the judge deems proper in the interest of justice.

Carruthers refers to several instances of allegedly improper argument that occurred during the guilt phase of the trial. He claims the prosecutor improperly characterized him as a conniver and liar and accused him of manipulating the jury. Evidence was introduced that Carruthers was the mastermind behind these crimes, and therefore, any reference by the state in this regard was not improper. However, the prosecutor may not comment unfavorably upon the defendant's pro se representation of himself or the presentation of his case. See Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). Nor should a prosecutor express his or her personal opinion about the credibility of witnesses, unless the comments are grounded upon evidence in the record. See State v. West, 767 S.W.2d 387, 394 (Tenn. 1989). Moreover, a prosecutor is strictly prohibited from commenting on the defendant's decision not to testify. Coker, 911 S.W.2d at 368. This would include his decision not to present any proof. However, a prosecutor's statement that proof is

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 193

unrefuted or uncontradicted is not an improper comment upon a defendant's failure to testify. State v. Thomas, 818 S.W.2d 350, 364 (Tenn. Crim. App. 1991); State v. Coury, 697 S.W.2d 373, 378 (Tenn. Crim. App. 1985). The prosecutor should also refrain from calling the defendant derogatory names. State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998).

In this case, it was improper for the prosecutor to call the appellant names, such as a liar. However, we do not find improper the comments telling the jury to watch out for "pitfalls" and "mind games" and not to succumb to a "guilt trip." The prosecutor was simply making reference to the strength of the state's proof. Also, the prosecutor should not have insinuated that Carruthers was trying to manipulate the jury or comment that Carruthers did not call any credible witnesses on his behalf. Contrary to Carruthers' claim, however, we do not believe these comments improperly referred to Carruthers' failure to testify. Similarly, Carruthers complains about the prosecutor's statements that Carruthers was trying to manipulate the media. However, Alfredo Shaw testified about this. Moreover, the state is permitted to argue reasonable inferences from the evidence in the record. Coker, 911 S.W.2d at 368. The state's argument in this respect was not improper. Carruthers also claims the state's reference to the "second part" of Carruthers' master plan mentioned in the letters he wrote to Maze was improper. Since this was brought up by the evidence, we do not think this comment was improper. Carruthers also claims the prosecutor's statement to the jury that they have a responsibility to the victims' family improperly appealed to the emotions and sympathies of the jury. See State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994). We agree. Finally, Carruthers contends the prosecutor's comment that there is a "gap" in the evidence was improper. Carruthers claims this was an improper inference on his failure to testify. We disagree. The state's case was based on circumstantial evidence and the prosecutor's comment in this respect merely informed the jury that not all the pieces to the puzzle were presented at trial.

Both appellants complain about certain comments made by the prosecutor during argument at the penalty phase of trial. Both appellants take issue with the prosecutor's mention of the ten commandments in the Bible. Just recently, in State v. Middlebrooks, 995 S.W.2d 550, 559 (Tenn. 1999), our Supreme Court made the following comment regarding this type of argument:

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 194

> We have condemned Biblical and scriptural references in a prosecutor's closing argument so frequently that it is difficult not to conclude that the remarks in this case were made either with blatant disregard for our decisions or a level of astonishing ignorance of the state of law in this regard.

This argument by the prosecutor was obviously improper under the decisions of our Supreme Court.

Both appellants also contend that the state made improper victim impact argument. Victim impact evidence and argument during sentencing are not prohibited by the constitution or statute. See State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998). However, the argument must be relevant to the specific harm to the victim's family, Middlebrooks, 995 S.W.2d at 558, and must be limited to "information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's family." Nesbit, 978 S.W.2d at 891 (footnote omitted). The "victim's family members' characterization and opinion about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." Id. at 888 n.8. Again, the prosecutor cannot simply appeal to the emotions and sympathies of the jury while invoking victim impact argument. Id. at 891 (citing State v. Bigbee, 885 S.W.2d 797 (Tenn. 1994)). We agree with the appellants that the prosecutor improperly commented that the family members who testified did not cry and had remained quiet during trial. Also improper was the comment that the families "trust in you [the jury]." The family members could have testified that they missed the victims (emotional impact of victim's death), and the comment by the prosecutor that they chose not to solicit this testimony was not improper.

. . . .

We find that the appellants have waived any challenge regarding the majority of the comments about which they complain because they failed to voice a contemporaneous objection. T.R.A.P. 36(a); see also State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992). Nonetheless, we have reviewed the entire arguments of all parties, and

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 195

> considering the factors listed above, we find that the relatively few improper comments by the prosecutors did not affect the verdict to the prejudice of the appellants. This issue is without merit. However, we remind counsel of the warnings recently related by our Supreme Court in State v. Middlebrooks, 995 S.W.2d 550, 561 (Tenn. 1999):
>
>> Those who interpret these cases as precedent for the view that improper closing argument and misconduct of this nature will be held harmless error in all cases do so at their own professional peril and at the risk that the misconduct, even if it does not prejudicially affect the verdict, may be deemed to be prejudicial to the judicial process as a whole and therefore require a new trial or sentencing hearing.

Carruthers, 1999 WL 1530153, at *47-49.

Carruthers asserts that the Tennessee Court of Criminal Appeals recognized the prosecutor's "numerous improper arguments" about Carruthers being a "conniver" and "liar," appealing to the sympathy of the jury by arguing about the jury's "responsibility to the victims," and reference to the Ten Commandments. (ECF No. 129 at 260-61.) He contends that the arguments that the jury should convict Carruthers because he had "no proof" unconstitutionally penalized him for choosing not to testify and did not hold the prosecution to its burden. (Id. at 261.) He asserts that the prosecution's personal attacks and the injections of emotions into the jury's decision made the trial fundamentally unfair. (Id.)

The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). The appropriate standard of review is

"the narrow one of due process, and not the broad exercise of supervisory power." Darden, 477 U.S. at 181 (quoting Donnelly, 416 U.S. at 642).[59]

Carruthers contends that the prosecution, by arguing that he had put on "no proof," unconstitutionally penalized him for choosing not to testify, and cites Doyle v. Ohio, 426 U.S. 610 (1976), in support of his argument. (ECF No. 129 at 261.) Carruthers did not specifically allege that the prosecutor's statement that Carruthers put on "no proof" violated his constitutional rights. Pursuant to Habeas Rule 2(c), that claim will not be considered.

Carruthers made similar arguments related to the prosecutor's comments on the credibility of his witnesses, "pitfalls," "mind games," not to succumb to a "guilt trip," and that there was a "gap" in the evidence. See Carruthers, 1999 WL 1530153, at *48. The Tennessee Court of Criminal Appeals did not believe that these comments referred to Carruthers's failure to testify and did not require corresponding relief. Id. In Brecht, the Supreme Court stated that "we think Doyle error fits squarely into the category of

[59] The Sixth Circuit has applied a "two-step analysis to determine whether prosecutorial misconduct, including vouching, warrants habeas relief that asks: (1) whether the prosecutor's conduct was improper, and, if so, (2) whether the misconduct was flagrant." Wilson v. Bell, 368 F. App'x 627, 633 (6th Cir. 2010); Bates v. Bell, 402 F.3d 635, 641 (6th Cir. 2005). To determine whether an improper comment was sufficiently flagrant to warrant reversal, the Sixth Circuit has enumerated the following four factors for consideration: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." Macias v. Makowski, 291 F.3d 447, 452 (6th Cir. 2002) (internal quotation marks omitted).

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 197

constitutional violations which we have characterized as trial error" and is, therefore, subject to a harmless error analysis. 507 U.S. at 629 (internal quotation marks omitted). In Wogenstahl v. Mitchell, 668 F.3d 307, 331 (6th Cir. 2012), the Sixth Circuit held that while, "'[i]n general, it is improper for a prosecuting attorney in a criminal case to state his personal opinion concerning the credibility of witnesses or the guilt of the defendant,'" the prosecution's comments in the closing argument that the defendant was a liar, based on reasonable inferences from the evidence adduced at trial, are not improper and failed to prejudice the defendant.

Also relevant to Carruthers's claims is the Sixth Circuit's holding in Bedford v. Collins, 567 F.3d 225, 234 (6th Cir. 2009) (citations omitted), that "[n]othing prevents the government from appealing to the jurors' sense of justice or from connecting the point to the victims in the case." The prosecutor's expressions of pride in the victims' family members and that he would not solicit additional testimony from the victims' families were not improper or so flagrant as to render the trial fundamentally unfair.

The prosecution's closing argument, taken as a whole, does not make Carruthers's trial fundamentally unfair. The evidence was not misstated or manipulated. The Tennessee Court of Criminal Appeals' decision is not contrary to or an unreasonable application of clearly established Supreme Court precedent and is based on a reasonable determination of facts. Claim 21 is without merit. Summary judgment is GRANTED and Claim 21 is, therefore, DENIED.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 198

**T. Jury Instructions (Claim 22, Amended Petition ¶¶ 445-46, & Claim 23, Amended Petition ¶¶ 447-48)**

In Claim 22, Carruthers alleges that, in the guilt phase, the trial court provided unconstitutional jury instructions on "reasonable doubt," presumptions about witness testimony, intent, premeditation, and the elements of the offenses. (ECF No. 21 at 108-09.) In Claim23, Carruthers alleges that, at sentencing, the trial court gave unconstitutional jury instructions on finding aggravating circumstances beyond a reasonable doubt and the "heinous, atrocious, or cruel" aggravating circumstance. (Id. at 109-10.)

Respondent argues that the claims were not presented to the Tennessee state courts for review and are procedurally defaulted. (ECF No. 114-1 at 25-26; ECF No. 149 at 28.) Carruthers argues ineffective assistance of counsel as cause for the prejudicial default because the claims are arguably meritorious and counsel's failure to raise them constitutes deficient performance. (ECF No. 129 at 247-48, 261-70.)

Carruthers argues that, pursuant to Tenn. Code Ann. § 39-13-206(c), the Tennessee Supreme Court considered the merits of Claim 23 because it raised the possibility that his death sentence was arbitrary, excessive, or disproportionate. (Id. at 242.) He contends that the court expressly acknowledged that it performed this review, stating:

> In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c) and the principles adopted in prior decisions, we have considered the entire record and

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 199

> conclude that the sentences of death imposed for Carruthers' three convictions of first degree murder were not imposed arbitrarily, that the evidence supports the jury's findings of the statutory aggravating circumstances, that the evidence supports the jury's finding that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

(Id. at 256.) Carruthers, 35 S.W.3d at 571-72.

The federal courts have rejected implicit-review theories based on the statutorily-mandated review that the Tennessee Supreme Court conducts pursuant to Tennessee Code Annotated § 39-13-206(c)(1) in capital cases. See, e.g., Miller v. Bell, 655 F. Supp. 2d 838, 869 (E.D. Tenn. 2009). The proposition that a claim has been exhausted because the Tennessee Supreme Court has to review significant errors is "too broad, as it would eliminate the entire doctrine of procedural bar in Tennessee in capital cases." Coe v. Bell, 161 F.3d at 336. In Zagorski, the Sixth Circuit rejected a petitioner's implicit-review argument that his claim was not procedurally defaulted because the Tennessee Supreme Court reviewed the record for "all possible claims" and found no reversible error. Zagorski v. Bell, 326 F. App'x 336, 342 (6th Cir. 2009), cert. denied, 559 U.S. 1068 (2010). The Sixth Circuit held that the record was examined for all issues raised and that those not presented remained defaulted. Id. The Sixth Circuit's acceptance of implicit-review theories has been limited to Eighth Amendment vagueness challenges. Webb v. Mitchell, 586 F.3d 383, 400 (6th Cir. 2009), cert. denied sub nom. Webb v. Bobby, 559 U.S. 1076 (2010). Carruthers has only alleged an Eighth Amendment vagueness challenge

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 200

related to the "heinous, atrocious, or cruel" ("HAC") aggravating circumstance during the sentencing phase. (See ECF No. 21 at 109-10, ¶ 448.2.) The Court rejects the implicit-review argument to demonstrate exhaustion for all the jury instructions except the claim related to the HAC jury instruction.[60] The remaining jury instruction claims were not exhausted in the state court.

As to the remaining unexhausted jury-instruction claims, Carruthers did not exhaust ineffective-assistance-of-counsel-claims related to these jury instructions in the state court. The Court has determined that Martinez does not establish cause and prejudice for these claims. (ECF No. 192 at 10, 27-30.) Carruthers has not otherwise demonstrated cause and prejudice. Carruthers has not demonstrated that a miscarriage of justice would result from the Court's failure to address these claims. Claims 22 and 23, with the exception of the Eighth Amendment vagueness aspects of the HAC jury instruction claim, are procedurally defaulted. Accordingly, summary judgment based on procedural default is GRANTED IN PART and DENIED IN PART as it relates to the HAC jury instruction.

In Claim 23, Amended Petition ¶ 448.2, Carruthers alleges that the jury instruction on the statutory HAC aggravating circumstance was unconstitutionally vague,

[60] Montgomery argued before the Tennessee Court of Criminal Appeals that the HAC jury instruction was improper because the court used the phrase "in that" instead of "and" the murder is especially heinous, atrocious, or cruel. See Carruthers, 1999 WL 1530153, at *57. Carruthers did not present this argument in the state court. Further, Montgomery's argument, which the state court rejected, differs from that presented in the habeas petition.

> where "heinous" was defined as "grossly wicked or reprehensible, abominable, odious, vile," where "atrocious" was defined as "extremely evil or cruel, monstrous, exceptionally bad, abominable," and "cruel" was defined as "disposed to inflict pain or suffering, causing suffering, painful."

(ECF No. 21 at 109-10; see ECF No. 55-3 at PageID 2228-2229.[61]) He contends that because the jury found this aggravating circumstance based upon these vague definitions, the death sentence is unconstitutional. (ECF No. 129 at 270.)

The Eighth Amendment requires that a state's capital sentencing scheme "channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." Godfrey v. Georgia, 446 U.S. 420, 428 (1980) (footnotes and internal quotation marks omitted). A state's definition of aggravating circumstances must be sufficiently specific to avoid the arbitrary and capricious infliction of the death penalty.

In Godfrey, the United States Supreme Court determined that the aggravating circumstance that the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim" was unconstitutionally vague. Id. at 422, 432-33.[62] The trial court's instructions to the jury did not elaborate on this aggravating

---

[61] The jury charge was reported but not transcribed. (See ECF No. 55-9 at PageID 7625.)

[62] Previously, the Supreme Court held that this statutory aggravating circumstance was not unconstitutional on its face. See Gregg v. Georgia, 428 U.S. 153, 201-07 (1976).

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 202

circumstance and the jury recited that a death sentence was imposed because the murder was "outrageously or wantonly vile, horrible or inhuman." Id. at 426, 428-29. The Supreme Court, in reaching its decision that the jury's finding was not sufficiently specific, said:

> There is nothing in these few words [outrageously or wantonly vile, horrible and inhuman], standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.' Such a view may, in fact, have been one to which the members of the jury in this case subscribed. If so, their preconceptions were not dispelled by the trial judge's sentencing instructions. These gave the jury no guidance concerning the meaning of any of § (b)(7)'s terms.

Id. at 428-29; see also Maynard v. Cartwright, 486 U.S. 356, 359, 361-64 (1988) (a statutory aggravating factor is unconstitutionally vague if it fails to furnish principled guidance for the choice between death and a lesser penalty).

The Supreme Court held that a state satisfies the constitutional requirement that it limit sentencing discretion by adopting a constitutionally narrow construction of a facially vague aggravating circumstance, and by applying that construction to the facts of a particular case. Richmond v. Lewis, 506 U.S. 40, 46-47 (1992). In Bell v. Cone, 543 U.S. 447, 447-48 (2005) (per curiam), the Supreme Court addressed the question of whether the narrowing construction that the Tennessee Supreme Court applied was unconstitutionally vague. The Supreme Court concluded that the aggravating circumstance, as construed by the Tennessee Supreme

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 203

Court, ensured that there was a "'principled basis' for distinguishing between those cases in which the death penalty was assessed and those cases in which it was not." Id. at 459. The Court held that the narrowing construction applied by the Tennessee Supreme Court satisfied constitutional demands. Id. at 459-60.

The Tennessee Supreme Court adopted a narrowing construction of the statutory HAC aggravating circumstance in State v. Williams, 690 S.W.2d at 517, 529-30 (Tenn. 1985). The trial court in Carruthers's case appropriately instructed the jury, using the definitions of "heinous," "atrocious," and "cruel" enunciated in Williams. The Sixth Circuit has found that the Williams narrowing construction is the same as that declared constitutional by the Supreme Court in Cone. See Payne v. Bell, 418 F.3d 644, 659-60 (6th Cir. 2005), cert. denied, 548 U.S. 908 (2006); see also Cauthern v. Colson, 736 F.3d 465, 488-89 (6th Cir. 2013) ("What law does exist with respect to Tennessee's HAC aggravator clearly supports the conclusion that the statute, with the limiting instructions given, is constitutional, and the difference in language between the two versions of the statute was irrelevant to the determination."); Hall v. Bell, No. 2:06-CV-56, 2010 WL 908933, at *27-29 (E.D. Tenn. Mar. 12, 2010) (finding no ineffective assistance for failing to challenge the HAC aggravating circumstance); Sutton v. Bell, 645 F.3d 752, 760 (6th Cir. 2011) (same). Because the narrowing construction applied by the Tennessee Supreme Court provides specific and detailed guidance and makes the



200

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 204

process of imposing a sentence of death subject to rational review, the claim that the HAC aggravating circumstance is unconstitutional is without merit.

The allegations in Claims 22 and 23 are either procedurally defaulted or without merit and, therefore, are DENIED.

**U. Extraneous, Improper Influences on the Verdict (Claim 24, Amended Petition ¶¶ 449-52)**

Carruthers alleges that, during jury deliberations, one juror brought a Bible into the jury room and read it to his fellow jurors to convince them to convict Carruthers and sentence him to death. (ECF No. 21 at 110.) He also alleges that the trial court subjected the jurors to such oppressive sequestration conditions that, by the time deliberations "began[,] individual jurors agreed to vote with the majority who favored conviction and death simply to get out of the courthouse." (Id. at 111.) Respondent argues that the claim was not presented to the Tennessee state courts for review and is procedurally defaulted. (ECF No. 114-1 at 25-26; ECF No. 149 at 28.)

Carruthers did not exhaust his claim in the state courts and does not address this claim in response to the Motion for summary judgment. Carruthers has not demonstrated cause and prejudice for the procedural default or that a miscarriage of justice would result from the Court's failure to address this claim. Claim 24 is procedurally defaulted. Summary judgment is GRANTED and Claim 24 is, accordingly, DENIED.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 205

**V. Juror 121 (Claim 25, Amended Petition ¶¶ 453-54, and Claim 27, Amended Petition ¶¶ 459-61)**

Carruthers alleges that Juror 121 led him to believe that no reason disqualified him from serving as a juror, but Juror 121 was his mother's neighbor and harbored ill feelings toward the Carruthers family. (ECF No. 21 at 110.) In Claim 27, he alleges that the trial court, after being provided information about Juror 121's misconduct, failed to hold a hearing on information that Juror 121 misled Carruthers to believe that there was no reason for the juror to be disqualified. (Id. at 111-12.)

Respondent argues that these claims were not presented to the Tennessee state courts for review and are procedurally defaulted. (ECF No. 114-1 at 25-26; ECF No. 149 at 28.) Carruthers does not address Claim 25 in response to the Motion for summary judgment. Carruthers argues ineffective assistance of counsel as cause for the prejudicial default of Claim 27 because the claim is arguably meritorious and counsel's failure to raise it constitutes deficient performance, and that the claim was fairly presented in the state courts and addressed on the merits. (ECF No. 129 at 242-43, 247-48, 271-73.)

The Tennessee Court of Criminal Appeals addressed Juror 121's post-conviction testimony:

> A member of the petitioner's anonymous jury, who was identified at trial by the number 121, testified that he was living at 2031 Pamela Drive in the Frayser community of Shelby County at the time he served on the petitioner's jury. He recalled that someone had run over his mailbox during the summer of 1992 but did not recall having reported the incident to the police or making a complaint

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 206

> to the police about a neighborhood party. He testified that he later learned that an elderly man from his church, who could not drive very well, had accidentally run into his mailbox. He said he did not remember recognizing any of the courtroom spectators as one of his neighbors and, although someone had mentioned that the petitioner's mother was present in the courtroom, he was never sure "which one she was."

Carruthers, 2007 WL 4355481, at *25. Juror 127, the jury foreperson, recalled that Juror 121 said he thought he recognized Carruthers's mother as living down the street from him. Id. at *33.

Jane and Terrance Carruthers, Tony Carruthers's mother and brother, testified about Juror 121:

> Jane Carruthers, the petitioner's mother, testified that in 1990 she purchased a home at 2013 Pamela Drive in the Frayser community, located two doors from the residence of Juror 121, where she lived until 1997. She stated that she was one of the first African-Americans to move into the predominantly white neighborhood and, as a result, felt intimidated. She was "nice and cordial to [her] neighbors but . . . kept to [her]self." She testified that Juror 121 was unfriendly and would not answer her when she greeted him. In addition, he once accused her son, Terrance, of knocking over his mailbox. Ms. Carruthers also recalled that when she was hosting a welcome home party on the street to celebrate the petitioner's release from prison, someone in the neighborhood complained to the police.
>
> Ms. Carruthers testified that she was not permitted to attend the jury selection process but was present every day of the petitioner's April 1996 trial. She said she recognized Juror 121 on the first day of trial and relayed the information to Patsy Weber, the jury specialist appointed to assist the petitioner, who told her that she would pass the information along to the judge. Ms. Carruthers testified that the trial judge mentioned the fact that Juror 121 was her neighbor at some point during the trial. However, she could not recall any of the particulars.
>
> Terrance Roger Carruthers, the petitioner's brother, testified that he lived with his mother at 2013 Pamela Drive from 1990 until 1993 and first became familiar with


203

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 207

> Juror 121 when that juror called the police and accused him of running over his mailbox. He said that when the petitioner was released from prison in August 1993, his mother held a neighborhood fish fry that was attended by almost every resident on their street with the exception of Juror 121. During that event, someone called and complained to the police that the party was disturbing the peace. Because Juror 121 came out of his house when the police arrived, the witness believed that he was the person who had lodged the complaint.

Id. at *25.

Carruthers raised an ineffective-assistance-of-appellate-counsel claim about Juror 121 in the post-conviction appellate proceedings. Carruthers, 2007 WL 4355481, at *41, 44-48. The Tennessee Court of Criminal Appeals stated:

> b. Juror 121
>
> The petitioner next contends that appellate counsel should have raised as an issue on appeal the trial court's failure to inquire into the alleged bias of Juror 121. The petitioner argues that the trial court's failure to inquire into Juror 121's alleged bias was per se prejudicial and, in the alternative, that an unrebutted presumption of prejudice arose when Juror 121's potential bias was disclosed. The State responds that the petitioner cannot show that appellate counsel were deficient for failing to raise the issue or that their failure to raise the issue changed the outcome of the trial.
>
> During the trial, as we have set out, the petitioner's mother informed Patsy Weber, the jury consultant appointed to assist the petitioner, that she had recognized Juror 121 as her neighbor. Weber, in turn, advised the trial court, which made no response until approximately two days later, after closing argument was completed. At that point, the trial court held a bench conference, attended by the petitioner, and stated the following:
>
>> But before I dismiss the alternates I want to just let you know, not that it has necessarily raised any concern on my part, but since the jurors were anonymous, listed only by number, I got a phone call from Patsy Weber, who is the


204

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 208

> jury consultant for [the petitioner], and she told me that she got a call from [the petitioner's] mother indicating that one of the jurors apparently lives down the street from her. It's a man on the jury. And in her opinion, she doesn't know him personally. She's said hi to him before. He moved onto that street after [the petitioner] was off in custody, and so he would not have had a reason to see [the petitioner] on that street. He may or may not know who she is. She is not sure.

The trial court told the parties that the court had not heard anything from the juror "indicating that he knows her or realizes that she lives on the same street or anything of that sort." One of the prosecutors then expressed his opinion that the juror should not be voir dired on the subject since he had never indicated he knew the petitioner's mother and to question him about the relationship would only serve to draw his attention to the matter. The trial court agreed:

> THE COURT: Right. I don't have any reason to suspect that he has knowledge of this situation or that he has in any way been compromised as a juror. I just wanted to put it on the record so that you-all would know that I received this phone call.

At that point, one of codefendant Montgomery's counsel expressed his concern that a potential problem might arise at the penalty phase should the petitioner call his mother as a witness:

> [CODEFENDANT'S COUNSEL]: My only concern, Judge, is if we end up in stage two and [the petitioner] should call his mother to the stand to testify, then where does that put us? That's the only question. By then the alternate will be gone, and then what? That's the only concern that I would have.
>
> THE COURT: Well, that's a valid point, although based on what Ms. Weber told me, and my only observation on that is, based on what she said, [the petitioner's] mother indicated that they didn't know each other personally and . . . he may not even recognize her. They have waved from time to time. But she told Ms. Weber, these are Ms. Weber's exact words, that, "The

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 209

> neighbors on that street are not close, they don't socialize or fraternize or get together, and so it's not a friendship or any relationship of that sort."
>
> So I think it's a valid point you raised. I don't think it is. I'm still not concerned enough to go further with it. So I just wanted-
>
> [THE STATE]: I think they have all taken an oath to judge the case on law and evidence, and it would be akin to one of those situations where most of the parties and jurors are at least acquainted with one another.
>
> [THE STATE]: When did Ms. Weber bring this up?
>
> THE COURT: She brought it up a couple of days ago, but in any event.
>
> [THE STATE]: Well, he hasn't mentioned anything.
>
> THE COURT: No, no one has.
>
> [THE STATE]: Let's just go forward.
>
> THE COURT: All right. Okay. Bring in the jury, please.

None of the parties requested to voir dire the juror about the issue, and none raised any further objections to the juror's continued presence on the jury. During the penalty phase of the trial, however, counsel for Montgomery informed the trial court that they had just learned that Juror 121 lived only two doors down from Ms. Carruthers and thus were moving for a mistrial. The trial court denied their request based on the fact that no evidence had been presented to suggest that Juror 121 was prejudiced against the petitioner or his family.

Citing Ricketts v. Carter, 918 S.W.2d 419 (Tenn. 1996), the petitioner first argues that the trial court had an affirmative duty to voir dire Juror 121 about his relationship with the petitioner's family regardless of whether voir dire was requested by the parties. The State responds that the trial court was under no affirmative duty to conduct an independent voir dire of the juror because, unlike the situation in Ricketts, there was nothing in the information presented to the trial court that raised any question of the juror's impartiality.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 210

*. . . .*

We agree with the State that Ricketts is inapposite to the case at bar. The information imparted to the trial court by Ms. Weber, that the petitioner's mother had recognized Juror 121 as her neighbor but did not know if he recognized her, was not enough to raise a question as to the impartiality of Juror 121. The record is clear that, at that time, there were no allegations that Juror 121 disliked the petitioner's mother or had called the police to complain about various activities of the petitioner's family members. Without more, the trial court was under no affirmative duty to independently voir dire the juror.

The petitioner also contends that the information that Juror 121 lived on the same street as the petitioner's mother raised a presumption of prejudice which was not rebutted by the State. Again, we disagree.

Challenges to juror qualifications generally fall into two categories: propter defectum or propter affectum. Carruthers v. State, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003). General disqualifications such as alienage, family relationship, or statutory mandate are classified as propter defectum, "on account of defect," and must be challenged before the return of a jury verdict. Id. (citing State v. Akins, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993)). However, an objection based upon bias, prejudice, or partiality is classified as propter affectum, "on account of prejudice," and may be made after the jury verdict is returned. Id. (citing Akins, 867 S.W.2d at 355). "Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the Defendant to show that a juror is in some way biased or prejudiced." State v. Caughron, 855 S.W.2d 526, 539 (Tenn. 1993) (citing Bowman v. State, 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980)).

In Akins, this court addressed the issue of a juror's failure to disclose information reflecting potential bias or partiality and stated as follows:

> We hold that when a juror's response to relevant, direct voir dire questioning, whether put to that juror in particular or to the venire in general, does not fully and fairly inform counsel of the matters which reflect on a potential juror's possible bias, a presumption of bias arises. While that presumption may be rebutted by an absence of actual prejudice, the

207

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 211

> court must view the totality of the circumstances, and not merely the juror's self-serving claim of lack of partiality, to determine whether the presumption is overcome.

867 S.W.2d at 357. The court also stated that the "integrity of the voir dire process depends upon the venire's free and full response to questions posed by counsel. When jurors fail to disclose relevant . . . information, counsel are hampered in the jury selection process. As a result, the defendant's right to trial by a fair and impartial jury is significantly impaired." Id. This presumption of bias, however, may be dispelled by an absence of actual favor or partiality by the jury. Id. at 355. The petitioner bears the burden of providing a prima facie case of bias or partiality. Id.

Even without a showing of actual bias, a juror's failure to truthfully answer questions about the juror's association with a party, a witness, or one of the attorneys may raise a presumption of bias. In Tennessee Farmers Mutual Ins. Co. v. Greer, 682 S.W.2d 920, 923 (Tenn. Ct. App. 1984), the potential jurors were asked on voir dire if they or any members of their families knew or were related to any of six named witnesses. No potential juror gave an audible answer to the question. During the course of the trial, the chancellor became aware that one of the jurors was familiar with a witness because her son worked with him, but the chancellor did not inform the attorneys of this fact. On appeal, the court of appeals noted that deliberate withholding of information amounts to false swearing and raises a presumption of bias and partiality. Id. at 924. The appellate court concluded that the trial court committed reversible error by not informing the attorneys about the juror's relationship to the witness and by failing to take whatever action was necessary to insure a fair and impartial jury. Id.

In this case, by contrast, there was no allegation that Juror 121 failed to disclose any association with the petitioner's family during voir dire or that any question was asked that should have triggered such a response from him. Indeed, the petitioner's mother testified that she was not even present during voir dire. Furthermore, there was no proof that Juror 121 knew or recognized the petitioner. The trial court relayed the information regarding Ms. Carruthers' identification of Juror 121 as a neighbor to all the parties, including the petitioner, during the bench conference prior to jury deliberation. The petitioner neither requested to voir dire Juror 121

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 212

> nor raised any objection to his continued presence on the jury.
>
> During the post-conviction hearing, Juror 121 denied knowing Ms. Carruthers. Arguably, this testimony was impeached by Juror 127, who stated that Juror 121 told her during the trial that he thought he recognized the petitioner's mother. Juror 127 testified, however, that Juror 121 did not say anything negative about the petitioner's mother and never indicated that he knew the petitioner. While the petitioner's family made numerous allegations that Juror 121 had accused them of wrongdoing in the neighborhood, Juror 121 testified that he could not recall having ever called the police to complain about either a neighborhood party or someone's having run over his mailbox during the summer of 1992. Juror 121, in fact, testified that he later learned that an elderly member of his church had accidentally hit the mailbox while driving down his street. In sum, the proof did not establish that Juror 121 knew the petitioner or was biased against him or his family. The fact that a juror knows a family member of a defendant fails, by itself, to establish bias or partiality. As this court has recognized in a similar case, "Tennessee courts have routinely refused relief in post-verdict propter affectum challenges in cases where there was a casual relationship not disclosed during voir dire or the record failed to reveal an inherently prejudicial relationship or a false answer." State v. Joseph Angel Silva, III, No. M2003-03063-CCA-R3-CD, 2005 WL 1252621, at *6 (Tenn. Crim. App. May 25, 2005), perm. to appeal denied (Tenn. Oct. 17, 2005) (citations omitted). We conclude, therefore, that the record supports the determination of the post-conviction court that the petitioner has not met his burden of showing that appellate counsel were ineffective in not raising this issue on appeal.

Carruthers, 2007 WL 4355481, at *44-48.

The Tennessee Court of Criminal Appeals addressed the merits of Claims 25 and 27 in the context of the ineffective-assistance-of-appellate-counsel claim. Therefore, the claim is exhausted. Summary judgment based on procedural default is DENIED.

The Court must now review the claim based on the merits. Carruthers argues that Judge Dailey abdicated his affirmative duty

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 213

to voir dire Juror 121, denying Carruthers of the right to an impartial jury under Irvin v. Dowd, 366 U.S. 717, 722 (1981). (ECF No. 129 at 229, 271.) He asserts that, under United States v. Rigsby, 45 F.3d 120, 124-25 (6th Cir. 1995), and United States v. Corrado, 227 F.3d 528, 536 (6th Cir. 2000), there is a duty to investigate credible allegations of bias to ensure that constitutional rights are not violated, even when a defendant does not expressly request a hearing at trial. (Id. at 229-230, 271.) Carruthers argues that the close proximity of Juror 121 to Carruthers's family "presents a breeding ground for potential bias." (Id. at 230.) He asserts that when the juror is not impartial or indifferent under Remmer v. United States, 347 U.S. 227, 229-30 (1954), the trial court must hold a hearing. (Id. at 271.) Respondent asserts that the state court's determination of the ineffective-assistance-of-appellate-counsel claim related to Juror 121, which encompasses this claim, is neither contrary to nor an unreasonable application of clearly established federal law and based on a reasonable determination of facts. (ECF No. 149 at 31.)

Remmer addresses "private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury." 347 U.S. at 229. Further, juror impartiality does not require ignorance of the facts and issues involved. See Irvin, 366 U.S. at 722. There is no evidence of communication, contact, or tampering with Juror 121, and no evidence of juror bias. The Tennessee Court of Criminal Appeals'

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 214

determination is not contrary to or an unreasonable application of clearly established Supreme Court precedent and is based on a reasonable determination of facts. Summary judgment is GRANTED. Claims 25 and 27 are without merit and, accordingly, DENIED.

**W. Jurors 120 and 127 (Claim 26, Amended Petition ¶¶ 455-58)**

Carruthers alleges that Jurors 120 and 127 were related to each other and to prosecutor Harris. (ECF No. 21 at 111.) Carruthers asserts that the jurors were harassed and pressured into withholding from Carruthers that they are related to Harris and committed misconduct by misleading Carruthers into believing that there was no reason to disqualify them. (Id.)

Respondent argues that this claim was not presented to the Tennessee state courts and is procedurally defaulted. (ECF No. 114-1 at 25-26.) Carruthers asserts ineffective assistance of counsel as cause for the failure to exhaust this claim. (ECF No. 129 at 247-248, 271.) Carruthers does not address his claims related to jurors 120 and 127[63] specifically; he merely states that the trial court was required to hold a Remmer hearing. (Id. at 271.) Carruthers did not have counsel at trial, and he did not exhaust an ineffective-assistance-of-counsel claim related to this issue. Ineffective assistance of counsel cannot establish cause for the failure to exhaust this claim. Carruthers has not demonstrated

---

[63] Juror 127 testified in the post-conviction proceedings about security at trial and about Juror 121. Carruthers, 2007 WL 4355481, at *33, 48. Juror 127 did not testify about being related to Harris. (ECF No. 56-7 at PageID 11247-11254.)

cause and prejudice or that a miscarriage of justice would result from the Court’s failure to consider the claim. Claim 26 is procedurally defaulted. Summary judgment is GRANTED. Claim 26 is, therefore, DENIED.

**X. Unconstitutional Exclusion of Persons from the Courtroom (Claim 28, Amended Petition ¶¶ 462-74)**

Carruthers alleges that the trial court denied him an open and public trial when it excluded certain persons from the courtroom. (ECF No. 21 at 112.) During voir dire, because of limited space, no one but potential jurors were permitted in the courtroom until the jury was selected. (Id.) Carruthers alleges that the court gave no notice, did not allow an opportunity to comment, or propose or suggest alternatives, and did not conduct a hearing on the closing of the courtroom. (Id.) Carruthers alleges that his mother and other family members were completely excluded from the jury selection process. (Id. at 112-13.) He asserts that the trial court limited his access to his investigator and jury consultant during voir dire. (Id. at 113.) He alleges that the sentencing on his non-capital offenses occurred at Riverbend Maximum Security Institution and was not open to the public or convenient for the citizens of Memphis, including his family and friends. (Id.) He complains about ex parte meetings held in chambers prior to trial without a record. (Id.) He asserts that the denial of his Sixth Amendment right to counsel was punitive, and as such the use of in camera, ex parte proceedings also violated his Sixth Amendment right to a public trial. (Id. at 113-14.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 216

Respondent argues that these claims were not presented to the Tennessee state courts for review and are procedurally defaulted. (ECF No. 114-1 at 25-26; ECF No. 149 at 28.) Carruthers argues ineffective assistance of counsel as cause for the prejudicial default of Claim 28 because the claim is arguably meritorious and counsel's failure to raise it constitutes deficient performance. (ECF No. 129 at 247-48, 271-72.) He asserts that the Supreme Court in In re Oliver, 333 U.S. 257, 273 (1948), made it clear that the right to a public trial extends to defendants prosecuted in state courts. (Id. at 271.) Relying on Waller v. Georgia, 467 U.S. 39, 45 (1984), he argues that a trial court may close its courtroom during a criminal proceeding "only upon articulating an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." (Id. at 271-72.) Carruthers contends that Judge Dailey identified no interest that overrode his right to a public trial and, through Judge Dailey's choice to hold proceedings against Carruthers out of the public's presence, violated his Sixth Amendment rights. (Id. at 272.)

Carruthers did not exhaust this claim or the related ineffective-assistance-of-counsel claim upon which he relies to establish cause in the state courts, see supra p. 31. The Court has determined that Martinez does not establish cause and prejudice for ht procedural default. (ECF No. 192 at 10, 27-30.) Carruthers has not otherwise established cause and prejudice or demonstrated that

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 217

a miscarriage of justice would result from the Court's failure to address this claim.[64] Claim 28 is procedurally defaulted. Summary judgment is GRANTED and Claim 28 is, therefore, DENIED.

**Y. Sentencing in Carruthers's Absence (Claim 29, Amended Petition ¶¶ 475-78)**

Carruthers alleges that, on May 29, 1996, the trial court held a sentencing hearing, heard evidence and argument on the convictions for especially aggravated kidnapping and especially aggravated robbery, and imposed a forty-year sentence for each conviction in his absence. (ECF No. 21 at 114.) Carruthers asserts that this claim is not subject to the strictures of 28 U.S.C. § 2254(d). (ECF No. 129 at 209, 211.) He argues that he had an "unqualified" due process right to be present at his non-capital sentencing proceeding that cannot be waived absent a showing of knowing, voluntary, and intelligent waiver of the right to be present. (Id. at 223.) He contends that the Tennessee Supreme Court denied relief on this claim without meeting the exacting standard for waiver, but based on hearsay statements from the prison warden that Carruthers did not want to attend. (Id.) Carruthers's actual concerns were about being restrained at the hearing. (Id.) He argues that the Tennessee Supreme Court's decision was an unreasonable application of Snyder v. Massachusetts, 291 U.S. 97, 105-06, 108 (1934), overruled in part by Malloy v. Hogan, 378 U.S. 1 (1964); United

[64] The Court notes that, prior to Presley v. Georgia, 558 U.S. 209 (2010), there was no clearly established Supreme Court precedent concerning partial courtroom closures. See Sowell v. Sheets, No. 2:09-CV-1089, 2011 WL 4914911, at *17 (S.D. Ohio Oct. 14, 2011). Therefore, there was no Supreme Court precedent in place to guide the trial court in its ruling.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 218

States v. Gagnon, 470 U.S. 522 (1985) (per curiam); and Johnson v. Zerbst, 304 U.S. 458, 464 (1938). (Id.)

The Tennessee Supreme Court stated:

> Sentencing: Non-Capital Offenses
>
> Citing state and federal constitutional provisions and Tennessee Rule of Criminal Procedure 43, Carruthers next contends that his right to be present at a crucial stage of his criminal proceeding was violated when the trial judge conducted the sentencing hearing on his convictions for especially aggravated robbery and especially aggravated kidnapping in his absence. The State responds that Carruthers waived his right to be present because he was voluntarily absent from the sentencing hearing. We agree.
>
> The record reflects that immediately after the sentencing verdict was rendered on the capital offenses, the trial judge announced that the sentencing hearing for the non-capital offenses would be held on May 20, 1996. Carruthers was present when this announcement was made. The trial judge was prepared to proceed with the sentencing hearing on that date. Because of a misunderstanding about which law enforcement agency was responsible for transporting the defendants from the prison facility outside of Nashville to Memphis, neither Carruthers nor Montgomery were present in court. The hearing was rescheduled for May 28, 1996, but the trial judge announced that day that because of security concerns the hearing would be held the next day, May 29, 1996, at the Riverbend Maximum Security Institution in Nashville where Carruthers and Montgomery were incarcerated. The defendants were not present in court when this announcement was made, and the record does not indicate that the defendants were personally notified of the change in date and location of the sentencing hearing. Counsel for Montgomery and the attorneys appointed to represent Carruthers on the new trial motion and on appeal previously had been advised at a meeting in chambers of the trial court's decision to hold the hearing at Riverbend.
>
> When the trial judge convened the hearing at Riverbend the next day, Carruthers and Montgomery refused to attend or participate although they were present in a holding room approximately twenty to thirty feet from the hearing room. Warden Ricky Bell informed the trial court that defendant

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 219

Carruthers was refusing to participate. Counsel informed the trial judge that despite a lengthy conference in which he had been advised to appear Montgomery also was refusing to appear, purportedly because of the presence of media personnel. The trial judge recessed the hearing to allow counsel to confer with Montgomery and to allow Warden Bell to confer with Carruthers and to inform him that the restraints would be removed if he decided to participate in the sentencing hearing.

When the hearing resumed, Warden Bell announced that Carruthers understood his restraints would be removed, but he was still refusing to attend or participate in the hearing. Carruthers had provided no explanation for his refusal. Counsel for Montgomery reported that he also was still refusing to attend or participate and that he was objecting to the hearing because it was not being held in a public place. Warden Bell was sworn and testified about his conversation with Carruthers, including Carruthers' refusal to attend despite assurances that his restraints would be removed. Following Warden Bell's testimony, the trial judge observed that he had two options:

> to drag them out here against their will, kicking and screaming, and strap them down to a chair and force them to sit here. Or allow them to remain in the holding room and go forward with the proceedings in their absence. And I think that the wiser course, the more prudent course, the course that the law would suggest be taken is the latter. We are going to proceed in their absence, since they have both voluntarily elected to absent themselves from these proceedings. If an individual were allowed to delay or disrupt proceedings simply by stating that he did not want to be present, then the entire judicial system would grind to a halt very quickly.

Noting that "a full and complete" sentencing hearing had already been held in conjunction with the murder convictions and that any additional witnesses would likely be "cumulative witnesses to what has already been testified to at the first sentencing hearing," the trial judge decided to proceed with the sentencing hearing.

The State called one witness, an employee of the Shelby County Criminal Court Clerk's Office, who testified that Carruthers had pled guilty to two counts of aggravated assault in 1990 and had been sentenced to ten years and

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 220

five years on those convictions. The State also relied upon the evidence adduced at both the guilt and sentencing phases of trial and the pre-sentence report prepared as to each defendant.

Following the State's proof, the trial court once again took a recess to allow counsel to confer with Montgomery to determine if he had decided to participate in the hearing and to enable Warden Bell to speak with Carruthers and advise him that he could testify if he so desired.

. . . .

Warden Bell returned after what was his third conversation with Carruthers and again advised the trial judge that he still was refusing to attend or participate in the hearing. Following argument, the trial judge imposed a forty-year sentence on each of the four convictions for each defendant and ordered that two of the sentences for especially aggravated kidnapping run concurrent to the other sentences and to the death penalty, with all other sentences running consecutive to each other and to the death penalty.

Initially we acknowledge that the right of a criminal defendant to be present at all critical stages of a criminal proceeding derives from several sources, including both the federal and state constitutions. See United States v. Gagnon, 470 U.S. 522, 526, 105 S. Ct. 1482, 1484, 84 L. Ed. 2d 486 (1985) ("The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, . . . but we have recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him."); State v. Muse, 967 S.W.2d 764, 766 (Tenn. 1998) ("Article I, § 9 of the Tennessee Constitution provides that 'the accused hath the right to be heard by himself and his counsel.' The 'right to be heard by himself' requires the presence of the defendant during the entire trial.").

In addition to constitutional protection, the right of a criminal defendant to be present at critical stages of a criminal proceeding also is protected by Tennessee Rule of Criminal Procedure 43(a), which provides:

> Unless excused by the court upon defendant's motion, the defendant shall be present at arraignment, at every stage of the trial

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 221

> including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.

(Emphasis added.)

Like many other constitutional and statutory rights, however, the right to be present may be waived by a criminal defendant. See Muse, 967 S.W.2d at 764. Voluntary absence after the trial has commenced or disruptive in-court behavior may constitute waiver of the right to be present. Id. at 767. With respect to waiver by voluntary absence, Tenn. R. Crim. P. 43(b) provides in relevant part:

> (b)The further progress of the trial to and including the return of the verdict and imposition of sentence shall not be prevented and the defendant shall be considered to have waived the right to be present whenever a defendant, initially present:
>
>> (1) voluntarily is absent after the trial has commenced (whether or not he or she has been informed by the court of the obligation to remain during the trial). . . .
>>
>> (2) . . . If a trial proceeds in the voluntary absence of the defendant . . . he or she must be represented in court by competent counsel. . . .

Construing subsection (b) only seven years after Rule 43 was adopted, the Court of Criminal Appeals explained that

> [a]n accused who has notice of the time and place of the trial and of his right to attend, and who nonetheless voluntarily absents himself, will be deemed to have waived his right to be present.
>
> [T]he court should indulge every reasonable presumption against a waiver. Counsel should be given a reasonable opportunity to locate his client, and there should be affirmative evidence that the accused was informed of his trial date. We think it is wise to take special precautions

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 222

> when a defendant fails to appear on the date set for trial and to require a high standard of proof that the defendant knew his trial date and that his absence is voluntary. Trial in his absence is not favored, and proceeding with trial only to find later that defendant did not know his trial date or did not voluntarily absent himself would run counter to the purposes expressed in [Tenn. R. Crim. P.] 2. Mere absence at the time the case is called for trial is insufficient to show a waiver of the right to be present.

State v. Kirk, 699 S.W.2d 814, 819 (Tenn. Crim. App. 1985); see also Muse, 967 S.W.2d at 767 (quoting and approving of this analysis from Kirk). Applying this analysis, the Court of Criminal Appeals in Kirk concluded that the defendant had waived his right to be present when he escaped from custody after he had appeared in court and had been advised of the date on which his trial would begin. See Kirk, 699 S.W.2d at 819.

Two years ago in Muse this Court applied the Kirk analysis in a case in which the defendant did not appear for jury selection proceedings because he was not aware that the trial judge had rescheduled the proceedings at the request of defense counsel. Concluding that Muse had been deprived of his right to be present at jury selection and that the deprivation constituted prejudice to the judicial process, this Court reversed his conviction and remanded for a new trial. See Muse, 967 S.W.2d at 768.

For purposes of this appeal, we have accepted Carruthers' contention that he had both a constitutional right to be present and a right to be present under Tenn. R. Crim. P. 43(a), and we have concluded that Carruthers waived those rights. Carruthers was aware a sentencing hearing would be held, and he was present when the hearing initially was scheduled. While the hearing did not occur on the date originally scheduled, the hearing was held on May 29, a delay of only nine days. The record does not reflect exactly when Carruthers became aware that the hearing would be held at Riverbend on May 29, but there is no doubt that he was aware a hearing was about to be held when he was in the holding area near the public hearing room.

This is not a case where waiver was presumed from Carruthers' mere absence at the time the sentencing hearing convened. The trial judge made every effort to

persuade Carruthers to attend the hearing. On three separate occasions, the trial judge instructed Warden Bell to confer with Carruthers and attempt to persuade him to appear. On each of those occasions, the record reflects that Warden Bell assured Carruthers his restraints would be removed and emphasized his right to make a statement at the hearing. Under these circumstances, we have no hesitation in concluding that Carruthers waived his right to be present at sentencing.

Finally, pointing to Tenn. R. Crim. P. 43(b)(2), which provides that "[i]f a trial proceeds in the voluntary absence of the defendant, . . . he or she must be represented in court by competent counsel," the defendant argues that even if he waived his right to be present, he is entitled to a new sentencing hearing because the trial judge did not appoint competent counsel to represent him.

Without question, the scenario that arose in this case is uncommon. In most instances, a voluntarily absent criminal defendant will already be represented by counsel and therefore will continue to be represented by counsel in proceedings that occur in his or her absence. Here, because the defendant had forfeited his right to counsel, there was no attorney present to represent him in the sentencing hearing.

In our view, the decision of whether or not to appoint counsel to represent a voluntarily absent defendant who previously has forfeited his right to counsel should be determined by the trial court on a case-by-case basis. The trial court is most familiar with the case and is in the best position to determine if an attorney should be appointed. Appellate courts should defer to the trial court's decision on this issue unless the record demonstrates a clear abuse of discretion. Cf. Small, 988 S.W.2d at 674.

The trial judge concluded that appointment of counsel was unnecessary. The proof presented by the State was, as the trial judge found, largely cumulative to the proof already presented at the sentencing hearing on the murder convictions. There is nothing in the record to suggest that Carruthers had intended to offer any additional proof at the sentencing hearing. Even on appeal, Carruthers' attorneys have not pointed to proof that would have been presented had Carruthers been present or represented by counsel at the hearing. They simply assert that "the trial judge presumed that Carruthers would have offered the same proof" as that offered at the capital sentencing

> hearing and state, "[w]hether or not this is true, we will never know." Given the circumstances of this case, we conclude that the trial court did not abuse its discretion in failing to appoint counsel to represent Carruthers when he was voluntarily absent from the sentencing hearing.

Carruthers, 35 S.W.3d at 565-69.

Respondent argues that the record reflects that Carruthers refused to attend the sentencing hearing and waived his right to be present. (ECF No. 114-1 at 26.) Respondent asserts that the Tennessee Supreme Court's determination of this issue is not contrary to or an unreasonable application of clearly established Supreme Court precedent and is based on a reasonable determination of facts in light of the evidence presented. (Id.)

A defendant, even in situations where the defendant is not actually confronting witnesses or presenting evidence, has a due process right "to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." Snyder, 291 U.S. at 105-06. A defendant is guaranteed the right to be present in a criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure. Kentucky v. Stiner, 482 U.S. 730, 745 (1987). The right to be present at all stages of criminal trial is not absolute and subject to waiver. See Gray v. Moore, 520 F.3d 616, 622 (6th Cir. 2008) (the right is not absolute when a defendant engages in speech and conduct that is noisy, disorderly or disruptive); see also Gagnon, 470 U.S. at 528 (a defendant's failure to invoke his right to be present at a

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 225

hearing he knows is taking place constitutes waiver of the right). A trial court may find a defendant's absence to be voluntary and an effective waiver of his right to be present even without a showing that the defendant knew or had been expressly warned by the trial court that the trial would continue in his absence. Taylor v. United States, 414 U.S. 17, 19-20 (1973) (per curiam); see Diaz v. United States, 223 U.S. 442, 455 (1912) (A criminal defendant's voluntary absence from a trial on a non-capital offense constitutes a waiver of his right to be present). A colloquy on the record is not required to establish a knowing waiver of defendant's right to be present during critical stages of trial. United States v. Riddle, 249 F.3d 529, 534-35 (6th Cir. 2001).

In the instant case, Carruthers was present and waiting just outside the courtroom. His refusal to appear, even if it was because he did not want to wear restraints, constitutes waiver. See Amaya-Ruiz v. Stewart, 121 F.3d 486, 495-96 (9th Cir. 1997) (defendant's complaints and refusal to be shackled in courtroom for a capital sentencing hearing constituted waiver of the right to be present). The Tennessee Supreme Court cited the correct Supreme Court precedent in Gagnon. Carruthers, 35 S.W.3d at 567. The Tennessee Supreme Court's decision was not contrary to or an unreasonable application of clearly established Supreme Court precedent or based on an unreasonable determination of fact in light of the evidence presented. Claim 29 is without merit. Summary judgment is GRANTED and Claim 29 is, accordingly, DENIED.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 226

**Z. Improper Judicial Fact-Finding in Sentencing (Claim 30, Amended Petition ¶¶ 479-84)**

Carruthers alleges that the trial court's findings of fact violated his Sixth and Fourteenth Amendment rights. (ECF No. 21 at 114.) He alleges that the trial court found the following enhancement factors to sentence him to forty years on each of the non-capital convictions:

- a previous history of criminal behavior;
- a victim was treated with exceptional cruelty;
- the crime involved a high degree of risk to human life;
- Carruthers had previously been convicted of a violent felony;
- he committed the crime while on parole; and
- he exhibited no remorse.

(Id. at 114-15.) Carruthers alleges that the court's finding that he was a dangerous offender with an extensive criminal history caused it to run the sentences consecutively. (Id. at 115.)

Respondent argues that the claim is procedurally defaulted and without merit because it is not cognizable on collateral review due to its non-retroactivity. (ECF No. 114-1 at 26.) See Humphress v. United States, 398 F.3d 855 (6th Cir. 2005). Carruthers asserts that procedural default does not entitle Respondent to summary judgment because he fails to carry his burden and does not explain the basis for his belief that the claim is procedurally defaulted. (ECF No. 129 at 230.) In reply, Respondent asserts that the claim was not raised to the Tennessee Court of Criminal Appeals and the

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 227

opportunity to do so has passed. (ECF No. 140 at 29.)

Carruthers did not exhaust his claim in the state courts. The Court has determined that Martinez does not establish cause and prejudice for procedural default. (ECF No. 192 at 11, 27-30.) Carruthers has not otherwise demonstrated cause and prejudice for the procedural default or that a miscarriage of justice would result from the Court's failure to address this claim. Claim 30 is procedurally defaulted. Summary judgment is GRANTED and Claim 30 is, therefore, DENIED.[65]

**AA. Insufficient Evidence (Claim 31, Amended Petition ¶¶ 485-86)**

Carruthers asserts that no rational trier of fact, viewing the evidence in the light most favorable to the State, would have found beyond a reasonable doubt that he was guilty of the crimes charged. (ECF No. 21 at 116.) The Tennessee Supreme Court stated:

> Carruthers argues that the witnesses against him were not credible and that the State relied too heavily on the testimony of convicted felons. . . .
>
> The proper inquiry for an appellate court determining the sufficiency of evidence to support a conviction, is whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659

[65] The Court finds it unnecessary to address the merits of Carruthers's Apprendi/Blakely argument, including the non-retroactivity argument (see ECF No. 129 at 274-75) because the claim is procedurally defaulted.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 228

(Tenn. 1997). Questions about the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not reweigh or reevaluate the evidence. Id. Nor may this Court substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). The standard for appellate review is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Vann, 976 S.W.2d 93, 111 (Tenn. 1998). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (quoting State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985)). A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury. Id.; see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In contrast, the State on appeal is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence. See Hall, 8 S.W.3d at 599; Bland, 958 S.W.2d at 659.

At the time this offense was committed, first degree murder was defined as an "intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202(a)(1)(1991). "Intentional" is defined as the "conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18) (1991). Premeditation, on the other hand, requires "the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-201(b)(2) (1991). Finally, deliberation requires proof of a "cool purpose" that includes some period of reflection during which the mind is free from passion and excitement. See Tenn. Code Ann. § 39-13-201(b)(1) (1991).

The elements of premeditation and deliberation are questions of fact to be resolved by the jury. See Bland, 958 S.W.2d at 660. These elements may be established by proof of the circumstances surrounding the killing. Id.; see also State v. Brown, 836 S.W.2d 530, 539 (Tenn. 1992). As we stated in Bland, there are several factors which tend to support the existence of these elements including: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 229

> defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); Bland, 958 S.W.2d at 660; Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992).
>
> Having reviewed the proof in the light most favorable to the State, as we are required to do, we agree with the Court of Criminal Appeals that the evidence is legally sufficient to support the jury's verdicts as to each defendant. The trial proof has been thoroughly and fully summarized. With respect to Carruthers' challenges to the State's witnesses, suffice it to say that, through cross-examination, the jury was made aware that some of the witnesses had prior felony records, that some of the witnesses admitted to past drug dealing, and that some of the witnesses had given inconsistent statements to the police regarding the events of February 24 and 25, 1994. However, the jury resolved these issues of credibility in favor of the State, and an appellate court may not reconsider the jury's credibility assessments. . . . In our view, the evidence is legally sufficient.

Carruthers, 35 S.W.3d at 557-58.

Respondent asserts that the Tennessee Supreme Court's decision is not contrary to or an unreasonable application of the clearly established Supreme Court precedent and is based on a reasonable determination of the facts in light of the evidence presented. (ECF No. 114-1 at 26.) He further asserts that to the extent Carruthers has presented new facts in his petition that he relies on, those facts are defaulted. (Id. at 26-27; ECF No. 149 at 129-30.)

Carruthers asserts that this claim is not subject to the strictures of 28 U.S.C. § 2254(d) and that Respondent is not entitled to summary judgment. (ECF No. 129 at 209-10, 213, 223-25.) He asserts that there was no physical evidence connecting him to the murders or establishing by inference or circumstance any of the

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 230

elements of Tenn. Code Ann. § 39-13-302. (Id. at 224-25.) The witnesses had not seen the deaths and could not address Carruthers's direct involvement. (Id. at 225.) Carruthers argues that the witnesses consisted of

> a parade of people who provided some small bits of information with little apparent relationship to Mr. Carruthers, along with a number of big-time drug dealers who themselves were potentially involved in the case in some way, and informants who appeared out of nowhere to add a piece here, a piece there, to a theory crafted by the prosecution.

(Id.) He contends that a "rational juror . . . would have had more questions and doubts than answers." (Id.)

In Jackson v. Virginia, 443 U.S. 307, 324 (1979), the Supreme Court held that, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 — if the settled procedural prerequisites for such a claim have otherwise been satisfied — the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." This standard requires a federal district court to examine the evidence in the light most favorable to the State. Id. at 326 ("[A] federal habeas corpus court faced with a record of conflicting facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."). A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 231

demeanor has been observed by the trial court. Marshall v. Lonberger, 459 U.S. 422, 434 (1983); see also Gall v. Parker, 231 F.3d 265, 286 (6th Cir. 2000) (an assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims); Avery v. Prelesnik, 548 F.3d 434, 439 (6th Cir. 2008) (stating that the Constitution leaves it to the jury to evaluate the credibility of witnesses in deciding a criminal defendant's guilt or innocence). The fact-finder weighs the probative value of the evidence and resolves any conflicts in testimony. Neal v. Morris, 972 F.2d 675, 679 (6th Cir. 1992). The mere existence of sufficient evidence to convict defeats a petitioner's claim. Matthews v. Abramajtys, 319 F.3d 780, 788-89 (6th Cir. 2003).

It is unclear whether Carruthers contends that the decision of the Tennessee Supreme Court was contrary to, or an unreasonable application of, clearly established federal law, 28 U.S.C. § 2254(d)(1), or whether it was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding, 28 U.S.C. § 2254(d)(2). The Tennessee Supreme Court cited and applied the Supreme Court's decision in Jackson. Carruthers, 35 S.W.3d at 557. The decision of the Tennessee Supreme Court is not contrary to Jackson.[66] Carruthers

---

[66] The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406; see also id. at 407 ("If a federal habeas court can, under the 'contrary to' (continued...)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 232

appears to argue that the Tennessee Supreme Court made an unreasonable application of Jackson in his comments that a rational juror would have had "more questions and doubts than answers." (See ECF No. 129 at 225.) Carruthers's argument about the credibility of witnesses does not support habeas relief as this is an issue for the fact-finder. Carruthers's argument about the lack of physical evidence connecting him to the murders does not support his habeas claim. United States v. Evans, 883 F.2d 496, 501-02 (6th Cir. 1989); United States v. Magallanez, 408 F.3d 672, 681 (10th Cir. 2005); see also Rafferty v. Hudson, No. 5:08CV1973, 2009 WL 2151832, at *28 (N.D. Ohio July 14, 2009) ("[B]ald assertions that the state lacked physical evidence and relied upon non-credible witnesses are insufficient to meet [the petitioner's] burden of establishing that the appellate court's ruling was contrary to or involved an unreasonable application of clearly established Federal law."). Carruthers has not satisfied his burden of demonstrating that the state court's resolution of this issue is objectively unreasonable, rather than merely incorrect. Carruthers has not demonstrated that the state court made an unreasonable determination of fact. Claim 31 is without merit. Summary judgment is GRANTED and Claim 31 is, therefore, DENIED.

---

[66] (...continued)
clause, issue the writ whenever it concludes that the state court's application of clearly established federal law was incorrect, the 'unreasonable application' clause becomes a nullity.").

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 233

**AB. Constitutionality of the Death Penalty (Claim 32, Amended Petition ¶¶ 487-91)**

Carruthers alleges that he has a fundamental right to life and that the State, by offering him a sentence less than death and by offering Montgomery a sentence less than death and accepting that sentence in a plea offer, demonstrated that a means less restrictive than a death sentence exists to effectuate its interest in punishing the defendants for the victims' death. (ECF No. 21 at 116.) Carruthers contends that the State unconstitutionally burdened his trial right when it sought a death sentence because he chose to go to trial. (Id.)

Respondent argues that the Tennessee Court of Criminal Appeals rejected Carruthers's argument and the United States Supreme Court has repeatedly rejected this argument. (ECF No. 114-1 at 27.) Respondent contends that the Tennessee Court of Criminal Appeals' decision is not contrary to nor an unreasonable application of clearly established Supreme Court precedent and was based on a reasonable determination of facts, and is without merit. (Id.)

Carruthers asserts that his claims are not subject to the strictures of 28 U.S.C. § 2254(d) and that Respondent has failed to satisfy his burden for summary judgment. (ECF No. 129 at 209-11, 225-27.) He contends that the Tennessee courts failed to engage his individual arguments, cited three cases, and summarily denied relief. (Id. at 225.) He argues that the Tennessee Supreme Court's rulings are contrary to clearly established federal law. (Id.) He relies on Justice Blackmun's dissent from the denial of certiorari

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 234

in Callins v. Collins, 510 U.S. 1141, 1144 (1994), for the proposition that federal law has held that "the requirement that the death penalty be imposed 'fairly, and with reasonable consistency or not at all,' has proven impossible to implement in practice." (Id. at 225-26.) He contends that, contrary to Collins, Tenn. Code Ann. § 40-23-114 is an unconstitutional delegation of legislative authority because it allows for inconsistency and unconstitutionally leaves the decision of death by electrocution or by lethal injection to the defendant. (Id. at 226.)

Carruthers did not allege in his habeas petition that Tenn. Code Ann. § 40-23-114 was an unconstitutional delegation of legislative authority. Pursuant to Habeas Rule 2(c), the Court will not consider this claim.[67]

The specific argument asserted in Claim 32 is not apparent on the state-court record and appears not to be exhausted. Nevertheless, Carruthers is not entitled to relief on the merits of the claim. The State is not required to demonstrate that it has a compelling state interest that cannot be satisfied by less restrictive means. In Gregg, the Supreme Court stated,

> while we have an obligation to insure the Constitutional bounds are not overreached, we may not act as judges as we might as legislators.
>
> . . . .

[67] Carruthers raised this issue on direct appeal. (See ECF No. 56-6 at PageID 10271-10272.) See Johnson v. Bell, 457 F. Supp. 2d 839, 840-43 (M.D. Tenn. 2006) (rejecting challenges to Tenn. Code Ann. § 40-23-114's election of methods for execution).

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 235

> Therefore, in assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.

Gregg, 428 U.S. 153, 174-175. Claims that the state's death penalty scheme encourage capital defendants to plead guilty and impose an impermissible risk of death on defendants who choose to exercise their right to trial have been rejected as without merit. See, e.g., Williams v. Bagley, 380 F.3d 932, 966 (6th Cir. 2004); see also Greer v. Mitchell, 264 F.3d 663, 690-92 (6th Cir. 2001) (denying petitioner's claim that the death penalty was neither the least restrictive punishment nor an effective means of deterrence); Whitaker v. Quarterman, 200 F. App'x 351, 356-58 (5th Cir. 2006) (prosecutors are not prevented from exercising discretion to offer the possibility of a lesser sentence in exchange for a guilty plea, even in cases involving the death penalty). Claim 32 is without merit and is, accordingly, DENIED.[68]

**AC. Actual Innocence (Claim 33, Amended Petition ¶¶ 492-94, and Claim 36, Amended Petition ¶¶ 490-91)**

Carruthers alleges that his convictions and death sentence are based on false, misleading testimony. (ECF No. 21 at 116-17.) He argues that, had appointed counsel investigated the case and had he not been compelled to represent himself before an anonymous jury in

[68] Summary judgment is GRANTED because Respondent is entitled to judgment as a matter of law; Respondent's argument, however, was not relevant to the claims presented.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 236

a courtroom "resembling an armed fortress," there is a reasonable probability that no juror would have found him guilty beyond a reasonable doubt. (Id. at 117.) He asserts that he is actually innocent of all crimes for which he was charged, convicted, and sentenced. (Id. at 117, 122.)

Respondent argues that these claims were not presented to the state courts for review and are procedurally defaulted. (ECF No. 114-1 at 27-28.) In response to the Motion for summary judgment, Carruthers does not address Claims 33 and 36 except to say that these claims are tied to a colorable showing of actual innocence. (ECF No. 129 at 274.) In the context of Carruthers's argument that his post-conviction counsel's deficient performance prejudiced him, he asserts that he has made a colorable showing of actual innocence. (ECF No. 129 at 207.) He argues that: (1) there was no physical evidence; (2) the latent fingerprint evidence was negative; (3) the DNA testing of biological samples did not match him and indicated the presence of an unknown male suspect; (4) Charles Smith and Alfredo Shaw testified falsely; and (5) James Montgomery said Carruthers "didn't have anything to do with the murder and was not involved." (Id. at 208.)

Carruthers did not exhaust his claims in the state courts. He has not shown cause and prejudice to excuse the procedural default of his claim. He has attempted to make a colorable showing of actual innocence. Even if he was able to show that the claim was entitled to review, however, he is not entitled to relief on an

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 237

independent claim of actual innocence. "A claim of actual innocence is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Herrera v. Collins, 506 U.S. 390, 404 (1993); Muntaser v. Bradshaw, 429 F. App'x 515, 521 (6th Cir. 2011) ("[A]n actual innocence claim operates only to excuse a procedural default so that a petitioner may bring an independent constitutional challenge"). The actual-innocence exception is very narrow in scope and requires proof of factual innocence, not just legal insufficiency. Bouseley v. United States, 523 U.S. 614, 623 (1998) ("It is important to note . . . that 'actual innocence' means factual innocence, not mere legal insufficiency."). The Herrera Court noted that "a truly persuasive demonstration of 'actual innocence' made after a trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." Herrera, 506 U.S. at 417; Wright v. Stegall, 247 F. App'x 709, 711-12 (6th Cir. 2007). The threshold showing for such a right would "necessarily be extraordinarily high." Wright, 247 F. App'x at 712 (Batchelder, J., concurring) (internal quotation marks omitted).[69] The Supreme Court declined to decide whether free-standing innocence claims in death penalty cases are possible. House v. Bell, 547 U.S. 518, 554-55 (2006). The Sixth Circuit has

---

[69] Carruthers's habeas claim of insufficiency of the evidence failed, see supra pp. 224-29, another indicator of his inability to prove factual innocence.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 238

held that a free-standing claim on the grounds of actual innocence is not cognizable. See Muntaser, 429 F. App'x at 521. Claims 33 and 36 are procedurally defaulted. Summary judgment is GRANTED based on the procedural default. The claims are also without merit and are, therefore, DENIED.

**AD. Arbitrary Death Penalty (Claim 34, Amended Petition ¶¶ 495-96)**

Carruthers alleges that it is arbitrary that he has been sentenced to death while Montgomery received a sentence less than death, is currently eligible for parole, and will be released from prison no later than January 19, 2020. (ECF No. 21 at 117.) Carruthers alleges that a death sentence is arbitrary when no rational basis exists to explain why it falls on one person and not on another who is equally or more culpable. (ECF No. 129 at 273.) He asserts that the State tried he and Montgomery together and considered its case against Montgomery stronger than the case against him. (Id.) Considering these realities, Carruthers argues that it is arbitrary that Montgomery received a term of years, and he received the death sentence. (Id.)

Respondent argues that his claim was not presented to the state courts for review and is procedurally defaulted. (ECF No. 114-1 at 27-28.) Respondent contends that Carruthers had the opportunity to present this claim after his co-defendant's death sentence was vacated on direct appeal, but he failed to do so. (ECF No. 149 at 30.) Respondent also notes the inherent difficulty of re-trying Montgomery's case years after the initial trial. (Id. at 30-31.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 239

Carruthers argues that, pursuant to Tenn. Code Ann. § 39-13-206(c), the Tennessee Supreme Court considered the merits of Claim 34 on the face of the record because it raised the possibility that his death sentence is arbitrary, excessive, or disproportionate. (ECF No. 129 at 241-42.) Carruthers's implicit-review argument has been denied, supra pp. 196-97. Carruthers has not demonstrated cause and prejudice or that a miscarriage of justice would result from the Court's failure to review this claim. Claim 34 is procedurally defaulted. Summary judgment is GRANTED and Claim 34 is, therefore, DENIED.

**AE. International Law (Claim 35, Amended Petition ¶¶ 497-98[70])**

Carruthers alleges that he possesses rights under international law, including the right to life; to be free from racial, gender, and economic discrimination; not to be sentenced to death; not to be executed by electrocution or lethal injection; to a fair and impartial trial; to be presumed innocent; to detailed notice of the charges against him; to adequate time and resources to obtain witnesses to prepare his defense; to be free from coercion; to refrain from testifying against himself; to be free from detention while awaiting trial; to be tried without undue delay; to be free from arbitrary searches and arbitrary detention; and to have his detention reviewed by a court without undue delay. (ECF No. 21 at 117-22.)

---

[70] In the amended petition, the paragraph numbering is incorrect starting on page 120. The Court will discontinue its reference to paragraph numbers in the amended petition from this point forward.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 240

Respondent argues that this claim was not presented to the state courts for review and is procedurally defaulted. (ECF No. 114-1 at 27-28.) Carruthers does not address this argument in response to the Motion for summary judgment.

Carruthers failed to exhaust this claim in the state courts and failed to demonstrate cause and prejudice or that a miscarriage of justice would occur if the Court failed to consider this claim. Claim 35 is procedurally defaulted. Summary judgment is GRANTED.

The Court further notes that the Sixth Circuit has rejected claims of a violation of constitutional rights based on international law, stating, "Courts that have considered the question of whether international law bars capital punishment in the United States have uniformly concluded that it does not." Buell v. Mitchell, 274 F.3d 337, 376 (6th Cir. 2001); see also Coleman v. Mitchell, 268 F.3d 417, 443 (6th Cir. 2001) (merits review of Petitioner's claims that the death sentence violates international treaties and customary international law would not have afforded petitioner habeas relief). Claim 35 is also without merit and is, therefore, DENIED.

**AF. Incompetent to Be Executed (Claim 37)**

Carruthers alleges that, at the time of any execution, he will not comprehend the punishment he is about to receive or the reason for it. (ECF No. 21 at 122.) Respondent argues that this claim was not presented to the state courts for review and is procedurally defaulted. (ECF No. 114-1 at 27-28.)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 241

Carruthers does not address this claim in response to the Motion for summary judgment. In the context of his argument about competence to stand trial, however, he cites Billiot v. Epps, 671 F. Supp. 2d 840, 876 (S.D. Miss. 2009), which held that a petitioner who had anosognosia, the same condition that Carruthers's counsel asserts Carruthers has,[71] was incompetent to be executed. (ECF No. 129 at 163, 174.)

In Panetti v. Quarterman, 551 U.S. 930, 947 (2007), the Supreme Court held that a petitioner's claim of incompetency to be executed because of his mental condition, based on Ford v. Wainwright, 477 U.S. 399 (1986), is not a claim that must be brought in an initial habeas petition on pain of being treated as a second or successive petition. Tompkins v. Sect'y, Dept. of Corr., 557 F.3d 1257, 1259 (11th Cir. 2009) (per curiam). The setting of an execution date, which causes a Ford incompetency claim to become ripe, has not occurred in this case. Panetti, 551 U.S. at 942-43. Carruthers's claim is not ripe for review and is, accordingly, DENIED.[72]

**AG. Death by Lethal Injection and Electrocution (Claim 38)**

Carruthers alleges that the ultimate risk in lethal injection

---

[71] See Report of Bhushan S. Agharkar, M.D., noting that Carruthers denies that he is mentally ill and "has no insight whatsoever into his paranoid delusional beliefs and irritability." (ECF No. 130-8 at PageID 17026, 17032.)

[72] The claim was not exhausted in the state courts. Procedural default, however, would not be appropriate because the petitioner's condition at the time of execution is what is relevant to this claim. Therefore, summary judgment based on procedural default is DENIED for this claim.

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 242

is that the inmate would remain conscious to experience suffocation and cardiac arrest at several stages based on Tennessee's protocol for administering the lethal injection. (ECF No. 21 at 122-28.) He alleges that the electric chair at RMSI does not function properly, and after RMSI technical personnel made modifications to the chair in 1996, the company responsible for the initial installation of the chair informed the RMSI associate warden that the modifications "raised the specter of a 'brain dead vegetable at the conclusion of the execution procedure'" and that the chair was an "instrument of torture." (Id. at 128.)[73]

Carruthers did not exhaust this claim in the state courts, and has not asserted cause and prejudice or that a miscarriage of justice would result from the Court's failure to consider this claim. Claim 38 is procedurally defaulted. Summary judgment is GRANTED.

Carruthers's claim also lacks merit. There is no Supreme Court decision holding that electrocution constitutes cruel and unusual punishment. To the contrary, the Supreme Court held, in In re Kemmler, 136 U.S. 436, 444-49 (1890), that death by electrocution does not deprive the petitioner of due process of law. The Sixth Circuit has also rejected Carruthers's argument. See Williams v. Bagley, 380 F.3d 932, 965 (6th Cir. 2004) (noting that the Sixth

[73] Tennessee enacted a law providing that the method for carrying out all death sentences for offenses committed before January 1, 1999, shall be lethal injection, unless the person to be executed signs a written waiver electing death by electrocution. See Tenn. Code Ann. § 40-23-114(a)-(b) (2000).

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 243

Circuit "has upheld the constitutionality of electrocution as a method of execution."); Buell v. Mitchell, 274 F.3d 337, 370 (6th Cir. 2001) ("Electrocution has yet to be found cruel and unusual punishment by any American court. We decline to be the first." (citation omitted)). Additionally, execution by lethal injection has not been deemed to constitute cruel and unusual punishment, despite concerns about lethal injection execution protocols. See, e.g., Harbison v. Little, 571 F.3d 531, 539 (6th Cir. 2009) (vacating a decision finding that the Tennessee lethal injection protocol violated the Eighth Amendment); see also Irick v. Ray, 628 F.3d 787, 789 (6th Cir. 2010) (denying § 1983 claim challenging Tennessee's lethal injection protocol as time-barred).

Claim 38 is procedurally defaulted and without merit; Claim 38 is, accordingly, DENIED.

**AH. Ineffective Assistance of Counsel on Direct Appeal (Claim 39)**

Carruthers alleges that appointed counsel failed to:

- challenge the trial court's actions, which interfered with and destroyed Carruthers's ability to employ an independent forensic pathologist;
- challenge the propriety of Juror 121 serving on the jury that convicted Carruthers of the crimes charged and sentenced him to death;
- challenge the propriety of the trial court's decision to have an anonymous jury decide whether Carruthers was guilty of the crimes charged and determine his sentences for the first-degree murder convictions;
- challenge the propriety of the trial court's decision to authorize, condone, and implement the security measures taken

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 244

for Carruthers's trial;

- challenge the trial court's failure to give Carruthers's jury an instruction for the consideration of Carruthers's alibi defense that he was in the company of Adolpho James when the incident occurred and neither James nor Carruthers were anywhere near the crime scene at the time; and

- failed to raise on appeal any and all claims raised in the habeas amended petition.

(ECF No. 21 at 128-30.)

Respondent argues that the Tennessee Court of Criminal Appeals rejected these claims, and its decision is not contrary to or an unreasonable application of Supreme Court precedent or based on an unreasonable determination of facts in light of the evidence presented. (ECF No. 114-1 at 28.)

The Tennessee Court of Criminal Appeals stated:

> 3. Ineffective Assistance of Appellate Counsel
>
> The petitioner next contends that appellate counsel were ineffective for failing to raise several meritorious issues on appeal. Specifically, the petitioner complains that:
>
> > 1. Appellate counsel's failure to challenge the trial court's interference with the petitioner's relationship with Dr. Cleland Blake as a violation of due process principles constituted ineffective assistance of counsel.
> >
> > 2. Appellate counsel's failure to challenge the trial court's failure to conduct an inquiry in response to information received regarding Juror 121 constituted ineffective assistance of counsel.
> >
> > 3. Appellate counsel's failure to challenge the impanelment of an anonymous jury as a matter of constitutional and statutory law constituted ineffective assistance of counsel.
> >
> > 4. Appellate counsel's failure to raise an issue

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 245

> regarding the extraordinary and excessive security measures implemented during the trial constituted ineffective assistance of counsel.
>
> 5. Appellate counsel's failure to challenge the trial court's failure to give an alibi instruction constituted ineffective assistance of counsel.

> The same principles apply in determining the effectiveness of both trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995). A petitioner alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel were objectively unreasonable in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that the petitioner's appeal would have been successful before the state's highest court. See, e.g., Smith v. Robbins, 528 U.S. 259, 285, 120 S. Ct. 746, 764, 145 L. Ed. 2d 756 (2000); Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001); Mayo v. Henderson, 13 F.3d 528, 533-34 (2d Cir. 1994). To show that counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of the issue. Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 2004) (citing Kimmelman v. Morrison, 477 U.S. 365, 375, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)). Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. Id. Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. Id. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim. Carpenter, 126 S.W.3d at 888 (citing United States v. Dixon, 1 F.3d 1080, 1083 (10th Cir. 1993)).

Carruthers, 2007 WL 4355481, at *40-41.

A criminal defendant is entitled to the effective assistance of counsel on direct appeal. Evitts v. Lucey, 469 U.S. 387, 395-96 (1985). Claims of ineffective assistance of appellate counsel are evaluated using the Strickland standards. Smith v. Robbins, 528 U.S. 259, 285-86 (2000) (failure to file a merits brief); see

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 246

also Smith v. Murray, 477 U.S. 527, 535-36 (1986) (failure to raise issue on appeal). The failure to raise a nonfrivolous issue on appeal does not constitute per se ineffective assistance of counsel, because "[t]his process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Murray, 477 U.S. at 536 (internal quotation marks omitted). Thus, to establish that appellate counsel was ineffective in failing to raise an issue, a prisoner

> must first show that his counsel was objectively unreasonable in failing to find arguable issues to appeal — that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them. If [the prisoner] succeeds in such a showing, he then has the burden of demonstrating prejudice. That is, he must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal.

Robbins, 528 U.S. at 285 (internal citation omitted).[74] The

---

[74] The Sixth Circuit has articulated a nonexclusive list of factors to consider when assessing claims of ineffective assistance of appellate counsel:

1. Were the omitted issues significant and obvious?
2. Was there arguably contrary authority on the omitted issues?
3. Were the omitted issues clearly stronger than those presented?
4. Were the omitted issues objected to at trial?
5. Were the trial court's rulings subject to deference on appeal?
6. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
7. What was the appellate counsel's level of experience and expertise?

(continued...)

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 247

Tennessee Court of Criminal Appeals' decision is not contrary to clearly established Supreme Court precedent.

The Court has previously cited the Tennessee Court of Criminal Appeals' arguments related to an anonymous jury, supra pp. 105-17; excessive security, supra pp. 117-25; forensic pathologist Dr. Cleland Blake, supra pp. 165-75; and Juror 121, supra pp. 202-11, and determined that these arguments are without merit.

The Court must now address Carruthers's claim related to the alibi instruction. The Tennessee Court of Criminal Appeals stated:

e. Alibi Instruction

> Lastly, the petitioner contends that appellate counsel were ineffective for not raising as an issue the fact that the trial court did not give an alibi instruction to the jury. The State responds that the proof did not warrant an alibi instruction and that appellate counsel were therefore not ineffective for failing to raise the issue on appeal. We agree that counsel were not deficient in this regard.
>
> A trial court has the affirmative duty to instruct the jury on every issue raised by the proof, including the defendant's theory of defense, and specifically including alibi. See Poe v. State, 212 Tenn. 413, 416, 370 S.W.2d 488, 489 (1963). The trial court must instruct the jury on the defense of alibi when it is "fairly raised" by the evidence, see Manning v. State, 500 S.W.2d 913, 915

---

[74] (...continued)

8. Did the petitioner and appellate counsel meet and go over possible issues?

9. Is there evidence that counsel reviewed all the facts?

10. Were the omitted issues dealt with in other assignments of error?

11. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

Franklin v. Anderson, 434 F.3d 412, 428-29 (6th Cir. 2006) (citing Mapes v. Coyle, 171 F.3d 408, 427-28 (6th Cir. 1999)).

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 248

(Tenn. 1973), regardless of whether the defendant requests the instruction. See Poe, 370 S.W.2d at 491. Proof of an alibi sufficient to require an instruction exists where (1) the defendant's claim that he was not at the scene of the crime is corroborated by other credible witnesses; (2) the victim has been unable to identify the defendant; or (3) the proof against the defendant is wholly circumstantial. Manning, 500 S.W.2d at 916. The failure to charge the jury with the defense of alibi when it has been fairly raised by credible evidence is reversible error. Moffitt v. State, 29 S.W.3d 51, 57 (Tenn. Crim. App. 1999).

The post-conviction court determined that this claim was without merit because the testimony upon which it relied for alibi evidence was "vague[ ] at best":

> The petitioner next argues that appellate counsel should have raised the issue of the failure of the trial judge to give the alibi instruction in light of the testimony of Aldolpho James. Mr. James' testimony is summarized by the Supreme Court as follows:
>
> > Another witness, Aldolpho Antonio James testified that he and [the petitioner] had been visiting a friend between the hours of 1:00 a.m. and 2:00 a.m. the day before these homicides were first reported on the news. This testimony was offered to provide at least a partial alibi for [the petitioner] for the early morning hours of February 25, 1994. However, on cross-examination, James admitted that he did not know the exact date he and [the petitioner] had been together.
>
> Carruthers, 35 S.W.3d at 528. . . . This Court is of the opinion that the appellate court would not have found the failure to give an alibi instruction (which was not requested by the defense) reversible error. Mr. James' testimony was vague, at best, and even if it could be determined to have referenced the date of the crime it was only a "partial alibi."

The petitioner argues that the post-conviction court erroneously relied upon the summary of James's testimony

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 249

> in our supreme court's direct appeal opinion instead of turning to the trial transcript itself, which reveals that James testified that the petitioner was already at the friend's house when James arrived between 1:00 and 2:00 in the morning. The petitioner asserts that this testimony established a "partial alibi" that was "materially more substantial than the [post-conviction] court necessarily viewed it by simply reciting the quotation from the Supreme Court's opinion." The State responds that James's vague testimony merely established that James had seen the petitioner at some point during the time of the victims' disappearance.
>
> We agree with the State that James's testimony that he had seen the petitioner in the early morning hours of the day before he first heard news reports about the victims' murders was not sufficient to warrant an alibi instruction. James testified that he arrived at a friend's house at about 1:35 or 1:45 a.m. to find the petitioner already there. He further testified that at about the same time that he arrived, someone else arrived to take the petitioner home. James was unable to recall the month or even the day of the week that these events transpired. As the State points out, this testimony merely established that "James saw [the] petitioner for only a few minutes on an undetermined night sometime before James heard the news about the victims' disappearance." We conclude, therefore, that the petitioner has failed to meet his burden of establishing that appellate counsel were deficient for failing to raise this issue on appeal or that he suffered any prejudice as a result of the issue not being raised.

Carruthers, 2007 WL 4355481, at *53-54 (alterations in original).

Carruthers argues that the record plainly shows that the testimony of Aldolpho James was exculpatory and sufficiently precise to raise a question about Judge Dailey's failure to give a proper charge. (ECF No. 129 at 229.) James testified that at about 1:00 or 2:00 in the morning on the day before he saw on the news that Marcellos Anderson was missing:

> I don't know what day it was. I can't remember what day it was, but only thing I can recall I seen you that night on the circle, on Pauline Circle. And I come in the

> house, you was sitting on the couch, and then a ride pulled up about that time and blowed [sic] the horn, told, "Tell Tony come on because I'm fixing to take him home. He's going home."

(ECF No. 55-9 at PageID 7214-7215.) On cross-examination, James clarified that he was uncertain of what night of the week, what day of the month, or even what month he saw Carruthers. (Id. at PageID 7218-7219.)

In challenging a trial court's refusal to give an accurate instruction on the defendant's theory of the case, such as an alibi, the defendant bears the burden of introducing evidence to support the defense beyond mere speculation. United States v. Brown, No. 97-1618, 2000 WL 876382, at *10 (6th Cir. June 20, 2000); see also Johnson v. Baker, No. 93-4057, 1994 WL 487343, at *2 (6th Cir. Sept. 8, 1994) (per curiam) (any error in the trial court was harmless under Brecht because Johnson failed to establish a complete alibi). Carruthers has failed to meet that burden. The Tennessee Court of Criminal Appeals' determination that he is not entitled to relief is not contrary to or an unreasonable application of Supreme Court precedent and is not based on an unreasonable determination of fact.

These claims are without merit and appellate counsel's failure to assert these claims does not establish ineffective assistance.

Carruthers also asserts that the failure to raise on appeal any and all claims raised in his amended habeas petition denied him the right to effective assistance of appellate counsel. (ECF No. 21 at 130.) This issue was not exhausted in the state court. To the

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 251

extent Carruthers claims that ineffective assistance of post-conviction counsel provides cause for the failure to exhaust this claim, the argument fails. (See ECF No. 192 at 11, 27-30.) Petitioner has not demonstrated cause and prejudice or that a miscarriage of justice will result from the Court's refusal to consider this claim.

Summary judgment is GRANTED; the allegations in Claim 39 are without merit or procedurally defaulted and, therefore, DENIED.

**AI. Cumulative Effect of Constitutional Errors (Claim 40)**

Carruthers alleges that to the extent the Court finds two or more constitutional errors that are individually harmless, the cumulative effect of those errors render Carruthers's conviction and/or death sentence unconstitutional. (ECF No. 21 at 131.) Respondent argues that the final claim is procedurally defaulted and does not state a cognizable claim for federal habeas relief. (ECF No. 114-1 at 28.) The Sixth Circuit has held that, "post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief." Hoffner v. Bradshaw, 622 F.3d 487, 513 (6th Cir. 2010) (quoting Moore v. Parker, 425 F.3d 250, 256 (6th Cir. 2005)), cert. denied, 131 S. Ct. 2117 (2011); see also Cross v. Stovall, 238 F. App'x 32, 41 (6th Cir. 2007) ("[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." (alteration in original) (quoting Williams v. Anderson, 460 F.3d 789, 816 (6th Cir. 2006))). Summary

judgment is GRANTED. Claim 40 is DENIED.

**VII. CONCLUSION**

Summary judgment based on procedural default is GRANTED for Claims 2, 3, 4, 5, 6, 7, 9, 15, 16 as to the claim about John Billings, 17, 18, 19, 20, 22, 23 except for the HAC jury instruction, 24, 26, 28, 30, 33, 34, 35, 36, 37, and 38.

Summary judgment based on the merits is GRANTED for Claims 5, 7, 8, 10, 15, 19, 21, 29, 31, 32, 39, and 40.

Summary judgment is DENIED for Claims 11, 12, 13, 14, 16 as it relates to Cleland Blake, 20, 25, 27, 32, 37, and 38.

The Court has also determined that Carruthers is not entitled to habeas relief on the merits of Claims 3, 4, 7, 11, 12, 13, 14, 16 as it relates to Cleland Blake, 19, 20 as it relates to the decision for Carruthers to proceed pro se, 23 as it relates to the HAC jury instruction, 25, 27, 33, 35, 36, 37, and 38.

Carruthers's petition is DENIED in its entirety, as all of his claims are either procedurally defaulted or without merit. The petition is DISMISSED WITH PREJUDICE. Judgment shall be entered for Respondent.

**VIII. APPEAL RIGHTS**

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. Miller-El v. Cockrell, 537 U.S. 322, 335 (2003); Bradley v. Birkett, 156 F. App'x 771, 772 (6th Cir. 2005) (per curiam). The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 253

§ 2254 petitioner. Habeas Rule 11(a). A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2)-(3). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 336 (internal quotation marks omitted); see also Henley v. Bell, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. Miller-El, 537 U.S. at 337; Caldwell v. Lewis, 414 F. App'x 809, 814-15 (6th Cir. 2011). Courts should not issue a COA as a matter of course. Bradley, 156 F. App'x at 773.

In this case, there can be no question that the claims in this petition are without merit. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court DENIES a certificate of appealability.

For the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would not be taken in

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 254

good faith, and leave to appeal in forma pauperis is DENIED.[75]

**IT IS SO ORDERED**, this 31st day of March, 2014.

/s/ Jon P. McCalla
JON P. McCALLA
U.S. DISTRICT COURT JUDGE

[75] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or file a motion to proceed in forma pauperis and supporting affidavit in the United States Court of Appeals for the Sixth Circuit within thirty (30) days of the date of entry of this Order. See Fed. R. App. P. 24(a)(5).

This is the statement of **Andre Jordan Johnson, M/B 23, years old, DOB 1/23/71, H/A: 1032 LaGrange, H/P: #525-7562, SSN: 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. A student at State Tech, taking GED.**

Next of Kin:Emergency (Mother) Mazine Johnson of 1032 LaGrange, Phone: 525-7562, unemployed. This statement is being taken at the Homicide Office, 201 Poplar, Rm. 11-21 on February 28, 1994 at 1:40 P.M. Statement is made to Sgt. R.F. Wilkinson and Sgt. R.W. McWilliams.

This statement is relative to the **Missing Person Report:** of **Deloris Anderson, F/B 43, who was reported missing on February 25, 1994 from 4520 Kerwin** and which is filed under MPD File: #94-02-25-7339 MF.

**Q:** Andre, are you known by any other name?
**A:** Yes sir, Baby Brother.

**Q:** Andre, do you know Deloris Anderson?
**A:** Yes sir. I know Deloris Anderson, I've been knowing her every since I was a baby.

**Q:** Do you know Marcellos Anderson?
**A:** Yes sir, I been knowing him every since we were small.

**Q:** And do you know Freddy Fred Tucker?
**A:** Yes sir, I have a baby by ah, his sister.

**Q:** When was the last time you spoke with Marcellos Anderson?
**A:** Wednesday morning, around 1 o'clock A.M.

**Q:** And what was that conversation?
**A:** About ah, going down to the Casino.

**Q:** Can you go in detail what was said?
**A:** Yes sir, he told me "naw," because he was at home in the bed sleep.

**Q:** When was the next time you heard something about Marcellos?
**A:** Thursday morning, around 3:30. Laventhia Anderson and Michael Harris had paged me, and told me ah, that Deloris Anderson and Marcellos Anderson was missing and Michael Harris told me that they had found his, ah, ah, found the truck down in Mississippi, his truck down in Mississippi burnt to pieces.

**Q:** What kind of truck does he have?
**A:** A 1993 Grand Cherokee, white, 4-door.

**Q:** Had Marcellos been driving that truck?
**A:** Yes sir.

**Q:** When you received this phone call, what did you do?
**A:** I had, me and my girlfriend, we was at home, laying down. We then got up, and got to calling people, asking them questions.

Q: Who did you call, and what was said?
A: I had called a guy by the name of Little Charles, Charles Smith. He told me the last time he had seen Marcellos was up on Dunlap Street, Thursday around 4 o'clock A.M., when he let James Montgomery and Jonathan Montgomery get in his truck.

Q: You said you received a call Thursday morning. Are you talking about Thursday morning, or Friday morning, the 25th?
A: No, I received the call Friday morn...Friday morning. Friday morning and they ah, Delor...I mean ah, Niecie Anderson, Laventhia Anderson, Michael Harris called me asking me ah, had I heard what went on, I told 'em "naw." They told me ah, Marcellos and Deloris was missing and that ah, ah ah Michael Harris told me, say they found his truck down there in Mississippi burnt, burnt up, and did I hear anything. By that time, I got up, I got up, made a phone call, I gave...he told me to find out as much as I could, so I called a guy by the name of Charles Smith. Charles Smith had told me that last time he seen Marcellos Anderson was on Dunlap, it's on 636 North Dunlap, and he let..by that time, he let James Montgomery and Jonathan Montgomery get into his truck.

Q: That Friday morning, did you go over and pick up Charles Smith to go riding?
A: Yes, yes sir.

Q: Where did ya'll go, and what did you learn?
A: We rode around, we was asking, we asked different guys, Terry Cauffman, Corey Ragland, ah, Shawn Anderson, and we went back to the address of 636 Dunlap, knocking on the door, asking them had they seen Marcellos. Terry Cauffman say the last time he seen Marcellos Anderson, he had Fred Tucker, James Montgomery in the truck with him. I called Shawn Anderson. Shawn Anderson say he walked to the truck at 636 North Dunlap. He asked Marcellos where was he headed to. He say he fixing to take James Montgomery to the Cleaners to git his clothes out, but he say, then he say James told him, told Marcellos, ah, "let's go, and told him to take him around to the house, before we go to the Cleaners.

Q: Did you learn that Fred Tucker was also missing?
A: Yes sir.

Q: How did you learn this?
A: I learned Fred Tucker was missing, because Shawn Anderson told me Fred Tucker was in the truck. By that time, I went over to Hurt Village, knocked on Fred's door, cause I be staying in Fred and them house some night. Asked Fred's mother had they seen him. They went from his grandmother's house, to his auntie's house and nobody had never seen Fred.

Q: How long have you known James Montgomery?
A: I knowed him when he was small, he had got into it with my brother. I believe he hit my brother with a board or something.

Q: Did ya'll grow up in the neighborhood together?
A: Everybody come up in the same neighborhood.

Q: Is Jonathan Montgomery his brother?
A: Jonathan Montgomery is his brother. Me and him went to school together.

Q: What have you heard in regards to Marcellos and Fred being missing?
A: Everybody saying, ah, they left with James and ain't nobody else seen them since they left with James Montgomery.

Q: Have you heard anything in regards to Tony Carruthers?
A: Yes. The only thing I know is they partners.

Q: Whose partners?
A: James, Jonathan (Jonathan Montgomery), James Montgomery, and Tony Carruthers.

Q: Have you had a conflict with either the Montgomery or Carruthers in the past?
A: Yes sir.

Q: Will you explain that conflict?
A: Yes sir. Tony Carruthers pulled me over in front of the Chicken House on Jackson, I don't know the address. He told me, to then pull over on Leath Street. He told me ah, ah, ah, let him use my phone to call James. I gave him my telephone to call James. He couldn't git James on the telephone. By that time, I kept telling him I got to go take my little girl to the hospital. I told him "let me go." He was in some kind of little gray car, and he had another guy with him. He told me, "naw, let's go around James house." I say, "naw, ain't going around James house." So, by that time, 10, about 10:30 or later on that night, James and Tony had parked down the street of my mother's house, on the side of Looney and Barry, I mean, Barry and LaGrange, they parked about a half of mile of watching. We didn't know that them two had looked up, and had seen them pulled off, and they pulled off, and came down, they rolled their window down, they had on black, black scarfs, black jackets, black jeans, black boots, and black gloves, and they ah, they got out the car, had walked over talking to me. By that time, Sherita Davis, Terrell Adair and Darrell got out of his car, and they walked...Terrell walked over and listened what was going on.

Q: What was said?
A: Ah, "we don't have no beef with you..ah, we want, if we had any beef with you, we'll kill your whole family. We ain't out to do nothing to you. We already got our main (man) staked out."

Q: Do you know why anyone would kidnap Marcellos and Fred?
A: For they money.

Q: How much money would they have had?
A: The most money I seen Marcellos with, in his pockets was six or seven hundred ($6 or $700.00).

Q: Does he have other money?
A: Yes sir.

Q: About how much?
A: I guess seven or eight-thousand dollars.

Q: Where does he keep this money?
A: At his home.

Q: Is this the home where his mother lives?
A: Yes sir.

Q: What night was it that the conversation when they were dressed in black, how long before they were missing?
A: Ah, I guess two or three days afterwards.

Q: Two or three days after they come up missing?
A: Yes sir.

Q: What is Fred Tucker to Marcellos?
A: A friend.

Q: What is Fred Tucker to you?
A: I got a baby by his sister.

Q: Is Marcellos any kind to Montgomery or Tony Carruthers?
A: No sir.

Q: Whenever you talked to Harris, or did you talk to Harris about his Jeep being missing?
A: Yes, he called me and told me.

Q: Did he say who had the Jeep last?
A: He had Marcellos Anderson had his Jeep last.

Q: Who else lives with Marcellos and his mother?
A: Laventhia Anderson.

Q: What is she known as?
A: Neicie.

Q: Has she any relationship with either Montgomery or Carruthers?
A: Yes, she has a little, she has a daughter by Carruthers.

Q: Does Carruthers visit the child?
A: Not that I done seen or know of.

Q: Do you know how long Deloris and Marcellos have lived at their present address of 4520 Kerwin?
A: Yes, about 2 weeks, but I don't, I ain't never seen they new house, never seen they new home.

Q: Has Neicie, who is..What's Neicie's name?
A: Laventhia Anderson.

Q: Has Laventhia Anderson had trouble with Tony Carruthers in the past?
A: Yes sir, he threw a bottle of gas in the house, and burnt they house down, whole house down.

Q: When did this occur?
A: This happened about 4 years.., about 5 years ago.

Q: Did he do time for this charge?
A: Yes sir.

Q: What time bottle did he throw in their house?
A: A beer bottle.

Q: Do you know if he's been involved in any other burnings?
A: Yes sir, he..they, ah, when he was in jail, I heard that he was going to trail on two more burnings.

Q: What type weapons do they carry?
A: I...the night they pulled up on the side of me, James had some kind of black gun, in his ah, some kind of black automatic weapon in his coat. I don't know if it was a 9 mm or what, but it was on that side.

Q: Does Marcellos have a weapon?
A: Not that I done seen him with, but he always's told me he had a shotgun at home.

Q: Does Fred Tucker have a weapon?
A: No sir.

Q: How old is Fred Tucker?
A: 'Bout 15 or 16.

Q: Have you or do you know anybody that has seen the Montgomery's or Carruther's out since this happened?
A: Yes sir. Marcus Bateman came, came came and told me..., I was in the Barber shop, that he had seen 'em, seen 'em down on Dunlap, and they had on new clothes and they had got a little, some kind of little Buick Century, with a drive-out tag on it.

Jonathan Montgomery, James Montgomery, Tony Carruthers. And Lois Shaffer came around my grandmother's house last night, and told me and Terrell, and Michael Holmes that he seen them around there, on Dunlap, and not to leave out the house, she got a gun, cause they was around on Dunlap with new jogging suits on, in a Buick Century.

Q: Have you ever known them to have any kind of cars or money in the past?
A: No sir.

Q: Have you received any phone calls for ransom money are anything?
A: No sir.

Q: Are you and Marcellos close?
A: Best of friends sir.

Q: Who is a closer friend than you to Marcellos if anyone?
A: Would be Terrell Adair.

Q: How would we get in touch with Shawn Anderson, who saw them get in the jeep with Marcellos?
A: Shawn Anderson lived at 636 North Dunlap. His telephone number is 373-4060 or 527-4698.

Q: Baby Bro, do you know of anything about statements being made about a war?
A: Yes, Wednesday, James Montgomery, I was riding down Pearce Street, turning on Orphanage. James Montgomery pulled me over, I pulls over. Octavious, John Thomas was in the car with me. Little Charles had walked out the house over to the car with me. James was ah, ah ah, talking to me. He asked me did I want to go to war. He asked me this 3 times. I told him "naw." He said, "well, ya'll need to, ya'll need to keep.. ya'll bitches need to keep ya'll mouths shut around here. Ya'll bitches need to keep ya'll mouths shut around here and stay out of my business." I said, "O.K. James," then by that time, ah, aha, ah, "he said, you feel like I'm fixing to blow your brains out your gaddammn head right now," and I told him, ah ah ah "ain't did nothing to you, what you gon' blow my brains out of my head for." By that time, a blue chevrolet pulls up. His brother and them parked on the other side of my car. Charles mother or sister, or somebody comes out the house, and said, "Charles your brother want you on the phone, Romeo." By that time, I gets in my car, Octavious gets in the passenger seat, John Thomas in the back seat, we pulls, I told her to tell James "I'll see you later, I'll holler at you whenever." And I pulled on off, and he got in the blue chevrolet, with his brother's and them.

Q: What is this war about?
A: Because sir, he used to be the head main (man) of Bone Family. He trying to get his organization formed again, because he some kind of Black Muslim. Ain't nobody fixing to be war...ing, fighting over no neighborhood or nothing.

Q: Is this war directly to you and your friends?
A: Exactly sir.

Q: And on James side, who is lining up with him?
A: Tony Carruthers, James Montgomery, Jonathan Montgomery, Johnny Saffrans, and some other dude name Little Po, who just get out.

Q: Where do these individuals live?
A: James and Jonathan lives on Pearce. Tony lives in Frayser, Johnny Saffrans lives in Dixie Holmes, and I don't know where this Po guy live.

Q: Do you know of any threats, or any reason or anything that's happened in the pass, that caused them to pick out Marcellos for this?
A: Not that I know of sir, the last threatening words Montgomery, and Carruthers told me, "if we had some beef with you, we'll kill your whole family."

Q: And he considered Marcellos part of your family?
A: No sir, I guess he was talking about my parents, sisters, and brothers.

Q: He knows that you and Marcellos are good friends?
A: He know that we are the best of friends.

Q: Is there anything else you want to add to this statement that would aid in our investigation?
A: No sir.

Q: Is there anything that you need to add that we haven't asked?
A: No sir.

Q: Andre, what is your beeper number?
A: 524-9321.

Q: What is your mobile phone number?
A: 482-3384.

Q: Andre, are you aware that this statement has been tape-recorded?
A: Yes sir.

Q: Andre, at a later date, this statement will be transcribed, at which time you will be asked to read it, and if you find it to be true and correct, as you have given it, we will then ask you to initial the pages and sign your name on the last one.

Do you understand it?
A: Yes sir.

THIS CONCLUDES THE STATEMENT OF ANDRE JORDAN JOHNSON.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 94-20256-G

CURTIS MCDONALD
ALICE MARIE JOHNSON
MAURICE MONDIE
ANDRE JOHNSON,
A/K/A "BABEBRO"
DERRICK JONES
A/K/A "D.J."
MITTY PALMER
JERLEAN MCNEIL
CATINA JOHNSON
GARCERIAL DOTSON,
A/K/A "TED"
VICTORIANO MINOTTA,
A/K/A "LEO"
[redacted]
MARCOS ANTONIO LOPEZ,
A/K/A "RAMBO"
ANGEL NABOA
ANGELICA REY
MARCELIA JARAMILLO
AND
RAMON RAMIREZ,
A/K/A "FABIAN."

Defendants.

21 U.S.C.§841(a)(1)
21 U.S.C.§846
18 U.S.C.§1956(h)
18 U.S.C.§1956(a)(1)(A)(i)
31 U.S.C.§5324(a)(3)
31 C.F.R.§103.11
18 U.S.C.§2

## I N D I C T M E N T

**THE GRAND JURY CHARGES:**

COUNT 1

From on or about June, 1991, and continuing thereafter up to and including September, 1994, the exact dates unknown to the Grand

Jury, in the Western District of Tennessee and elsewhere, the Defendants,

CURTIS MCDONALD
ALICE MARIE JOHNSON
MAURICE MONDIE
ANDRE JOHNSON, A/K/A "BABEBRO"
DERRICK JONES, A/K/A "D.J."
MITTY PALMER
JERLEAN MCNEIL
CATINA JOHNSON
GARCERIAL DOTSON, A/K/A "TED"
VICTORIANO MINOTTA, A/K/A "LEO"
MILTON VALENCIA
MARCOS ANTONIO LOPEZ, A/K/A "RAMBO"
ANGEL NABOA
ANGELICA REY
MARCELIA JARAMILLO

did knowingly combine, conspire, confederate and agree together, and with Merrick Bill Thomas, William Saa, a/k/a "Jose Alicano," Ramon Ramirez, a/k/a "Fabian," Clemencia Angulo, Henry Castillo-Candelo, James Montana, Mose Williams, Paul Duventre, Michael Barnes, Felix Cohens, Reginald Stewart, Michael Clear, Michael Holmes, Kelvin Willis, and Darryl Carter and with other persons known and unknown to the Grand Jury, to commit the following offenses against the United States:

1. To unlawfully, knowingly, and intentionally possess with the intent to distribute cocaine, a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1);

2. To unlawfully, knowingly, and intentionally distribute cocaine, a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

This conspiracy consisted of an agreement between and among the various co-conspirators, allowing for each member thereof to perform certain specific functions designed, when each conspirator performed his part, to transport cocaine from the State of Texas and elsewhere to the State of Tennessee.

OVERT ACTS

During the course of the conspiracy, at least one of the following acts was performed by at least one conspirator in furtherance, and to effect the goals of said conspiracy in the Western District of Tennessee and elsewhere:

1. On or about June, 1991, the exact date unknown, **Curtis McDonald** gave Mose Williams one half of a kilogram of cocaine to hold for him.

2. During the summer of 1991, the exact date unknown, **Curtis McDonald** gave Mose Williams five kilograms of cocaine outside the residence of **Alice Johnson's** house on Queen Elizabeth Street in Memphis, Tennessee.

3. During the summer of 1991, the exact date unknown, Mose Williams met **Curtis McDonald** and **Victoriano Minotta, a/k/a "Leo,"** at **Alice Johnson's** house on Queen Elizabeth Street and was given a bag containing approximately five to six kilograms of cocaine by **Curtis McDonald.**

4. During the summer of 1991, the exact dates unknown, **Curtis McDonald** instructed Mose Williams to distribute cocaine which had been given to Mose Williams by **Curtis McDonald.**

5. On or about July, 1991, **Alice Johnson** rented an apartment in the McKellar Woods Apartment complex in Memphis, Tennessee, in the name of Tretessa Johnson.

6. From on or about June, 1991, the exact date unknown, up to on or about August, 1991, **Victoriano Minotta, a/k/a "Leo," Milton Valencia,** and Merrick Bill Thomas made a series of trips from Houston, Texas, to Memphis, Tennessee, to deliver cocaine to **Alice Johnson, Curtis McDonald,** and others known and unknown to the Grand Jury.

7. From on or about June, 1991, the exact date unknown, up to on or about August, 1991, **Curtis McDonald** and **Alice Johnson** delivered large sums of U.S. currency to **Victoriano Minnota, a/k/a "Leo," Milton Valencia,** and to Merrick Bill Thomas as payment for cocaine.

8. On or about August 3, 1991, **Victoriano Minotta, a/k/a "Leo," Milton Valencia,** and Merrick Bill Thomas left Houston, Texas, to transport approximately 12 kilograms of cocaine to Memphis, Tennessee.

9. **On or about the summer of 1992, the exact date unknown,** William Saa, a/k/a "Jose Alicano," **met Curtis McDonald and Alice Johnson at the Hickory Ridge Mall in Memphis, Tennessee, to discuss future cocaine transactions.**

10. From on or about the summer of 1992, the exact date unknown, up to on or about October of 1992, the exact date unknown, William Saa, a/k/a "Jose Alicano," made a series of trips from Houston, Texas, to Memphis, Tennessee, transporting cocaine to **Alice Johnson**, **Curtis McDonald**, and Mose Williams at the direction of **Victoriano Minnota, a/k/a "Leo."**

11. From on or about October, 1992, the exact date unknown, up to December 15, 1992, Paul Duventre made a series of trips transporting cocaine from Houston, Texas, to Memphis, Tennessee, at the direction of **Curtis McDonald** and **Alice Johnson.**

12. From on or about October, 1992, the exact date unknown, up to December 15, 1992, Paul Duventre picked up loads of cocaine from **Victoriano Minnota, a/k/a "Leo,"** and William Saa, a/k/a "Jose Alicano" in Houston, Texas.

13. On or about December 15, 1992, **Curtis McDonald** and Paul Duventre loaded a large sum of U.S. currency into tar buckets which were then driven by Paul Duventre to Houston, Texas, at the direction of **Curtis McDonald.**

14. On or about December 15, 1992, Paul Duventre delivered a large sum of U.S. currency to William Saa, a/k/a "Jose Alicano" in Houston, Texas, as payment for cocaine.

15. On or about December 15, 1992, William Saa, a/k/a "Jose Alicano," Paul Duventre, and Henry Castillo-Candelo loaded approximately nine kilograms of cocaine into tar buckets in Houston, Texas, for Paul Duventre to deliver to **Curtis McDonald.**

16. On or about October, 1992, the exact date unknown, continuing up to on or about August 20, 1993, **Curtis McDonald, Garcerial Dotson, a/k/a "Ted,"** and Mose Williams made a series of trips to Texarkana, Arkansas, to pick up a Nissan station wagon loaded with cocaine.

17. From on or about October, 1992, the exact date unknown, continuing up to on or about August, 1993, Ramon Ramirez, a/k/a "Fabian," and others known and unknown to the Grand Jury, delivered cocaine to **Curtis McDonald, Garcerial Dotson, a/k/a "Ted,"** and Mose Williams.

18. From on or about October, 1992, the exact date unknown, continuing up to on or about August, 1993, **Mitty Palmer, Jerlean McNeil**, and Mose Williams, stored cocaine at their residences in Memphis, Tennessee, at the direction of **Curtis McDonald.**

19. On or about February 13, 1993, **Curtis McDonald** instructed Mose Williams to rent two hotel rooms at the Comfort Inn in Memphis, Tennessee.

20. On or about February 13, 1993, **Curtis McDonald**, Ramon Ramirez, a/k/a "Fabian," **Angelica Rey**, and **Angel Naboa** met at the Comfort Inn in Memphis, Tennessee.

21. On or about February 13, 1993, **Curtis McDonald** instructed Mose Williams to unload cocaine from a Nissan station wagon.

22. On or about February 13, 1993, **Mitty Palmer** picked up approximately 30 kilograms of cocaine from Mose Williams in Memphis, Tennessee.

On or about [illegible]

Tennessee, and elsewhere, the Defendants,

--------------------VICTORIANO MINOTTA, A/K/A "LEO"--------------
----------------------------MILTON VALENCIA---------------------
-------------------------CURTIS MCDONALD------------------------
AND
--------------------------ALICE JOHNSON-------------------------

being aided and abetted, each by the other, and by Merrick Bill Thomas, and others unknown to the Grand Jury, did attempt to possess with the intent to distribute approximately 12 kilograms of cocaine, a controlled substance as classified by Title 21, United States Code, Section 812, in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2.

> [nlt 10 yrs., nmt life., nmt $4 million fine, or both; plus a mandatory term of at least five years supervised release, together with a mandatory special assessment of $50; see 18 U.S.C., Section 3013(a).]

COUNT 3

On or about December 15, 1992, in the Western District of Tennessee, and elsewhere, the Defendants,

-------------------VICTORIANO MINOTTA, A/K/A "LEO"----------------
--------------------------CURTIS MCDONALD-------------------------
AND
---------------------------ALICE JOHNSON--------------------------

being aided and abetted, each by the other, and by Henry Castillo-Candelo, William Saa, a/k/a "Jose Alicano," Paul Duventre and others unknown to the Grand Jury did unlawfully, knowingly, and intentionally attempt to possess with intent to distribute approximately nine kilograms of cocaine, a controlled substance as classified by Title 21, United States Code, Section 812, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

> [nlt 10 yrs., nmt life., nmt $4 million fine, or both; plus a mandatory term of at least five years supervised release, together with a mandatory special assessment of $50; see 18 U.S.C., Section 3013(a).]

On or about May 6, 1993, in the Western District of Tennessee, and elsewhere, the Defendant,

----------------------------MAURICE MONDIE-----------------------

being aided and abetted by Reginald Stewart, did unlawfully, knowingly, and intentionally cause the possession with intent to distribute of approximately three kilograms of cocaine, a controlled substance as classified by Title 21, United States Code, Section 812, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

> [nlt 5 yrs., nmt 40 yrs., nmt $2 million fine, or both; plus a mandatory term of at least four years supervised release, together with a mandatory special assessment of $50; see 18 U.S.C., Section 3013(a).]

COUNT 5

On or about August 19, 1993, in the Western District of Tennessee, and elsewhere, the Defendants,

--------------------------CURTIS MCDONALD----------------------
---------------------------ALICE JOHNSON-----------------------
---------------------------JERLEAN MCNEIL----------------------
AND
----------------------GARCERIAL DOTSON, A/K/A "TED"------------

being aided and abetted, each by the other, and by Ramon Ramirez, a/k/a "Fabian," Mose Williams, and others unknown to the Grand Jury, did unlawfully, knowingly, and intentionally attempt to possess with the intent to distribute approximately 75 kilograms of cocaine, a controlled substance as classified by Title 21, United States Code, Section 812, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

> [nlt 10 yrs., nmt life., nmt $4 million fine, or both; plus a mandatory term of at least five years supervised release, together with a mandatory special assessment of $50; see 18 U.S.C., Section 3013(a).]

30. On or about August 20, 1993, Ramon Ramirez, a/k/a "Fabian," stored approximately $1 million dollars in U.S. currency and 24 kilograms of cocaine at 4914 Tenderwood, Houston, Texas.

31. During the course of the conspiracy, Mose Williams delivered large sums of U.S. currency to **Catina Johnson** as payment for cocaine.

32. On or about February, 1993, the exact date unknown, **Curtis McDonald** and **Alice Johnson** instructed Mose Williams to deliver approximately 10 kilograms of cocaine to **Maurice Mondie**.

33. On or about February, 1993, the exact date unknown, Mose Williams delivered approximately 10 kilograms of cocaine to **Maurice Mondie** in Memphis, Tennessee.

34. On or about March, 1993, the exact date unknown, **Maurice Mondie** gave Reginald Stewart approximately three kilograms of cocaine to hold for him.

35. From on or about March, 1993, the exact date unknown, up to and including May, 1993, the exact date unknown, **Maurice Mondie** gave Reginald Stewart cocaine to distribute.

36. On or about May 6, 1993, Reginald Stewart received three kilograms of cocaine from **Maurice Mondie** to be distributed in Marion, Arkansas.

37. On or about December, 1993, the exact date unknown, **Maurice Mondie** instructed Kelvin Willis to drive a load of cocaine from Houston, Texas, to Memphis, Tennessee.

38. On or about December 11, 1993, **Maurice Mondie** instructed Cassell Brown to deliver approximately $265,000 in U.S. currency to Houston, Texas, as payment for cocaine.

39. On or about December, 1993, the exact date unknown, **Maurice Mondie** and **Derrick Jones** gave Kelvin Willis a large sum of U.S. currency to deliver to Houston, Texas.

40 On or about January 27, 1994, Kelvin Willis delivered approximately one kilogram of cocaine to Darryl Carter in Memphis, Tennessee.

41. On or about January 27, 1994, Darryl Carter delivered approximately one kilogram of cocaine to Larry Ayers in Memphis, Tennessee.

42. On or about January 27, 1994, **Maurice Mondie** asked Michael Clear to hold a bag which would be delivered to him by Kelvin Willis.

43. On or about January 27, 1994, **Maurice Mondie** instructed Kelvin Willis to deliver a bag containing three kilos of cocaine to Michael Clear at 1641 Hunters Bluff, No. 202 in Memphis, Tennessee.

44. On or about January 27, 1994, Kelvin Willis delivered a bag containing three kilograms of cocaine to Michael Clear at 1641 Hunters Bluff, No. 202 in Memphis, Tennessee.

45. From on or about December, 1993, up to on or about May, 1994, **Maurice Mondie**, **Derrick Jones**, and Darryl Carter unloaded cocaine from vehicles which had been transported from Texas.

46. From on or about December, 1993, the exact date unknown, up to and including April, 1994, Michael Barnes travelled from

Houston, Texas, to West Memphis, Arkansas, at the direction of **Marcos Antonio Lopez, a/k/a "Rambo,"** to deliver cocaine to **Curtis McDonald, Alice Johnson, Maurice Mondie, Andre Johnson, a/k/a "Babebro,"** and others known and unknown to the Grand Jury.

47. On or about April 26, 1994, **Marcus Antonio Lopez, a/k/a "Rambo,"** Michael Holmes, and Michael Barnes loaded approximately nine kilograms of cocaine into a Chevrolet Cavalier in Houston, Texas.

48. On or about April 26, 1994, Michael Holmes and Michael Barnes left Houston, Texas, to transport approximately nine kilograms of cocaine to Memphis, Tennessee, to **Andre Johnson,** a/k/a **"Babebro."**

49. On or about September 13, 1994, **Alice Johnson** instructed **Marcelia Jaramillo** to check into a hotel in Memphis, Tennessee.

50. On or about September 13, 1994, **Marcelia Jaramillo** delivered the keys to her car to an unknown individual at the Holiday Inn hotel in Memphis, Tennessee.

51. On or about September 13, 1994, **Curtis McDonald** followed **Marcelia Jaramillo's** car from the Holiday Inn hotel in Memphis, Tennessee.

All in violation of Title 21, United States code, Section 846.

[nlt 10 yrs., nmt life., nmt $4 million fine, or both; plus a mandatory term of at least five years supervised release, together with a mandatory special assessment of $50; see 18 U.S.C., Section 3013(a).]

On or about January 27, 1994, in the Western District of Tennessee, the Defendant,

---------------------------MAURICE MONDIE----------------------

being aided and abetted by Kelvin Willis and Michael Clear did unlawfully, knowingly, and intentionally cause the possession with intent to distribute of approximately three kilograms of cocaine, a controlled substance as classified by Title 21, United States Code, Section 812, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

> [nlt 5 yrs., nmt 40 yrs., nmt $2 million fine, or both; plus a mandatory term of at least four years supervised release, together with a mandatory special assessment of $50; see 18 U.S.C., Section 3013(a).]

COUNT 7

On or about April 27, 1994, in the Western District of Tennessee, and elsewhere, the Defendants,

-------------MARCOS ANTONIO LOPEZ, A/K/A "RAMBO"---------------
AND
-----------------ANDRE JOHNSON, A/K/A "BABEBRO"----------------

being aided and abetted, each by the other, and by Michael Holmes and Michael Barnes and others as yet unknown to the Grand Jury did unlawfully, knowingly, and intentionally attempt to possess with the intent to distribute approximately nine kilograms of cocaine, a controlled substance as classified by Title 21, United States Code, Section 812, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

> [nlt 10 yrs., nmt life., nmt $4 million fine, or both; plus a mandatory term of at least five years supervised release, together with a mandatory special assessment of $50; see 18 U.S.C., Section 3013(a).]

COUNT 8

On or about September 14, 1994, in the Western District of Tennessee., and elsewhere, the Defendants,

---------------------------CURTIS MCDONALD-----------------------
----------------------------ALICE JOHNSON------------------------
AND
--------------------------MARCELIA JARAMILLO--------------------

being aided and abetted, each by the other, and by others unknown to the Grand Jury, did unlawfully, knowingly, and intentionally attempt to possess with the intent to distribute approximately ten kilograms of cocaine, a controlled substance as classified by Title 21, United States Code, Section 812, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

[nlt 10 yrs., nmt life., nmt $4 million fine, or both; plus a mandatory term of at least five years supervised release, together with a mandatory special assessment of $50; see 18 U.S.C., Section 3013(a).]

COUNT 9

From on or about June, 1991, and continuing up to and including September, 1994, the exact dates unknown to the Grand Jury, in the Western District of Tennessee and elsewhere, the Defendants,

-----------------------------CURTIS MCDONALD--------------------
--------------------------ALICE MARIE JOHNSON-------------------
------------------------------MAURICE MONDIE--------------------
---------------------ANDRE JOHNSON, A/K/A "BABEBRO"-------------
--------------------DERRICK JONES, A/K/A "D.J."-----------------
-----------------------------MITTY PALMER-----------------------
-----------------------------JERLEAN MCNEIL---------------------
-----------------------------CATINA JOHNSON---------------------
--------------------GARCERIAL DOTSON, A/K/A "TED"---------------
---------------------VICTORIANO MINOTTA, A/K/A "LEO"------------
------------------------------MILTON VALENCIA-------------------
--------------------RAMON RAMIREZ, A/K/A "FABIAN"----------------
AND
-------------------MARCOS ANTONIO LOPEZ, A/K/A "RAMBO"----------

did unlawfully, knowingly, and intentionally combine, conspire, confederate and agree together and with Merrick Bill Thomas, William Saa, a/k/a "Jose Alicano," Henry Castillo-Candelo, Paul Duventre, Mose Williams, Clemencia Angulo, James Montana, Fernando McDonald, Felix Cohens, Reginald Stewart, Michael Holmes, Michael Barnes, Kelvin Willis, Darryl Carter, and other persons known and unknown to the Grand Jury, to commit the following offenses against the United States:

1. Knowingly conduct and attempt to conduct financial transactions affecting interstate commerce; to wit, the purchases of cocaine with funds transferred from Tennessee and delivered to places outside the State of Tennessee, which involved the proceeds of a specified unlawful activity; that is, the possession with the

intent to distribute and distribution of cocaine, in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to possess with the intent to distribute and distribution of cocaine, in violation of Title 21, United States Code, Section 846, with the intent to promote the carrying on of said specified unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i), and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions, represented the proceeds of some form of unlawful activity.

It was the object of this conspiracy to collect the proceeds of the distribution of the cocaine and cause these proceeds to be transferred in interstate commerce to the ultimate suppliers in order to purchase additional amounts of cocaine.

OVERT ACTS

During the course of the conspiracy, at least one of the following acts was performed by at least one conspirator in furtherance of, and to effect the goals of the said conspiracy in the Western District of Tennessee and elsewhere:

1. From on or about June, 1991, the exact date unknown, up to and including July, 1991, the exact date unknown, **Victoriano Minotta, a/k/a "Leo," Milton Valencia** and Merrick Bill Thomas picked up large sums of United States currency from **Curtis McDonald, Alice Johnson**, and others known and unknown to the Grand Jury in Memphis, Tennessee.

2. From on or about June, 1991, the exact date unknown, up to and including July, 1991, the exact date unknown, Merrick Bill Thomas delivered large sums of United States currency to **Ramon Ramirez, a/k/a "Fabian,"** in Houston, Texas, as payment for cocaine.

3. From on or about the summer of 1992, the exact date unknown, up to on or about December, 1992, the exact date unknown, **Curtis McDonald**, **Alice Johnson**, and Mose Williams delivered large sums of United States currency to William Saa, a/k/a "Jose Alicano," in Memphis, Tennessee, as payment for cocaine.

4. From on or about the summer of 1992, the exact date unknown, up to on or about December, 1992, the exact date unknown, William Saa, a/k/a "Jose Alicano," delivered large sums of U.S. currency to **Victoriano Minotta, a/k/a "Leo,"** in Houston, Texas, as payment for cocaine.

5. On or about December 15, 1992, **Curtis McDonald** and Paul Duventre loaded approximately $159,000.00 in U.S. currency into tar buckets in Memphis, Tennessee.

6. On or about December 15, 1992, **Curtis McDonald** instructed Paul Duventre to deliver approximately $159,000.00 in U.S. currency to Houston, Texas, as payment for cocaine.

7. On or about December 15, 1992, Paul Duventre delivered approximately $159,000.00 in U.S. currency to William Saa, a/k/a "Jose Alicano," and Henry Castillo-Candelo in Houston, Texas, as payment for cocaine.

8. On or about September 30, 1992, Fernando McDonald and **Mitty Palmer** went to the Memphis International Airport in possession of approximately $100,000.00 in order for Fernando McDonald to transport the money to Houston, Texas, for **Curtis McDonald** as payment for cocaine.

9. On or about August 16, 1993, **Curtis McDonald, Alice Johnson, Jerlean McNeil,** and Mose Williams met at **Jerlean McNeil's** house at 1324 Timothy, and **Curtis McDonald** and Mose Williams loaded approximately $1.5 million dollars in U.S. currency into a Nissan station wagon.

10. On or about August 16, 1993, **Curtis McDonald, Garcerial Dotson, a/k/a "Ted,"** and Mose **Williams** delivered approximately $1.5 million dollars in U.S. currency to **Ramon Ramirez, a/k/a "Fabian,"** and Clemencia Angulo as payment for cocaine.

11. On or about August 17, 1993, **Curtis McDonald** and Mose Williams counted and delivered approximately $87,000 in U.S. currency to James Montana in Memphis, Tennessee, as payment for cocaine.

12. On or about August 20, 1993, **Ramon Ramirez, a/k/a "Fabian,"** stored approximately $1 million dollars in U.S. currency at 4914 Tenderwood, Houston, Texas.

13. During the course of the conspiracy, Mose Williams delivered large sums of U.S. currency to **Catina Johnson** as payment for cocaine.

14. On or about January, 1993, the exact date unknown, **Maurice Mondie** and Felix Cohens counted approximately $300,000.00

in U.S. currency and delivered to **Mitty Palmer** in Memphis, Tennessee, as payment for cocaine.

15. On or about the Spring of 1993, the exact date unknown, **Maurice Mondie** delivered approximately $25,000 to Mose Williams in Memphis, Tennessee, as payment for cocaine.

16. On or about the spring of 1993, the exact date unknown, **Maurice Mondie** and Felix Cohens delivered approximately $850,000.00 in U.S. currency to **Mitty Palmer** in Memphis, Tennessee, as payment for cocaine.

17. From on or about March, 1993, the exact date unknown, up to and including May, 1993, the exact date unknown, Reginald Stewart and Felix Cohens counted large sums of United States currency from sales of cocaine and delivered it to **Maurice Mondie**.

18. On or about October 23, 1993, **Maurice Mondie** wired $1,000.00 to Marco Hurtado in Houston, Texas.

19. On or about November 2, 1993, **Maurice Mondie** wired $1,500.00 to **Milton Valencia** in Houston, Texas.

20. On or about November 2, 1993, **Derrick Jones, a/k/a "D.J.,"** wired $1,500.00 to Marco Hurtado in Houston, Texas.

21. On or about December 11, 1993, **Maurice Mondie** instructed Cassell Brown to deliver approximately $265,000 in U.S. currency to Houston, Texas, as payment for cocaine.

22. On or about December, 1993, the exact date unknown, **Maurice Mondie** and **Derrick Jones, a/k/a "D.J."** gave Kelvin Willis a large sum of U.S. currency to deliver to Houston, Texas as payment for cocaine.

23. On or about January 28, 1994, Maurice Mondie stored approximately $65,000.00 in U.S. currency at 270 Arbor Commons Circle, No. 107, in Memphis, Tennessee.

24. On or about April 26, 1994, Michael Holmes and Andre Johnson, a/k/a "Babebro" loaded a large sum of U.S. currency into a Chevrolet Cavalier in Memphis, Tennessee.

25. On or about April 26, 1994, Michael Holmes drove to Houston, Texas, and delivered a large sum of U.S. currency to Marcos Antonio Lopez, a/k/a "Rambo," in Houston, Texas, as payment for cocaine.

All in violation of Title 18, United States Code, Section 1956(h).

[nmt 20 yrs., nmt $500,000 fine, or both, plus a mandatory term of at least three years supervised release, together with a mandatory special assessment of $50., see 18 U.S.C. Section 3013(a).]

COUNT 10

On or about December 15, 1992, in the Western District of Tennessee and elsewhere, the Defendants,

---------------------------CURTIS MCDONALD-----------------------
AND
-------------------VICTORIANO MINOTTA, A/K/A "LEO"--------------

being aided and abetted, each by the other, and by Henry Castillo-Candelo, William Saa, a/k/a "Jose Alicano," and Paul Duventre, and others unknown to the Grand Jury, did knowingly cause, conduct, and attempt to conduct a financial transaction affecting interstate commerce; to wit, the transfer and payment of approximately $159,000.00 for cocaine, which involved the proceeds of a specified unlawful activity; that is, the possession with intent to distribute and distribution of cocaine, in violation of Title 21, United States Code, Section 841(a)(1) and conspiracy to possess with the intent to distribute and distribution of cocaine, in violation of Title 21, United States Code, Section 846, with the intent to promote the carrying on of said specified unlawful activity, and that while attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

In violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and 2.

[nmt 20 yrs., nmt $500,000 or both, plus a mandatory term of at least three years supervised release, together with a mandatory special assessment of $50., see 18 U.S.C. Section 3013(a).]

COUNT 11

On or about September 30, 1992 in the Western District of Tennessee and elsewhere, the Defendants,

-------------------------CURTIS MCDONALD----------------------
AND
-------------------------MITTY PALMER-------------------------

being aided and abetted, each by the other, and by Fernando McDonald and Mose Williams, and others unknown to the Grand Jury, did knowingly cause, conduct, and attempt to conduct a financial transaction affecting interstate commerce; to wit, the transfer and payment of approximately $100,000.00 for cocaine, which involved the proceeds of a specified unlawful activity; that is, the possession with intent to distribute and distribution of cocaine, in violation of Title 21, United States Code, Section 841(a)(1) and conspiracy to possess with the intent to distribute and distribution of cocaine, in violation of Title 21, United States Code, Section 846, with the intent to promote the carrying on of said specified unlawful activity, and that while attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

In violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and 2.

[nmt 20 yrs., nmt $500,000 or both, plus a mandatory term of at least three years supervised release, together with a mandatory special assessment of $50., see 18 U.S.C. Section 3013(a).]

COUNT 12

On or about August 16, 1993, in the Western District of Tennessee and elsewhere, the Defendants,

--------------------------CURTIS MCDONALD----------------------
---------------------------ALICE JOHNSON-----------------------
---------------------------JERLEAN MCNEIL----------------------
-----------------[redacted]---------------
AND
---------------------GARCERIAL DOTSON, A/K/A "TED"-------------

being aided and abetted, each by the other, and by Clemencia Angulo and Mose Williams, and others unknown to the Grand Jury, did knowingly cause, conduct, and attempt to conduct a financial transaction affecting interstate commerce; to wit, the transfer and payment of approximately $1.5 million dollars for cocaine, which involved the proceeds of a specified unlawful activity; that is, the possession with intent to distribute and distribution of cocaine, in violation of Title 21, United States Code, Section 841(a)(1) and conspiracy to possess with the intent to distribute and distribution of cocaine, in violation of Title 21, United States Code, Section 846, with the intent to promote the carrying on of said specified unlawful activity, and that while attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

In violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and 2.

[nmt 20 yrs., nmt $500,000 or both, plus a mandatory term of at least three years supervised release, together with a mandatory special assessment of $50., see 18 U.S.C. Section 3013(a).]

COUNT 13

On or about August 17, 1993, in the Western District of Tennessee and elsewhere, the Defendant,

--------------------------CURTIS MCDONALD-----------------------

being aided and abetted by Mose Williams and James Montana, and others unknown to the Grand Jury, did knowingly cause, conduct, and attempt to conduct a financial transaction affecting interstate commerce; to wit, the transfer and payment of approximately $87,000.00 for cocaine, which involved the proceeds of a specified unlawful activity; that is, the possession with intent to distribute and distribution of cocaine, in violation of Title 21, United States Code, Section 841(a)(1) and conspiracy to possess with the intent to distribute and distribution of cocaine, in violation of Title 21, United States Code, Section 846, with the intent to promote the carrying on of said specified unlawful activity, and that while attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

In violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and 2.

[nmt 20 yrs., nmt $500,000 or both, plus a mandatory term of at least three years supervised release, together with a mandatory special assessment of $50., see 18 U.S.C. Section 3013(a).]

COUNT 14

On or about December 11, 1993, in the Western District of Tennessee, the Defendant,

----------------------------MAURICE MONDIE----------------------

being aided and abetted by Cassell Brown and others unknown to the Grand Jury did knowingly cause, conduct, and attempt to conduct a financial transaction affecting interstate commerce; to wit, the transfer and payment of approximately $265,000 for cocaine, which involved the proceeds of a specified unlawful activity; that is, the possession with intent to distribute and distribution of cocaine, in violation of Title 21, United States Code, Section 841(a)(1) and conspiracy to possess with the intent to distribute and distribution of cocaine, in violation of Title 21, United States Code, Section 846, with the intent to promote the carrying on of said specified unlawful activity, and that while attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

In violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and 2.

[nmt 20 yrs., nmt $500,000 or both, plus a mandatory term of at least three years supervised release, together with a mandatory special assessment of $50., see 18 U.S.C. Section 3013(a).]

COUNT 15

From on or about September 27, 1991, up to and including September 30, 1991, in the Western District of Tennessee, the Defendant,

------------------------------ALICE JOHNSON------------------------

for the purpose of evading the reporting requirements of Section 5313(a) of Title 31, United States Code, and the regulations promulgated thereunder, did knowingly structure and cause to be structured and did assist in structuring a transaction with domestic financial institutions; that is, the purchase of two cashier's checks, in violation of Title 31, United States Code, Section 5324(a)(3), Title 31, Code of Federal Regulations, Section 103.11, and Title 18, United States Code, Section 2.

[nmt 5 yrs., nmt $250,000 fine, or both, plus a mandatory term of at least three years supervised release, together with a mandatory special assessment of $50., see 18 U.S.C. Section 3013(a).]

A TRUE BILL:

F O R E M A N

DATED: ______________

UNITED STATES ATTORNEY

A.G. FILE # W5580

NO. ~~94-01592~~

STATE OF TENNESSEE

Indictment for

T.C.A. 39-14-103

(SCATS - 21039)

Theft

VS.

ALFREDO B. SHAW

WITNESSES:
Summon for State

C. DYE, MPD/AUTO THEFT
EDWIN & FRANCIS MULLINS, P.O.BOX 314, LUONS, MS.
LARUTH COOK, 2721 FRAYSER
MICHELLE HARRIS, 4895 BRADY
VERONICA MOTTLEY, 4159 THE PLACE #4
DANNY ILUOBE, 1300 E. RAINS
CLVIN SHARPE, S., 1641 BRANCH WAY #2
G. BENNETT, L.B. ROSS, MPD
P. HARPER, MPD

C. DYE
Prosecutor

A TRUE BILL

Foreman of the Grand Jury

Date Indictment Returned: 2-24-94

# IN THE CRIMINAL COURT OF SHELBY COUNTY, TENNESSEE

Case Number: 94-01592 Count #: ______ Attorney for the State: K.R. Hardin
Judicial District: 30th Judicial Division: IX Counsel for Defendant: Ed Lewis

☒ Retained: ☐ Appointed: ☐ Public Defender

State of Tennessee
vs.
Defendant: Alfredo B. Shaw Alias: UK
Date of Birth: 3/14/66 Sex: M Race: B SSN: ______
From Indictment #: 94-01592 Warrant #: ______ TDOC #: ______

## JUDGMENT

Comes the District Attorney General for the State and the defendant with counsel of record for entry of judgment.
On the 28 day of May, 1996, the defendant: JUL 12 1996

| | |
|---|---|
| ☒ Pled guilty ☐ dismissal/nolle prosequi<br>☐ nolo contendere ☐ remand/transfer to other court<br>☐ retired/unapprehended defendant<br>Is found:<br>☐ guilty ☐ not guilty<br>☐ jury verdict ☐ not guilty by reason of insanity<br>☐ bench trial | Indictment: Class (circle one): 1st A B C D E ☒ Felony ☐ Misdemeanor<br>Offense: Theft over $1000<br>Amended Charge:<br>Offense date: 8-20-93 County: Shelby<br>Conviction offense: Theft over $1000<br>TCA #: ______ Sentence-imposed date: 5-28-96<br>Conviction class (circle one): 1st A B C (D) E ☒ Felony ☐ Misdemeanor |

After considering the evidence, the entire record, and all factors in T.C.A. Title 40, Chapter 35, all of which are incorporated by reference herein, the Court's findings and rulings are:

| | | |
|---|---|---|
| ☒ Sentence Reform Act of 1989<br>☐ Mitigated 20% ☐ Mitigated 30%<br>☒ Standard 30% Range I ☐ Multiple 35% Range 2:<br>☐ Persistent 45% Range 3 ☐ Career 60%<br>☐ Violent 100%<br>☐ 1st Degree Murder ☐ Multiple Rapist<br>☐ Repeat Violent Offender ☐ Child Rapist<br>☐ School Zone | ☐ Pre 1982 Sentence: ______<br>☐ 1st Degree Murder<br>☐ Sentence Reform Act of 1982<br>☐ 30% Range 1<br>☐ 35% Range 2<br>☐ 40% Range 2<br>☐ 1st Degree Murder | Concurrent with:<br>94-03193, 94 940159[4]<br>94-1540, 95-06064<br>95-09238, 96-01389-90<br><br>Consecutive to: |

Sentenced to: Sentence Length:

☐ TDOC ___ Years ___ Months ___ Days ___ Life ______ Life without Parole ______ Death
Mandatory Minimum Sentence (applicable to T.C.A. 39-17-417 in School Zone) ______

☒ Workhouse ☐ County Jail 4 Years ___ Months ___ Days ___ Hours ___ Week-ends ___ Periodic:(______)
Mandatory Minimum Sentence (applicable to T.C.A. 55-10-403; 55-50-504; 39-17-417; 39-13-513 and 39-13-514 in School Zone)
Period of Incarceration to be Served Prior to Release on Probation ___ Months ___ Days ___ Hours (Misdemeanors Only)
______% Minimum Service Prior to Eligibility for Work Release, Furlough, Trusty Status and Rehabilitative Programs (Misdemeanors Only)

☒ Probation ☐ Diversion 4 Years ___ Months ___ Days Effective: 4-3-97 Split confinement
☐ Community Based Alternative ___ Years ___ Months ___ Days ___ Hours ___ Week-ends
Specify:

Pretrial Jail Credit Period: from 10-8-93 to 4-5-94 from 5-30-94 to 7-4-94 or Number of Days: 359

| | |
|---|---|
| Court Ordered Fees and Fines 2-10-96 to 7-3-96<br>$ 210.50 Criminal Injuries Compensation Fund<br>$ ______ Supervision<br>$ ______ Child Support<br>$ ______ Court Costs<br>$ ______ FINE ASSESSED<br>The costs of this cause is accessed against the Defendant. | Restitution:<br>Victim Name ______<br>Address ______<br>Total Amount $ ______ $ ______ per month<br>☐ Unpaid Community Service: ___ Hours ___ Days ___ Weeks ___ Months<br><br>☒ The Defendant having been found guilty is rendered infamous. |

Special Conditions:

RECOMMENDED FOR:
ALCOHOL / SUBSTANCE ABUSE PROGRAM

Judg Exec. 7-3-96

Joseph B. Brown [signature] 5-28-96
Judge Judge's Signature Date of Entry of Judgment

[signature] [signature]
Attorney for State/Signature (optional) Defendant's Attorney Signature (optional)

ORIGINAL - CRIMINAL COURT CLERK
COPY - TN DEPT OF CORRECTION - MIS-SMS
COPY - SENTENCING COMMISSION
COPY - JAIL

[signature: Alfredo Shaw] 5-28-96
Defendant's Signature Date

[JS-AMEN.doc REVISED 12/20/95]

STATE OF TENNESSEE ) CRIMINAL COURT OF SHELBY COUNTY
SHELBY COUNTY ) JANUARY TERM, 1994

Count 1

THE GRAND JURORS of the State of Tennessee, duly selected, empaneled, sworn and charged to inquire for the body of the county of Shelby, Tennessee, upon their oath, present that:

ALFREDO B. SHAW

on August 20, 1993, in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully and knowingly obtain property, to wit: one (1) motor vehicle, all over the value of one thousand dollars but under the value of ten thousand dollars of the proper goods and chattels of Danny Iluobe without the effective consent of Danny Iluobe with intent to deprive the owner thereof, in violation of T.C.A. 39-14-103, against the peace and dignity of the State of Tennessee.

District Attorney General
30th Judicial District

A.G. FILE # W5580

NO. 94-01593

STATE OF TENNESSEE

Indictment for

T.C.A. 39-14-103

Theft (SCATS - 21039)

VS.

ALFREDO B. SHAW

WITNESSES:
Summon for State

C. DYE, MPD/AUTO THEFT
EDWIN & FRANCIS MULLINS, P.O.BOX 314 LUONS, MS.
LARUTH COOK, 2721 FRAYSER
MICHELLE HARRIS, 4895 BRADY
VERONICA MOTTLEY, 4159 THE PLACE #4
DANNY ILUOBE, 1300 E. RAINS
CALVIN SHARPE, SR., 1641 BRANCH WAY #2
G.BENNETT, L.B. ROSS, MPD
P. HARPER, MPD

C. DYE
Prosecutor

A TRUE BILL

H.W. Rob
Foreman of the Grand Jury

Date Indictment Returned: 2-24-94

# IN THE CRIMINAL COURT OF SHELBY COUNTY, TENNESSEE

Case Number: 94-05193 Count #: ____
Judicial District 30th Judicial Division IX

Attorney for the State K.R.Rardin
Counsel for Defendant E.L.Lewis

☒ Retained: ☐ Appointed: ☐ Public Defender

State of Tennessee
vs.
Defendant Alfredo B. Shaw
Date of Birth 3/14/66 Sex M Race B
From Indictment # 94-05193 Warrant # ____

Alias ____ UK
SSN ____
TDOC # ____

## JUDGMENT

JUL 12 1996

On the 28 day of May, 1996 Comes the District Attorney General for the State and the defendant with counsel of record for entry of judgment. the defendant:

☒ Pled guilty ☐ dismissal/nolle prosequi
☐ nolo contendere ☐ remand/transfer to other court
☐ retired/unapprehended defendant
Is found:
☐ guilty ☐ not guilty
☐ jury verdict ☐ not guilty by reason of insanity
☐ bench trial

Indictment: Class (circle one): 1st A B C (D) E ☒ Felony ☐ Misdemeanor
Offense Theft over $1,000.00
Amended Charge
Offense date 2/16/93 County Shelby
Conviction offense Theft over $1000
TCA #: Theft Sentence imposed date 5-28-96
Conviction class (circle one): 1st A B C (D) E ☒ Felony ☐ Misdemeanor

After considering the evidence, the entire record, and all factors in T.C.A. Title 40, Chapter 35, all of which are incorporated by reference herein, the Court's findings and rulings are:

☒ Sentence Reform Act of 1989
☐ Mitigated 20% ☐ Mitigated 30%
☒ Standard 30% Range 1 ☐ Multiple 35% Range 2
☐ Persistent 45% Range 3 ☐ Career 60%
☐ Violent 100%
☐ 1st Degree Murder ☐ Multiple Rapist
☐ Repeat Violent Offender ☐ Child Rapist
☐ School Zone

☐ Pre 1982 Sentence: ____
☐ 1st Degree Murder
☐ Sentence Reform Act of 1982
☐ 30% Range 1
☐ 35% Range 2
☐ 40% Range 2
☐ 1st Degree Murder

Concurrent with:
94-05192, 94
94-01594, 94-11540
95-06064 95-09237
96-01389-4 96-01390

Consecutive to:

Sentenced to: Sentence Length:

☐ TDOC ____ Years ____ Months ____ Days ____ Life ____ Life without Parole ____ Death
Mandatory Minimum Sentence (applicable to T.C.A. 39-17-417 in School Zone) ____

☒ Workhouse ☐ County Jail 4 Years ____ Months ____ Days ____ Hours ____ Week-ends ____ Periodic:( ____ )
Mandatory Minimum Sentence (applicable to T.C.A. 55-10-403; 55-50-504; 39-17-417; 39-13-513 and 39-13-514 in School Zone) ____
Period of Incarceration to be Served Prior to Release on Probation ____ Months ____ Days ____ Hours (Misdemeanors Only)
____ % Minimum Service Prior to Eligibility for Work Release, Furlough, Trusty Status and Rehabilitative Programs (Misdemeanors Only)

☒ Probation ☐ Diversion 4 Years ____ Months ____ Days Effective: 4-3-96 Split Concurrent
☐ Community Based Alternative ____ Years ____ Months ____ Days ____ Hours ____ Week-ends
Specify:

Pretrial Jail Credit Period: from 10-8-93 to 4-5-94 from 5-30-94 to 7-4-94 or Number of Days: 359
3-10-96 to 7-2-96

Court Ordered Fees and Fines
$26.50
Criminal Injuries Compensation Fund
$ ____ Supervision
$ ____ Child Support
$ ____ Court Costs
$ ____ FINE ASSESSED
The costs of this cause is accessed against the Defendant.

Restitution:
Victim Name ____
Address ____
Total Amount $ ____ $ ____ per month
☐ Unpaid Community Service: ____ Hours ____ Days ____ Weeks ____ Months

☒ The Defendant having been found guilty is rendered infamous.

Special Conditions:

RECOMMENDED FOR:
ALCOHOL / SUBSTANCE ABUSE PROGRAM
Judg Erec
7-3-96

Joseph B. Brown
Judge

Judge's Signature [signature]

5-28-96
Date of Entry of Judgment

Attorney for State Signature (optional) [signature]

Defendant's Attorney Signature (optional) [signature]

Defendant's Signature [signature]

5-28-96
Date

ORIGINAL - CRIMINAL COURT CLERK
COPY - TN DEPT OF CORRECTION - MIS-SMS
COPY - SENTENCING COMMISSION
COPY - JAIL

[JS-AMEN doc REVISED 12/20/95]

STATE OF TENNESSEE ) CRIMINAL COURT OF SHELBY COUNTY
SHELBY COUNTY ) JANUARY TERM, 1994

Count 1

THE GRAND JURORS of the State of Tennessee, duly selected, empaneled, sworn and charged to inquire for the body of the county of Shelby, Tennessee, upon their oath, present that:

ALFREDO B. SHAW

on August 16, 1993, in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully and knowingly obtain property, to wit: one (1) motor vehicle, all over the value of one thousand dollars but under the value of ten thousand dollars of the proper goods and chattels of LARUTH COOK without the effective consent of LARUTH COOK with intent to deprive the owner thereof, in violation of T.C.A. 39-14-103, against the peace and dignity of the State of Tennessee.

District Attorney General
30th Judicial District

A.G. FILE # W5580

NO. 94-01594

**STATE OF TENNESSEE**

Indictment for

T.C.A. 39-14-103

(SCATS - 21039)

Theft

VS.

ALFREDO B. SHAW

WITNESSES:
Summon for State

C. DYE, MPD/AUTO THEFT
EDWIN & FRANCIS MULLINS, P.O.BOX 314, LUONS, MS.
MICHELLE HARRIS, 4895 BRADY
VERONICA MOTTLEY, 4159 THE PLACE #4
DANNY ILUOBE, 1300 E. RAINS
CALVIN SHARPE, SR., 1641 BRANCH WAY #2
G. BENNETT. L. ROSS, MPD
LARUTH COOK, 2721 FRAYSER
P. HARPER, MPD

C. DYE
Prosecutor

**A TRUE BILL**

H.W. Rob
Foreman of the Grand Jury

Date Indictment Returned: 2-24-94

# IN THE CRIMINAL COURT OF SHELBY COUNTY, TENNESSEE

Case Number: 94-01594 Count #: ______ Judicial District 30th Judicial Division IX

Attorney for the State: [signature]
Counsel for Defendant: [signature]
☒ Retained: ☐ Appointed: ☐ Public Defender

State of Tennessee
vs
Defendant: Alfredo B Shaw
Date of Birth: 3-14-66 Sex: M Race: B
From Indictment #: 94-01594 Warrant #: ______

Alias: ______
SSN: UR
TDOC #: ______

## JUDGMENT

On the 28 day of May, 1996 came the District Attorney General for the State and the defendant with counsel of record for entry of judgment. the defendant:

☒ Pled guilty ☐ dismissal/nolle prosqui
☐ nolo contendere ☐ remand/transfer to other court
☐ retired/unapprehended defendant
Is found:
☐ guilty ☐ not guilty
☐ jury verdict ☐ not guilty by reason of insanity
☐ bench trial

Indictment: Class (circle one): 1st A B (C) D E ☒ Felony ☐ Misdemeanor
Offense: Theft over 1000 10,000 4121
Amended Charge:
Offense date: 4/7/93 County: Shelby
Conviction offense: Theft over 1000 $10,000 4121
TCA #: ______ Sentence-imposed date: 5-28-96
Conviction class (circle one): 1st A B (C) D E ☒ Felony ☐ Misdemeanor

After considering the evidence, the entire record, and all factors in T.C.A. Title 40, Chapter 35, all of which are incorporated by reference herein, the Court's findings and rulings are:

☒ Sentence Reform Act of 1989
☐ Mitigated 20% ☐ Mitigated 30%
☒ Standard 30% Range 1 ☐ Multiple 35% Range 2
☐ Persistent 45% Range 3 ☐ Career 60%
☐ Violent 100%
☐ 1st Degree Murder ☐ Multiple Rapist
☐ Repeat Violent Offender ☐ Child Rapist
☐ School Zone

☐ Pre 1982 Sentence: ______
☐ 1st Degree Murder
☐ Sentence Reform Act of 1982
☐ 30% Range 1
☐ 35% Range 2
☐ 40% Range 2
☐ 1st Degree Murder

Concurrent with:
94-01592-93
94-11540 95-06064
95-09238 96-01389-90

Consecutive to:

Sentenced to: Sentence Length:

☐ TDOC ____ Years ____ Months ____ Days ____ Life ______ Life without Parole ______ Death
Mandatory Minimum Sentence (applicable to T.C.A. 39-17-417 in School Zone) ______

☒ Workhouse ☐ County Jail 4 Years ____ Months ____ Days ____ Hours ____ Week-ends ____ Periodic:( ______ )
Mandatory Minimum Sentence (applicable to T.C.A. 55-10-403; 55-50-504; 39-17-417; 39-13-513 and 39-13-514 in School Zone) ______
Period of Incarceration to be Served Prior to Release on Probation ____ Months ____ Days ____ Hours (Misdemeanors Only)
____ % Minimum Service Prior to Eligibility for Work Release, Furlough, Trusty Status and Rehabilitative Programs (Misdemeanors Only)

☒ Probation ☐ Diversion 4 Years ____ Months ____ Days Effective: 4-3-97 Split concurrent

☐ Community Based Alternative ____ Years ____ Months ____ Days ____ Hours ____ Week-ends
Specify: ______

Pretrial Jail Credit Period: from 10/8/93 to 4/5/94 from 5/30/94 to 7/4/94 or Number of Days: 359
2-10-96 to 7-2-96

Court Ordered Fees and Fines:
$ 26.50 Criminal Injuries Compensation Fund
$ ______ Supervision
$ ______ Child Support
$ ______ Court Costs
$ ______ FINE ASSESSED
The costs of this cause is accessed against the Defendant.

Restitution:
Victim Name ______
Address ______
Total Amount $ ______ $ ______ per month
☐ Unpaid Community Service: ____ Hours ____ Days ____ Weeks ____ Months

☒ The Defendant having been found guilty is rendered infamous.

Special Conditions:

[stamp] Judg Exec 7-3-96

Joseph B. Brown
Judge

[signature] Judge's Signature

5 28 96
Date of Entry of Judgment

[signature] Attorney for State Signature (optional)

[signature] Defendant's Attorney Signature (optional)

[signature] Defendant's Signature

5 28 96
Date

ORIGINAL - CRIMINAL COURT CLERK
COPY - TN DEPT OF CORRECTION - MIS-SMS
COPY - SENTENCING COMMISSION
COPY - JAIL

[JS-AMEN.doc REVISED 12/20/95]

| | | |
|---|---|---|
| STATE OF TENNESSEE | ) | CRIMINAL COURT OF SHELBY COUNTY |
| SHELBY COUNTY | ) | JANUARY TERM, 1994 |

Count 1

THE GRAND JURORS of the State of Tennessee, duly selected, empaneled, sworn and charged to inquire for the body of the county of Shelby, Tennessee, upon their oath, present that:

ALFREDO B. SHAW

on August 17, 1993, in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully and knowingly obtain property, to wit: one (1) motor vehicle, all over the value of ten thousand dollars but under the value of sixty thousand dollars proper goods and chattels of Francis W. Mullins without the effective consent of Francis W. Mullins with intent to deprive the owner thereof, in violation of T.C.A. 39-14-103, against the peace and dignity of the State of Tennessee.

[signature]
District Attorney General
30th Judicial District

A.G. FILE # W5580

NO. 94-01595

STATE OF TENNESSEE

Indictment for

T.C.A. 39-14-103
T.C.A. 39-14-103

Theft
Theft

(SCATS - 21039)
(SCATS - 21039)

VS.

ALFREDO B. SHAW

WITNESSES:
Summon for State

C. DYE, MPD/AUTO THEFT
EDWIN & FRANCIS MULLINS, P.O.BOX 314, LUONS, MS.
LARUTH COOK, 2721 FRAYSER
MICHELLE HARRIS, 4895 BRADY
VERONICA MOTTLEY, 4159 THE PLACE #3
DANNY ILUOBE, 1300 E. RAINS
CALVIN SHARP, 1641 BRANCH WAY #2
G.BENNETT, L.B.ROSS, MPD
P. HARPER, MPD

C. DYE
Prosecutor

A TRUE BILL

[signature]
Foreman of the Grand Jury

Date Indictment Returned: 2-24-94

# IN THE CRIMINAL COURT OF SHELBY COUNTY, TENNESSEE

Case Number: 94-01595 Count #: ____ Attorney for the State: K.R. Carden
Judicial District: 30th Judicial Division: IX Counsel for Defendant: Ed Thomas

☒ Retained: ☐ Appointed: ☐ Public Defender

State of Tennessee
vs.
Defendant: Alfred OBShaw Alias ____
Date of Birth: 3/7/66 Sex: M Race: B SSN: UK
From Indictment #: ____ Warrant #: ____ TDOC #: ____

125837/5-28-96 125837

## JUDGMENT

JUL 12 1996

On the 28 day of May, 1996, came the District Attorney General for the State and the defendant with counsel of record for entry of judgment. the defendant:

☒ Pled guilty ☐ dismissal/nolle prosequi
☐ nolo contendere ☐ remand/transfer to other court
☐ retired/unapprehended defendant
Is found:
☐ guilty ☐ not guilty
☐ jury verdict ☐ not guilty by reason of insanity
☐ bench trial

Indictment: Class (circle one): 1st A B C (D) E ☒ Felony ☐ Misdemeanor
Offense: Theft of Property over $1000
Amended Charge: ____
Offense date: 10/7/93 County: Shelby
Conviction offense: Theft of Property over $1000
TCA #: ____ Sentence imposed date: 5-28-96
Conviction class (circle one): 1st A B C (D) E ☒ Felony ☐ Misdemeanor

After considering the evidence, the entire record, and all factors in T.C.A. Title 40, Chapter 35, all of which are incorporated by reference herein, the Court's findings and rulings are:

☒ Sentence Reform Act of 1989
☐ Mitigated 20% ☐ Mitigated 30%
☒ Standard 30% Range 1 ☐ Multiple 35% Range 2
☐ Persistent 45% Range 3 ☐ Career 60% ☐ Violent 100%
☐ 1st Degree Murder ☐ Multiple Rapist
☐ Repeat Violent Offender ☐ Child Rapist ☐ School Zone

☐ Pre 1982 Sentence: ____
☐ 1st Degree Murder
☐ Sentence Reform Act of 1982
☐ 30% Range 1
☐ 35% Range 2
☐ 40% Range 2
☐ 1st Degree Murder

Concurrent with: 94-01592-94
94-11348
95-09238
96-01389-90
95-06064

Consecutive to: ____

Sentenced to: Sentence Length:

☐ TDOC ____ Years ____ Months ____ Days ____ Life ____ Life without Parole ____ Death
Mandatory Minimum Sentence (applicable to T.C.A. 39-17-417 in School Zone) ____

☒ Workhouse ☐ County Jail 4 Years ____ Months ____ Days ____ Hours ____ Week-ends ____ Periodic:( ____ )
Mandatory Minimum Sentence (applicable to T.C.A. 55-10-403; 55-50-504; 39-17-417; 39-13-513 and 39-13-514 in School Zone) ____
Period of Incarceration to be Served Prior to Release on Probation ____ Months ____ Days ____ Hours (Misdemeanors Only)
____% Minimum Service Prior to Eligibility for Work Release, Furlough, Trusty Status and Rehabilitative Programs (Misdemeanors Only)

☒ Probation ☐ Diversion 4 Years ____ Months ____ Days Effective: SB CL. 397. Confinement

☐ Community Based Alternative ____ Years ____ Months ____ Days ____ Hours ____ Week-ends
Specify: ____

Pretrial Jail Credit Period: from 10-8-93 to 4-5-94 from 5-30-94 to 6-21-94 for Number of Days: 259

Court Ordered Fees and Fines 2-10-96 to 7-2-96
$ ____ Criminal Injuries Compensation Fund
$ ____ Supervision
$ ____ Child Support
$ ____ Court Costs
$ ____ FINE ASSESSED
The costs of this cause is accessed against the Defendant.

Restitution:
Victim Name ____
Address ____
Total Amount $ ____ $ ____ per month
☐ Unpaid Community Service: ____ Hours ____ Days ____ Weeks ____ Months

☒ The Defendant having been found guilty is rendered infamous.

Special Conditions:

ALCOHOL / ... Judg Exec 7-3-96

Joseph B. Brown
Judge

Judge's Signature 5-28-96
Date of Entry of Judgment

ORIGINAL - CRIMINAL COURT CLERK
COPY - TN DEPT OF CORRECTION - MIS-SMS
COPY - SENTENCING COMMISSION
COPY - JAIL

Attorney for State Signature (optional) Defendant's Attorney Signature (optional)

[JS-AMEN.doc REVISED 12/20/95]

Defendant's Signature 5-28-96
Date

STATE OF TENNESSEE ) CRIMINAL COURT OF SHELBY COUNTY
SHELBY COUNTY ) JANUARY TERM, 1994

Count 1

THE GRAND JURORS of the State of Tennessee, duly selected, empaneled, sworn and charged to inquire for the body of the county of Shelby, Tennessee, upon their oath, present that:

ALFREDO B. SHAW

on October 7, 1993, in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully and knowingly obtain property, to wit: one (1) motor vehicle, all over the value of one thousand dollars but under the value of ten thousand dollars of the proper goods and chattels of ANGELA WHITELAW without the effective consent of ANGELA WHITELAW with intent to deprive the owner thereof, in violation of T.C.A. 39-14-103, against the peace and dignity of the State of Tennessee.

District Attorney General
30th Judicial District

| | |
|---|---|
| STATE OF TENNESSEE<br>SHELBY COUNTY | ) CRIMINAL COURT OF SHELBY COUNTY<br>) JANUARY TERM, 1994 |

Count 2

THE GRAND JURORS of the State of Tennessee, duly selected, empaneled, sworn and charged to inquire for the body of the county of Shelby, Tennessee, upon their oath, present that:

ALFREDO B. SHAW

on October 7, 1993, in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully and knowingly exercise control over property, to wit: one (1) motor vehicle, all over the value of one thousand dollars but under the value of ten thousand dollars of the proper goods and chattels of ANGELA WHITELAW without the effective consent of ANGELA WHITELAW with intent to deprive the owner thereof, in violation of T.C.A. 39-14-103, against the peace and dignity of the State of Tennessee.

District Attorney General
30th Judicial District

This is the statement of: Charles Ray Smith Age: 25
DOB: 4-30-68 Sex: M Race: B Social Security #: 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
Home Address: 633 Pearce Home Telephone: 526-3604
Education: 11th grad Occupation: (School) Tech High School
Employed by: Address:
Work Telephone:

Next of kin/emergency: (Aunt - Jeannette Richardson) Telephone: 854-1120
Address: Sycamore Street, Collierville, TN Employed by:
Business Address: Work Telephone:

This statement is being taken at the Homicide Office, 201 Poplar, Room 11-21 on February 28, 1994 at 10:35 A.M..
Statement made to: Sgt. K.F. Free and Sgt. R.F. Wilkinson
Typed by: Elise C. Flowers

This statement is relative to the Missing Person Report of **Deloris Anderson,F/B 43** who was reported missing on **February 25, 1994** from **4520 Kerwin**, and which is filed under MPD File # 94-02-25-7239.

Q: Do you know Deloris Anderson, her son Marcellus Anderson, and Fred Tucker?
A: Yes.

Q: When is the last time you have either seen or talked to the above individuals?
A: Thursday evening, February 24th, at approximately 4:15 in the evening. I seen them, Marcellus and Fred Tucker on Dunlap Street, near Dunlap and Jackson.

Q: Describe the vehicle they were in?
A: A 1993 Grand Cherokee, white in color.

Q: Whose Cherokee is this?
A: Marcellus Anderson.

Q: Explain the circumstances that occurred the last time you seen Marcellus and Fred?
A: Marcellus was coming down Dunlap, and James Montgomery flagged him down, and told him to take him to the cleaners to get his clothes and take him out to Frayser, and Marcellus let Montgomery get into the truck with him, and Fred was in the truck, and they turned around, and went halfway down the street, and they stopped. Montgomery told his brother, Jonathan to get into the truck, and they left. This was about 4:30 P.M., and that was the last time I seen them.

C.S

And later on Friday morning, about 4:00 A.M., I received a phone call from "Baby Bro" and he asked me when was the last time I seen Marcellus and I told him about 4 o'clock that evening, and I asked him "why." He said, "because they just found Marcellus truck down in Mississippi, burnt up." He said he been beeping Marcellus, and want nobody call back, he said, Marcellus mother is missing too, and I asked him how he know. He told me that "White Boy" called him, and told him that he called Marcellus' mother and there was no answer, and "Baby Bro" told me he was going to call me back when he find out something else.

So he called me back about 30 minutes later, and asked me who else was in the truck with Marcellus, and I told him, "Fred Tucker." He asked me who else seen Montgomery get into the truck with Marcellus, and I told him, "Sean Anderson and Olive Anderson." I told Baby Bro to come around my house and pick me up, and I told him we gon' ride, and try to find out something.

So, we went over Fred Tucker's brother's house, to see was Fred at home, but nobody seen him, they said he was missing every since yesterday evening. So Andre Tucker got in the car with me and Baby Bro and Terrell Adair, and we rode around by James Montgomery's house. It appeared that there wasn't anyone there, and while we were riding, we called Sean Anderson on the phone, and Sean told Baby Bro that he seen Montgomery get in the truck with Marcellus last. And we went around Olive Anderson's house, and she told Baby Bro, the same thing. So, I told Baby Bro to just drop me off until he find out something else.

When I got home, I called down to Montgomery's house, just checking to see if he was at home, and Tony Carruthers answered the phone, and he asked me what I was doing up that early in the morning, and I told him to put James on the phone, and I told James, "did he know that Marcellus was missing," and he acted like he didn't want to talk, he just told me he would get back with me later on that evening, said when he get up, he was going to come back and talk with me. I hung up, I called my other friend, named Husan, and Husan wanted me to go to Juvenile Court with him, and since I was up, I told him I would be around there in about 5 minutes, and I told him I had just heard from Montgomery and Carruthers, and that Montgomery and Carruthers were up early that morning, and he asked me what was wrong with that, and I told him that Marcellus was missing, and Montgomery was the last person seen with him, and I told him I believe that they got Marcellus and his mother, and Fred, because of the way that they were

acting.

So, I left and went to Juvenile Court with Husan. Early that day, everybody was getting prepared to protect theirselves from Montgomery and Carruthers, because they said they wasn't going to let them snatch them up. The word was out that Montgomery and Carruthers wanted to get Baby Bro, Terrell Adair, and me (Charles Smith), so we got prepared with weapons.

We broke off, and I went to work that night, at Club River City, and as I was leaving the club, I got pulled over by the police, and the police arrested me.

Q: Since being in the jail, what have you heard in regards to Marcellus and his mother?
A: I heard that they found their bodies, and I also heard through a reliable resource that Montgomery and Carruthers called Baby Bro, and told him to give them one-hundred thousand dollars, in cash money, if they want to ever see Marcellus and his mother again, alive.

Q: Who told you this information about Montgomery calling Baby Brother?
A: "Big Gip", runs a pool hall on Dunlap and Mosby.

Q: Why would Montgomery kidnap Marcellus and Freddie?
A: Only reason I can think of is for money.

Q: Do you have any knowledge of Baby Brother and a person named Octavious Jackson, and also Fish robbing dope dealers in the Dunlap Street area?
A: No.

Q: Tell me what type of coats you have seen Marcellus Anderson wearing?
A: Wednesday, I was with Marcellus, and he had a black one on then, and Thursday, he had a black shirt on, I didn't see him with a jacket, but I was with him at the Mall when he bought a brown leather jacket.

Q: ~~Was~~ What (C.S.) is Montgomery's full name?
A: James Montgomery.

Q: How long have you known James Montgomery?
A: For about 14 years, since we were kids. We went to Training School together, and he was my Charge partner, on Receiving/Concealing charge.

Q: I am going to show you a color B of I photograph, with the number 0062736, and ask you who this individual is?
A: James Montgomery, nickname "Montgomery". He lives about 5 doors down the street from me.

Q: How long have you known Tony Carruthers?
A: I've known him for about 12 years. We used to run together as Juveniles, in a gang together, and we did time as juveniles and as adults together. Carruthers and Montgomery were cell partners, recently while we were in the penitentiary, and we had some words, and they said they were going to kill me when we get out on the street. Baby Bro came back and told me that Tony Carruthers told him that he got to hurry up and get some money, before Little Charles get some money, so he can have Charles killed. Because if Charles get some money before Carruthers do, Charles going to have Carruthers killed. That's what Carruther's told Baby Bro.

Q: Who is Little Charles?
A: That's me. When me and Carruther's used to talk, when we were locked up, he would tell me if he was going to get somebody, and rob them for some money, that he wasn't going to leave no witnesses. Cause he said if you don't have a body, you don't have a case.

Q: Charles, I am going to show you a color B of I photograph bearing the number 93173062 and ask you who this individual is?
A: Tony Carruthers.

Q: You said in your statement that Marcellus was possibly kidnapped for money. How much money would Marcellus have?
A: I do not know. He's bought a house.

Q: How does Marcellus earn his money?
A: Selling drugs.

Q: How does Fred Tucker earn his money?
A: Well, he still goes to school, and I really don't see that much of him, I can't say.

Q: What kind of weapons does Marcellus have?
A: I've never seen him with a weapon, except one time I was on Furlough, from jail and I seen him with a .9 mm

Q: What kind of weapons does Carruther's and Montgomery have?
A: I've never seen them with any weapons.

Q: Have you ever seen Carruther's and Montgomery dressed in military attire?
A: I haven't seen Montgomery dressed in it, but I have seen Carruther's. I heard that both of them were dressed in it (military attire) standing on the corner of Dunlap and Saffarans.

Q: Describe this clothing?
A: Green type camouflage, military clothing, with dark shades, gloves, black do rags around the head.

Q: How long have you known Jonathan Montgomery?
A: For about 14 years.

Q: I am going to show you a color B of I photograph bearing booking #92311098 and ask you who this individual is?
A: Jonathan Montgomery, alias, "LuLu"

Q: Have you seen Lulu since he got in the jeep with Marcellus on Thursday?
A: Yes. He came back around on Dunlap Street, Thursday about 5:00 P.M., and hung around for about 2 hours, asking for money. He asked me for $40 to pay his parole officer. I told him I did not have it. He said he would be back later on.

Q: When James Montgomery got in the jeep with Marcellus, what was he wearing?
A: A black leather jacket, blue jeans, some black and white high-top tennis shoes, a black and yellow hat with silver-plate on it.

Q: What type car does James Montgomery or Tony Carruthers have?
A: James Montgomery doesn't have a car, he drives his mother's turquoise-blue Skylark, about a '92 model. Tony Carruthers got a 4-door Buick Century, light-green, I'd say about an '82.

Q: I am going to show you a color B of I photograph bearing numbers 92336016 and ask you who this individual is?
A: I do not know.

Q: Is there anything else you can add to your statement that would aid us in this investigation?
A: I forgot to tell you about James Montgomery and Baby Bro had a slight conflict that Thursday morning, before Marcellus came up missing. James made threats toward Baby Bro, saying that he was going to kill him, and everybody that got anything to do with Baby Bro.

James told Baby Bro "if you want to go to war, I'll take you to war." He told Baby Bro, "if I felt that you wanted to do something to me, or even thought about it, or even dreamed about it, I'll kill you."

Q: Explain what James meant by going to war?
A: I couldn't exactly explain what he meant by going to war, but I guess it's ah, just going all out.

Q: Does going to war mean possibly mean kidnapping and killing people?
A: Yes, you could say that.

Q: Charles, can you read and write without the aid of eyeglasses?
A: Yes I can read and write.

Charles Smith
CHARLES RAY SMITH

2/28/94 11:55 A.M
DATE/TIME

94-02111
Appeals
~~98-00234~~
1#

Dear Honorable Judge Joseph Dailey

The reason why, I'am writing you is because I don't trust knowone and since 1995 as a state witness whom testified in open tech courtroom against the two defendants, Tony Carruthers and James Montgomery and my name was printed in the Commercial Appeal News papers. I've had to face alot of circumstances and challenges due to my involvment and knowone, knows my mental conditions; but me; because I get to receive the proper drug treatment; or mental conseling. What I'am about to say is the truth and I never thought I'll have to make this decision to talk with you; cause seems like someone within this Shelby County Justice Complex is trying to fix it; so I won't. I was told, back in 1995 and 1996 by Edward G. Thomas and Jerry Harris not to worry about anything; but back in 1994 I was sent to Hardeman County Prison in Whiteville, Tn. when I received Parole and Probation out at the Shelby County Penal Farm from when I testified as a state witness in 1995. It was like someone fixed it like that to have me killed. Cause until this day I don't over

2#

understand why wasn't I sent back to the Shelby County Penal Farm when the only thing I did was violate my Parole and Probation condition. I wrote a letter to the Public Defender in Division Two Criminal Court which was suppose to be her, telling her what I was facing and asking her why and who, had me sent to Prison when I Parole and received Probation while out at the Shelby County Penal Farm; later on I founded out; when I call the Court Clerk's office they got Mr. Edwin C. Lenow saying that he represented me at my violation of Probation hearing in Division Two; cause there's no way he could have represented me; cause I told the Judge in Division Two I didn't want Mr. Edwin C. Lenow representing me any longer; cause I didn't trust him after everything had happen to me in society with me loosing my job, family, friends, kids, as well as the challenges I've had in different situation due to my name been printed in the Commercial Appeal after my testimony was given in the Triple Murder Trial. I have abused drugs and everything else I can think of inorder to help cope with the kinda of life style I been

3#

happen to Cure, Murder to survive, I would never hurt anyone unless there trying to take my life. Due to my involvement as a state's witness against Tony Carothers and James Montgomery. I even tried to leave Memphis, Tn. I was followed by a informant all the way to Dyersburg, Tn. and set up for serving what was a 131 grams of wax now that charge has disappeared and none of my Court appointed lawyer want to deal with the case; or tell me what happen to it? The reason why I say this is because when I was arrested in Memphis by the O.C.U. the first thing the Detective B. Black of O.C.U. asked me was, wasn't you the one who was involved in the Triple Murder Trial against Tony Carothers and James Montgomery? This all happen March of this year on the 21 2000 since know one else has said anything else to me about that case at. After I was bonded out of Jail on a $5,000 dollar bond one of the brothers of the men who was working with O.C.U to set me up comes over to my mother's house and picks my brother Carroll Maze up and takes him to Rose Hill Cemetary and tells him to tell me he didn't have nothing to do

#5.

with me began 3rd gr. Before this I was put out of my mother's house and forced to live in the streets with nowhere to go and no one to trust I got real depressed and started back using drugs to cope with what I've been having to go through with since 1995 I thought about killing myself and everything; but I am not the kinda person who would do something like that to myself I got to many peoples seems like want me dead. Now what I am about to tell you is the mother of them all! Since I've been in this Shelby County Justice Complex from April 20, 2000 I was sent to four floor R-Pod someone have been going in my out going and in coming mail to Dyersburg, TN. So I wrote a complaint about it because I feel like someone within this Justice Complex is out to invade my privacy. I also caught a skin Disease in the showers while housed in four Floor R-Pod. along with other inmates complaining about the same thing. I wrote a complaint on the Medical Administrators Mr. Tony Cooper and the Jail Administrators concerning the lack of Medical treatment. I also wrote a letter to the

#5,

Fed's too; cause alot of things where getting out of hands and like I said I don't trust Everyone. And I feel someone was going to try and move me; cause I just had this feeling. I wrote the Fed's and told my mother in a package I sent home to her incase something happen to me behind what I'am about to finish. Anyways I was right Mr. Tony Cooper and Dr. Gerald Stephanie and this Jail Administration had me moved on 8/14/00 from four Floor & Pod to JMG-cell 1 on the second Floor and I was told it was for Medical observation; I saw the Dr. on 8/16/00 and was only given some cream to treat my rash the rash is gone; But what I can't understand why move me out of 41 inmates complaining about the lack of Medical treatment. When I first got down here on 8/14/00 I told the Sgt. and this officer Thompson that I didn't feel right where I was that I feared for my life nothing was done. Now on 8/25/00 I been stalked by this officer Thompson and I'am not gay. I was asked by this officer Thompson could he suck my dick and give a life sytle condom

#6.

which I still have. And I'am Afraid to say anything to anybody cause I don't trust these officers or knowone within this Justice System cause to many things have been happening to me. Officer Thompson asked me if I liked my but licked I told him I don't get down like that. Officer Thompson asked me did I like to be fucked in my ass I told him I don't get down like that. He has writen notes at my window and asked me to allow him to see my dick. I want to say something to somebody; but who can I trust? It's certain mail I can send out going certain places that I feel like knowone will notice. This Lt. Henderson of this Justice Complex come asked me; if I knew the Fed's sent the letter to them. He only had a copy of the original letter I wrote to them in case some-thing shoud happen to me. I'am writing you; cause I know; if I'am forced to defend myself it want be like I didn't tell knowone about this officer Thompson who's been trying to take advantage of me; under the circumstances I'am facing in this Justice Complex. I'am seeking your help Honorable Judge

7.

Joseph Darby, Now every body on the second Floor want to know what part did Alfarno Shaw have to do with the Triple Murder Trial; cause he to was housed down here on the second Floor before he made bond. But I wasn't moved down here until he made bond that's why I know something is wrong concerning everything someone is doing to do to I Jimmy L. Maze since my involvement back in 1995 as a state witness, why I don't know; but it's causing me to be very mental disturbed especially concerning this latest matter with this Correctional Officer Thompson

Sincerely Yours
Mr. Jimmy Lee Maze

P.S. I still have this life style condom officer Thompson give to me and told not to tell know body. I have know use for a condom in Jail or have know way of get one either.

→ over

Mr. Jimmy Lee Maze #00120949
201 Poplar Ave,
Memphis, Tn. 38103

MEMPHIS TN 381
PM
29 AUG
2000




Honorable Judge Joseph Daily
Division Five Criminal Court
201 Poplar Ave.,
Memphis, Tn. 38103

Official Business

38103+1945

I DIDN'T PUT TAPE ON HOLE "MAZE"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CURTIS McDONALD,<br>MITTY PALMER,<br>JERLEAN McNEIL and<br>ALICE MARIE JOHNSON,<br><br>Defendants. | ) | No. CR-94-20256-G<br><br>FILED<br>MAY 06 1998<br>ONARD GREEN C |

VOLUME XI

TRANSCRIPT OF TRIAL

BEFORE THE HONORABLE JULIA SMITH GIBBONS
and a jury

October 9, 1996

97-5187
97-519
97-5338
97-5339
97-5556

JOE N. MOORE
Official Reporter
1132 Federal Building
Memphis, Tennessee 38103

ORIGINAL

313 807

# I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Phillip Barnett | 2183 | | | |
| Boyd Newton Schaeffer | 2193 | 2225 | 2233 | |
| Mark Chism | 2234 | 2251<br>2252 | 2254 | |
| Michael Anthony Barnes | 2255 | 2310<br>2335 | 2339 | 2341<br>2346 |
| Andre Jordan Johnson | 2353 | 2394<br>2415<br>2420 | 2421 | |


# E X H I B I T S


| NO. | DESCRIPTION | ADMITTED |
|---|---|---|
| 92 | Bag of Cocaine | 2189 |
| 93 | Lab Report | 2190 |
| 94 | Map | 2199 |
| 95 | Money Counting Machine | 2209 |
| 96 | Electronic Scales | 2210 |
| 97 | BellSouth Mobility Records, 486-6138 | 2217 |
| 98 | Three Wire Transfer Records | 2220 |
| 99 | BellSouth Mobility Records, 493-4864 | 2222 |
| 100 | Cellular One Records, 481-5926 | 2222 |
| 101 | Cellular One Records, 481-6640 | 2223 |
| 102 | Cellular One Records, 481-4719 | 2224 |
| 103 | Cellular One Records, 481-6913 | 2224 |
| 104 | Black Nylon Bag | 2235 |
| 105 | Three Kilos of Cocaine | 2236 |
| 106 | DEA Lab Report | 2238 |
| 107 | Bag From Maurice Mondie's Apartment | 2240 |
| 108 | DEA Lab Report | 2240 |
| 109 | Photographs of Maurice Mondie's Apartment | 2242 |
| 110 | Ziploc Baggies from Maurice Mondie's Apartment | 2244 |
| 111 | Cellular One Bill, 483-0764 | 2245 |
| 112 | BellSouth Subscriber Information, 357-9218 | 2250 |
| 113 | Documents from Maurice Mondie's Apartment | 2251 |
| 114 | Best Western Registration | 2270 |
| 115 | Best Western Phone Records | 2276 |
| 116 | Holiday Inn Records | 2278 |
| 117 | Photograph of Marcos Antonio Lopez | 2287 |
| 118 | Photograph of Michael Barnes | 2293 |
| 119 | Holiday Inn Records | 2296 |
| 120 | Items on Michael Barnes | 2309 |
| 120A | Business Card of Michael Barnes | 2309 |
| 121 | Photograph of Cathy | 2380 |
| 122 | Photograph of Marcelia | 2380 |
| 123 | Photograph of Andre Johnson | 2381 |
| 124 | Photograph of Michael Holmes | 2381 |
| 125 | Nine Kilos of Cocaine | 2427 |
| 126 | DEA Lab Report | 2427 |

know about that.

JUROR DECARO: When I heard the name, I didn't think anything of it. I saw him, and I thought they're going to call him.

THE COURT: They have made a decision not to do that.

(Jury in at 3:38 p.m.)

THE COURT: What next?

MR. CANALE: Your Honor, the government calls Andre Johnson to the stand.

THE COURT: Did we do away with your two short witnesses in between?

MR. CANALE: One of them. Another one we're going to work in somewhere else.

THE COURT: In an effort to finish Mr. Johnson today?

MR. CANALE: Yes, Your Honor.

ANDRE JORDAN JOHNSON,

plaintiff's witness, sworn

DIRECT EXAMINATION

BY MR. CANALE:

Q Mr. Johnson, if you would pull that microphone towards you and make sure you speak into it, all right?

State your name, and spell your last name, please.

A Andre Jordan Johnson, J-O-H-N-S-O-N.
Q Mr. Johnson, you have been charged in the indictment here in the federal court here in the Western District of Tennessee, is that correct?
A Yes, sir.
Q And you were actually a named defendant in this case on trial here today, is that correct?
A Yes, sir.
Q You have entered a guilty plea, is that correct?
A Yes, sir.
Q And you have agreed to cooperate in this case?
A Yes, sir.
Q The government has agreed to make a 5K1 motion at the time you are ultimately sentenced, is that your understanding?
A Yes, sir.
Q In exchange for your cooperation you could receive a reduced sentence?
A Yes, sir.
Q Has anybody promised to you what your sentence will be?
A No, sir.
Q Now, in addition to this conviction that you now have on your record, you were also convicted back in 1991 in the Criminal Court of Shelby County, here in Shelby County, for

selling cocaine, is that correct?
A Yes, sir.
Q That was a felony offense as well?
A Yes, sir.
Q Let me ask you this. Did you go to jail back in 1991?
A Yes, sir.
Q How long did you serve back in 1991?
A I did three months and fifteen days.
Q That was over in the state system?
A Yes, sir.
Q Prior to 1991 you were in the cocaine business, correct?
A Yes, sir.
Q Do you know Curtis McDonald?
A Yes, sir.
Q Do you see Mr. McDonald in the courtroom here today?
A Yes, sir.
Q Please describe him, please.
A He has got the white shirt on, white sweater, sitting there, the black guy.
Q How long have you known Curtis McDonald?
A All my life.
Q How old are you, Mr. Johnson?
A I'm twenty five.

Q When you say you've known him all your life, how is it that you have known him all your life?
A We live on the same street together.
Q Which street is that?
A LaGrange.
Q What house did you grow up in, Mr. Johnson?
A 1022 and 1032.
Q You say 1022 and 1032, is that correct?
A Yes, sir.
Q Who lives in 1022?
A My brother lives in 1022.
Q Who lives in 1032?
A My mother lives in 1032.
Q So at various times did you live at one of the other house?
A Either or both of them.
Q Did Curtis McDonald at some point during your lifetime while you were living over there on LaGrange, did he also live on LaGrange?
A Yes, sir.
Q Does he have family that live on LaGrange?
A Yes, sir.
Q He doesn't live on LaGrange any longer, does he?
A No, sir.
Q Do you know where he lives now?

A Yes, sir.
Q Where is that?
A In Frayser.
Q Do you know the street?
A Whitney.
Q Now, when you got out of jail in 1991, did you continue your sale of cocaine?
A Yes, sir.
Q And when you got out of jail, who did you begin getting your cocaine from, Mr. Johnson?
A Mr. McDonald.
Q Curtis McDonald?
A Yes, sir.
Q Do you recall the first time you ever got cocaine from Curtis McDonald?
A Yes, sir, '91.
Q How much cocaine did you buy from him?
A A kilo.
Q Prior to that did you have other people you got your cocaine from?
A Yes, sir, Mose Williams.
Q I'm talking about prior to your arrest, talking about before your arrest in 1991, who did you get your cocaine from?
A Before my arrest?

Q Yes.
A Different guys, different other guys.
Q When you first began getting cocaine from Curtis, do you remember about when that was? You said '91. Do you remember when in '91?
A It was either the spring or the summer. The date I can't recall.
Q When did you get out of jail?
A April of '91.
Q So it would have been after April of '91?
A After April of '91.
Q When you first started getting cocaine from him, you said you got a kilo the first time, correct?
A Yes, sir.
Q Did you sell that kilo?
A Yes, sir.
Q How would you sell cocaine?
A I sold it in ounces.
Q What would you sell an ounce for?
A I believe it was going for $1,000.00 then, $1,000.00 or $900.00.
Q Anywhere from $900.00 to $1,000.00 an ounce?
A Yes, sir.
Q Are you familiar with the term, "cut""?
A Yes, sir.

Q Would you cut the cocaine that you got from Curtis McDonald?
A No, sir.
Q You would just sell it ounces just like they came off the block?
A Yes, sir.
Q What do you mean by the word, "cut"?
A Cut is when you take and add some imitation cocaine to the original cocaine and stretch and make more out of it.
Q So you can maybe turn a kilo into one and a half kilos if you had enough cut?
A Yes, sir.
Q How much were you paying for your cocaine when you first started getting it from Curtis McDonald?
A Twenty-five thousand.
Q $25,000.00?
A Yes, sir.
Q Did you continue through the spring and summer of 1991 buying cocaine from Curtis McDonald?
A Yes, sir, and then he started fronting it to me.
Q When you say he started fronting it to you, what do you mean?
A You know, he would give it to me on consignment, and I would pay at a later time.

Q So at first were you having to pay for it on the front?
A Yes, I was paying for it when I first started.
Q Did you ever talk to Curtis about who his source of cocaine was?
A Yes, sir.
Q And did he tell you where he was getting this cocaine?
A Houston, Texas.
Q Do you know Alice Johnson?
A Yes, sir.
Q She is not any relation to you, is she?
A No, sir.
Q Do you see Ms. Johnson in the courtroom today?
A Yes, sir.
Q Please point her out.
A The first female next to the guy, to Mr. Emmons with the purple suit on, the female with the black and white on.
Q When is the first time you met Alice Johnson?
A I met her in '92.
Q Do you remember where you met Ms. Johnson?
A Yes, sir.
Q Where was that?
A In front of McDonald's residence.
Q In front of Curtis' residence?

A His mother's residence.
Q Which street is that?
A LaGrange Street.
Q The street where you grew up?
A Yes, sir.
Q How did you happen to meet Ms. Johnson? What was she doing over at LaGrange Street?
A Talking to Ms. Palmer, Mitty Palmer.
Q You have mentioned Ms. Mitty Palmer. Do you know her, too?
A Yes, sir.
Q Do you see her in the courtroom?
A Yes, sir.
Q Where is she?
A Straight ahead. She has got on I believe a blue or black shirt with a brown coat on.
Q Were Ms. Johnson and Ms. Palmer together the first time you met Ms. Johnson?
A Yes, sir.
Q Did you know Ms. Palmer previous to that?
A Yes, sir.
Q Is she Curtis McDonald's sister?
A Yes, sir.
Q Were you aware that Ms. Johnson was in the cocaine business with Curtis McDonald?

A Yes, sir.
Q How did you know that?
A Because like after a month I had met her, I had a conversation with her on LaGrange Street.
Q What was that conversation about, Mr. Johnson?
A She stated that McDonald couldn't get no cocaine if it wasn't for her, because it was her people in Houston, Texas, and her niece was married to some cartel named Leo.
THE COURT: Did you get all that?
Q Slow down, Mr. Johnson.
THE COURT: Say that again.
A She had talked to me. We was out there talking on LaGrange Street, and she told me, said the commission that McDonald had --
Q When you say McDonald, you are referring to Curtis, right?
A Curtis, yes. Said that he couldn't get no cocaine unless it was for her, because it was her people. Her niece was married to one of the cartel named Leo.
Q Did you know that the cocaine was coming in through Alice Johnson?
A I didn't know until she had told me.
Q Who would you get, during 1991 when you first started getting cocaine, who were you actually getting it from?
A Who was delivering it or -- Who was delivering

cocaine?
Q Who did you go to to buy a kilo or order up a kilo from?
A Curtis.
Q And would he actually bring it to you, or somebody else bring it to you?
A Somebody else would bring it to me.
Q Who was that?
A Mose Williams.
Q Mose Williams?
A Yes.
Q How long have you known Mose Williams?
A I just had met him in probably '91.
Q Was Mose Williams a friend of Curtis?
A Yes, sir.
Q Did he work for Curtis?
A Yes, sir.
Q What kind of work did he do for Curtis?
A He was a runner.
Q A runner?
A Yes.
Q What do you mean by the term runner?
A You know, he was the one dropped the drugs off, delivered the drugs.
Q Mr. Williams, was he a drug user?

A Yes, sir, he smoked crack.
Q Let me ask you this, Mr. Johnson. Did you ever meet a man by the name of Paul Duventre?
A Yes, sir.
Q Did he work for Curtis?
A Yes, sir.
Q What did he do for Curtis?
A He was a runner, too.
Q How do you know that?
A Through Curtis.
Q Did you ever meet Paul Duventre?
A Yes, sir.
Q Did you know he got arrested?
A Yes, sir.
Q How do you know he got arrested?
A Through Mr. McDonald.
Q What did Mr. McDonald tell you about Mr. Duventre's arrest?
A Told me Mr. Duventre tried to bring some cocaine back from Houston in some tar buckets when he should have just drove the car, and Mr. Duventre had got arrested in Houston.
Q Had you ever gotten cocaine on any of these shipments that Mr. Duventre had driven up?
A Yes, sir.

Q Do you recall when that was when Mr. Duventre got arrested?
A I believe it was in '92 sometime.
Q When Mr. Duventre got arrested, how many kilos -- Were you still getting cocaine from Curtis?
A Yes, sir.
Q How many kilos were you getting at a time?
A I didn't get but one that day at the time I did get one when Duventre was present.
Q So there was actually a time when you actually got a kilo from Duventre?
A Yes, sir.
Q I guess what my question was, Mr. Johnson, by the time he got arrested, which was some time in 1992, you said, how many kilos of cocaine were you getting from Curtis McDonald, say in a month's time period?
A I guess about twelve, ten or twelve, something like that.
Q You had actually moved up?
A Yes, sir.
Q In the business, is that correct?
A Yes, sir.
Q Did you have people that worked for you?
A Yes, sir.
Q Who were some of those people?

A Friends of mine. Darryl.
Q Do you know a guy named Turrell Adair?
A Yes, sir.
Q Is he a friend of yours?
A Yes, sir.
Q Did you sell cocaine to him?
A Yes, sir.
Q What about Michael Shea Holmes?
A Michael Holmes.
Q Did he sell cocaine with you?
A Yes, sir.
Q After Mr. Duventre got arrested, did you know how they were getting the cocaine to Memphis once he got arrested?
A Once Mr. Duventre had got arrested, then they were getting the cocaine -- The cocaine was coming to Memphis then, it was coming through -- You say after he had got arrested?
Q After he was arrested, did you continue to get cocaine from Curtis McDonald?
A Is this in '92 or '93?
Q Well, say in '93.
A Yes, sir.
Q How was the cocaine getting to Memphis? Did Curtis hire anybody else to drive for him?

A Yes, sir.
Q Who was that?
A Mose Williams and a dude named Garcerial Dotson, named Ted.
Q Do you know Ted?
A Yes.
Q How do you know Ted?
A Through Curtis.
Q Do you know how they were getting the cocaine to Memphis?
A Yes, sir.
Q How was that?
A Driving a brown Nissan station wagon.
Q Did you ever see that car?
A Yes, sir.
Q Where did you see that car?
A On LaGrange Street.
Q The same street where Curtis and you grew up?
A Yes, sir.
Q Do you know when Mose Williams and when Ted started bringing cocaine to Memphis, do you know where the cocaine was being stored?
A Yes, sir.
Q Where was it being stored?
A In Ms. McNeil's house.

Q When you say Ms. McNeil's house, who do you refer to?
A Ms. Jerlean McNeil.
Q Do you see her in the courtroom?
A Yes, sir.
Q Would you please describe her?
A She have on the white sweater and like a black and green dress.
Q Had you ever been to her house?
A No, sir.
Q Did Curtis ever tell you where her house is?
A No, sir.
Q Is there any reason why you were not allowed to know where this house is, Mr. Johnson?
A I guess they thought I was going to rip them off.

MR. WILSON: Judge, I object to his guesses.

THE COURT: Not your speculation about it. If it's based on something that was said to you, you can testify about that.

A Yes, they thought I was going to --

MR. WILSON: Judge, that's exactly --

THE COURT: Mr. Johnson, if that's just the reason you thought they didn't tell you, you can't say what you thought their reasons were, but, for example, if someone said something to you about why you couldn't know the location of the house, then that might be admissible,

depending on who said it to you.

MR. CANALE: I'll ask another question, Your Honor.

THE COURT: All right.

Q Mr. Johnson, in your career as a cocaine trafficker did you ever rob other cocaine dealers?

A Yes, sir.

Q That's something you did often?

A Yes, sir.

Q Did you have a reputation for being that kind of person?

A Yes, sir.

Q So you never went to Ms. McNeil's house, is that correct?

A No, sir.

Q How do you know they were storing it at her house?

A Through Mr. McDonald.

Q What did you know about this house? Did you know where it was?

A No, sir.

Q But you knew the name?

A Yes, sir.

Q Did you ever meet Ms. McNeil?

A Yes, sir.

Q How did that come about?

A Through Mr. McDonald.
Q Tell me about that.
A I had to sell four kilograms of cocaine one day, and I asked Mr. McDonald did he have them, and he told me he had, and it was hard for me to get them right then, but I told him I had some people due from Arkansas waiting on four kilos.
Q You're going too fast.
A That's the way I talk. I had a dude named John from Marked Tree, Arkansas, waiting on me, and, so, he called Ms. McNeil, and I met her on Elvis Presley.
Q Where did you meet her on Elvis Presley?
A At a Chinese restaurant.
Q Is that normally how you did business with Curtis McDonald?
A No, sir, I had never did that before.
Q Explain again why was there this rush on this particular day?
A Because Mr. McDonald was at the dog track, and he didn't have nobody to come over.
Q Who was this person you were meeting with?
A The guy that I was going to take the cocaine to?
Q Yes?
A A dude named John from Marked Tree, Arkansas.
THE COURT: Did you give a last name?

THE WITNESS: No. I didn't know his last name.
THE COURT: A dude named John from Marked Tree, Arkansas? Is that what you said?
THE WITNESS: Yes, ma'am.
Q Was he in town?
A Yes, sir.
Q How much cocaine were you going to sell to this guy from Marked Tree?
A Four kilos.
Q Did you get the four kilos that day?
A Yes, sir.
Q Who delivered them to you?
A Ms. McNeil.
Q Is that the first time you ever met her?
A Yes, sir.
Q Did you sell the four kilos you got from Ms. McNeil to this guy named John?
A Yes, sir.
Q What did you do with the money?
A I had later on that evening paged Curtis and told him what did he want me to do with the money, and he told me he wanted me to go pay Ms. Alice Johnson the money.
Q Did you take the money to Alice Johnson?
A Yes, sir.
Q Where was that?

A On Covington Pike at the Amoco service station.
Q Gas station?
A Gas station.
Q How much money did you pay Ms. Johnson, do you recall?
A I think around ninety-six thousand.
Q $96,000.00?
A Yes.
Q If you would buy kilos from Curtis for twenty-five thousand, how much would you usually make off a kilo?
A I would make $1,500.00 to $2,000.00 if I sell it like it is.
Q What if you broke it down and sold ounces or quarter kilos, half kilos?
A Probably make about thirty-two off each one.
Q $3,200.00?
A Yes, 3,200.
Q You were doing quite well in the cocaine business, were you not, Mr. Johnson?
A Yes, sir.
Q You drive nice cars?
A Yes, sir.
Q Did you have a nice place to live?
A Yes, sir.
Q Did you know that Mose Williams got arrested?

A Yes, sir.
Q How did you learn about that, Mr. Johnson?
A The day that he had got arrested Mr. McDonald paged me and told me.
Q He did what?
A Paged me and told me, placed 911 on my pager and told me.
Q Placed 911 in your pager?
A Yes, sir.
Q What is 911? Is that something you put in the pager?
A An emergency callback.
Q Did you meet with Curtis that day?
A Yes, sir.
Q Where did you meet with him?
A At a duplex on LaGrange Street.
Q Do you remember what time of day that was?
A I believe it was in the afternoon.
Q Who all was there? Was it just you and Curtis McDonald.
A No, it was me, Curtis and Alice Johnson.
Q Did Mr. McDonald tell you why Mr. Mose Williams had been arrested?
A He said it was seventy-five kilograms of cocaine.
Q Why did he want you to know that Mose had been arrested?

A He just told me. He told me that. Said they had been out on the highway and seen Mose Williams in the wagon, and Mose Williams turned his head and told them to get away, he had been busted.
Q Was Mose Williams the person who you were getting your cocaine from during this time frame?
A Yes, sir.
Q After that event did you see Mose Williams, after hearing that he had been arrested?
A Yes, sir.
Q When did you see Mose Williams?
A I seen him the next following day.
Q Where did you see him the next day?
A On Breedlove.
Q Where is Breedlove?
A Around the corner from my house.
Q Is that like one block over, or where is that in relation to LaGrange?
A It's around the corner, but it's like two blocks up around the corner.
Q Where was Mose when you saw him on Breedlove?
A Over at a guy's house by the name of Rip.
Q How did you know that Mose was at Rip's house?
A Because Rip came around on the street and told McDonald to come around and talk to Mr. Williams because

Mr. McDonald sent me around there to talk to him.
Q Again, you're referring to Curtis?
A Yes, sir.
Q Why didn't Curtis want to go meet with Mose?
A He sent me to go meet with Mr. Williams. He told me to give Mr. Williams $1,000.00 and trail Mr. Williams out of town.
Q Give him $1,000.00?
A Yes, sir.
Q Why did he want to give Mose $1,000.00?
A To leave town, I guess, so he wouldn't talk to the police officers.
Q Did he tell you why he didn't want to go meet with Mose and pay him this $1,000.00 himself?
A Yes.
Q Why was that?
A He said just in case he get wired up or something.
Q Wired up?
A Yes.
Q What do you mean by wired up?
A Wired so he can be recorded or something. He said he didn't want to talk to him.
Q In case he was working with the police?
A Yes, sir.
Q Did you in fact go and meet with Mose Williams?

A Yes, sir.
Q Did you pay him any money?
A Yes, sir.
Q How much money did you pay him?
A $1,000.00.
Q Did you tell him he had to get out of town like Curtis told you to?
A Yes, sir, to trail him to the expressway. When he got on the expressway, he ran off and left me, and I don't know where he went to.
Q He took off and left you?
A Yes.
Q You didn't follow him out of town?
A No, sir.
Q Let me ask you this, Mr. Johnson. After Mose Williams got arrested, did you continue to get cocaine from Curtis McDonald and Alice Johnson?
A Yes, sir.
Q Let me ask you this. Who were some of the people that brought cocaine, who were driving and delivering cocaine after Mose Williams got arrested?
A A dude by the name of Rambo.
Q A guy by the name of Rambo?
A Yes.
Q Did you ever meet this person, Rambo?

A Yes, sir.
Q Did Mr. Rambo have any unusual physical characteristics?
A Yes, he was a handicapped guy.
Q Describe how he was handicapped.
A He had been shot up. He had been shot up.
Q And how was he handicapped is what I'm asking?
A One leg, crippled in one leg, and couldn't barely see out of one of his eyes and could barely walk.
Q Where was Rambo from, do you know?
A Houston, Texas.
Q Did you ever meet Rambo?
A Yes, sir.
Q Did Rambo come to Memphis?
A No, sir, West Memphis, Arkansas.
Q Did he bring anybody with him?
A Yes, sir.
Q Who was that?
A A guy by the name of Michael Barnes.
Q Did you ever meet Michael Barnes?
A Yes, sir.
Q Did you ever get cocaine from those two individuals?
A Yes, sir.
Q Where did you get the cocaine from these two individuals?

A Down in a motel in West Memphis, Arkansas.
Q Did you go with anybody on these trips to pick this cocaine up?
A Yes, sir.
Q Who?
A Mr. McDonald.
Q Curtis McDonald?
A Yes, sir.
Q By the way, what kind of car did Curtis McDonald have back during that time frame?
A He had a Lexus and a Toyota 4Runner.
Q What kind of Lexus did he have?
A GS300.
Q What color was it?
A Black.
Q Was it shiny?
A Yes, sir.
Q Metallic black?
A Yes, sir.
Q Dark car?
A Yes, sir.
Q What about his Toyota 4Runner?
A It was white.
Q Two door or four door?
A Four door.

Q Did you ever ride in it?
A Yes, sir.
Q Do you remember what color interior it had?
A Blue.
Q Did it have any stripes or anything on it?
A I think it had a blue stripe down the side.
Q Other than Rambo, did you ever pick up cocaine -- With Rambo and Michael Barnes. Did you ever pick up cocaine from any other people that were bringing it here to Memphis or Arkansas?
A Yes, sir.
Q Who was this?
A Another Hispanic lady named Cathy. She was black, and another Hispanic lady named Marcelia.
Q A Spanish lady by the name of what?
A Marcelia.
Q Marcelia?
A Yes.
Q Describe Marcelia.
A She's a fat Spanish lady. She looks almost white, and wears glasses.
Q What about Cathy, what did she look like?
A She was a black Spanish lady, kind of tall and had braids in her hair.
Q Would you recognize those individuals if I showed you

a picture?
A Yes.
Q Let me hand you, if I could, a picture and ask you if you recognize that picture (passing photograph to the witness). It's not a very good picture. Do you recognize that person?
A Yes, sir.
Q Who is that?
A Cathy.
Q Is that the lady you mentioned earlier?
A Yes, sir.
Q Let me hand you another picture and ask you if you recognize that (passing photograph to the witness)?
A That's Marcelia.
Q Marcelia?
A Yes, sir.

MR. CANALE: Your Honor, if I could have Cathy's picture numbered as the next exhibit, followed by the picture of Marcelia.

(Said photographs were marked Trial Exhibits Numbers 121 and 122 respectively and admitted into evidence.)

Q I hand you two other pictures and ask you if you recognize that picture (passing photographs to the witness)?

A Yes, sir.
Q Who is that?
A Me.
Q What about this picture?
A Michael Holmes.
Q That is the person you mentioned earlier, I believe, is that correct?
A Yes, sir.
MR. CANALE: Your Honor, if I could have the picture of Mr. Johnson marked as the next exhibit, followed by the picture of Mr. Holmes.
(Said photographs were marked Trial Exhibit Numbers 123 and 124 respectively and admitted into evidence.)
Q Let me ask you this, Mr. Johnson. How many occasions did you meet Cathy and Marcelia?
A Several occasions.
Q Where would you usually meet Cathy and Marcelia?
A In West Memphis, Arkansas.
Q At hotels?
A At hotels.
Q Did they always come to the same hotel?
A No, sir.
Q Did Cathy come by herself?
A No, sir.

Q Who would she usually come with?
A She would come with Marcelia or Rambo.
Q Marcelia or Rambo?
A Yes, sir.
Q What about Marcelia, who would she travel with, or would she travel by herself?
A Marcelia came by herself before. She would usually come with Cathy.
Q When you would meet these people in West Memphis, Arkansas, what was your job, Mr. Johnson?
A Driving cars back.
Q Who would give you the instructions to drive these cars back?
A Curtis McDonald.
Q Where would you drive the car back to?
A LaGrange Street.
Q Was there a place on LaGrange Street where you would deliver these cars to?
A Yes, sir.
Q Where is that?
A It's not the driveway on the side of my mom's house, but the driveway between my mom's house and his mom's house. You could drive all the way back up in there and park the car.
Q In the back yard?

A Yes.
Q Who lived in that house between there?
A An old lady, and when she had died, she gave the house to her son. Her name was Ms. Leora.
Q Was that a safe place?
A Yes, sir.
Q How long would you leave the cars there?
A Until somebody else would come pick the cars up after they get the key from Mr. McDonald.
Q Would the cocaine be unloaded right away?
A Sometimes it would, and sometimes it wouldn't.
Q During this time period did you ever learn that an individual by the name of Michael Barnes, who I believe you mentioned earlier, had been arrested?
A Yes, sir.
Q I believe that was on April 27, 1994, is that correct?
A Yes, sir.
Q Do you know who also was arrested on that date?
A Michael Holmes.
Q Did you know or did you actually participate in that event?
A Yes, sir.
Q That led to the arrest?
A Yes, sir.

Q Tell us how that event began, Mr. Johnson.

A The event began, Mr. McDonald asked me would I drive to go down to Houston and bring back ten kilograms of cocaine. Originally ten kilograms of cocaine, and ended up nine, and I told him no. He said did I know anybody that would drive. He said he was willing to pay.

Q Slow down, Mr. Johnson. It's not a race. Are you nervous?

A No, sir.

Q Slow down.

Q He asked me would I drive the car from Houston, Texas, with the kilograms and I told him no, sir. He asked me did I know anybody that could who wouldn't run off with it and would drive the car. I said I would talk to a friend of mine. I asked one of my friends, Turrell Adair, and he said he wouldn't drive. I asked Michael Holmes, and he said he would drive if they would pay him $1,000.00 a kilo. So Michael Holmes agreed to drive the car. He agreed to drive the car, and we met, and I told him what Curtis McDonald told me.

Q Let me stop you there. Did Mr. McDonald tell you why he needed somebody to drive to Houston and why these people from Houston weren't coming up to West Memphis like they normally would?

A He didn't give me no exact reason.

Q So did you call Michael Holmes?
A Yes, sir.
Q Did he agree to do this?
A Yes, sir.
Q Tell us what happened.
A So we went to his duplex, and me and Michael Holmes was in my cousin's car. We got $200,000.00 from Mr. McDonald, and then he gave Mr. Holmes some keys to a Chevrolet Beretta, and he told us where the car was located.
Q Where was it located?
A In the Peachtree Apartments in Frayser.
Q Did you and Michael Holmes go get that car?
A Yes, sir.
Q Did you take the cash with you?
A Yes, sir.
Q And what did you do when you found this car?
A Mr. Holmes got in the car.
Q Where did he take the car?
A We went to the Country Squire Apartments in Cordova on Germantown Parkway.
Q Who lived out there?
A Turrell Adair.
Q Turrell Adair did?
A Yes, sir.

Q When you got out to the Country Squire Apartments, what did you do?
A When we got to the Country Squire Apartments, we loaded the car and loaded the money inside the car.
Q Then who was going to drive the car down to Houston?
A Mr. Michael Holmes.
Q And did he leave?
A Yes, sir.
Q Did he make it to Houston?
A Yes, sir.
Q And did you speak with him at all while he was in Houston?
A Yes, sir.
Q And what happened next? What was your next involvement after he got to Houston?
A He paged me and paged Mr. McDonald and told us he had made it to Houston safe, and the next thing I ever heard back from him was en route back to Memphis.
Q I missed that.
A He paged me and Mr. McDonald that he made it to Houston, and I had heard nothing since from him until he was back en route to Memphis.
Q What happened next?
A So it came on, a guy by the name of Michael Barnes paged me.

Q Michael Barnes paged you?
A Yes, sir.
Q Did he have your pager number?
A Yes, sir.
Q When he paged you, what happened?
A He told me that Michael Holmes was en route to his house with the car. Said he was back from Houston.
Q Did you know at that time that Michael Holmes and Michael Barnes had been arrested by the Arkansas State Police?
A No, sir.
Q Where did Mr. Holmes come and find you?
A Where did Mr. Holmes find me?
Q Yes.
A He paged me.
Q Where did he say he was?
A He said he was at home.
Q Where was that?
A On Woodlawn Street.
Q Is that near LaGrange?
A It's about five blocks over.
Q Did you meet Mr. Holmes that day?
A Yes, sir.
Q Where'd you go, to Woodlawn?
A Yes, sir.

Q What happened when you got over there?
A When we got over there, he came out of the house, and he was shaking and acting real strange. Had something like a pager on his side.
Q He had a pager on his side?
A Some type pager. He just told me, said, "Don't go. Don't bother the car. The police watching the car," so I left.
Q You left?
A Yes.
Q He tipped you off, in other words?
A Yes, sir.
Q Where did you go?
A On LaGrange Street.
Q When you got to LaGrange, who did you talk to?
A Mr. McDonald.
Q Where was he?
A On LaGrange.
Q Where?
A At his duplex.
Q You keep mentioning this duplex. What is the address of the duplex?
A I think it's 1035 LaGrange.
Q Did Mr. McDonald spend a lot of time there?
A Yes, sir.

Q What did you and Mr. McDonald talk about?
A Mr. Holmes was arrested, Michael Holmes.
Q What did you all decide to do now that you knew they had been arrested in trying to deliver this cocaine?
A We didn't talk to them.
Q Didn't talk to who?
A Michael Holmes.
Q What happened to the car, do you know?
A Michael Holmes came around on our street with the car. He knocked on my mom's door first and asked me was I there. My mom told him to leave the house. He went to Mr. McDonald's house and asked for Mr. McDonald.
Q Where were you?
A Me and Mr. McDonald, we was in another man's house down the street watching.
Q You were watching all this?
A Watching, over at a guy whose name was Mr. Williams' house.
Q Did eventually Mr. Holmes and Mr. Barnes, did that deal end? You were not arrested, is that correct?
A No, sir.
Q The police never talked to you that day?
A No, sir.
Q That was in April of 1994, correct?
A Yes, sir.

Q Did you continue your cocaine business after April of 1994 when this happened?
A Yes, sir.
Q Now, the cocaine that was contained in the car that Michael Barnes and Michael Holmes were driving up here, you said it was supposed to be ten kilos, is that correct?
A Yes, sir.
Q Who was that cocaine coming to?
A Mr. McDonald.
Q Were you going to get any of that cocaine?
A Yes, sir.
Q How much were you going to get?
A Two kilos.
Q He was going to get the other seven?
A Yes, sir.
Q After that occurred, you continued to cocaine deal, correct?
A Yes, sir.
Q Who were you getting cocaine from after April of 1994, after Michael Barnes had been arrested?
AA From Mr. McDonald.
Q Did you ever have any other occasions after April of '94 to meet any of these Colombians or people from Houston?
A Yes, sir, Ms. Marcelia.
Q Marcelia?

A Yes.
Q The lady whose picture, she kept coming?
A Yes, sir.
Q Anybody else?
A Cathy.
Q Again, the same lady you identified?
A Yes, sir.
Q How often were Marcelia and Cathy coming up with cocaine?
A They came on several occasions.
Q Excuse me?
A Several occasions.
Q Let me ask you this. In September of 1994 did you learn that Curtis McDonald and Alice Johnson had been arrested?
A Yes, sir.
Q How did you find out about that, Mr. Johnson?
A Through a guy by the name of Jack, real name Travis Chaffin.
Q Travis Chaffin?
A Yes.
Q You call him Jack?
A Yes.
Q Is that his street name?
A Yes, sir.

Q Do you know an individual by the name of Donald Chaffin?
A Yes, sir.
Q Is he related to Travis Chaffin?
A Yes, sir.
Q How are they related?
A Don was Travis' uncle.
Q Did Donald and Travis Chaffin work for Curtis McDonald?
A Yes, sir.
Q What kind of work did they do for Curtis McDonald?
A Don, he didn't do no drugs. He would get telephones and pagers in his name and rent hotel rooms.
Q Kind of a gofer for Curtis, is that right?
A Yes, sir.
Q What about Travis?
A Travis was a runner.
Q You mentioned that term earlier. Is that a person that would make trips?
A Yes, sir.
Q Did Travis Chaffin make trips to pick up cocaine for Curtis McDonald?
A Yes, sir.
Q Did you speak to Mr. McDonald about his arrest?
A Yes, sir.

Q What did he tell you?
A He said he had took Mr. Chaffin over to Holiday Inn on Poplar right at I-240 and said Mr. Chaffin got out of his truck and went up to the hotel room and got the keys to the car from Marcelia.
Q Marcelia, the same lady you had met on many occasions?
A Yes, sir, and said Mr. Chaffin got the keys from her and drove off, and said as they were driving off, he told us that Jack had noticed surveillance, like they was trying to block him in.
Q What happened?
A So he pulled -- Mr. McDonald said that Mr. Chaffin pulled the car and got away, and they arrested him --
THE COURT: Wait a minute. Replay that for us.
Q Speak up, Mr. Johnson. Slow down.
A He said that Mr. Chaffin abandoned the car.
Q Call him Jack.
A Jack abandoned the car, and Mr. McDonald was placed under arrest, but he said Jack had got away.
Q Mr. McDonald told you he had been arrested, but Travis Chaffin, also known as Jack, had got away, is that what you said?
A Yes, sir.
Q I believe, Mr. Johnson, that their arrest occurred on

September 14, 1994, does that sound right?
A Yes, sir.
Q And about two weeks after that is when you were arrested after you had been indicted, is that correct?
A Yes, sir.
Q Did that indictment pretty much end your cocaine trafficking with Curtis McDonald?
A Yes, sir.
Ask me the question again.
Q After your arrest and indictment, did you continue to deal cocaine with Curtis McDonald?
A No, sir.
MR. CANALE: Your Honor, I pass the witness.

CROSS EXAMINATION

BY MR. CHANDLER:
Q Mr. Johnson, you didn't mention the name Maurice Mondie, did you?
A Sir?
Q Did you mention the name Maurice Mondie?
A Yes, sir.
Q When you were testifying, did you talk about Maurice Mondie a while ago? Did you know him?
A Yes, sir.
Q He was a drug dealer independent of Mr. McDonald?
A Yes, sir.

Q In other words, he had his own organization, don't you agree?
A No, sir.
Q You said he was independent. You agree with that, right? Maurice Mondie was independent of Curtis McDonald?
A Independent such as?
Q Pardon me?
A Independent such as?
Q Had his own business?
A As far as I ever knowed, he worked for Mr. McDonald.
Q Did you know that he was getting cocaine directly from Houston?
A No, sir.
Q You never knew that. How many times did you actually deal with Mr. Mondie?
A I hadn't dealt with Mr. Mondie but once, one occasion.
Q In your whole life, right?
A You said what?
Q Only once in your whole life?
A Had business with him?
Q Yes, sir?
A Just me and him had, the deal me and him had.
Q You remember when you gave your affidavit for Mr. Jagendorf? Do you remember that?

A Yes, sir.
Q Back on October 20, 1994?
A Yes, sir.
Q And in that affidavit you said that you had met Maurice Mondie one time in your life, right?
A Yes, sir.
Q And that was in Mr. Jagendorf's office, wasn't it?
A Yes, sir.
Q So the only place you've ever seen Mr. Mondie was in a lawyer's office, right?
A No, sir, Mr. Jagendorf told me to say that so he could represent me on my case.
Q Is the affidavit a lie?
A Yes, sir.
Q So under oath -- You understand what an affidavit is, don't you?
A No, sir.
Q You represent that what you're saying is true, right, on an affidavit? What is an affidavit?
A I don't really know, sir.
Q Do you remember signing an affidavit?
A Yes, sir.
Q And it said, "Andre Johnson, being duly sworn, hereby states as follows." Do you remember that?
A I didn't read that affidavit. I just signed it. Mr.

Jagendorf just called me over to his office and told me, "Sign this paper right here so I can handle your case," and I did.

Q You knew it was a lie, right?

A Knew it was a lie?

Q That you had seen him more than once?

A I didn't read it. He just said sign it.

Q Let me ask you if you signed the affidavit and made this statement:

"That I have met Maurice Mondie one time in my life, and that was at Mr. Jagendorf's office wherein he was leaving after an appointment, and I was coming in, and I was introduced to Maurice Mondie at that time."

Did you make that affidavit, that statement?

A No, sir, Mr. Jagendorf made that statement. I just signed it.

Q You signed it, right?

A Yes, sir.

Q For what purpose?

A So Mr. Jagendorf could handle my case.

Q That was to deceive the Court, right?

A Deceive, I don't understand.

Q Was it the truth?

A I just signed it. I didn't read it.

Q Was it true or false?

A You're trying to make me answer something that I didn't even read. I'm just telling you I did sign the affidavit, whatever you call an affidavit, but I didn't read it.

Q You heard the statement I just read?

THE COURT: Now he wants to know, I think, whether that statement was true or not.

A No, the statement is not true.

Q It's false?

A False.

Q You knew that Mr. Jagendorf was going to take it over to court and file it as a false statement, right?

A I didn't know what was on the statement.

Q I just read it to you, right?

A Yes, sir.

Q You have never heard that before?

A Have I ever heard that before?

Q Yes?

A Yes, sir.

Q You testified just a moment ago that Mr. Jagendorf told you to sign this so he could represent you? You knew it was false?

A Yes, sir.

Q Didn't you?

A No, Mr. Jagendorf had me sign it. I heard it again when we was in court. Mr. Jagendorf told me to say I don't know Maurice Mondie, and I met him only once in my life, and that was in Ms. Gibbons' courtroom that day, and he said that was the only way he could represent me, so I signed it.
Q Was that a lie, or was it true?
A That was a lie.
Q Have you ever lied before on an affidavit or in court?
A Yes, sir.
Q If I understand correctly, in 1991 you were convicted, your testimony, you went to jail because you were a drug dealer?
A That's right.
Q So from 1991 until you were arrested September 24, 1994, you made your money selling drugs, right?
A And robbing drugs, too.
Q So you were a drug dealer, right?
A Yes, sir.
Q And a robber, is that correct, sir?
A Yes, sir.
Q And you would kill somebody for $100,000.00, wouldn't you?
A No, sir.

Q You have offered to, haven't you?
A No. I was offered, somebody asked me would I kill somebody for $100,000.00.
Q You said you would do it for $100,000.00?
A Yes, sir.
Q They talked to you and you said, "Yes, I'll kill him for $100,000.00," did you not?
A Yes, sir.
Q And you meant it, didn't you?
A No, sir.
Q Did you tell a lie?
A No, I meant it, but I wasn't going to do the actual killing. I was going to give somebody else twenty-five thousand, and I was going to make seventy-five thousand.
Q You were not going to pull the trigger?
A No, I wasn't going to be the trigger man. I ain't never killed nobody.
Q But you led these people to believe that you would do it for $100,000.00? Isn't that what you told them?
A Exactly.
Q What you meant was you would hire somebody else to do it?
A Yes, sir.
Q Okay. So being involved in murder, that's no problem for you, is it? Sir?

A No, sir.

Q I believe you have also testified against Tony Carruthers that got the death penalty for burying people alive in the cemetery, didn't you?

A Yes, sir.

Q You said under oath at that trial -- Do you remember the date and year you testified?

MR. CANALE: Your Honor, I object to what he said in that trial.

THE COURT: Unless it has something to do with this particular case.

MR. CHANDLER: It does.

THE COURT: Let's talk up here about that.

(Bench conference on the record out of the hearing of the jury.)

MR. CHANDLER: My information is when he testified, the question he was asked, and Tony Carruthers, who is the defendant on death row, by telephone he testified that he did not have an agreement --

THE COURT: Undoubtedly a reliable source.

MR. CHANDLER: This is what he told me, Judge.

THE COURT: Okay.

MR. CHANDLER: He told me that when he got up on the witness stand, he denied he had an agreement with the Federal authorities to get his sentence reduced. He

testified in that case, and he did get credit for it with the federal authorities.

THE COURT: He denied that?

MR. CHANDLER: He denied that.

THE COURT: Is he supposed to get credit for that case?

MR. CANALE: Credit for what case?

THE COURT: Apparently, Mr. Carruthers and Mr. Chandler take the position that when Mr. Johnson is sentenced, that a part of the cooperation that I am to consider would be his testimony in Mr. Carruthers' case.

MR. CANALE: Your Honor, Mr. Johnson and I have not discussed that. I was aware that he testified as a state witness. I have not promised him anything in that regard. If the state sends me a letter or something like that telling what he had done, then I would probably bring the information to you, but there is no agreement.

THE COURT: There is no agreement to do that?

MR. CANALE: No.

THE COURT: And you haven't had any discussion with him about it?

MR. CANALE: No.

MR. CHANDLER: I can ask him why did he testify in the case. How about asking that? Was it in thinking he would get consideration --

THE COURT: He denied that.

MR. CHANDLER: Denied that.

THE COURT: If I'm understanding, Mr. Johnson testified in Mr. Carruthers' case and denied a reason for his testimony was in expectation that he would get any consideration in his federal case for that state cooperation. Mr. Canale says there was no representation he will get anything.

MR. CANALE: That's right.

MR. CHANDLER: If I ask him why did he testify, his answer will be he expects to get consideration from this court for that.

MR. CANALE: This all came up after he was already cooperating with us. I'm trying to remember now. I'm sure he was testifying, and I want to clarify something. I never promised him that I would bring that to the Court's attention, but because none of this was ever reduced to writing or anything, I don't want to say something wrong for the record. Mr. Hansom and I did discuss the fact that he was testifying for the state, and it may -- I can't recall, Your Honor. It may have come up that if the state wants to come over here and tell what he did, would I be opposed to that, and I wouldn't be opposed to that. That may happen, but as far as us having an agreement at this time, no.

MR. CHANDLER: He thinks it is.

THE COURT: He might have an expectation. You can ask him about whether he has any expectation, but don't go into the substance --

MR. CANALE: Either he can do it or I can do it on redirect. I would like to make it clear that he was not a defendant charged in that case. He was not involved in the murder. He was a witness called to testify because he knew people.

MR. CHANDLER: You can do that Monday.

THE COURT: We'll see on Friday.

(End of bench conference.)

Q Mr. Johnson, you remember testifying over in the state court against Tony Carruthers?

A Yes, sir.

Q Do you remember the month and the year?

A No, sir.

Q Was it this year?

A Yes, sir.

Q A few months ago?

A Yes, sir.

Q And were you in custody at the time you testified?

A No, sir.

Q You were out of jail?

A Yes, sir.

Q Who was your lawyer at that time?
A Ted Hansom.
Q Your reason you went over there and testified, hoping that you would get credit in this court for that testimony, didn't you?
A No, sir.
Q Didn't Mr. Hansom tell you that he would use that --
MR. CANALE: I object to what Mr. Hansom told him.
THE COURT: I'll sustain the objection to that.
Q You went over there as a good citizen?
A Yes, sir.
Q You weren't involved in the crime, right?
A No, sir.
Q This was a murder, and you wanted to help the State of Tennessee out, right?
A No, that was my best friend got killed.
Q You didn't do this for any other reason, just your best friend?
A Yes, sir.
Q You don't hope to get anything out of this court for having testified over there?
A No, sir.
Q Since then you have been arrested again, have you not?

A Yes, sir.

MR. CANALE: Your Honor, I object to any -- Your Honor, Mr. Chandler knows arrests are not admissible in evidence.

THE COURT: We're not going to go into anything other than prior convictions with respect to that.

MR. CANALE: Your Honor, I object and ask Mr. Chandler --

MR. CHANDLER: Do you want us to come up there?

THE COURT: Yes, briefly.

(Bench conference on the record out of the hearing of the jury.)

MR. CANALE: Your Honor, I object. He's talking about a prior arrest. There is no reason to be --

THE COURT: What are you trying to do?

MR. CHANDLER: He has got arrested since then.

THE COURT: So what?

MR. CHANDLER: Because he holds himself out to be a good citizen.

THE COURT: Let me tell you he has held himself out to be less than the best citizen of any witness I have heard.

MR. CHANDLER: He is going to get consideration for this additional crime in this plea agreement.

MR. CANALE: He is going to trial is my

understanding on that, so he is not getting any consideration.

MR. CHANDLER: What if he does, Judge? It's not right is what I think.

MR. CANALE: I have been told by Mr. Hansom they are taking that case to trial.

MR. CHANDLER: But Mr. Hansom is not going to take that case to trial.

MR. CANALE: It's not relevant.

MR. CHANDLER: Because I asked him what he thinks.

THE COURT: Do you have any basis for --

MR. CHANDLER: Conversation with Mr. Hansom, but I can't quote him what he thinks is happening.

MR. CANALE: I think we ought to do that out of the presence of the jury. He is not getting any consideration out of that, not from me.

MR. CHANDLER: I don't mind taking a quick recess.

MR. CANALE: Your Honor, they are trying to delay now. That's all Mr. Chandler is doing.

MR. CHANDLER: I'm not trying to delay, Judge. I am very serious about this. He is the one that wanted the hearing.

THE COURT: If you succeed in delaying, we will

be in session Friday. That's the short of it.

(End of bench conference.)

THE COURT: Let me send you all out for a minute, hopefully very briefly.

(Jury out at 4:42 p.m.)

THE COURT: Let's see if you can ask one question about this and decide as a basis for a decision about it and get the jury back in.

Q (By Mr. Chandler) Mr. Johnson, you are back in custody again, and you've been arrested again, and you've been charged with another crime in Mississippi, and you hope that whatever penalty you are facing there will be run concurrent with this case when it's all over?

A No, sir.

Q What is your agreement as you understand it?

A The last I heard it was going to get dismissed.

Q Why?

A I wasn't involved.

Q It has nothing to do with this court or the deal you made with this prosecutor?

A Nothing at all.

THE COURT: You just don't have any basis for asking him about that.

MR. CHANDLER: I understand. I may have one later on.

THE COURT: You don't right at this present time.

MR. CHANDLER: Thank you.

(Jury in at 4:44 p.m.)

Q Mr. Johnson, you testified earlier today you had an agreement with the government that your sentence would be reduced in this case if you cooperated, is that correct?
A That my sentence would be reduced?
Q Yes.
A It wasn't nothing promised to me.
Q I understand that. You don't have any idea what you're going to get, do you?
A No, sir.
Q You could get one day reduced, one year, five years, ten years, fifteen years, twenty years, thirty years, forty years, you don't know, do you?
A I don't know.
Q What does it actually depend on? What have you got to do to get it from forty years to, say, a year?
A I don't know, because wasn't nothing promised to me.
Q Would it depend on whether you told the truth in here?
A Would it depend on had I told the truth?
Q If you told the truth in here, would that be important?

A Yes, sir.
Q So you don't know what determines what sentence you actually get?
A No, sir.
Q Mr. Hansom didn't discuss that with you?
A No, sir.
Q Mr. Canale didn't?
A No, sir.
Q And the agents didn't?
A No, sir.
Q What is the maximum penalty you are facing in your case?
A I guess about eleven years, ten or eleven years.
Q Not life?
A No, sir.
Q Ten years?
A Yes, sir.
Q Well, what about for the cases you haven't been charged with? You were selling cocaine in 1991, and you continued to sell it up until you got arrested with the nine kilograms, right? Yes or no? Did you sell cocaine from 1991 until the time of your arrest in 1994?
A Yes, sir.
Q How many thousands of kilograms of cocaine is that?
A I can't count them.

Q Have you been indicted for those sales?
A No, sir.
Q Are you going to be indicted for those sales?
A No, sir.
Q Wouldn't you agree that that would be life in prison for those sales?
A If you said it would, it would.
Q No one has ever discussed this with you?
A No, sir.
Q You understand you could be prosecuted for those crimes, don't you?
A No, sir.
Q Well, the only one you've got to worry about is one nine kilogram sale, is that all?
A Yes, sir.
Q And the government is going to just forget the rest of it?
A Yes, sir.
Q Isn't that part of the deal?
A That I wouldn't be charged with all --
Q Yes.
A Yes, sir.
Q So instead of going to prison for life, you've got a shot at ten years or less, right?
A No, sir, you're going back to the same question. I

wasn't promised nothing.
Q In other words, you might just get one day off your sentence?
A Yes, sir.
Q That would be all right with you?
A Yes, sir.
Q When you were arrested on September 24, 1994, remember that?
A Yes, sir.
Q You gave them a false name, didn't you?
A Yes, sir.
Q What lie did you tell them about your name?
A Octavius Guy.
Q Was that on your drivers license?
A Yes, sir.
Q That was a false drivers license, too, wasn't it?
A Yes, sir.
Q You owned a home at that time at 4011 Rolling Green in Shelby County?
A Yes, sir.
Q You had it under the name Robert Boland, right?
A Yes, sir.
Q That was a lie, wasn't it?
A No, that wasn't a lie. That's the name the house was up under.

Q It was really your house, wasn't it?
A Yes, sir.
Q Why did you have the house in somebody else's name?
A Because I didn't have no credit and no job.
Q It wasn't to deceive anybody other than the bank?
A I didn't understand.
Q Did you borrow money?
A No, sir.
Q How did you get the house?
A I took my drug money and bought the house.
Q How much money?
A I paid like about twenty grand down on the house.
Q Where did you get the rest of the money?
A The rest of the money?
Q Yes, for the house?
A I had the money saved up.
Q What did you pay for the house?
A I didn't ever pay for it.
Q How much were you supposed to pay for it?
A 120,000.
Q How much did you pay down?
A Twenty thousand.
Q What were your monthly installments?
A 950.00.
Q To what bank?

A I don't remember. I can't remember.
Q But the bank thought that you were Robert Boland, right?
A Yes, sir.
Q Because you didn't have any credit, right?
A No, sir.
Q And you wanted to trick the bank, right?
A No, I wasn't trying to trick the bank.
Q Deceive the bank?
A No, sir.
Q Cheat the bank?
A No, sir, I was just trying to purchase a home.
MR. CANALE: Your Honor, one time is enough.
THE COURT: I agree once.
Q Have you lost that home?
A Yes, sir.
Q What happened?
A When I got arrested, the agents seized all my cash.
Q How much money did they seize?
A About 140,000.
Q Where was it hidden?
A In the house.
Q Did you tell them about it?
A No, sir.
Q Did you consent to them to search your house?

A No, sir.
Q You had a hearing over that, didn't you?
A Hearing over the house?
MR. CANALE: Your Honor, it's not relevant.
THE COURT: It doesn't matter whether he challenged the search of his house. That's not pertinent at this point.
Q Did the policeman claim that you did?
MR. CANALE: Your Honor, I object to that.
THE COURT: I'll sustain the objection.
Q Did you tell Officer McGriff and Mr. Chism that you owned the house at 4011 Rolling Green?
A No, sir.
MR. CHANDLER: That's all I have, Your Honor.
MR. EMMONS: I have no questions.
MR. HIGGS: No questions.
MR. WILSON: I have just a couple.

CROSS EXAMINATION

BY MR. WILSON:
Q Mr. Johnson, if I understood your testimony on direct examination, you pointed to this lady in the courtroom, and you called her Ms. McNeil?
A Yes.
Q So you have only met her, I believe your testimony was, one time?

A Yes, sir.
Q And in that meeting, that one meeting, did she say, "Hello, I'm Ms. McNeil"?
A No, sir.
Q Did she tell you her first name?
A The only reason I know her was because Mr. McDonald described her and told me where she would meet me at.
Q He described her for you?
A He told me and told her what kind of vehicle I would be coming in, and she came to me.
Q I want to know what he told you. What did Mr. McDonald tell you? Did he tell you her first name?
A Yes, sir.
Q Did he tell you her last name?
A No, sir.
Q Well, when you pointed to her in the courtroom, you said Ms. McNeil. Who told you Ms. McNeil?
A I noticed her name on the indictment. I didn't ever know her last name.
Q You noticed it on the indictment.
I want to talk to you for a moment about the first time that you say you met Ms. McNeil. If I understood your testimony was you met her at a Chinese restaurant in Whitehaven?
A Yes, sir.

Q And you had apparently called Curtis McDonald, and he was at the dog track?
A Yes, sir.
Q And this was the first time, your first contact on that evening was by telephone with him?
A Yes, sir.
Q And about what time of day was that?
A I guess it was around eight o'clock.
Q Eight o'clock a.m., in the morning?
A No, sir, at night.
Q Eight o'clock p.m.?
A Yes, sir.
Q And what day of the week are we talking about now?
A I can't remember. It was on a Friday or Saturday, I think.
Q A Friday or Saturday. What year are we talking about?
A Must have been '93, I guess '93. '93. I'm not for sure. I'm not positive.
Q Well, you said you remembered in your direct examination about Mose Williams being arrested?
A Yes.
Q And you remembered meeting him and following him out of town. Was it before or after that?
A That I met Ms. McNeil?

Q Yes, that you say you met Ms. McNeil?
A I believe it was after. I ain't positive, though.
Q You're not sure one way or the other?
A No, sir.
Q So you can't tell us the month, and you're not real sure about the year, but you believe it was on a Friday or Saturday?
A I think so. I ain't positive, though.
Q About what time of day was it when you met Ms. McNeil?
A I knew it was night, because I had the guy from Arkansas, he was in the car, and I kept him in the car and stalling him to keep him from leaving. I know it was dark, turning dark.
Q It was eight o'clock you said when you called Curtis the first time. How long after that phone call was it?
A About like an hour or so.
Q Do you know? If you're guessing, tell me. Do you know how long it was after that?
A I think about an hour.
Q You think about an hour. About nine o'clock p.m.?
A Yes.
Q How long did you meet there?
A Did I meet?
Q How long were you at this Chinese restaurant?

A When I got there, she was already there.
Q How long were you there?
A I came right on and got the stuff and left.
Q How long were you there with her?
A With her?
Q Yes.
A She just gave me the bag and just left.
Q Are we talking about a matter of seconds?
A Yes, a few seconds. It wasn't too long.
Q What conversation did you have?
A She just walked up and asked me, "Is you Babebro?" I said yes.
Q So you were there a matter of seconds, and that's all that was said?
A Yes, sir.
Q You never saw her before that?
A No, sir.
Q The only time you have seen her before is when we have been in this courtroom for prior proceedings, isn't that right?
A Yes, sir.
Q You never were shown any photographs.
A Any photographs?
Q You never identified any photographs of Ms. McNeil?
A Yes, sir.

Q You did?
A Yes, sir.
Q When did you do that?
A It was afterwards, though.

MR. WILSON: Would Your Honor indulge me just a moment?

Q Let me ask you again, now, are you telling me under oath and this jury and the Court that you have identified Ms. McNeil's picture prior to this day?
A Prior to this day here?
A Prior to this moment? Have you been shown photographs that included a photograph of Ms. McNeil and identified her?
A I'm not sure I did.
Q You're not sure. You're not sure.

MR. WILSON: I believe that's all I have.

MR. CHANDLER: Judge, I have one omitted question. Could I?

THE COURT: All right.

CROSS EXAMINATION

BY MR. CHANDLER (Resumed):

Q When did you plead guilty? What date or month this year did you change your plea from not guilty to guilty?
A I can't remember.
Q A month ago, two months ago, three months ago?

A Few months ago.
Q It was in 1996?
A Yes, sir.
Q Before or after the testimony -- Did we get into that?

THE COURT: I don't think we got into that.

MR. CHANDLER: Let me back up. Strike that.

MR. CANALE: Your Honor, it doesn't really matter. I haven't objected.

MR. CHANDLER: It does matter, Judge, but that's okay. Thank you.

THE COURT: Anything else?

MR. CANALE: Just a few.

REDIRECT EXAMINATION

BY MR. CANALE:

Q Babebro, is that your street name?
A Yes, sir.
Q Who calls you Babebro?
A Everybody in the neighborhood in Memphis.
Q Did Curtis call you Babebro?
A Yes, sir.
Q I want to clear up one or two things, Mr. Johnson. The affidavit that you signed that Mr. Jagendorf prepared that Mr. Chandler asked you about, do you recall that?
A Yes, sir.

# Declaration of Curtis McDonald

I, Curtis McDonald, being of lawful age and legal resident of Memphis, Shelby County, Tennessee, declare the following, based on my personal knowledge:

(1) I am aware of the facts surrounding the state's prosecution of Tony Carruthers and James Montogmery as I knew most of the players involved in the Memphis drug trade in the late 1990s.

(2) The federal government charged me, Andre "BabyBro" Johnson and many others with drug trafficking back in the mid 1990s. Johnson ended up making a deal and testified against me. As he told the jury, we knew each other from the neighborhood and running together. Before our indictment, Andre confided in me frequently.

(3) I learned after that indictment that Andre was not to be trusted. He would cross anybody about anything if he thought that doing so served his interests.

(4) I recall Andre telling me that he and the Durham twins went to Houston to buy dope at one point and Andre ripped the twins off for the buy money and came back home, leaving the twins in Houston without the money. I never heard what, if anything, happened after that.

(5) I know Andre on another occasion set up his own brother in order to help himself on a charge in Mississippi.

(6) I know that Andre sold dope to a guy who then sold that dope to Andre's father, who overdosed on Andre's dope. At one point, I talked Andre out of

having his dad killed because he owed Andre drug money.

(7) Ultimately, Andre was shot in the head after he robbed a drug dealer during a transaction. During the robbery, he shot and killed one of the two guys he was doing business with. He jumped out of the car and started running. Later, the other drug dealer located Andre and shot him in the head. Andre did not die, though he is pretty bad off.

(8) Until approached by Ben Leonard of the Office of the Federal Public Defender for the Middle District of Tennessee in May 2026, I was unwilling to be involved in any way with helping Mr. Carruthers or Mr. Montgomery. I was reluctant to talk initially because of my own legal troubles and because Montgomery's lawyer had once charged me several thousand dollars to look at a legal matter for me and then told me there was nothing to be done.

(9) After I was granted clemency in 2020, I was on supervised release until late 2022.

(10) I would not have told what I know about Andre "BabyBro" Johnson until now because I did not want to jeopardize my own case.

I declare under penalty of perjury and the laws of the United States and State of Tennessee that the foregoing is true and correct to the best of my knowledge.

Dated this 15th day of May 2026 in Memphis, Shelby County, Tennessee.



CMD

Curtis McDonald

Curtis McDonald

# DECLARATION OF ZILLAH FERRARI

I, Zillah Ferrari, a resident of Shelby County, Tennessee, being of lawful age declare as follows:

1. I was a juror at Tony Carruthers's trial.
2. At the time of Tony Carruthers's trial I was told that the victims had been buried alive. I recently learned that the medical examiner had taken back his opinion that the victims were not buried alive.
3. Had I known that the victims were not buried alive, I would have not voted for a death sentence.
4. Mr. Carruthers did a really poor job of representing himself. In my mind, he buried himself.
5. I was recently informed that Mr. Carruthers has serious mental illness. This explains a lot about why he did such a poor job representing himself.
6. Mr. Carruthers's witnesses did not support his innocence. It did not make sense to call these witnesses.
7. For example, Mr. Carruthers called Alfredo Shaw who said Mr. Carruthers confessed to him.
8. I was recently informed that Alfredo Shaw was a paid informant. Had I known that Shaw was a paid informant, I would not have voted for a death sentence.
9. I recently learned that there is unknown DNA on the bindings used to tie the victims' wrists that does not match Mr. Carruthers.
10. I think that Mr. Carruthers should have the chance to have the DNA tested.
11. A DNA match with a different person would make me doubt Mr. Carruthers's guilt.
12. In light of what I have learned, I would support Mr. Carruthers receiving a life sentence. I do not want to see Mr. Carruthers released but I do not support his execution.

The foregoing is true and correct and executed under penalty of perjury under the laws of the State of Tennessee and United States of America on April 20, 2026.

Zillah Ferrari

# DECLARATION OF DAVID ADAMS

I, David Adams, a resident of Shelby County, Tennessee, being of lawful age declare as follows:

1. I was a juror at Tony Carruthers's trial.
2. At the time of Tony Carruthers's trial I was told that the victims had been buried alive. I recently learned that the victims were not buried alive and that the medical examiner had changed his opinion.
3. Had I known that the victims were not buried alive, I would have not voted for a death sentence.
4. I would support Mr. Carruthers receiving a life sentence. I do not want to see Mr. Carruthers released but I do not support his execution.

The foregoing is true and correct and executed under penalty of perjury under the laws of the State of Tennessee and United States of America on April 21, 2026.

David Adams

David Adams

**RAY & FRENSLEY**

**ATTORNEYS AT LAW**

**CHARLES R. RAY***
**JEFFERY S. FRENSLEY**

*Also Licensed in Kentucky

TWO HUNDRED ELEVEN
THIRD AVENUE NORTH
P.O. BOX 198288
NASHVILLE, TENNESSEE 37219
TELEPHONE (615) 256-2111
FAX (615) 248-6730
E-MAIL lawdog@attglobal.net

December 16, 2002

FILED 12/18/02
WILLIAM R. KEY, CLERK
BY D. Copperwinter D.C.

John W. Campbell, Esq.
Assistant District Attorney General
30th Judicial Circuit
201 Popular Avenue
Suite 301
Memphis, Tennessee 38103-1947

RE: Tony X. Carruthers Shelby County Post Conviction Relief No. P-25948

Dear Mr. Campbell:

I have and thank you for your supplemental response, but I fear that your response does not clear up the question. You keep on qualifying your response with the statement that Shaw "was not a 'paid government agent' planted in the jail to get a statement from the Petitioner." The question put to you is whether Shaw was a paid government agent period. The government includes local, state and federal. If you would be so kind to respond to the question put to you as to whether Shaw was a government agent irrespective of whether he was placed in the jail to get a statement from the Petitioner, it would be deeply appreciated. Again, so there can be no misunderstanding the question put to you is whether Shaw was a paid government agent. The time period encompassed is the time he was incarcerated contemporaneous with the Petitioner's incarceration at the Shelby County jail.

Thank you for your cooperation in this matter.

Very Truly Yours,

Charles R. Ray

cc: Larry Copeland
Tony Carruthers
Criminal Court Clerk Shelby County

**RAY & FRENSLEY**

ATTORNEYS AT LAW
TWO HUNDRED ELEVEN
THIRD AVENUE NORTH
P. O. BOX 198288
NASHVILLE, TENNESSEE 37219

VILLE TN
16 DEC




Criminal Court Clerk
Shelby County
201 Popular Avenue,
Room 401
Memphis, Tennessee 38103-1819

38103+1945

JAMES J. CHALLEN III
DEPUTY DISTRICT ATTORNEY GENERAL
KENNETH R. ROACH
ADMINISTRATIVE ASSISTANT/CHIEF PROSECUTOR
CRIMINAL COURT DIVISION
THOMAS D. HENDERSON
ADMINISTRATIVE ASSISTANT/CHIEF PROSECUTOR
GENERAL SESSIONS CRIMINAL/
JUVENILE COURT DIVISIONS
M. CARTER MYERS
GRAND JURY ADMINISTRATIVE ASSISTANT
PRISCILLA C. CAMPBELL
CHIEF ADMINISTRATIVE OFFICER
JERRY HARRIS
CHIEF HOMICIDE PROSECUTOR
JOHN W. CAMPBELL
DIRECTOR
MAJOR CRIMES PROSECUTION UNIT
J. ROBERT CARTER, JR.
DIRECTOR, NARCOTICS PROSECUTION UNIT
JENNIFER S. NICHOLS
DIRECTOR, ANTI-GANG TEAM
KEVIN R. RARDIN
LEAD PROSECUTOR
CHILD PROTECTION INVESTIGATION TEAM
WILLIAM D. BOND, III
DIRECTOR, DOMESTIC VIOLENCE
PROSECUTION UNIT
HENRY P. WILLIAMS
LEAD PROSECUTOR
FRAUD & ECONOMIC CRIME TEAM
GEORGE A. KING
CHIEF INVESTIGATOR
GORDON E. BIGGS
ASSISTANT CHIEF INVESTIGATOR
KENNETH E. BLACKBURN
DIRECTOR, VICTIM-WITNESS UNIT
SANDRA B. TRUITT
CHIEF ADMINISTRATIVE CLERK

P.T. HOOVER, JR.
JAMES A. WAX, JR.
JERRY R. KITCHEN
PATIENCE R. BRANHAM
PAUL F. GOODMAN
RODNEY P. FAULK,JR.
CHARLES W. BELL, JR.
JOHNNY R. McFARLAND
JAMES M. LAMMEY, JR.
REGINALD R. HENDERSON
AMY P. WEIRICH
KAREN COOK
PERRY S. HAYES
GLEN BAITY
ALANDA HORNE DWYER
LEE V. COFFEE
MICHAEL LEAVITT
ROSEMARY S. ANDREWS
JULIE MOSLEY
SCOTT D. GORDON
BETSY CARNESALE
STEPHEN P. JONES
STEPHANIE ZANDER-JOHNSON
DAVID N. PRITCHARD
JOHN TIBBETTS
KATRINA EARLEY
WILLIAM G. RAMSEY
DAVID ZAK, JR.
THERESA McCUSKER
R. SCOTT McCULLOUGH
KIMKEA HARRIS
LINDA KIRKLEN
MICHAEL S. DAVIS
SCOT BEARUP
GAIL VERMASS
DOUGLAS G. GILBERT
MICHELLE L. KIMBRIL
VALERIE L. SMITH
RAYMOND J. LEPONE
ERIC N. CHRISTENSEN
WILLIAM S. CROSSNOE
PAUL HAGERMAN
W. CHRIS SCRUGGS
ASSISTANT DISTRICT ATTORNEYS
CRIMINAL COURT DIVISION

DAVID N. McGRIFF
CHERYL HAYS
MARK K. GLANKLER
DEBORAH A. OWEN
CHARLES SHETTLESWORTH
R. R. DAVIS
RONALD F. WILKINSON
JIMMY CHAMBERS
J. D. HALL
GEORGE DUNLAP
EDDIE D. SCALLIONS
THOMAS A. SHOUSE
DONALD BLACKWELL
DONNA KERNS
ERIC HOLMES
ROBERT HARRISON
EDIE HILL
DONALD J. FLYNN, M.P.D.
ALEXANDER McGOWAN, M.P.D.
RONNIE McWILLIAMS, M.P.D.
RONALD GOODWIN, M.P.D.
ELAINE SHELBY, S.C.S.O.
INVESTIGATORS
CRIMINAL COURT DIVISION

**WILLIAM L. GIBBONS**
**DISTRICT ATTORNEY GENERAL**
SHELBY COUNTY, TENNESSEE
CRIMINAL COURT SECTION
201 POPLAR - SUITE 301
MEMPHIS, TENNESSEE 38103-1947
PHONE (901) 545-5900
FAX (901) 545-3937
www.scdag.com

District Attorney General · Shelby County, Tennessee

January 7, 2003

Charles R. Ray
Attorney at Law
211 Third Avenue North
Nashville, TN 37219

Re: Alfredo Shaw

Dear Mr. Ray:

I thought that this matter was resolved by my earlier response. But just incase, I have talked to the prosecutors who tried your client and neither is aware of any situation where Alfredo Shaw acted as a paid informant for anybody. To the best of their knowledge, Alfredo Shaw was never a paid informant during the time frame you stated in your letter of December 16, 2002. I do not know how much clearer I can be on this topic.

Sincerely

JW Campbell

JOHN W. CAMPBELL
Assistant District Attorney General

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 395

## Case Information

97 08556-97624760 | The State of Tennessee vs BERNARD KIMMONS

| Case Number | Court | Judicial Officer |
|---|---|---|
| 97 08556-97624760 | Division III | Carter, Robert |
| File Date | Case Type | Case Status |
| 08/07/1997 | Criminal Court | Conversion |

## Party

State of Tennessee
The State of Tennessee

Race
Other

Defendant
KIMMONS, BERNARD

DOB
08/27/1964

Race
Black

Address
4184 RAINWOOD DR
Apt # 2
MEMPHIS TN 38116

## Charge

Charges
KIMMONS, BERNARD

| | Description | Statute | Level | Date |
|---|---|---|---|---|
| 1 | MANUF/DEL/SELL CONTROLLED SUBSTANCE | 39-17-417 | Felony E | 08/27/1997 |
| 2 | POSS CONT SUB W/I TO MANUF/DEL/SELL | 39-17-417 | Felony E | 08/27/1997 |

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 396

## Bond Settings

Setting Date

8/8/1997

8/8/1997

8/8/1997

8/8/1997

8/8/1997

8/8/1997

## Events and Hearings

08/07/1997 Case Filed

08/07/1997 Indicted - Grand Jury

08/08/1997 Issue Capias

08/27/1997 Jail

08/27/1997 Bond

09/25/1997 Bond Arraignment ▾

Hearing Time
9:00 AM

11/06/1997 Report Date ▾

Hearing Time
9:00 AM

12/16/1997 Report Date ▾

Hearing Time
9:00 AM

01/28/1998 Report Date ▾

Hearing Time
9:00 AM

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 397

03/12/1998 Report Date

Hearing Time
9:00 AM

04/30/1998 Report Date

Hearing Time
9:00 AM

06/10/1998 Report Date

Hearing Time
9:00 AM

08/21/1998 Motion Hearing

Hearing Time
9:00 AM

08/28/1998 Motion Hearing

Hearing Time
9:00 AM

09/04/1998 Motion Hearing

Hearing Time
9:00 AM

10/15/1998 Motion Hearing

Hearing Time
9:00 AM

10/19/1998 Motion Hearing

Hearing Time
9:00 AM

10/29/1998 Motion Hearing

Hearing Time
9:00 AM

11/16/1998 Set Trial

Hearing Time
9:00 AM

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 398

11/17/1998 Set Trial ▾

Hearing Time
9:00 AM

12/10/1998 Report Date ▾

Hearing Time
9:00 AM

01/29/1999 Report Date ▾

Hearing Time
9:00 AM

03/22/1999 Report Date ▾

Hearing Time
9:00 AM

07/12/1999 Set Trial ▾

Hearing Time
9:00 AM

07/13/1999 Report Date ▾

Hearing Time
9:00 AM

08/16/1999 Report Date ▾

Hearing Time
9:00 AM

09/20/1999 Report Date ▾

Hearing Time
9:00 AM

12/06/1999 Set Trial ▾

Hearing Time
9:00 AM

01/20/2000 Report Date ▾

Hearing Time
9:00 AM

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 399

03/17/2000 Report Date ▾

Hearing Time
9:00 AM

04/17/2000 Report Date ▾

Hearing Time
9:00 AM

05/12/2000 Report Date ▾

Hearing Time
9:00 AM

09/18/2000 Set Trial ▾

Hearing Time
9:00 AM

10/19/2000 Report Date ▾

Hearing Time
9:00 AM

12/01/2000 Report Date ▾

Hearing Time
9:00 AM

04/02/2001 Set Trial ▾

Hearing Time
9:00 AM

05/29/2001 Set Trial ▾

Hearing Time
9:00 AM

06/11/2001 Set Trial ▾

Hearing Time
9:00 AM

07/30/2001 Set Trial ▾

Hearing Time
9:00 AM

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 400

07/31/2001 Set Trial ▾

Hearing Time
9:00 AM

08/01/2001 On Trial ▾

Hearing Time
9:00 AM

08/02/2001 On Trial ▾

Hearing Time
9:00 AM

08/03/2001 On Trial ▾

Hearing Time
9:00 AM

08/31/2001 Sentence Deferred ▾

Hearing Time
9:00 AM

09/28/2001 Motion for New Trial ▾

Hearing Time
9:00 AM

10/12/2001 Motion for New Trial ▾

Hearing Time
9:00 AM

12/14/2001 Motion for New Trial ▾

Hearing Time
9:00 AM

12/20/2001 Motion for New Trial ▾

Hearing Time
9:00 AM

02/28/2002 Motion for New Trial ▾

Hearing Time
9:00 AM

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 401

03/01/2002 Motion for New Trial ▾

Hearing Time
9:00 AM

03/01/2002 Court Hearing

03/01/2002 Final Disposition

03/01/2002 Final Disposition

11/30/2003 Garnishment Candidate list

12/31/2003 Garnishment Candidate list

01/31/2004 Garnishment Candidate list

02/29/2004 Garnishment Candidate list

03/31/2004 Garnishment Candidate list

04/30/2004 Garnishment Candidate list

05/25/2004 Garnishment Fees-CC

05/25/2004 First Garnishment

05/31/2004 Garnishment Candidate list

06/21/2004 Garnishment Returned Not Employed

07/01/2004 Collection Notice 2nd Letter

07/30/2004 Collection Notice 2nd Letter

08/30/2004 Collection Notice 2nd Letter

09/27/2004 Collection Notice 2nd Letter

10/27/2004 First Notice Letter 3rd

11/01/2004 Collection Notice 2nd Letter

11/29/2004 Collection Notice 2nd Letter

12/29/2004 First Notice Letter 3rd

12/30/2004 Collection Notice 2nd Letter

01/31/2005 Collection Notice 2nd Letter

Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 402

03/01/2005 Collection Notice 2nd Letter

03/29/2005 Collection Notice 2nd Letter

04/28/2005 First Notice Letter 3rd

04/29/2005 Collection Notice 2nd Letter

05/30/2005 First Notice Letter 3rd

05/31/2005 Collection Notice 2nd Letter

07/01/2005 Collection Notice 2nd Letter

07/08/2005 Enter Wage Earner/Bankruptcy Ch 13

06/13/2008 Exit Wage Earner/Bankruptcy Ch 13

08/12/2008 Enter Universal Collection Agency

09/15/2009 Cancel Universal Collections

09/15/2009 Uncollectable Collection Agency Return

11/16/2009 Enter Wage Earner/Bankruptcy Ch 13

11/23/2009 Valid Address-Collections

03/31/2012 Uncollectable 10 Years Old

03/14/2013 Paid-Zero Balance

03/25/2024 Criminal Court File Copies

OFFICE OF THE
FEDERAL PUBLIC DEFENDER
MIDDLE DISTRICT OF TENNESSEE

HENRY A. MARTIN
FEDERAL PUBLIC DEFENDER

810 BROADWAY, SUITE 200
NASHVILLE, TN 37203-3805
TELEPHONE: 615-736-5047
FAX: 615-736-5265

October 3, 2019

District Attorney General Amy Weirich
Office of the District Attorney General-Shelby County
201 Poplar Avenue, Suite 301
Memphis, Tennessee 38103

Re: Request For Disclosure Of Exculpatory Evidence Regarding Alfredo Shaw, DOB 3-14-1966

Dear General Weirich:

I am counsel for Tony Carruthers. The Attorney General for the State of Tennessee has recently moved that the Tennessee Supreme Court set a date for his execution.

As Mr. Carruthers' counsel, I write to request disclosure of any and all exculpatory evidence (including all documents) in the actual or constructive possession of your office regarding the credibility, reliability, and/or bias of Alfredo Shaw (DOB 3-14-1966), a witness who testified at the 1996 trial of Tony Carruthers in the Criminal Court of Shelby County, Tennessee. I make this request pursuant to all available authority, including the Tennessee Public Records Act.

The exculpatory evidence and documents concerning Alfredo Shaw which I request include, but is not limited to, exculpatory information about Alfredo Shaw regarding the following matters:

(1) The timing and nature of Alfredo Shaw's employment, work for, or assistance to, at any time, your office, other prosecutorial authorities and/or law enforcement authorities, including but not limited to the Shelby County Sheriff's Office, the Memphis Police Department, the Tennessee Bureau of Investigation, the FBI, the DEA, the ATF. It is my understanding that Shaw worked as an informant for Shelby County during the 1990s and even before;

(2) Any agreements or understandings, written or otherwise, between the your office, other prosecutorial authorities and/or law

enforcement authorities, including but not limited to the Shelby County Sheriff's Office, the Memphis Police Department, the Tennessee Bureau of Investigation, the FBI, the DEA, the ATF, and Alfredo Shaw about any and all consideration Shaw was to receive in exchange for his assistance to your office, other prosecutorial authorities, or law enforcement, including, but not limited to cash payments, reduction of charges, willingness to assist Shaw with pending or past criminal charges, or any other types of consideration to be provided to Shaw;

(3) Copies of checks or any other document reflecting money paid to Alfredo Shaw at any time and for any reason by your office, other prosecutorial authorities and/or law enforcement authorities, including but not limited to the Shelby County Sheriff's Office, the Memphis Police Department, the Tennessee Bureau of Investigation, the FBI, the DEA, the ATF, whether paid to Shaw or any of his family members, without any regard to any alleged reason for the payment. In other words, any and all checks or payments to Shaw for any reason are requested.

As you may know, the courts have held that under *Brady v. Maryland*, 373 U.S. 83 (1963), the duty of the prosecutor and law enforcement to disclose exculpatory evidence is ongoing, and remains in force even during post-conviction proceedings, as in this case. The "duty to disclose is ongoing." *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987) and "extends to all stages of the judicial process." *Smith v. Roberts*, 115 F.3d 818, 820(10th Cir. 1997). The state must continue to disclose exculpatory evidence during the course of federal habeas corpus proceedings, which is the case here. *Thomas v. Goldsmith*, 979 F.2d 746, 749-750 (9th Cir. 1992)(state has a "duty to turn over exculpatory evidence at trial, but . . . [also a] present duty to turn over exculpatory evidence relevant to the instant habeas corpus proceeding."). *See also Thompson v. Calderon*, 151 F.3d 918, 935 n. 12 (9th Cir. 1998)(Reinhardt, J., concurring and dissenting)("The *Brady* duty is an ongoing one, and continued to bind the prosecution throughout . . . habeas proceedings.").

In addition, the United States Court of Appeals for the Sixth Circuit has recently overturned a Shelby County, Tennessee murder conviction where the prosecution and authorities did not disclose that a witness against the defendant received a cash payment of $750 from the Federal Bureau of Investigation before the defendant's trial. *Thomas v. Westbrooks*, 849 F.3d 649 (6th Cir. 2017). As in *Thomas*, any payments made by to Alfredo Shaw should thus be disclosed as I request.

Thank you very much for your assistance in this matter. If you have any questions, please feel free to contact me.

Very truly yours,

Richard Lewis Tennent
Assistant Federal Public Defender

**OFFICE OF THE DISTRICT ATTORNEY GENERAL**

30th JUDICIAL DISTRICT ~ SHELBY COUNTY, TENNESSEE
201 Poplar Avenue, Third Floor, Memphis, TN 38103-1947
Tel. 901-222-1300 ~ Fax 901-222-7971
*www.scdag.com*

AMY P. WEIRICH
*District Attorney General*

October 28, 2019

Mr. Richard Lewis Tennent
Assistant Federal Defender
Federal Public Defender, Middle District of Tennessee
810 Broadway St., Ste. 200
Nashville TN 37203-3805

RE: Records request of documents regarding Alfredo Shaw

Mr. Tennent,

This Office has received a writing, copy enclosed, requesting certain evidence and documents concerning Alfredo Shaw. This writing was submitted, in part, as a Public Records request pursuant to the Tennessee Open Records Act, T.C.A. 10-5-701, *et seq*.

The Tennessee Open Records Act does not require this agency to sift through its files in an effort to locate the records requested. If there are specific records sought related to the individual listed by you, please provide that information. Your request is vague, overbroad and lacks sufficient specificity for this Office to comply. It is DENIED pending receipt of further clarification provided by you.

Enclosed also is a highlighted copy of the Public Records Policy of the Shelby County District Attorney General's Office. Specifically highlighted are Section II, sub F, Section III, D and F, and Section IV, B. You may refer to this Policy for future requests of records and may direct those requests to this Desk at the above mailing address or via email at publicrecords@scdag.com. You will also find the Public Records Policy at the Office website, www.scdag.com.

Respectfully,

*Timothy A. Beacham*

Assistant District Attorney General
Public Records Counsel and Request Coordinator
Publicrecords@scdag.com

OFFICE OF THE
FEDERAL PUBLIC DEFENDER
MIDDLE DISTRICT OF TENNESSEE

HENRY A. MARTIN
FEDERAL PUBLIC DEFENDER

810 BROADWAY, SUITE 200
NASHVILLE, TN 37203-3805
TELEPHONE: 615-736-5047
FAX: 615-736-5265

RECEIVED
OCT 08 2019
GENERAL WEIRICH'S
OFFICE

October 3, 2019

District Attorney General Amy Weirich
Office of the District Attorney General-Shelby County
201 Poplar Avenue, Suite 301
Memphis, Tennessee 38103

Re: Request For Disclosure Of Exculpatory Evidence Regarding Alfredo Shaw, DOB 3-14-1966

Dear General Weirich:

I am counsel for Tony Carruthers. The Attorney General for the State of Tennessee has recently moved that the Tennessee Supreme Court set a date for his execution.

As Mr. Carruthers' counsel, I write to request disclosure of any and all exculpatory evidence (including all documents) in the actual or constructive possession of your office regarding the credibility, reliability, and/or bias of Alfredo Shaw (DOB 3-14-1966), a witness who testified at the 1996 trial of Tony Carruthers in the Criminal Court of Shelby County, Tennessee. I make this request pursuant to all available authority, including the Tennessee Public Records Act.

The exculpatory evidence and documents concerning Alfredo Shaw which I request include, but is not limited to, exculpatory information about Alfredo Shaw regarding the following matters:

(1) The timing and nature of Alfredo Shaw's employment, work for, or assistance to, at any time, your office, other prosecutorial authorities and/or law enforcement authorities, including but not limited to the Shelby County Sheriff's Office, the Memphis Police Department, the Tennessee Bureau of Investigation, the FBI, the DEA, the ATF. It is my understanding that Shaw worked as an informant for Shelby County during the 1990s and even before;

(2) Any agreements or understandings, written or otherwise, between the your office, other prosecutorial authorities and/or law

enforcement authorities, including but not limited to the Shelby County Sheriff's Office, the Memphis Police Department, the Tennessee Bureau of Investigation, the FBI, the DEA, the ATF, and Alfredo Shaw about any and all consideration Shaw was to receive in exchange for his assistance to your office, other prosecutorial authorities, or law enforcement, including, but not limited to cash payments, reduction of charges, willingness to assist Shaw with pending or past criminal charges, or any other types of consideration to be provided to Shaw;

(3) Copies of checks or any other document reflecting money paid to Alfredo Shaw at any time and for any reason by your office, other prosecutorial authorities and/or law enforcement authorities, including but not limited to the Shelby County Sheriff's Office, the Memphis Police Department, the Tennessee Bureau of Investigation, the FBI, the DEA, the ATF, whether paid to Shaw or any of his family members, without any regard to any alleged reason for the payment. In other words, any and all checks or payments to Shaw for any reason are requested.

As you may know, the courts have held that under *Brady v. Maryland*, 373 U.S. 83 (1963), the duty of the prosecutor and law enforcement to disclose exculpatory evidence is ongoing, and remains in force even during post-conviction proceedings, as in this case. The "duty to disclose is ongoing." *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987) and "extends to all stages of the judicial process." *Smith v. Roberts*, 115 F.3d 818, 820(10th Cir. 1997). The state must continue to disclose exculpatory evidence during the course of federal habeas corpus proceedings, which is the case here. *Thomas v. Goldsmith*, 979 F.2d 746, 749-750 (9th Cir. 1992)(state has a "duty to turn over exculpatory evidence at trial, but . . . [also a] present duty to turn over exculpatory evidence relevant to the instant habeas corpus proceeding."). *See also Thompson v. Calderon*, 151 F.3d 918, 935 n. 12 (9th Cir. 1998)(Reinhardt, J., concurring and dissenting)("The *Brady* duty is an ongoing one, and continued to bind the prosecution throughout . . . habeas proceedings.").

In addition, the United States Court of Appeals for the Sixth Circuit has recently overturned a Shelby County, Tennessee murder conviction where the prosecution and authorities did not disclose that a witness against the defendant received a cash payment of $750 from the Federal Bureau of Investigation before the defendant's trial. *Thomas v. Westbrooks*, 849 F.3d 649 (6th Cir. 2017). As in *Thomas*, any payments made by to Alfredo Shaw should thus be disclosed as I request.

Thank you very much for your assistance in this matter. If you have any questions, please feel free to contact me.

Very truly yours,

Richard Lewis Tennent
Assistant Federal Public Defender

**<u>PUBLIC RECORDS POLICY</u>**

**<u>FOR</u>**

**<u>THE OFFICE OF THE DISTRICT ATTORNEY GENERAL</u>**

**<u>30TH JUDICIAL DISTRICT, SHELBY COUNTY, TENNESSEE</u>**

Pursuant to Tenn. Code Ann. § 10-7-503(g), the following Public Records Policy for the Office of the District Attorney General, 30th Judicial District, Shelby County, Tennessee is hereby adopted to provide economical and efficient access to public records as provided under the Tennessee Public Records Act ("TPRA") in Tenn. Code Ann. § 10-7-501, et seq.

The TPRA provides that all state, county and municipal records shall, at all times during business hours be open for personal inspection by any citizen of this state, and those in charge of the records will not refuse such right of inspection to any citizen, unless otherwise provided by state law. The public records of this Office are presumed to be open for inspection unless otherwise provided by law.

Personnel of this Office will timely and efficiently provide access and assistance to persons requesting to view or receive copies of public records. No provisions of this Policy will be used to hinder access to open public records. However, the integrity and organization of public records, as well as the efficient and safe operation of the Office, will be protected as provided by current law. Concerns about this Policy should be addressed to the Public Records Request Coordinator for this Office or to the Tennessee Office of Open Records Counsel ("OORC").

This Policy is available for inspection and duplication in the office of the Public Records Request Coordinator during regular Office business hours and online at <u>www.scdag.com</u>. This Policy will be reviewed annually or more often if need demands.

This Policy will be applied consistently throughout the various offices, departments, and/or divisions of this Office.

**I. Definitions**

A. *<u>Public Records</u>*: All documents, papers, letters, maps, books, photographs, microfilms, electronic data processing files and output, films, sound recordings, or other material, regardless of physical form or characteristics, made or received pursuant to law or ordinance or in connection with the transaction of official business by any governmental agency. This does not

include the device or equipment that may have been used to create or store the record. **However, no record of this Office related to a criminal case that results in conviction is considered a public record unless one (1) year has passed from the final judgment in the case, there are no pending post-conviction proceedings and/or other collateral attacks in either State or Federal court(s), and one (1) year has passed since any such post-conviction or collateral attack has been concluded.**

B. *Public Records Request Coordinator*: The individual, or individuals, designated in Section III, A.3 of this Policy, who has, or have, the responsibility to ensure public record requests are routed to the appropriate records custodian and are fulfilled in accordance with the TPRA.

C. *Records Custodian*: The office, official, or employee lawfully responsible for the direct custody and care of a public record. The records custodian is not necessarily the original preparer or receiver of the record.

**II. Requesting Access to Public Records**

A. Public record requests shall be made to the Public Records Request Coordinator ("PRRC") or his/her designee in order to ensure public record requests are routed to the appropriate records custodian and fulfilled in a timely manner.

B. Requests for inspection only will not be required to be made in writing. The PRRC may request a mailing or email address from the requestor for providing any written communication required under the TPRA.

C. Requests for inspection may be made orally, in writing, or by phone at 901-222-1300, or at publicrecords@scdag.com.

D. Requests for copies, or requests for inspection and copies, must be made in writing to: Public Records Desk, Shelby County District Attorney General's Office, 201 Poplar Ave., Ste. 11000, Memphis, TN 38103, or at publicrecords@scdag.com.

E. Proof of Tennessee citizenship by presentation of a valid state-issued form of identification is required as a condition to inspect or receive copies of public records.

F. All requests must be specific as to the record(s) desired by name, serialization, or other unique characteristic of the case(s) or record(s). This Office does not provide generalized research, analytical, statistical, or other measured data compiled as a result of a review of cases, files or other records. This Office will not create or re-create records that do not exist at the time of the request.

G. No records related to pending or contemplated criminal cases may be requested. Records related to criminal cases are not considered a public record unless one (1) year has passed from the final judgment in the case, there are no pending post-conviction proceedings and/or other collateral

attacks in either State or Federal court(s), and one (1) year has passed since any such post-conviction or collateral attack has been concluded.

## III. Responding to Public Records Requests

A. Public Record Request Coordinator

1. The PRRC will review public record requests and make an initial determination of the following:

    a. If the requestor provided evidence of Tennessee citizenship;

    b. If the records requested are described with sufficient specificity to identify them; and

    c. If this Office is the custodian of the records.

2. The PRRC will acknowledge receipt of the request within 10 working days and take any of the following appropriate action(s):

    a. Advise the requestor of this Policy and the elections made regarding:

        i. Proof of Tennessee citizenship;

        ii. Form(s) required for copies;

        iii. An estimate of fees, including labor and redaction costs;

        iv. Aggregation of multiple or frequent requests.

    b. If appropriate, deny the request in writing, providing the appropriate ground such as one of the following:

        i. The requestor is not, or has not presented evidence of being, a Tennessee citizen.

        ii. The request lacks specificity. This Office will attempt to assist in clarifying the request.

        iii. An exemption makes the record not subject to disclosure under the TPRA. Such exemption will be provided in a written denial.

        iv. This Office is not the custodian of the requested records.

        v. The records do not exist.

    c. If appropriate, contact the requestor to see if the request can be narrowed.

d. Where applicable, may forward the records request to the appropriate records custodian in the Office.

e. If requested records are in the custody of a different governmental entity, and the PRRC knows the correct governmental entity, advise the requestor of the correct governmental entity and PRRC.

B. Records Custodian

1. Upon receiving a public records request, a records custodian will promptly make requested public records available. If the records custodian is uncertain that an applicable exemption applies, the custodian may consult with the PRRC, other counsel, or the OORC.

2. If not practicable to promptly provide requested records because additional time is necessary to determine whether the requested records exist; to search for, retrieve, or otherwise gain access to records; to determine whether the records are open; to redact records; or for other similar reasons, then a records custodian will, within seven (7) business days from the records custodian's receipt of the request, send the requestor a completed Public Records Request Response Form or other suitable correspondence.

3. If a records custodian denies a public record request, he or she will deny the request in writing.

4. If a records custodian reasonably determines production of records should be segmented because the records request is for a large volume of records, or additional time is necessary to prepare the records for access, the records custodian will use the Public Records Request Response Form or similar method to notify the requestor that production of the records will be in segments and that a records production schedule will be provided as expeditiously as practicable. If appropriate, the records custodian will contact the requestor to see if the request can be narrowed.

5. If a records custodian discovers records responsive to a records request were omitted, the records custodian may contact the requestor concerning the omission and produce the records as quickly as practicable.

C. Redaction

1. If a record contains confidential information or information that is not open for public inspection, the records custodian will prepare a redacted copy prior to providing access. No record may be copied or inspected without first determining whether any confidential material within the record exists and must be redacted. If questions arise concerning redaction, the records custodian shall coordinate with counsel, the PRRC, or other appropriate parties regarding review and redaction of records. The records custodian and the

D. Fees will be based on the following schedule.

1. If physical paper copies are produced - $0.15 per page for letter- and legal-size black and white copies, $0.25 per page for letter- and legal-size color copies.

2. $15 for 1st digital disc, flash-drive or other similar device used to convey the record, $10 for each subsequent disc, flash-drive or other similar device as needed.

3. Labor when production time exceeds 1 hour. This rate may vary and will be determined based on the hourly rate of pay the lowest-paid employee engaged in the particular task of each step of the production process; i.e. a lower-paid employee may be assigned to complete a task of producing copies while a higher-paid employee may be tasked to perform any redactions. The time necessary to copy will be charged at the lower rate of pay; the time necessary to complete the redactions will be charged at the higher rate of pay.

4. If an outside vendor is used, the actual costs assessed by the vendor, including any retrieval fee if applicable.

E. Payment is to be made by cash, check or money order payable to the "**Shelby County District Attorney General's Office**" and presented to the PRRC; if by mail, addressed to:

Public Records Desk,
Shelby County District Attorney General's Office
201 Poplar Ave., Ste. 11000
Memphis, TN 38103.

Such payment will deposited by the Office within 7 working days.

F. Payment in advance is required before copies of records are provided.

G. Aggregation of Frequent or Multiple Requests. This Office may aggregate record requests in accordance with the Frequent and Multiple Request Policy promulgated by the OORC when more than three (3) requests are received within a calendar month, either from a single individual or a group of individuals deemed working in concert. The PRRC is responsible for making the determination that a group of individuals are working in concert. The PRRC or the records custodian must inform the individuals that they have been deemed to be working in concert and that they have the right to appeal the decision to the OORC. Routinely released and readily accessible records may be excluded from aggregation.

(Adopted July 1, 2017; rev'd July, 2018; May, June 2019)

PRRC may also consult with the OORC or with the Office of Attorney General and Reporter.

2. Whenever a redacted record is provided, a records custodian will provide the requestor with the basis for redaction, if requested. The basis given for redaction will be general in nature and not disclose confidential information.

**IV. Inspection of Records**

A. There will be no charge for inspection of public records. After the records have been appropriately redacted, such inspection will be supervised and require the presence of the PRRC or a staff member.

B. The location for inspection of records within this Office will be determined by either the PRRC or the records custodian.

C. The PRRC or records custodian may require an appointment for inspection or may require inspection of records at an alternate location. The PRRC may also require that the inspection be conducted in the presence of the PRRC or other staff.

**V. Copies of Records**

A. The PPRC or records custodian will promptly respond to a public record request for copies in the most economic and efficient manner practicable.

B. Copies will be available for pickup at a location specified by the records custodian or the PRRC.

C. Upon payment for postage or shipping, copies will be delivered at the requestor's designated address by the United States Postal Service or other delivery service. Records may also be delivered by electronic means where appropriate.

D. A requestor will not be allowed to copy, reproduce or transmit records with personal equipment.

**VI. Fees and Charges and Procedures for Billing and Payment**

A. Fees and charges for copies of public records will not be used to hinder access to public records.

B. The PRRC or records custodian will provide requestors with an estimate of the charges prior to producing copies of records and may require pre-payment of such charges before producing requested record.

C. When fees for copies and labor do not exceed $15, the fees may be waived. Requests for waivers for fees above $15 must be presented to the PRRC who is authorized to determine if such waiver is in the best interest of this Office and for the public good. Fees associated with aggregated records requests will not be waived.

RECEIVED
NOV 04 2019
Federal Public Defender's Office
Nashville, TN

IN THE CRIMINAL COURT OF TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS
DIVISION 5

| | | |
|---|---|---|
| TONY CARRUTHERS | ] | |
| | ] | |
| v. | ] | No. 94-02797, 94-02798, 94-02799, |
| | ] | 95-11128, 95-11129 |
| STATE OF TENNESSEE | ] | |

---

**AGREED ORDER DIRECTING THE MEMPHIS POLICE DEPARTMENT TO RELEASE DATA REGARDING ALFREDO SHAW TO THE SHELBY COUNTY JUSTICE REVIEW UNIT**

---

By agreement of the parties and pursuant to the Sixth, Eigth, and Fourteenth Amendments to the United States Constitution, Article 1 § 16 of the Tennesee Constitution, and Tenn. Code Ann. § 40-30-123, this Court hereby orders the Memphis Police Department to release the following information regarding Alfredo Shaw to Kevin Rardin, Asst. District Attorney General, Shelby County District Attorney General Justice Review Unit, 201 Poplar, 8th Floor, Memphis, TN 38103-1945. Specifically, within 30 days of the entry of this Order, the Memphis Police Department shall release the following information:

1. Any and all information about Mr. Alfredo Shaw's activities as an informant, any payments received, any promises made to help him out with any criminal charges, whether or not he was formally charged.
2. Whether Alfredo Shaw was determined to have provided false information

Filed 5. 9. 24
Heidi Kuhn, Clerk
BY JW D.C.

in any cases and if so, details regarding these findings.

3. Any information regarding instructions by agents of the Memphis Police Department to Mr. Shaw to contact Crime Stoppers and any payments made to Mr. Shaw by Crime Stoppers.

SO ORDERED this 9th day of May 2024.

Carlyn L. Addison

Criminal Court Judge Carlyn Addison

Approved for Entry:

**FEDERAL PUBLIC DEFENDER FOR**
**THE MIDDLE DISTRICT OF TENNESSEE**

Kelley J. Henry (BPR # 021113)
Chief, Capital Habeas Unit
810 Broadway, Suite 200
Nashville, TN 37203
Phone: (615) 736-5047
Email: Kelley_Henry@fd.org

SHELBY COUNTY DISTRICT ATTORNEY GENERAL
JUSTICE REVIEW UNIT

Kevin Rardin
201 Poplar Avenue, 8th Floor
Memphis, TN 38103-1945
Phone: (901) 222-1450
Email: Kevin.Rardin@scdag.com



| | | | | | |
|---|---|---|---|---|---|
| Name: Alfredo Bernard Shaw | | AKA: Jake | | | |
| Gaithor co. | DOB: 66 | POB: Shelby County | | Occup. | Bof I# |
| Height: 5'11" | Weight: 165 | Hair: Black | Eyes: Brown | Other | FBI # |
| Spouse: DNA | | Activity | | | So # |
| Kin: Floyzell Bailey "mother" | | Associates | | | 7618 |
| | | | | | DL# |
| Memphis, Tenn. | | | | | |

IDENTISEAL ®

F-2100.468

CONSENT TO TAPE RECORD AND MONITOR ALL PERSONAL AND TELEPHONE CONVERSATIONS

B.S. I, Alfreda B. Shaw do hereby affix my signature to this document with the
B.S. understanding that I give freely and voluntarily to the Memphis Police Department,
B.S. Organized Crime Strike Unit, and any officer assigned to this unit, consent to monitor
B.S. and tape record all of the conversations that I have with all persons and all telephone
B.S. conversations with people with whom I may have conversation. I do give this freely
B.S. and voluntarily, without any prior agreements, promises, or compensation, monetary or
B.S. otherwise. I understand that any conversations, whether through electronic recording
B.S. devices or telephone devices, or any conversations that I am a party to will be recorded
B.S. and they have my consent and my knowledge and my full and voluntary cooperation to
B.S. record these conversations.

B.S. I further understand and know that I may have to at some future time, and I am willing
B.S. and agreeable to, appear in any court or before the federal or state grand jury or any
B.S. investigation that is derived from any of these tape recorded conversations.

B.S. I give my consent to these officers to do this freely and voluntarily and with full
B.S. knowledge of what I am doing.

B.S. This agreement is for the period of time as indicated below in my handwriting.

from a period of Sept. 16, 1986 to Dec. 31, 1986.

WITNESSED BY:

Alfreda B. Shaw
Signed

L. M. Torrance

R. Thompson

CONSENT TO TAPE RECORD AND MONITOR ALL PERSONAL AND TELEPHONE CONVERSATIONS

I, *Alfredo B. Shaw* do hereby affix my signature to this document with the understanding that I give freely and voluntarily to the Memphis Police Department, Organized Crime Strike Unit, and any officer assigned to this unit, consent to monitor and tape record all of the conversations that I have with all persons and all telephone conversations with people with whom I may have conversation. I do give this freely and voluntarily, without any prior agreements, promises, or compensation, monetary or otherwise. I understand that any conversations, whether through electronic recording devices or telephone devices, or any conversations that I am a party to will be recorded and they have my consent and my knowledge and my full and voluntary cooperation to record these conversations.

I further understand and know that I may have to at some future time, and I am willing and agreeable to, appear in any court or before the federal or state grand jury or any investigation that is derived from any of these tape recorded conversations.

I give my consent to these officers to do this freely and voluntarily and with full knowledge of what I am doing.

This agreement is for the period of time as indicated below in my handwriting.

From: 3/13/87 to Sept 13, 1987

WITNESSED BY:

*Alfredo B. Shaw*
Signed

*L. M. Torrance*

*R. Thompson*

Z ICRS,86108019 *COURT STATUS* DKT#:86108019 RI#00082052 ":01
NAME:SHAW,ALFREDO BERNARD SEX:M RACE:B DOB: 66
ADDRESS: GAITHER COVE # MEMPHIS ,TN 38106
ARREST:04/18/86,0729 OFFS:#1SANDIDGE RICHARD #2NAME NOT ON FILE
CURR.COURT SET: 06/27/86 DIV:09 SESS:1 REASON:PRELIM HEARING #RESETS:04
ORIG.COURT SET: 04/21/86 DIV:11 SESS:1
TOTAL BOND SET:$ 5000

---

COURT:GS **CHARGE GROUP#:01** <DISPOSED >
01 39-1-501 ATTEMPT TO COMMIT FELONY - F <DISPOSED >
DISP:HELD TO STATE -06/27/86 COMMENTS: SENT-DT: 6/27/86
CRED: 0YRS 0MO 0DYS SENT-LOC: FINE:$ 0 COSTS:$ 0.00 AMT-DATE: 6/27/86
***BOND SUMMARY FOR CHARGE GROUP#:01***
BOND#1:D0082 COMPANY:CONTINENTA AMT:$ 5000 STATUS:INACTIVE
****HISTORY DATA FOR CHARGE GROUP#:01****

| RESET | DATE | DIV | SESS | REASON |
|---|---|---|---|---|
| # 1 | 04/21/86 | 11 | 1 | ARRAIGNMENT |
| # 2 | 05/05/86 | 10 | 1 | ATTORNEY |
| # 3 | 05/19/86 | 10 | 1 | REPORT |
| # 4 | 06/27/86 | 09 | 1 | PRELIM HEARING |

B/W NUMBER ISSUED DIV STATUS COSTS

**INQUIRY COMPLETED** - TRANSMIT TO VIEW CRIMINAL COURT

*Z ICRS,. *
NEXT PAGE. . BOOKING #:86108019 R&I #:00082052 BOND SET: 5,000
NAME:SHAW ALFREDO BENARD SEX:M RACE:B DOB:03/14/66

---

*** PRE-INDICTMENT CHARGES ***

| TCA CODE | T C A D E S C R I P T I O N | ENTRY | D/W DATE | IND. NO. |
|---|---|---|---|---|
| 39-1-501 | ATTEMPT TO COMMIT FELONY | HTS | | 86 03908 |
| 39-3-401 | BURGLARY I | OTHER | | 86 03908 |

IND:86 03908 AG:K7622 FOR:BURGLARY I < ACTIVE >
CURR-COURT SET:09/10/86 DIV:05 REASON:BA
*** B O N D S U M M A R Y ***

| POWER NUMBER | IND. NO. | AMOUNT | B O N D C O M P A N Y | STATUS |
|---|---|---|---|---|
| 91-0000D0082 | 86 03908 | 5,000 | CONTINENTAL INS & BONDING INC | ACTIVE |

* I N Q U I R Y C O M P L E T E *

*Z AHIS, *
NEXT PAGE. *R&I:00082052 SCSD:00000000 MPD:00000000
NAME:SHAW ALFREDO BERNARD S/R:M/B
ADDR: GAITHER COVE MEMPHIS TN

DATE:041886 BOOKING#: 86108019 NAME:SHAW ALFREDO BERNARD
TK BY/ON CHARGE GS/DISPOS CC/INDICT CC/DISPOS #BW #CBF NLT-NMT/LO
01 MP/AC ATTEMPT TO COMMIT F HS/062786
AMEND BURGLARY I IN/071886 /091086
(NO MORE BOOKING NUMBERS THIS RNI NUMBER )

*Z IRTK,10025,86108019,00,I * DATE 08/28/86 TIME 08:11

NAME:SHAW ALFREDO BERNARD RACE:BLACK
ADDR:922 GAITHER COVE SEX:MALE
DOB: /66

ARREST BY:MP ON:PC DATE:041886 TIME:0729 RPT#:000000 ASN:
OFFICERS:(1) 07848 SANDIDGE RICHARD C (2)
ARREST TICKET-01

COMPLAINANT: RUDY WHALEY . . . . RACE: .
ADDR.855 . .WOODLAND . . . SEX: .
.MPHS .TN. . DOB: .
LOCATION OF ARREST: . .THE MED CENTER . . .
.MPHS .TN. .

VEHICLE - LIC#. . ST. . YR. . TYP. . VIN. .
YR. . MAK. . MDL. . STY. . CLR. / . DISP. .

WEAPON - SER#: . MAK. . CAL. . TYP. .
SER#: . MAK. . CAL. . TYP. .

LAST RECORD

*Z IRPC, .*
R&I #: 00082052

NAME: LAST SHAW FIRST ALFREDO MID BERNARD SFX
ADDR: ST NO . DIR. . NAME.GAITHER COVE . SFX. . APT. .
CITY.MEMPHIS . STATE.TN. ZIP.00000 .
PHYS: HGT.511. WGT.165. HAIR.BLK. EYES.BRO. SKIN.DRK. RACE.B. SEX.M.
BIRTH: CITY.MPHS . STATE.TN. DOB. 66.
****** CRIMINAL CHARACTER CODES:ARM. . DNG. . MTL. . SUI. . RST. .
SSN. . FBI .938 188 EA7. OPR LIC. . ST. .
REMARKS: .HEART LEFT ARM .
.BULLET HOLE RIGHT ARM PIT .
BLD.MED. EDUC. . REL. . MAR-STAT.S. HNDCPD. . CLASS. . SEC-TYP.MIN.

A/C CODE R E M A R K S
. . . . . .
. . . . . .
. . . . . .
. . . . . .
. . . . . .
. . . . . .

* INQUIRY TRANSACTION COMPLETE *

```
KZ IRRA,$10025,00082052,I,           ,0169918707* R&I NUMBER:00082052

INMATE: LAST: SHAW                    FIRST: ALFREDO     MID: BERNARD     JR/SR:

NAME: LAST .SHAW                 . FIRST.GEORGE      . MID.            . JR/SR. .
ST-NO.2436   . ST-DIR.   . ST-NAME.LATHAM                . SUFFIX.  . APT.     .
CHG.N. CITY.MPHS           . STATE.TN. ZIP.000000    . RELATION*FATHER        *

NAME: LAST .BAILEY               . FIRST.FLOYZELL    . MID.            . JR/SR. .
ST-NO.2317   . ST-DIR.   . ST-NAME.SPRINGDALE            . SUFFIX.  . APT.     .
CHG.N. CITY.MPHS           . STATE.TN. ZIP.000000    . RELATION*MOTHER        *

NAME: LAST .BAILEY               . FIRST.SIDNEY      . MID.            . JR/SR. .
ST-NO.2317   . ST-DIR.   . ST-NAME.SPRINGDALE            . SUFFIX.  . APT.     .
CHG.N. CITY.MPHS           . STATE.TN. ZIP.000000    . RELATION*BROTHER       *

NAME: LAST .BAILEY               . FIRST.RACHAEL     . MID.            . JR/SR. .
ST-NO.2317   . ST-DIR.   . ST-NAME.SPRINGDALE            . SUFFIX.  . APT.     .
CHG.N. CITY.MPHS           . STATE.TN. ZIP.0000000   . RELATION*SISTER        *


    *                        NO MORE RECORDS                        *
     NEXT  *    *                                                   SEC-ID *00000*


KZ IRRE,                                 .*       SEC-ID.00000.  R&I#:00082052

---- REAL NAME & ADDRESS ----

NAME: LAST.SHAW                 . FIRST.ALFREDO     . MID.BERNARD      . JR/SR. .

ADDR: ST#.        . DIR.   . NAME.GAITHER COVE          . SUFFIX.   .   APT.      .
      CITY.MEMPHIS       . STATE.TN. ZIP.00000       .                   CHANGE.N.

---- EMPLOYER NAME & ADDRESS ----

NAME: .                                          .       NO EMPLOYER DATA FOUND

ADDR: ST#.        . DIR.   . NAME.                      . SUFFIX.   .   APT.      .
      CITY.              . STATE.   . ZIP.           . OCCUPATION.                .
                                                                      CHANGE.N.

                           INQUIRY COMPLETE
```

KZ TIES,DS *

( TRANSMIT TO CHECK FOR MORE PAGES)

RR.ILLIC0000
07:51 08/28/00 01052
07:51 08/28/86 00258 TNMPD00B0
KCA79999999
TXT
082886 0752

.GZ110 1086
MC QUEEN VERDENE
723 20TH ST 3 ROCK ISLAND 61201
6L47S5Q278265 75 CADILLAC COUPE
4250-8603-2091

Veh. operated at time Shaw first came OCU




CRIMINAL INTELLIGENCE

**SUBJECT'S NAME:** Alfredo Bernard Shaw

**RESIDENCE ADDRESS:** Gaither Cv.

**CITY:** Mph, TN 38106

**RES. PHONE:**

**FILE NO.:** 1069

**ALIASES:** "Jake" or "Bernard"

**BUSINESS ADDRESS:**

**CITY:**

**BUS. PHONE:**

**B OF I NO.:** 00082052

**SEX:** M B

**DATE OF BIRTH:** 06

**HEIGHT:** 5'11"

**WEIGHT:** 157 lbs.

**HAIR:** Blk

**EYES:** Brn.

**TYPE ACTIVITY:**

**VEH. YEAR MAKE BODY TYPE COLOR LIC. NO. YEAR STATE**

**FBI NO.:**

**VEH. REGISTERED TO: ADDRESS CITY RELATION TO SUBJ.**

**DRIVER LIC. NO.:**

**NAME OF SPOUSE: OCCUPATION EMPLOYED BY**

**SOC. SEC. NO.:**

PHOTO

**HANGOUTS**

Girlfriend's House: Bullington

**ASSOCIATES**

Alice Morris No Phone Above address

**MISC. INFO. - ADDITIONAL ADDRESSES**

C-2100.161

# SUMMARY INFORMANT PAYMENT RECORD

Informant Code Name or Number: 1069

**Form A-6**

| Payment Date | Case or Reference Number | Amount Paid |
|---|---|---|
| 10-15-03 | D310000545 SH | $300.00 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**This form should be filed on top of the applicable informant file and should reflect all payments made to the informant. Receipts for payment to informants should back up this file.**

Revised 09/20/2000

OCUCI 1.0

Memphis Police Department
Organized Crime Unit
Confidential Informant Agreement

I x Alfredo Shaw, understand and will comply with the following Organized Crime Unit regulations.

1. The Confidential Informant must not sell or deliver or cause to be sold or delivered any controlled substance, dangerous drug, marijuana, or any substance purported to be same, to any person who would then in turn sell or deliver said controlled substance, dangerous drug, marijuana, or any substance purported to be same, to any member of the unit or any other person.

2. The Confidential Informant must not use their sex, sexuality, or sexual activity to induce or persuade any individual.

3. The Confidential Informant must not conduct a search of any suspect, person, house, papers, or personal effects.

4. The Confidential Informant must not engage in any activities that would constitute entrapment.

5. The Confidential Informant must not engage in any unlawful acts, except as specifically authorized by Officers of the Organized Crime Unit, and is subject to prosecution for any unauthorized unlawful acts.

6. The Confidential Informant is not an employee of the Organized Crime Unit and may not represent himself /herself as such.

7. When the Confidential Informant is cooperating with the Organized Crime Unit in exchange for consideration by a prosecuting office(s), the Organized Crime Unit cannot make any prosecutive or sentencing promises. Upon the request of the Confidential Informant, the Organized Crime Unit will advise the prosecuting office(s) of the nature and extent of the Confidential Informant's assistance.

8. The Confidential Informant agrees to cooperate with the **ORGANIZED CRIME UNIT** of their own free will and accord, and not as a result of any intimidation or threats.

9. The Confidential Informant understands and agrees that any money issued to him/her for the purchase, as evidence, of controlled substances is to be used solely for that purpose. If no such purchase is made, or if such a purchase is made for less than the total sum furnished, he/she will forthwith refund the sum so furnished or the balance thereof, as the case may be, to the issuing officer of the Organized Crime Unit. In any event, upon demand by the issuing officer of the Organized Crime Unit at any time, he/she will forthwith refund to the issuing officer of the Organized Crime Unit the total amount of any sum thus furnished to him/her that has not yet been expended by him/her for the purchase, as evidence, of controlled substances. Furthermore, it is understood that this money is the property of the **ORGANIZED CRIME UNIT** and that misuse or conversion of the same to his/her personal use will render him/her liable to prosecution.

Signed: x Alfredo Shaw Date: 10-15-03

Contact Officer: Sgt. P. Wright Jr. Alternate: Sgt. J. Griffin

Supervisor : Lt. R Y Adams

OCUCI 2.0

Memphis Police Department
Organized Crime Unit

Consent to Record

I Alfredo Shaw, do hereby affix my signature to this document with the understanding that I give freely and voluntarily, to the Memphis Police Department, Organized Crime Unit, and any officer assigned to this unit, consent to monitor and tape record all of the conversations that I have with all persons, including telephone conversations. I do give this freely and voluntarily, without any prior agreements, promises, or compensation, monetary or otherwise. I understand that any conversations, whether through electronic recording devices or telephone devices, or any conversations that I am a party to, will be recorded and they have my consent and my knowledge, and my full and voluntary cooperation, to record these conversations.

I further understand and know that I may have to, at some future time, and I am willing and agreeable to, appear in any court or before the Federal or State Grand Jury or any investigation that is derived from any of these tape-recorded conversations.

I give my consent to these officers to do this freely and voluntarily and with full knowledge of what I am doing.

This agreement is valid while I am an active Cooperating Individual/Confidential Informant for the Memphis Police Department Organized Crime Unit.

Witness by:

| | | | |
|---|---|---|---|
| [signature] | 10-15 | Sgt. [signature] JR. | 10-15-03 |
| Signature | Date | Contact Officer | Date |
| Lt. R.Y. Adams | 10-15-03 | Sgt. J. Griffin | 10-15-03 |
| Supervisor | Date | Alternate Contact Officer | Date |

OCUCI 3.0

CI Number: 1069 Code Name: Jake Wright Date: 10/15/03

Full Name: Shaw Alfredo (Last, First, Middle) Spouse's Name:

Aliases: SS#: -2864

Home Address: Creek Stone Cr 38127 (Street Address, City, State, ZIP) Home Phone: -5768

Occupation: Employer: (Name, Address, City, State)

License: State: Veh: (Year, Make, Model, Color/Description)

Race: Sex: DOB: 66 - (YY-MM-DD) POB: (City, State)

Height: 5'11 Weight: 190 Hair: BLACK Eyes: BRO Photos Attached: (✓) (✓) (Mandatory: Front, Right Profile)

Scars/Tattoos/Other:

True Name Signature:

1. Alfedo Shaw
2. Alfedo Shaw
3. AlFedo Shaw
4. Alfredo Shaw
5. Alfredo Shaw

Code Name Signature:

1. Jake Wright
2. Jake Wright
3. Jake Wright
4. Jake Wright
5. Jake Wright

Applicant

Is Is not

( ) (X) A minor (under 18 years old, requires OCU Commander's approval)

( ) ( ) On federal or non-federal parole, probation or supervised release

( ) ( ) Working in a like capacity for any other law enforcement agency

( ) ( ) Active/inactive OCU CI(Prior Contact Officer )



Right Thumb Print

Contact Officer: Sgt. P. Wright Jr (Name) 9511 (IBM) Alternate: Sgt. J. Gifford (Name) 3142 (IBM)

**Information Verification/Criminal History Checks** - SCATS & NCIC must be completed before supervisor approval. Attach applicable printouts for criminal history, SCATS, NCIC, TN DMV and B of I photo.

| | | | | |
|---|---|---|---|---|
| SCATS/local arrest check | ( ) Positive | ( ) Negative | By: | Date: |
| NCIC/Criminal History | ( ) Positive | ( ) Negative | By: | Date: |
| Parole/Probation Check | ( ) Positive | ( ) Negative | By: | Date: |
| TN DMV Photo | ( ) Positive | ( ) Negative | By: | Date: |
| OCU CI File Check | ( ) Positive | ( ) Negative | By: | Date: |

**Reviewed and Approved By:**

Lt. R.J. Adams (Supervisor) 10-15-03 (Date) Capt. J. D. Hall (CI Coordinator) 10-15-03 (Date)




Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 430



Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 431

```
*Z AHIS$000820520640837634016991866 2  38                         01*
NEXT PAGE:     :                     *R&I:00082052 SCSD:00000000 MPD:00000000
   NAME:SHAW                   ALFREDO     BERNARD          S/R:M/B  DOB       6*
   ADDR:              GAITHER CV                       MPHS                 TN
-------------------------------------------------------------------------------
DATE:091688 BOOKING#: 88260103 NAME:SHAW                   ALFREDO     BENARD
TK BY/ON        CHARGE        GS/DISPOS CC/INDICT CC/DISPOS #BW #CBF NLT-NMT/LO
01 SO/WT CR88251002/88214050
02 SO/BS BURGLARY II          BS/091688
03 SO/BS THREATENING/COERCIN BS/091688

DATE:080188 BOOKING#:88214050 NAME:SHAW                   ALFREDO     BERNARD
01 SO/WT CR88183003
         BURGLARY II          HS/080188 IN/063088 GP/110388       01 003 -    /SC
         GRAND LARCENY        HS/080188 IN/063088
   AMEND BURGLARY II                            GP/110388       01 003 -    /SC
         REC/CON STOLEN PROP HS/080188 IN/063088
   AMEND BURGLARY II                            GP/110388       01 003 -    /SC
                 (       MORE ARREST TICKETS                  )
```

```
*Z AHIS$0008205206054391800169918711  36                                  02*
NEXT PAGE.   :                             *R&I:00082052 SCSD:00000000 MPD:00000000
   NAME:SHAW                ALFREDO      BERNARD            S/R:M/B  DOB:     66*
   ADDR:              GAITHER                         COVE  MEMPHIS                 TN
------------------------------------------------------------------------------------------
DATE:042288 BOOKING#: 88113034 NAME:SHAW                     ALFREDO
TK BY/ON        CHARGE         GS/DISPOS CC/INDICT CC/DISPOS #BW #CBF NLT-NMT/LO
01 SO/WT GS88112078
         THREATENING/COERCIN HS/060388            DW/120188

DATE:040488 BOOKING#:88095018 NAME:SHAW                     ALFREDO      B
01 SO/WT GS88091003
         BURGLARY II          NP/050688

DATE:010588 BOOKING#:88005029 NAME:SHAW                     ALFAGEDO
01 SO/WT GS87356006
         BURGLARY II          HS/030388 IN/120288 GP/120888          003 -    /SC
                 (      MORE ARREST TICKETS                   )
```

```
*Z AHIS,                                                                        *
NEXT PAGE.                                  *R&I:00082052 SCSD:00000000 MPD:00000000
   NAME:SHAW                   ALFREDO      BERNARD           S/R:M/B   DOB:     66*
   ADDR:               GAITHER                           MEMPHIS                 TN
-------------------------------------------------------------------------------------
DATE:112186 BOOKING#: 86325058 NAME:SHAW                   ALFREDO      BENARD
TK BY/ON         CHARGE          GS/DISPOS CC/INDICT CC/DISPOS #BW #CBF NLT-NMT/LO
01 SO/CV ATTEMPT TO COMMIT F CV/112186

DATE:041886 BOOKING#:86108019 NAME:SHAW                   ALFREDO      BERNARD
01 MP/AC ATTEMPT TO COMMIT F HS/062786
   AMEND BURGLARY  I                   IN/071886
   AMEND ATTEMPT TO COMMIT F                     GP/112186         002 -     /SC
                        (NO MORE BOOKING NUMBERS THIS RNI NUMBER )
```

```
*Z SCWW.
                                                        ASP#.86108036. RNI#.00082052.
  NAME: LAST.SHAW                .  FIRST.ALFREDO     . MID.BERNARD     . SFX. .
  ADDR: ST NO.       . DIR.  . NAME.GAITHER COVE          . SFX.   . APT.      .
         CITY.MEMPHIS       .  STATE.TN. ZIP.00000    .
  PHYS: HGT.511. WGT.165. HAIR.BLK. EYES.BRO. SKIN.DRK. RACE.B. SEX.M.
        BIRTH: CITY.MPHS          . STATE.TN. DATE.    466.
 ****** CRIMINAL.CHARACTER.CODES: ARM.  . DNG.  . MIL.  . SUI.  . RST.  .
  SSN.          . FBI..938188EA7   . OPR LIC.                          . ST.   .
  REMARK:  .HEART LEFT ARM
           .BULLET HOLE RIGHT ARM PIT

  WRNT: NO.GS89230110. DATE.081889. TP.SW. CT/DV.GS/12. CASE.00000000.00.
  NAME: LAST.SHAW                .  FIRST.ALFREDO     . MID.BERNARD     . SFX. .
  ADDR: .        .   .GAITHER                  .CO.     .
        .MEMPHIS       .TN.         .
        ISSUING ST.TN. ISSUING COUNTY.SHELBY           . INDICTMENT#.
  CHRGS:.           .39-3-1103   PETIT LARCENY

,****** NO ADDITIONAL WARRANTS FOR THIS INDIVIDUAL FOUND ON THE SYSTEM ******.
```

CI PAYMENTS FOR THIS MONTH

| CI NUMBER | OFFICER | ISSUE DATE | AMOUNT SPENT: | RECEIPT 1 |
|---|---|---|---|---|
| 0 | 61 | 91/12/02 | 170.00 | 12261 |
| 584 | 5402 | 91/12/10 | 20.00 | 12324 |
| 584 | 5402 | 91/12/20 | 75.00 | 12422 |
| 600 | 1536 | 91/12/11 | 20.00 | 12342 |
| 600 | 1536 | 91/12/12 | 950.00 | 12364 |
| 600 | 1536 | 91/12/20 | 750.00 | 12421 |
| 600 | 1536 | 91/12/31 | 450.00 | 12445 |
| 637 | 5242 | 91/12/12 | 25.00 | 12357 |
| 678 | 1499 | 91/12/23 | 80.00 | 12424 |
| 678 | 3324 | 91/12/19 | 20.00 | 12407 |
| 758 | 9344 | 91/12/04 | 40.00 | 12293 |
| 758 | 9344 | 91/12/10 | 600.00 | 12332 |
| 1069 | 1536 | 91/12/05 | 20.00 | 12302 |
| 1188 | 655 | 91/12/02 | 40.00 | 12266 |
| 1188 | 1448 | 91/12/05 | 150.00 | 12303 |
| 1279 | 9344 | 91/12/11 | 25.00 | 12348 |
| 1293 | 3581 | 91/12/20 | 50.00 | 12420 |
| 1293 | 3581 | 91/12/31 | 60.00 | 12444 |
| 1345 | 8792 | 91/12/18 | 75.00 | 12393 |
| 1458 | 4662 | 91/12/04 | 50.00 | 12276 |
| 1573 | 8792 | 91/12/18 | 200.00 | 12392 |
| 1625 | 482 | 91/12/07 | 700.00 | 12313 |
| 1625 | 3324 | 91/12/13 | 20.00 | 12372 |
| 1625 | 9255 | 91/12/19 | 300.00 | 12411 |
| 1638 | 3134 | 91/12/17 | 75.00 | 12383 |
| 1678 | 694 | 91/12/06 | 75.00 | 12311 |
| 1678 | 694 | 91/12/10 | 500.00 | 12331 |
| 1678 | 694 | 91/12/17 | 75.00 | 12381 |
| 1694 | 663 | 91/12/11 | 800.00 | 12340 |
| 1708 | 3324 | 91/12/13 | 75.00 | 12369 |
| 1767 | 7291 | 91/12/13 | 125.00 | 12367 |
| 1768 | 694 | 91/12/04 | 75.00 | 12287 |
| 1774 | 482 | 91/12/13 | 20.00 | 12375 |
| 1792 | 482 | 91/12/20 | 400.00 | 12415 |
| 1810 | 655 | 91/12/18 | 50.00 | 12406 |
| 1817 | 3559 | 91/12/04 | 975.00 | 12291 |
| 1817 | 4350 | 91/12/13 | 40.00 | 12376 |
| 1819 | 9291 | 91/12/12 | 700.00 | 12365 |
| 1825 | 3134 | 91/12/04 | 20.00 | 12294 |
| 1841 | 2510 | 91/12/13 | 300.00 | 12370 |
| | | | 9195.00S | |
| | | | | 40T |

69

ORGANIZED CRIME UNIT

CI-STATUS CHANGE

The following changes are to be made to the CI-FILE # 1069 effective immediately.

TERMINATION DATE: 12-11-91

WARNING: Kept money

STREET NAME: Benard Shaw

TYPE OF INFORMANT: ______
INFORMANT DEF/INFORMANT RESTRICT/INFORM

NAME: ______

HEIGHT: 5'11 WEIGHT: 157 HAIR COLOR: BS EYE COLOR: Br

SCARS: ___ TATTOOS: ___

ADDRESS: Gaither Cv HOME PH: 2749484

CITY: Memphis STATE: Tenn WORK PH: ______

SECOND ADDRESS: /

COMMENTS: Kept 475.00 on PC Buy

Sgt C Shaff 12/11/91
OFFICER SIGNATURE DATE

**MEMPHIS POLICE DEPARTMENT**

**ORGANIZED CRIME UNIT**

**INTER OFFICE MEMO**

**TO:** LT. CHUCK BRYANT

**FROM:** SGT. C.L. HUFF

**DATE:** DECEMBER 11, 1991

**SUBJECT:** LOST BUY MONEY

ON 12-6-91, ALFREDO BERNARD SHAW, C/I #1069, WAS ISSUED $475.00 ON RECEIPT #12309 FOR THE PURPOSE OF MAKING A P/C BUY FOR A SEARCH WARRANT. THE WRITER TOOK SHAW TO SOUTHWALL AND LAMAR WHERE THE C/I GOT OUT OF THE CAR AND WAS GOING TO WALK TO A HOUSE ON SOUTHWALL TO MAKE THE P/C BUY.

AS OF THIS DATE THE C/I HAS NOT RETURNED THE MONEY OR NARCOTICS BOUGHT WITH THE MONEY AND HAS NOT MADE ANY ATTEMPTS TO CONTACT THE WRITER OR THIS OFFICE.

AN OFFENSE REPORT WAS TURNED IN ON TODAY'S DATE, REPORT #9112113682 AND A WARRANT WILL BE OBTAINED FOR HIS ARREST.

MEMPHIS POLICE DEPARTMENT

ORGANIZED CRIME UNIT

INTER OFFICE MEMO

TO: LT. CHUCK BRYANT

FROM: SGT. C.L. HUFF

DATE: DECEMBER 11, 1991

SUBJECT: LOST BUY MONEY

ON 12-6-91, ALFREDO BERNARD SHAW, C/I #1069, WAS ISSUED $475.00 ON RECEIPT #12309 FOR THE PURPOSE OF MAKING A P/C BUY FOR A SEARCH WARRANT. THE WRITER TOOK SHAW TO SOUTHWALL AND LAMAR WHERE THE C/I GOT OUT OF THE CAR AND WAS GOING TO WALK TO A HOUSE ON SOUTHWALL TO MAKE THE P/C BUY.

AS OF THIS DATE THE C/I HAS NOT RETURNED THE MONEY OR NARCOTICS BOUGHT WITH THE MONEY AND HAS NOT MADE ANY ATTEMPTS TO CONTACT THE WRITER OR THIS OFFICE.

AN OFFENSE REPORT WAS TURNED IN ON TODAY'S DATE, REPORT #9112113682 AND A WARRANT WILL BE OBTAINED FOR HIS ARREST.



Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 439

LARceny Other —

**MEMPHIS POLICE DEPARTMENT**

**OFFENSE/OFFICER WORKSHEET SUPPLEMENT**

REPORT # 91/12/11/3682

PAGE ____ OF ____

## VICTIM INFORMATION

MORE? ____

Victim (L,F,M) Memphis Police Dept
Residence Address 247 / / Washington / / St
City/State/Zip Memphis Tenn
Business Name Organized Crime Unit
Business/Other ___ / ___ / ___ / ___ / ___
City/State/Zip ____

Sex ____ Race ____ Age ____
DOB __ / __ / __ Marital Status ____
Residence Phone ____ / ____ - ____
Bureau Victim to Call ____
Phone ____ / ____ - ____ Ext ____
Identify Suspect? ____

Victim (L,F,M) ____
Residence Address ___ / ___ / ___ / ___ / ___
City/State/Zip ____
Business Name ____
Business/Other ___ / ___ / ___ / ___ / ___
City/State/Zip ____

Sex ____ Race ____ Age ____
DOB __ / __ / __ Marital Status ____
Residence Phone ____ / ____ - ____
Bureau Victim to Call ____
Phone ____ / ____ - ____ Ext ____
Identify Suspect? ____

## WITNESS INFORMATION

MORE? ____

Name (L,F,M) SHAW, ALFREDO BENARD
Residence Address ___ / [illegible] Ci / ___ / ___
City/State/Zip Memphis Tenn
Business/Other ___ / ___ / ___ / ___ / ___
City/State/Zip ____

Sex Male Race Black Age 25
Residence Phone ____
Call Bureau ____ ID Suspect? ____
Business Name ____
Phone ____ / ____ - ____ Ext ____

Name (L,F,M) ____
Residence Address ___ / ___ / ___ / ___ / ___
City/State/Zip ____
Business/Other ___ / ___ / ___ / ___ / ___
City/State/Zip ____

Sex ____ Race ____ Age ____
Residence Phone ____ / ____ - ____
Call Bureau ____ ID Suspect? ____
Business Name ____
Phone ____ / ____ - ____ Ext ____

## SUSPECT INFORMATION

MORE? ____

Name (L,F,M) Shaw Alfredo Benard
AKA (L,F,M) ____
Slang Nickname ____
Residence Address ___ / [illegible] / ___ / Cir
Business/Other ___ / ___ / ___ / ___ / ___
Hair/Length Short /Color BK /Style ____
Facial Hair/Color ____ /Style ____
Complexion ____ Demeanor ____ General Appearance ____
Scars/Marks ____ /Location ____ /Description ____

Sex Male Race Black Age 25
DOB /66 Height 5'11 Weight 157
Marital Status ____
Residence Phone -9404
Phone ____ / ____ - ____ Ext ____
Eyes ____ Glasses? ____
Voice ____ Speech Good
Build ____

| | Color | Type | Desc. |
|---|---|---|---|
| Shirt/Blouse | | | |
| Pants/Skirt | | | |
| Accessories | | | |

Known/Related Victim? ____ How ____ How Arrested ____

**Multiple Suspects**

| Number | Black | White | Other |
|---|---|---|---|
| Male | | | |
| Female | | | |

Group? ____ Name ____

**SUSPECT VEHICLE**

Make ____ Model ____ Style ____ Year ____ Color ____ / ____
License # ____ License State ____ Suspect Vehicle ID? ____ Disposition ____
Features ____

Name (L,F,M) ____
AKA (L,F,M) ____
Slang Nickname ____
Residence Address ___ / ___ / ___ / ___ / ___
Business/Other ___ / ___ / ___ / ___ / ___
Hair/Length ____ /Color ____ /Style ____
Facial Hair/Color ____ /Style ____
Complexion ____ Demeanor ____ General Appearance ____
Scars/Marks ____ /Location ____ /Description ____

Sex ____ Race ____ Age ____
DOB __/__/__ Height ____ Weight ____
Marital Status ____
Residence Phone ____ / ____ - ____
Phone ____ / ____ - ____ Ext ____
Eyes ____ Glasses? ____
Voice ____ Speech ____
Build ____

| | Color | Type | Desc. |
|---|---|---|---|
| Shirt/Blouse | | | |
| Pants/Skirt | | | |
| Accessories | | | |

Known/Related Victim? ____ How ____ How Arrested ____

**Multiple Suspects**

| Number | Black | White | Other |
|---|---|---|---|
| Male | | | |
| Female | | | |

Group? ____ Name ____

**SUSPECT VEHICLE**

Make ____ Model ____ Style ____ Year ____ Color ____ / ____
License # ____ License State ____ Suspect Vehicle ID? ____ Disposition ____
Features ____



Case: 26-5434 Document: 3 Filed: 05/16/2026 Page: 440

F-2100 470A (Front) New 6/88

## M.O. INFORMATION

MORE? ____

Type of Business ____
Place of Attack ____
Targets ____ / ____
Point of Entry ____
Tools Used ____
How Entered ____
Type of Structure ____
Description of Area ____
Security Used ____
Point of Exit ____
How Tools Used ____
Weather ____ Lighting ____
Weapon Used ____
Weapon Color ____
Weapon Type ____
Weapon Size ____
Suspect Actions ____ / ____ / ____
Words Spoken ____

## WORTHLESS DOCUMENT INFORMATION

MORE? ____

Type Instrument ____ Instrument No. ____ Date __/__/__
Card Company ____ Account Name ____ Color ____
Signature ____
Bank Name ____
Instrument Amount ____
Amount of Loss ____
Preparation Method ____
ID Used ____
Who Accepted Transaction (Victim/Complainant/Witness) ____

## PROPERTY INFORMATION

MORE? ____

01 Currency (circled)
02 Jewelry, Precious Metal
03 Clothing
04 Office Equipment
05 TV, Stereo, Radio, Camera, etc.
06 Firearms
07 Household Goods
08 Appliances
09 Consumable Goods
10 Livestock
11 Miscellaneous
12 Musical Instruments
13 Sporting Goods

Property Code 01 Item Type $475.00 Item Description Cash / ____
Color ____ Brand Name ____ Model # ____ Serial # ____
Unit/Measure ____ Size ____ Quantity Taken ____ $$ Taken ____ $$ Recovered ____

Property Code ____ Item Type ____ Item Description ____ / ____
Color ____ Brand Name ____ Model # ____ Serial # ____
Unit/Measure ____ Size ____ Quantity Taken ____ $$ Taken ____ $$ Recovered ____

Property Code ____ Item Type ____ Item Description ____ / ____
Color ____ Brand Name ____ Model # ____ Serial # ____
Unit/Measure ____ Size ____ Quantity Taken ____ $$ Taken ____ $$ Recovered ____

Property Code ____ Item Type ____ Item Description ____ / ____
Color ____ Brand Name ____ Model # ____ Serial # ____
Unit/Measure ____ Size ____ Quantity Taken ____ $$ Taken ____ $$ Recovered ____

Property Code ____ Item Type ____ Item Description ____ / ____
Color ____ Brand Name ____ Model # ____ Serial # ____
Unit/Measure ____ Size ____ Quantity Taken ____ $$ Taken ____ $$ Recovered ____

## NARRATIVE INFORMATION

MORE? ____

On 12-6-91 the above Described MB who is a CI for Memphis Police Org. Crime Unit was assigned $475.00 on Rec 12304 for the purpose of making a Probable Cause Buy. The CI took the money & has not returned the money or has not tried to contact this office as of this date.

438



F-2100 470A (Back) Rev. 6/88

# Shelby County Sheriff's Office

*Bill Oldham, Sheriff*

December 19, 2017

Mr. Paul R. Bottei
Assistant Federal Public Defender, Middle District
810 Broadway, Suite 200
Nashville, TN 37203-3805

RE: **Request for Records—Tony Carruthers v. Westbrooks, USDC 08-2425**
**Records of Alfredo Shaw from "1990's and even before"**

Dear Mr. Bottei:

You have made what we construe to be a Tennessee Public Records Act request wherein you asked that the Shelby County Sheriff's Office provide you, on behalf of your client, certain records pertaining to Alfredo Shaw and his work as a confidential informant. Last month, you provided additional information to assist us in responding.

Several things should be addressed at the outset pertaining to your client's pending writ of habeas petition matter.

1. Your client's appeal of the federal district court's denial of his writ of habeas corpus is now pending before the Sixth Circuit Court of Appeals. By Order filed January 25, 2016, the Sixth Circuit allowed him to proceed on the following issues: (1) whether the trial court violated Carruthers's right to counsel when it compelled him to proceed pro se at trial; (2) whether Carruthers was denied his right to counsel in violation of United States v. Cronic; (3) whether Carruthers was competent to stand trial and to waive his right to counsel; and (4) whether Carruthers procedurally defaulted (1), (2) and/or (3).

It is duly noted that the Sixth Circuit did not grant permission to pursue any claims related to Mr. Shaw.

2. By Order entered October 2, 2013, federal district court Judge Jon P. McCalla denied your client's discovery requests pertaining to Mr. Shaw: (1) a subpoena ad testificandum for the deposition of Alfredo Shaw; (2) require the production, by the Shelby County Sheriff, Memphis Police Department, and federal law enforcement agencies in Memphis, identifying the work done by and/or consideration received by Shaw for his assistance on cases from 1992-2006; and (3) a subpoena ad testificandum to the trial prosecutors on the grounds of their work with, involvement with, discussions with, offers to, assistance to, and contact with Shaw. The Judge noted that your client had been granted, "extensive discovery in the case," that the discovery

201 Poplar Ave., Room 9-15 • Memphis, TN 38103 • 901-222-2116 • Fax 901-222-5657
Debra.Fessenden@shelby-sheriff.org

period was closed, dispositive motions had been filed, and there was no good cause to grant discovery.

Your office is attempting to circumvent the rulings of the federal district court as well as the Sixth Circuit Court of Appeals, in addition to the federal statute governing discovery habeas corpus proceeding.

3. Judge McCalla's Order of October 2, 2013, fully outlines the reasons the State of Tennessee elected not to rely on Mr. Shaw's testimony during the trial of your client:

> The prosecution asserted that because it refused to aid Shaw with his continued arrests, he "called the media and began this program of recantation or attempted recantation." …The prosecution noted that Shaw's behavior in constantly getting arrested and seeking aid from them was the reason why they announced in open court that Shaw would not testify for the prosecution at trial…The decision was not because the prosecution did not believe that Shaw's prior testimony was true, but because they could not "give [Shaw] carte blanc to go out and get arrested.

4. By filing of October 31, 2012, your client submitted a variety of documents which indicate that Mr. Shaw had cooperated with authorities for some period of time, serving as a "confidential informant." None of this information is "new" or "recently discovered."

5. Without waiving any objection that you are not entitled to any of the records you are seeking, regardless of whether the request is couched as a TPRA request, or any objection that your client is not entitled to records pertaining to confidential informants, and to the extent you are seeking a record of monetary transactions involving Mr. Shaw and the Sheriff's Office, that is being provided. The document provided is a redacted computer record of the funds provided to Mr. Shaw. That took two (2) hours to retrieve from a computer system that is no longer in use. A statement for our services is enclosed.

Records pertaining to criminal investigations or prosecutions involving Mr. Shaw will not be provided absent a Court Order.

Yours very truly,

Debra L. Fessenden
Chief Policy and Statutory Compliance Officer

Enclosures
\\sofdata1\cycom\Wpdocs\D006\P002\00028086.DOC/A17-0120

Page 1

11/17/99

SHELBY COUNTY SHERIFF'S DEPARTMENT
NARCOTICS DIVISION
OFFICIAL INVESTIGATIVE FUNDS
MONEY IN/OUT ACCOUNT SUMMARIES
FROM 01/01/01 TO 11/17/99
[illegible]

| Out Recpt. | Date Issued | Issued To: | | Box | Amount | Acct.# | Description | Property Receipt | In Recpt. | Date Return | Amount Returned | Case Number | Net Expense | Reason Returned |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14196 | 09/23/91 | [redacted] | [redacted] | 22 | 20.00 | 52022 | P/C BUY CRACK COCAINE | [redacted] | | 09/23/91 | 0.00 | [redacted] | 20.00 | |
| 14216 | 09/25/91 | [redacted] | [redacted] | 22 | 20.00 | 52022 | P/C BUY CRACK COCAINE | [redacted] | | 09/25/91 | 0.00 | [redacted] | 20.00 | |
| 10048 | 10/28/92 | [redacted] | [redacted] | 22 | 100.00 | 54082 | "ADVANCE" - NON-RETURNABLE | [redacted] | | 10/28/92 | 0.00 | [redacted] | 100.00 | INACTIVE REMOVED. |
| 10053 | 10/29/92 | [redacted] | [redacted] | 22 | 225.00 | 54022 | P/C BUY MARIJUANA | [redacted] | [redacted] | 10/29/92 | 225.00 | [redacted] | 0.00 | DID NOT MAKE BUY |
| 1016 | 11/30/95 | [redacted] | [redacted] | 22 | 100.00 | 55022 | P/C BUY MARIJUANA | [redacted] | | 12/11/95 | 0.00 | [redacted] | 100.00 | .6 GRMS CRACK |
| 2338 | 12/06/96 | [redacted] | [redacted] | 22 | 75.00 | 49022 | U/C BUY MARIJUANA | [redacted] | | 12/13/96 | 0.00 | [redacted] | 75.00 | INFORMANT PAYMENT |
| 2340 | 12/06/96 | [redacted] | [redacted] | 22 | 75.00 | 49082 | UC BUY CRACK COCAINE | [redacted] | | 12/13/96 | 0.00 | [redacted] | 75.00 | U/C MARIJUANA |
| 2367 | 12/12/96 | [redacted] | [redacted] | 22 | 75.00 | 49042 | S/W, INFORMANT PMT MARIJUANA | [redacted] | | 12/13/96 | 0.00 | [redacted] | 75.00 | |
| 1593 | 12/16/96 | [redacted] | [redacted] | 11 | 75.00 | 49012 | INFORMANT PAYMENT | [redacted] | | 12/16/96 | 0.00 | [redacted] | 75.00 | |
| 2386 | 12/17/96 | [redacted] | [redacted] | 22 | 75.00 | 49082 | U/C BUY 1/2 LBS PURCHASE | [redacted] | | 12/26/96 | 0.00 | [redacted] | 75.00 | PMT FOR U/C BUY |
| 2428 | 01/09/97 | [redacted] | [redacted] | 22 | 550.00 | 49082 | U/C BUY 1/2 LBS MARIJUANA | [redacted] | [redacted] | 01/14/97 | 50.00 | [redacted] | 500.00 | 149.0 GRAM MARIJUANA |
| 2429 | 01/09/97 | [redacted] | [redacted] | 22 | 125.00 | 49082 | U/C BUY , 1 OZ. MARIJUANA | [redacted] | | 01/14/97 | 0.00 | [redacted] | 125.00 | 22.6 GRAMS MARIJUANA |
| 1599 | 01/09/97 | [redacted] | [redacted] | 11 | 125.00 | 49082 | U/C BUY MARIJUANA | [redacted] | | 01/09/97 | 0.00 | [redacted] | 125.00 | 149.0 GMS MARIJUANA |
| 1601 | 01/21/97 | [redacted] | [redacted] | 11 | 50.00 | 49082 | U/C BUY MARIJUANA | [redacted] | | 01/21/97 | 0.00 | [redacted] | 50.00 | 11.0 GMS MARIJUANA |
| 1602 | 01/23/97 | [redacted] | [redacted] | 11 | 125.00 | 49082 | U/C BUY MARIJUANA | [redacted] | | 01/23/97 | 0.00 | [redacted] | 125.00 | 307.0 GMS MARIJUANA |
| 2501 | 01/28/97 | [redacted] | [redacted] | 22 | 50.00 | 49072 | CI EXPENSE | [redacted] | | 02/05/97 | 0.00 | [redacted] | 50.00 | CI EXPENSE |
| 2524 | 01/31/97 | [redacted] | [redacted] | 22 | 300.00 | 49082 | UC BUY PMT. | [redacted] | | 01/31/97 | 0.00 | [redacted] | 300.00 | PMT FOR U/C BUY |
| 2521 | 02/13/97 | [redacted] | [redacted] | 22 | 100.00 | [illegible] | ADVANCE | [redacted] | | [illegible] | 0.00 | [redacted] | 100.00 | |
| 2707 | 02/24/97 | [redacted] | [redacted] | 22 | 60.00 | 49012 | INFORMANT EXPENSE | [redacted] | | 02/24/97 | 0.00 | [redacted] | 60.00 | INFORMANT EXPENSE |
| 2789 | 03/19/97 | [redacted] | [redacted] | 22 | 42.00 | 49012 | INFORMANT EXPENSE | [redacted] | | 03/19/97 | 0.00 | [redacted] | 42.00 | INFORMANT EXPENSE |
| 2873 | 04/28/97 | [redacted] | [redacted] | 22 | 42.00 | 49082 | INFORMANT EXPENSE | [redacted] | | 04/30/97 | 0.00 | [redacted] | 42.00 | INFORMANT |
| 2892 | 05/02/97 | [redacted] | [redacted] | 22 | 75.00 | 49012 | INFORMANT EXPENSE | [redacted] | | 05/09/97 | 0.00 | [redacted] | 75.00 | INFORMANT EXPENSE |
| 2908 | 05/07/97 | [redacted] | [redacted] | 22 | 100.00 | 49012 | INFORMANT EXPENSE | [redacted] | | 05/09/97 | 0.00 | [redacted] | 100.00 | INFORMANT EXPENSE |
| [illegible] | [illegible] | [redacted] | [redacted] | [illegible] | 50.00 | 49012 | "ADVANCE" | [redacted] | | [illegible] | 0.00 | [redacted] | 50.00 | "ADVANCE" |
| 1108 | 07/27/98 | [redacted] | [redacted] | 66 | 100.00 | 53022 | PC BUY COCAINE | [redacted] | | 07/28/98 | 0.00 | [redacted] | 100.00 | |
| 1202 | 08/31/98 | [redacted] | [redacted] | 66 | 100.00 | 55022 | PC BUY COCAINE | [redacted] | | 09/08/98 | 0.00 | [redacted] | 100.00 | |
| 1233 | 09/13/98 | [redacted] | [redacted] | 66 | 75.00 | 55022 | PC BUY CRACK COCAINE | [redacted] | | 09/13/98 | 0.00 | [redacted] | 75.00 | |

Total disbursed: 2909.00

Total returned: 275.00

Net: 2634.00

## Chief Policy and Statutory Compliance Officer

## Memorandum

# INVOICE

To: Mr. Paul R. Bottei
Assistant Federal Public Defender, Middle District
810 Broadway, Suite 200
Nashville, TN 37203-3805

From: Debra L. Fessenden
Chief Policy and Statutory Compliance Officer

Date: December 19, 2017

Subject: **Request for Records—Tony Carruthers v. Westbrooks, USDC 08-2425**
**Records of Alfredo Shaw from "1990's and even before"**

---

| | |
|---|---|
| 2 Hours of Research – @ 18.00 an hour | 36.00 |
| **Total** | **$36.00** |

NO PERSONAL CHECKS OR CASH ARE ACCEPTABLE
**MAKE BUSINESS CHECK, CASHIER CHECK OR MONEY ORDER PAYABLE TO:**
Shelby County Sheriff's Office
Attention: Chief Policy and Statutory Compliance Office
201 Poplar Avenue, Room 9-15
Memphis, TN 38103

FD-302 (Rev. 10-6-95)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription 6/10/98

ALFREDO SHAW, black male, date of birth 3/14/66, Booking #96041051, temporarily incarcerated at the Shelby County Corrections Center, 1045 Mullins Station Road, Memphis, TN 38134, was interviewed regarding his knowledge of the hanging death of Jonathan Montgomery in 1995, and his relationship with former Deputy Jailer Earley Story.

SHAW advised that, although he had been lodged in 1995 in a different "pod" in the Shelby County Jail than the one occupied by Jonathan Montgomery, and, although he had no firsthand knowledge of Montgomery's "suicide" by hanging, he nevertheless heard that now-Sgt. Ephraim Holmes had been paid by outside interests to allow Montgomery to be killed. Supposedly, Holmes had been assigned to the "pod" with specific instructions to ensure that all of the inmates were out of their cells and at the gym during their break period. Apparently, he succeeded in removing a majority of the inmates.

SHAW advised he heard that inmate Lacy Gordon and two other Gangster Disciple (GD) members broke Montgomery's neck earlier that morning before the prisoners were scheduled for gym. They then arranged his body to make it appear as if he had hung himself to death in his cell.

SHAW said that this information came from Det. Harrison, Sgt. Dunlap and Det. Blackwell, all of whom are Metro Narcotics Officers for the Shelby County Sheriff's Office (SCSO), working downtown at the Madison Avenue substation.

SHAW advised that Montgomery was ordered killed by his own brother, James Montgomery, for providing incriminating testimony at the triple-murder trial of James Montgomery and Tony Carruthers. Jonathan also led officers to the gravesite of the three victims.

In a related matter, SHAW said that Earley Story, Bernard Kimmons and Victor Campbell, former Deputy Jailers for the SCSO, were framed regarding drug charges lodged against them.

SHAW explained that during the first part of 1997, after he had been released from prison, he participated as a

2

Investigation on 6/10/98 at Memphis, TN

File # 282A-ME-50216, 282B-ME-52439 Date dictated 6/10/98

by S.A. WILLIAM C. RASMUSSEN:wcr

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

282A-ME-50216, 282B-ME-52439

Continuation of FD-302 of ALFREDO SHAW, On 6/10/98, Page 2

confidential informant for the SCSO by purchasing drugs on the street for an undercover agent, Jeff Butler. He said although he actually bought drugs from street dealers, he was informed that he was "always purchasing drugs from..." (then-jailers) "...Story, Kimmons and Campbell."

SHAW stated that a SCSO Metro Narcotics officer by the name of Det. Carl Harrison, also known as "Red Light," told him that the Sheriff wanted the three above-mentioned jailers--especially Story--out! SHAW emphasized that Harrison said the orders had come from high up in the SCSO.

SHAW advised that he was scheduled to be released from jail today, 6/10/98, but Desoto County had placed a "hold" on him. He was hoping shortly to be back together with his wife,

SHAW said in closing that he hoped the information he has provided will be instrumental in clearing Earley Story of all drug charges lodged against him.